**Exhibit H**



**URGENT MATERIAL ENCLOSED**

**VIA FEDEX**

April 17, 2009

Flagstar Bank, FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Re: Flagstar Home Equity Loan Trust 2005-1, Asset Backed Notes Series 2005-1

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Purchase Agreement (the "Purchase Agreement") entered into in connection with the above-referenced transaction (the "Transaction"), dated as of December 8, 2005, by and among Flagstar Bank, FSB ("Flagstar Bank"), as Seller, and Flagstar ABS, LLC ("Flagstar ABS"), as Purchaser; (ii) that certain Sale and Servicing Agreement (the "SSA") entered into in connection with the Transaction, dated as of December 8, 2005, among Flagstar ABS, as Depositor, Flagstar Bank, as Seller and Servicer, Flagstar Home Equity Loan Trust 2005-1 (the "Trust"), and JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Indenture Trustee and Auction Administrator; (iii) that certain Indenture entered into in connection with the Transaction, dated as of December 1, 2005 (the "Indenture"), among the Trust as Issuer and JPMorgan Chase as Indenture Trustee; and (iv) that certain Insurance and Indemnity Agreement entered into in connection with the Transaction, dated as of December 8, 2005 (the "I&I Agreement"), among Financial Security Assurance Inc. ("FSA"), Flagstar Bank, Flagstar ABS and the Trust. Capitalized terms used but not defined herein have the meanings assigned to such terms in Annex 1 to the Indenture.

By notice dated January 13, 2009 (the "Breach Notice"), issued pursuant to Section 2.04(c) of the SSA, FSA officially notified you of its discovery of breaches by Flagstar Bank of one or more of the representations and warranties contained in Section 3.02(a) of the Purchase Agreement and Section 2.04(a) of the SSA with respect to the Mortgage Loans identified in Appendix A attached thereto (the "Identified Defective Mortgage Loans").

You have advised FSA that Appendix A to the Breach Notice did not take into consideration certain documentation previously provided by you supplementally prior to the issuance of the Breach Notice in response to claims by FSA that such documentation was missing from the loan files of certain of the Identified Defective Mortgage Loans. Upon further review, FSA has determined that Appendix A to the Breach Notice had not given effect to such supplementally provided documentation. Accordingly, and without prejudice to any rights or remedies available to FSA, FSA hereby amends Appendix A to the

Financial Security Assurance
31 West 52nd Street · New York, New York 10019 · Tel: 212.826.0100 · Fax: 212.688.3101
New York · Dallas · San Francisco · London · Madrid · Paris · Singapore · Sydney · Tokyo

Breach Notice in the manner and to the extent of the changes reflected on Appendix A attached hereto, which has been marked for convenience of reference.

Please be advised that the amendment of Appendix A to the Breach Notice effectuated hereby is being made solely for your convenience, shall be effective retroactively to the date of the Breach Notice, shall not under any circumstances constitute the withdrawal of the Breach Notice and shall in no way affect the time period available to Flagstar Bank to honor its obligations pursuant to Sections 2.04(d) and 2.07(a) of the SSA, which time period began to run with respect to the Identified Defective Mortgage Loans upon the receipt by you of the Breach Notice.

The claims made and sums demanded pursuant to this letter and the Breach Notice are without prejudice to any additional claims or demands with respect to indemnification, expense reimbursement, breaches of representations or warranties, breaches of other provisions of any documents relating to the Transaction, claims in tort, or otherwise that PSA or any other party may make with respect to any matter relating to the Transaction. PSA is continuing its investigation of the Transaction, including of the Identified Defective Mortgage Loans set forth in Appendix A, and will communicate additional issues or concerns if, as and when it considers it appropriate to do so. Nothing contained in this letter shall bind, prejudice or estop PSA to any extent whatever or be construed as an admission by PSA. All rights and remedies of PSA and of every other person or entity that might be benefited or otherwise affected by PSA's exercise of rights and remedies in this letter are completely reserved.

Very truly yours,

Errol Uhr
Managing Director

Cc:     Flagstar Home Equity Loan Trust 2005-1
        c/o Wilmington Trust Company, as Owner Trustee
        Rodney Square North
        1100 North Market Street
        Wilmington, Delaware 19890-0001
        Attention: Corporate Trust Administration
        Telecopy: (302) 636-4140

        Flagstar ABS, LLC
        c/o The Corporation Trust Company
        Corporation Trust Center
        1209 Orange Street
        Wilmington, Delaware 19801
        Telecopy: (866) 372-8255

        The Bank of New York Trust Company, N.A.
        2 North LaSalle Street, Suite 1020
        Chicago, Illinois 60602

3260380v.2



A Dexia Company

URGENT MATERIAL ENCLOSED

VIA FEDEX

April 17, 2009

Flagstar Capital Markets Corporation
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Flagstar Bank FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Re: Flagstar Home Equity Loan Trust 2006-2, Asset Backed Notes Series 2006-2

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Purchase Agreement (the "Purchase Agreement") entered into in connection with the above-referenced transaction (the "Transaction"), dated as of December 21, 2006, by and among Flagstar Capital Markets Corporation ("FCMC"), as Seller, Flagstar Bank FSB ("Flagstar Bank"), as Sponsor, and Flagstar ABS, LLC ("Flagstar ABS"), as Purchaser; (ii) that certain Sale and Servicing Agreement (the "SSA") entered into in connection with the Transaction, dated as of December 21, 2006, among FCMC, as Seller, Flagstar ABS, as Depositor, Flagstar Bank, as Sponsor and Servicer, Flagstar Home Equity Loan Trust 2006-2 (the "Trust"), and The Bank of New York Trust Company, N.A. ("BNY"), as Indenture Trustee and Auction Administrator; (iii) that certain Indenture entered into in connection with the Transaction, dated as of December 21, 2006 (the "Indenture"), among the Trust as Issuer and BNY as Indenture Trustee; and (iv) that certain Insurance and Indemnity Agreement entered into in connection with the Transaction, dated as of December 21, 2006 (the "I&I Agreement"), among Financial Security Assurance Inc. ("FSA"), Flagstar Bank, FCMC, Flagstar ABS and the Trust. Capitalized terms used but not defined herein have the meanings assigned to such terms in Annex 1 to the Indenture.

By notice dated January 13, 2009 (the "Breach Notice"), issued pursuant to Section 2.04(c) of the SSA, FSA officially notified you of its discovery of breaches by FCMC and Flagstar Bank of one or more of the representations and warranties contained in Section 3.02(a) of the Purchase Agreement and Section 2.04(a) of the SSA with respect to the Mortgage Loans identified in Appendix A attached thereto (the "Identified Defective Mortgage Loans").

You have advised FSA that Appendix A to the Breach Notice did not take into consideration certain documentation previously provided by you supplementally prior to the issuance of the Breach Notice in response to claims by FSA that such documentation was missing from the loan files of certain of the Identified Defective Mortgage Loans. Upon further review, FSA has determined that Appendix A to the Breach Notice

Financial Security Assurance
31 West 52nd Street · New York, New York 10019 · Tel: 212.826.0100 · Fax: 212.688.3101
New York · Dallas · San Francisco · London · Madrid · Paris · Singapore · Sydney · Tokyo

had not given effect to such supplementally provided documentation. Accordingly, and without prejudice to any rights or remedies available to FSA, FSA hereby amends Appendix A to the Breach Notice in the manner and to the extent of the changes reflected on Appendix A attached hereto, which has been marked for convenience of reference.

Please be advised that the amendment of Appendix A to the Breach Notice effectuated hereby is being made solely for your convenience, shall be effective retroactively to the date of the Breach Notice, shall not under any circumstances constitute the withdrawal of the Breach Notice and shall in no way affect the time period available to FCMC (or Flagstar Bank, pursuant to Section 8.10 of the SSA) to honor its obligations pursuant to Sections 2.04(d) and 2.07(a) of the SSA, which time period begin to run with respect to the Identified Defective Mortgage Loans upon the receipt by you of the Breach Notice.

The claims made and sums demanded pursuant to this letter and the Breach Notice are without prejudice to any additional claims or demands with respect to indemnification, expense reimbursement, breaches of representations or warranties, breaches of other provisions of any documents relating to the Transaction, claims in tort, or otherwise that FSA or any other party may make with respect to any matter relating to the Transaction. FSA is continuing its investigation of the Transaction, including of the Identified Defective Mortgage Loans set forth in Appendix A, and will communicate additional issues or concerns if, as and when it considers it appropriate to do so. Nothing contained in this letter shall bind, prejudice or estop FSA to any extent whatever or be construed as an admission by FSA. All rights and remedies of FSA and of every other person or entity that might be benefited or otherwise affected by FSA's exercise of rights and remedies in this letter are completely reserved.

Very truly yours,

Errol Jlhr
Managing Director

Cc:    Flagstar Home Equity Loan Trust 2006-2
       c/o Wilmington Trust Company, as Owner Trustee
       Rodney Square North
       1100 North Market Street
       Wilmington, Delaware 19890-0001
       Attention: Corporate Trust Administration
       Telecopy: (302) 636-4140

       Flagstar ABS, LLC
       c/o The Corporation Trust Company
       Corporation Trust Center
       1209 Orange Street
       Wilmington, Delaware 19801
       Telecopy: (866) 372-8255

       The Bank of New York Trust Company, N.A.
       2 North LaSalle Street, Suite 1020
       Chicago, Illinois 60602

**Exhibit I**



A Dexia Company



RECEIVED
JAN 14 2009

## URGENT MATERIAL ENCLOSED

**VIA FEDEX**

January 13, 2009

Flagstar Bank, FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Re: Flagstar Home Equity Loan Trust 2005-1, Asset Backed Notes Series 2005-1

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Purchase Agreement (the "Purchase Agreement") entered into in connection with the above-referenced transaction (the "Transaction"), dated as of December 8, 2005, by and among Flagstar Bank FSB ("Flagstar Bank"), as Seller, and Flagstar ABS, LLC ("Flagstar ABS"), as Purchaser; (ii) that certain Sale and Servicing Agreement (the "SSA") entered into in connection with the Transaction, dated as of December 8, 2005, among Flagstar ABS, as Depositor, Flagstar Bank, as Seller and Servicer, Flagstar Home Equity Loan Trust 2005-1 (the "Trust"), and JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Indenture Trustee and Auction Administrator; (iii) that certain Indenture entered into in connection with the Transaction, dated as of December 1, 2005 (the "Indenture"), among the Trust as Issuer and JPMorgan Chase as Indenture Trustee; and (iv) that certain Insurance and Indemnity Agreement entered into in connection with the Transaction, dated as of December 8, 2005 (the "I&I Agreement"), among Financial Security Assurance Inc. ("FSA"), Flagstar Bank, Flagstar ABS and the Trust. Capitalized terms used but not defined herein have the meanings assigned to such terms in Annex 1 to the Indenture.

This notice is issued pursuant to Section 2.04(c) of the SSA.

FSA hereby officially notifies you of its discovery of breaches by Flagstar Bank of one or more of the representations and warranties contained in Section 3.02(a) of the Purchase Agreement and Section 2.04(a) of the SSA with respect to the Mortgage Loans identified in Appendix A attached hereto, which breaches materially and adversely affect the interests of FSA in the identified Mortgage Loans. The foregoing breaches are described with specificity in Appendix A with respect to each Mortgage Loan identified therein (the "Identified Defective Mortgage Loans").

**Financial Security Assurance**
31 West 52nd Street · New York, New York 10019 · Tel: 212.826.0100 · Fax: 212.688.3101
New York · Dallas · San Francisco · Mexico City · London · Madrid · Paris · Singapore · Sydney · Tokyo

Without prejudice to any other rights or remedies available to FSA, FSA hereby demands that Flagstar Bank honor its obligations pursuant to Sections 2.04(d) and 2.07(a) of the SSA by accepting the retransfer of the Identified Defective Mortgage Loans, depositing immediately available funds in the amount of $14,522,865 (the "Transfer Deposit Amount") in the Custodial Account in respect of the Identified Defective Mortgage Loans, and taking all other actions that it is required to take, in accordance with, and within the time frames specified by, Section 2.04(d) and 2.07(a) of the SSA.

Appendix A sets forth the amount Flagstar Bank is obligated to deposit in the Custodial Account pursuant to Section 2.07(a) of the SSA in respect of each Identified Defective Mortgage Loan upon the retransfer thereof to Flagstar Bank, as well as the Transfer Deposit Amount, each as estimated by FSA based solely upon information supplied by Flagstar Bank. FSA reserves the right to amend this repurchase demand in the event any information supplied by Flagstar Bank is incorrect or incomplete, or for any other reason.

Further, please be advised that the sums demanded pursuant to this letter do not include the fees and expenses of consultants and counsel incurred by FSA in connection with the breaches identified herein and other claims, costs, damages and expenses for which FSA is entitled to be reimbursed and indemnified pursuant to the provisions of Sections 3.03 and 3.04(a) of the I&I Agreement. All such amounts shall be identified and billed to Flagstar Bank under separate cover as FSA deems appropriate.

The claims made and sums demanded pursuant to this letter are without prejudice to any additional claims or demands with respect to indemnification, expense reimbursement, breaches of representations or warranties, breaches of other provisions of any documents relating to the Transaction, claims in tort, or otherwise that FSA or any other party may make with respect to any matter relating to the Transaction. FSA is continuing its investigation of the Transaction, including of the Identified Defective Mortgage Loans set forth in Appendix A, and will communicate additional issues or concerns if, as and when it considers it appropriate to do so. Nothing contained in this letter shall bind, prejudice or estop FSA to any extent whatever or be construed as an admission by FSA. All rights and remedies of FSA and of every other person or entity that might be benefited or otherwise affected by FSA's exercise of rights and remedies in this letter are completely reserved.

Very truly yours,

Errol Uhr
Managing Director

cc:     Flagstar Home Equity Loan Trust 2005-1
        c/o Wilmington Trust Company, as Owner Trustee
        Rodney Square North
        1100 North Market Street
        Wilmington, Delaware 19890-0001
        Attention: Corporate Trust Administration
        Telecopy: (302) 636-4140

        Flagstar ABS, LLC
        c/o The Corporation Trust Company
        Corporation Trust Center
        1209 Orange Street
        Wilmington, Delaware 19801
        Telecopy: (866) 372-8255

        (SSA specified Notice address)
        The Bank of New York Trust Company, N.A.
        2 North LaSalle Street, Suite 1020
        Chicago, Illinois 60602

        (FSA contact person's address)
        Keith R. Richardson
        Vice President
        The Bank of New York Trust Company, N.A.
        2 North LaSalle Street, Suite 1020
        Chicago, Illinois 60602
        E-Mail: keith.richardson@bnymellon.com





**URGENT MATERIAL ENCLOSED**

**VIA FEDEX**

January 13, 2009

Flagstar Capital Markets Corporation
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Flagstar Bank FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Re: Flagstar Home Equity Loan Trust 2006-2, Asset Backed Notes Series 2006-2

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Purchase Agreement (the "Purchase Agreement") entered into in connection with the above-referenced transaction (the "Transaction"), dated as of December 21, 2006, by and among Flagstar Capital Markets Corporation ("FCMC"), as Seller, Flagstar Bank FSB ("Flagstar Bank"), as Sponsor, and Flagstar ABS, LLC ("Flagstar ABS"), as Purchaser; (ii) that certain Sale and Servicing Agreement (the "SSA") entered into in connection with the Transaction, dated as of December 21, 2006, among FCMC, as Seller, Flagstar ABS, as Depositor, Flagstar Bank, as Sponsor and Servicer, Flagstar Home Equity Loan Trust 2006-2 (the "Trust"), and The Bank of New York Trust Company, N.A. ("BNY"), as Indenture Trustee and Auction Administrator; (iii) that certain Indenture entered into in connection with the Transaction, dated as of December 21, 2006 (the "Indenture"), among the Trust as Issuer and BNY as Indenture Trustee; and (iv) that certain Insurance and Indemnity Agreement entered into in connection with the Transaction, dated as of December 21, 2006 (the "I&I Agreement"), among Financial Security Assurance Inc. ("FSA"), Flagstar Bank, FCMC, Flagstar ABS and the Trust. Capitalized terms used but not defined herein have the meanings assigned to such terms in Annex 1 to the Indenture.

This notice is issued pursuant to Section 2.04(c) of the SSA.

FSA hereby officially notifies you of its discovery of breaches by FCMC and Flagstar Bank of one or more of the representations and warranties contained in Section 3.02(a) of the Purchase

**Financial Security Assurance**
31 West 52nd Street · New York, New York 10019 · Tel: 212.826.0100 · Fax: 212.688.3101.
New York · Dallas · San Francisco · Mexico City · London · Madrid · Paris · Singapore · Sydney · Tokyo

Agreement and Section 2.04(a) of the SSA with respect to the Mortgage Loans identified in Appendix A attached hereto, which breaches materially and adversely affect the interests of FSA in the identified Mortgage Loans. The foregoing breaches are described with specificity in Appendix A with respect to each Mortgage Loan identified therein (the "Identified Defective Mortgage Loans").

Without prejudice to any other rights or remedies available to FSA, FSA hereby demands that FCMC (or Flagstar Bank, pursuant to Section 8.10 of the SSA) honor its obligations pursuant to Sections 2.04(d) and 2.07(a) of the SSA by accepting the retransfer of the Identified Defective Mortgage Loans, depositing immediately available funds in the amount of $15,973,636 (the "Transfer Deposit Amount") in the Custodial Account in respect of the Identified Defective Mortgage Loans, and taking all other actions that it is required to take, in accordance with, and within the time frames specified by, Section 2.04(d) and 2.07(a) of the SSA.

Appendix A sets forth the amount FCMC or Flagstar Bank is obligated to deposit in the Custodial Account pursuant to Section 2.07(a) of the SSA in respect of each Identified Defective Mortgage Loan upon the retransfer thereof to FCMC, as well as the Transfer Deposit Amount, each as estimated by FSA based solely upon information supplied by Flagstar Bank. FSA reserves the right to amend this repurchase demand in the event any information supplied by Flagstar Bank is incorrect or incomplete, or for any other reason.

Further, please be advised that the sums demanded pursuant to this letter do not include the fees and expenses of consultants and counsel incurred by FSA in connection with the breaches identified herein and other claims, costs, damages and expenses for which FSA is entitled to be reimbursed and indemnified pursuant to the provisions of Sections 3.03 and 3.04(a) of the I&I Agreement. All such amounts shall be identified and billed to FCMC Flagstar Bank under separate cover as FSA deems appropriate.

The claims made and sums demanded pursuant to this letter are without prejudice to any additional claims or demands with respect to indemnification, expense reimbursement, breaches of representations or warranties, breaches of other provisions of any documents relating to the Transaction, claims in tort, or otherwise that FSA or any other party may make with respect to any matter relating to the Transaction. FSA is continuing its investigation of the Transaction, including of the Identified Defective Mortgage Loans set forth in Appendix A, and will communicate additional issues or concerns if, as and when it considers it appropriate to do so. Nothing contained in this letter shall bind, prejudice or estop FSA to any extent whatever or be construed as an admission by FSA. All rights and remedies of FSA and of every other person or entity that might be benefited or otherwise affected by FSA's exercise of rights and remedies in this letter are completely reserved.

Very truly yours,

Errol Uhr
Managing Director

cc:    Flagstar Home Equity Loan Trust 2006-2
       c/o Wilmington Trust Company, as Owner Trustee
       Rodney Square North
       1100 North Market Street
       Wilmington, Delaware 19890-0001
       Attention: Corporate Trust Administration
       Telecopy: (302) 636-4140

       Flagstar ABS, LLC
       c/o The Corporation Trust Company
       Corporation Trust Center
       1209 Orange Street
       Wilmington, Delaware 19801
       Telecopy: (866) 372-8255

       (SSA specified Notice address)
       The Bank of New York Trust Company, N.A.
       2 North LaSalle Street, Suite 1020
       Chicago, Illinois 60602

       (FSA contact person's address)
       Keith R. Richardson
       Vice President
       The Bank of New York Trust Company, N.A.
       2 North LaSalle Street, Suite 1020
       Chicago, Illinois 60602
       E-Mail: keith.richardson@bnymellon.com

**Exhibit J**



RECEIVED WFM '10 07 12 AM 11 :11

## URGENT MATERIAL ENCLOSED

**VIA FEDEX**

July 9, 2010

Flagstar Bank FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Flagstar ABS, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801
Telecopy: (866) 372-8255

Re: Flagstar Home Equity Loan Trust 2005-1, Asset Backed Notes Series 2005-1 (the "Transaction")

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Purchase Agreement (the "Purchase Agreement") entered into in connection with the above-referenced transaction (the "Transaction"), dated as of December 8, 2005, by and among Flagstar Bank FSB ("Flagstar Bank"), as Seller, and Flagstar ABS, LLC ("Flagstar ABS"), as Purchaser; (ii) that certain Sale and Servicing Agreement (the "SSA") entered into in connection with the Transaction, dated as of December 8, 2005, among Flagstar ABS, as Depositor, Flagstar Bank, as Seller and Servicer, Flagstar Home Equity Loan Trust 2005-1 (the "Trust"), and JPMorgan Chase Bank, N.A. ("JPMC"), as Indenture Trustee and Auction Administrator; (iii) that certain Indenture entered into in connection with the Transaction, dated as of December 8, 2005 (the "Indenture"), among the Trust as Issuer and JPMC as Indenture Trustee; and (iv) that certain Insurance and Indemnity Agreement entered into in connection with the Transaction, dated as of December 8, 2005 (the "I&I Agreement"), among Financial Security Assurance Inc. (now known as Assured Guaranty Municipal Corp.; "AGM"), Flagstar Bank, Flagstar ABS and the Trust. Capitalized terms used but not defined herein have the meanings assigned to such terms in Annex 1 to the Indenture.

This notice is issued pursuant to Section 2.04(c) of the SSA.

AGM hereby officially notifies you of its discovery of breaches by Flagstar ABS and Flagstar Bank of one or more of the representations and warranties contained in Section 3.02(a) of the

Assured Guaranty Corp.

| 31 West 52nd Street<br>New York, NY 10019 | main 212 974 0100<br>fax 212 581 3268 | Info@assuredguaranty.com | www.assuredguaranty.com |
|---|---|---|---|



Purchase Agreement, Section 2.01 of the I&I Agreement and Section 2.04(a) of the SSA with respect to the Mortgage Loans identified in Appendix A attached hereto, and that each such breach materially and adversely affects the interests of each of the Issuer, the Indenture Trustee under the Indenture, the Noteholders and AGM in the identified Mortgage Loans. The foregoing breaches are described with specificity in Appendix A with respect to each Mortgage Loan identified therein (the "Identified Defective Mortgage Loans"). Appendix A identifies 238 Identified Defective Mortgage Loans with an original principal balance of $17,578,506. Also, a computer CD containing supporting documentation is included herein.

Without prejudice to any other rights or remedies available to AGM, AGM hereby demands that Flagstar Bank and Flagstar ABS honor their respective obligations (pursuant to Sections 2.02, 2.04 and 2.07 of the SSA, Section 3.02(c) of the Purchase Agreement and Section 2.03(b), 4.02(a), 4.02(b), 4.03(d) and 6.03 of the I&I Agreement) to (A) either (i) cure each of the breaches described with specificity in Appendix A or (ii) accept the retransfer of the Identified Defective Mortgage Loans, and deposit in the Custodial Account immediately available funds in the aggregate amount of the respective Transfer Deposit Amounts of the Identified Defective Mortgage Loans, and (B) take all other actions that each of them is required to take, in accordance with, and within the time frames specified by, the provisions of the Transaction Documents set forth above.

The time frames specified in the Transaction Documents with regard to the parties' contractual obligations as to this notice and the foregoing breaches (including without limitation the time frames set forth in Section 2.04(d) of the SSA) will not be extended or tolled for any reason, including any assertion by Flagstar Bank or Flagstar ABS that no breach has occurred, or that any breach has been cured. Pursuant to the Transaction Documents, nothing short of a timely and effective cure of the identified breaches, or Flagstar's timely acceptance of retransfer of the loans at issue and deposit of the respective Transfer Deposit Amounts into the Custodial Account, will satisfy the contractual cure-or-repurchase obligations thereunder of Flagstar Bank and Flagstar ABS.

Please note that Appendix A hereto does not include information as to any other breaches of such representations or warranties that may have occurred with respect to the Identified Defective Mortgage Loans, and the Note Insurer reserves all of its rights with respect to such breaches.

Further, please be advised that the sums demanded pursuant to this letter do not include the fees and expenses of consultants and counsel incurred by AGM in connection with the breaches identified herein and other claims, costs, damages and expenses for which AGM is entitled to be reimbursed and indemnified (along with interest thereon at the Late Payment Rate per annum, and overdue interest compounded monthly) by Flagstar Bank, Flagstar ABS and (as applicable) the Trust, both by law and in equity, as well as pursuant to the provisions of Sections 3.03 and 3.04(a) of the I&I Agreement. All such amounts shall be identified and billed to Flagstar Bank,

Assured Guaranty Corp.

| 31 West 52nd Street | main | 212 974 0100 | Info@assuredguaranty.com | www.assuredguaranty.com |
| New York, NY 10019 | fax | 212 581 3268 | | |



Flagstar ABS and (as applicable) the Trust under separate cover as and when AGM deems appropriate.

The claims made and sums demanded pursuant to this letter are without prejudice to any additional claims or demands with respect to indemnification, expense reimbursement, breaches of representations or warranties, breaches of other provisions of any documents relating to the Transaction, claims in tort, or otherwise that AGM or any other party has made, or may make, with respect to any matter relating to the Transaction or the Mortgage Loans. AGM is continuing its investigation of the Transaction, including of the Identified Defective Mortgage Loans set forth in Appendix A, and will communicate additional issues or concerns if, as and when it considers it appropriate to do so. Nothing contained in this letter shall either limit, restrict, or waive in any way, any rights, actions, or remedies that the Note Insurer may have or bind, prejudice or estop AGM to any extent whatever or be construed as an admission by AGM. All rights and remedies of AGM and of every other person or entity that might be benefited or otherwise affected by AGM's exercise of rights and remedies in this letter are completely reserved.

Please be advised that this repurchase request letter reflects the Note Insurer's findings after reviewing loan files relating to only a small portion of the Mortgage Loans included in the Transaction. The Insurer reserves all of its rights and remedies, including its right to give notice of additional breaches relating to any Mortgage Loans, as well as its rights under all other agreements, not referenced herein, related to the Transaction.

If you have any questions regarding this letter or the attached Appendix A, please contact the undersigned at (212) 339-3444.

ASSURED GUARANTY MUNICIPAL CORP. (formerly known as Financial Security Assurance Inc.)

By:

Name: Linda Kobrin

Title:   Director, Loss Mitigation

Assured Guaranty Corp.

| | | | | |
|---|---|---|---|---|
| 31 West 52nd Street | main | 212 974 0100 | info@assuredguaranty.com | www.assuredguaranty.com |
| New York, NY 10019 | fax | 212 581 3268 | | |



**ASSURED GUARANTY**
ENDURING FINANCIAL STRENGTH

Cc: Flagstar Home Equity Loan Trust 2005-1
c/o Wilmington Trust Company, as Owner Trustee
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Administration
Telecopy: (302) 636-4140

Cc: JPMorgan Chase Bank, N.A.
4 New York Plaza – 6th Floor
New York, NY 10017
Attention: World Wide Securities Services/Structured Finance Services – Flagstar Home
Equity Loan Asset Backed Notes, Series 2005-1
Telecopy: (212) 623-8422

Cc: JPMorgan Chase Bank, N.A.
277 West Monroe Street, 26th Floor
Chicago, Illinois 60606
Attention: World Wide Securities Services – Keith R. Richardson

Assured Guaranty Corp.

| 31 West 52nd Street | main | 212 974 0100 | info@assuredguaranty.com | www.assuredguaranty.com |
| New York, NY 10019 | fax | 212 581 3268 | | |



**APPENDIX A**

[See Attached Spreadsheets]

**Assured Guaranty Corp.**

| 31 West 52nd Street | main | 212 974 0100 | info@assuredguaranty.com | www.assuredguaranty.com |
| New York, NY 10019 | fax | 212 581 3268 | | |



RECEIVED UFN '10 07 12 AM11 :04

## URGENT MATERIAL ENCLOSED

**VIA FEDEX**

July 9, 2010

Flagstar Capital Markets Corporation
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Flagstar Bank FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

Flagstar ABS, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801
Telecopy: (866) 372-8255

Re: Flagstar Home Equity Loan Trust 2006-2, Asset Backed Notes Series 2006-2 (the "Transaction")

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Purchase Agreement (the "Purchase Agreement") entered into in connection with the above-referenced transaction (the "Transaction"), dated as of December 21, 2006, by and among Flagstar Capital Markets Corporation ("FCMC"), as Seller, Flagstar Bank FSB ("Flagstar Bank"), as Sponsor, and Flagstar ABS, LLC ("Flagstar ABS"), as Purchaser; (ii) that certain Sale and Servicing Agreement (the "SSA") entered into in connection with the Transaction, dated as of December 21, 2006, among FCMC, as Seller, Flagstar ABS, as Depositor, Flagstar Bank, as Sponsor and Servicer, Flagstar Home Equity Loan Trust 2006-2 (the "Trust"), and The Bank of New York Trust Company, N.A. ("BNY"), as Indenture Trustee and Auction Administrator; (iii) that certain Indenture entered into in connection with the Transaction, dated as of December 21, 2006 (the "Indenture"), among the Trust as Issuer and BNY as Indenture Trustee; and (iv) that certain Insurance and Indemnity Agreement entered into in connection with the Transaction, dated as of December 21, 2006 (the "I&I Agreement"), among Financial Security Assurance Inc. (now known as Assured Guaranty Municipal Corp.;

**Assured Guaranty Corp.**

| 31 West 52nd Street | main | 212 974 0100 | Info@assuredguaranty.com | www.assuredguaranty.com |
| New York, NY 10019 | fax | 212 581 3268 | | |



"AGM"), Flagstar Bank, FCMC, Flagstar ABS and the Trust. Capitalized terms used but not defined herein have the meanings assigned to such terms in Annex 1 to the Indenture.

This notice is issued pursuant to Section 2.04(c) of the SSA.

AGM hereby officially notifies you of its discovery of breaches by FCMC, Flagstar ABS and Flagstar Bank of one or more of the representations and warranties contained in Section 3.02(a) of the Purchase Agreement, Section 2.01 of the I&I Agreement and Section 2.04(a) of the SSA with respect to the Mortgage Loans identified in Appendix A attached hereto, and that each such breach materially and adversely affects the interests of each of the Issuer, the Indenture Trustee under the Indenture, the Noteholders and AGM in the identified Mortgage Loans. The foregoing breaches are described with specificity in Appendix A with respect to each Mortgage Loan identified therein (the "Identified Defective Mortgage Loans"). Appendix A identifies 404 Identified Defective Mortgage Loans with an original principal balance of $43,628,406. Also, a computer CD containing supporting documentation is included herein.

Without prejudice to any other rights or remedies available to AGM, AGM hereby demands that FCMC and Flagstar Bank honor their respective obligations (pursuant to Sections 2.02, 2.04, 2.07 and 8.10 of the SSA, Section 3.02(c) of the Purchase Agreement and Section 2.03(b), 4.02(a), 4.02(b), 4.03(d) and 6.03 of the I&I Agreement) to (A) either (i) cure each of the breaches described with specificity in Appendix A or (ii) accept the retransfer of the Identified Defective Mortgage Loans, and deposit in the Custodial Account immediately available funds in the aggregate amount of the respective Transfer Deposit Amounts of the Identified Defective Mortgage Loans, and (B) take all other actions that each of them is required to take, in accordance with, and within the time frames specified by, the provisions of the Transaction Documents set forth above.

The time frames specified in the Transaction Documents with regard to the parties' contractual obligations as to this notice and the foregoing breaches (including without limitation the time frames set forth in Section 2.04(d) of the SSA) will not be extended or tolled for any reason, including any assertion by Flagstar Bank or FCMC that no breach has occurred, or that any breach has been cured. Pursuant to the Transaction Documents, nothing short of a timely and effective cure of the identified breaches, or Flagstar's timely acceptance of retransfer of the loans at issue and deposit of the respective Transfer Deposit Amounts into the Custodial Account, will satisfy the contractual cure-or-repurchase obligations thereunder of Flagstar Bank and FCMC. Please note that Appendix A hereto does not include information as to any other breaches of such representations or warranties that may have occurred with respect to the Identified Defective Mortgage Loans, and the Note Insurer reserves all of its rights with respect to such breaches.

Further, please be advised that the sums demanded pursuant to this letter do not include the fees and expenses of consultants and counsel incurred by AGM in connection with the breaches identified herein and other claims, costs, damages and expenses for which AGM is entitled to be

Assured Guaranty Corp.

| 21 West 52nd Street New York, NY 10019 | main 212 974 0100 fax 212 581 3268 | info@assuredguaranty.com | www.assuredguaranty.com |



reimbursed and indemnified (along with interest thereon at the Late Payment Rate per annum, and overdue interest compounded monthly) by FCMC, Flagstar Bank, Flagstar ABS and (as applicable) the Trust, both by law and in equity, as well as pursuant to the provisions of Sections 3.03 and 3.04(a) of the I&I Agreement. All such amounts shall be identified and billed to FCMC, Flagstar Bank, Flagstar ABS and (as applicable) the Trust under separate cover as and when AGM deems appropriate.

The claims made and sums demanded pursuant to this letter are without prejudice to any additional claims or demands with respect to indemnification, expense reimbursement, breaches of representations or warranties, breaches of other provisions of any documents relating to the Transaction, claims in tort, or otherwise that AGM or any other party may make with respect to any matter relating to the Transaction or the Mortgage Loans. AGM is continuing its investigation of the Transaction, including of the Identified Defective Mortgage Loans set forth in Appendix A, and will communicate additional issues or concerns if, as and when it considers it appropriate to do so. Nothing contained in this letter shall either limit, restrict, or waive in any way, any rights, actions, or remedies that the Note Insurer may have or bind, prejudice or estop AGM to any extent whatever or be construed as an admission by AGM. All rights and remedies of AGM and of every other person or entity that might be benefited or otherwise affected by AGM's exercise of rights and remedies in this letter are completely reserved.

Please be advised that this repurchase request letter reflects the Note Insurer's findings after reviewing loan files relating to only a small portion of the Mortgage Loans included in the Transaction. The Insurer reserves all of its rights and remedies, including its right to give notice of additional breaches relating to any Mortgage Loans, as well as its rights under all other agreements, not referenced herein, related to the Transaction.

If you have any questions regarding this letter or the attached Appendix A, please contact the undersigned at (212) 339-3444.


ASSURED GUARANTY MUNICIPAL CORP. (formerly known as Financial Security Assurance Inc.)

By: *Linda Kobrin*

Name: Linda Kobrin
Title:   Director, Loss Mitigation

Assured Guaranty Corp.

| 31 West 52nd Street | main | 212 974 0100 | info@assuredguaranty.com | www.assuredguaranty.com |
| New York, NY 10019 | fax | 212 581 3268 | | |



**ENDURING FINANCIAL STRENGTH**

Cc:    Flagstar Home Equity Loan Trust 2006-2
       c/o Wilmington Trust Company, as Owner Trustee
       Rodney Square North
       1100 North Market Street
       Wilmington, Delaware 19890-0001
       Attention: Corporate Trust Administration
       Telecopy: (302) 636-4140

       The Bank of New York Trust Company, N.A.
       2 North LaSalle Street, Suite 1020
       Chicago, Illinois 60602

**Assured Guaranty Corp.**

31 West 52ⁿᵈ Street       main  212 974 0100       info@assuredguaranty.com       www.assuredguaranty.com
New York, NY 10019       fax   212 581 3268

# APPENDIX A

[See Attached Spreadsheets]

Exhibit K

**From:**    Jo_M_Sopha/Flagstar__notes%FLAGSTAR__NOTES [Jo_M_Sopha/Flagstar__notes%
        FLAGSTAR__NOTES@CORP.FSROOT.FLAGSTAR.COM]
**Sent:**    Tuesday, July 28, 2009 12:33 PM
**To:**     Kobrin, Linda
**Subject:**   Re: Shipment Received

Linda,

We sent an individual paper response for each loan file using your format in the original spreadsheet. We did this in this manner as it appeared that the spreadsheets sent the last three times were not being reviewed fully and we wanted to ensure all points were reviewed fully. All items are in numerical order and labeled in sections of 30 loan files. One box has the 2005 schedules and the other has the 2006.

Please let me know if you have any other questions or concerns.

Thank you



**Jo M Sopha**
**Vice President**
**Repurchase Department**
5151 Corporate Dr.
Troy, MI 48098
Office: (248) 312-5157
Fax: (888) 636-8925
Jo.Sopha@Flagstar.com
www.flagstar.com

"Kobrin, Linda" —07/22/2009 11:48:34 AM—Jo, we are in receipt of your recent shipment of appeals to our January 13 2009 demands, and are in

| From: | "Kobrin, Linda" <lkobrin@fsa.com> |
|---|---|
| To: | "Jo.Sopha@Flagstar.com" <Jo.Sopha@flagstar.com> |
| Date: | 07/22/2009 11:48 AM |
| Subject: | Shipment Received |

Jo, we are in receipt of your recent shipment of appeals to our January 13 2009 demands, and are in the midst of inventorying them. Do you have the responses in spreadsheets, possibly on for each transaction, which you can forward to me? Thank you for your assistance. Regards, Linda

Linda Kobrin
Director
Financial Security Assurance Inc.
31 West 52nd Street
New York, NY 10019

1

212-339-3444
lkobrin@fss.com

This e-mail message is for the sole use of the intended recipient(s)
and
may contain proprietary, confidential and/or privileged information.
Any
unauthorized review, use, disclosure or distribution is prohibited.
If you
are not the intended recipient (or an employee or agent responsible
to
deliver it to the intended recipient), you may not copy or deliver
this
message to anyone. In such case, you should destroy this message and
kindly notify the sender by reply e-mail. AG/FSA-

Exhibit L



November 30, 2010

Assured Guaranty Municipal Corp.
31 West 52nd Street
New York, NY 10019
Attention: Linda Kobrin

RE: Flagstar Home Equity Loan Trusts 2006-2

Dear Ms Kobrin:

I am writing in response to your letter dated July 9, 2010 advising of alleged breaches of the representations and warranties made in the Purchase Agreement for the above referenced contract. In this notification you submitted a spreadsheet of 404 loans with several breaches being cited on each loan.

Flagstar Bank has reviewed all of the loans on your list and we are providing you with responses for each alleged breach that has been indicated. Several of these items are missing documents of which we are enclosing a disc with the related missing documents on it for your review.

Through our review of these loans we saw several commonalities including breaches that confirm the loan was a no income documented loan but citing an automated underwriting response from the first mortgage requiring income to be fully documented, requests for AVMS when no AVM was required per the program information we originally sent, to citings of misrepresentation for income on stated income loans requiring that employment be verified with an employer and not requiring the income to be fully documented or verified.

We find the cited breaches to be inaccurate at this time and ask that you provide careful consideration to the responses we are supplying to you at this time and rescind your claims of the cited breaches.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Jo Sopha

Jo Sopha
Manager, Repurchase Department

**Exhibit M**

**EXECUTION COPY**

# FLAGSTAR CAPITAL MARKETS CORPORATION
the Seller

# FLAGSTAR BANK, FSB
the Sponsor

# FLAGSTAR ABS, LLC
the Purchaser

---

## PURCHASE AGREEMENT
Dated as of December 21, 2006

---

# FLAGSTAR HOME EQUITY LOAN TRUST 2006-2,
## ASSET BACKED NOTES
Series 2006-2

NYI 5998523v.10

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................................3
    Section 1.01.  Definitions. ...............................................................................3

ARTICLE II SALE OF MORTGAGE LOANS; PAYMENT OF PURCHASE
PRICE ...............................................................................................................................4
    Section 2.01.  Sale of the Mortgage Loans. ....................................................4
    Section 2.02.  Obligations of Seller Upon Sale. .............................................5
    Section 2.03.  Payment of Purchase Price for the Mortgage Loans. ...............8

ARTICLE III REPRESENTATIONS AND WARRANTIES; REMEDIES FOR
BREACH ............................................................................................................................8
    Section 3.01.  Seller Representations and Warranties. .....................................8
    Section 3.02.  Seller Representations and Warranties Relating to the Mortgage
                  Loans. ...................................................................................10

ARTICLE IV SELLER'S COVENANTS ..........................................................................23
    Section 4.01.  Covenants of the Seller. .........................................................23

ARTICLE V SERVICING ..................................................................................................23
    Section 5.01.  Servicing. ................................................................................23

ARTICLE VI TERMINATION ..........................................................................................23
    Section 6.01.  Termination. ............................................................................23

ARTICLE VII MISCELLANEOUS PROVISIONS ..........................................................24
    Section 7.01.  Amendment. ...........................................................................24
    Section 7.02.  Governing Law. .......................................................................24
    Section 7.03.  Notices. ...................................................................................24
    Section 7.04.  Severability of Provisions. .....................................................25
    Section 7.05.  Counterparts; Electronic Delivery. .........................................25
    Section 7.06.  Further Agreements. ...............................................................26
    Section 7.07.  Successors and Assigns: Assignment of Purchase Agreement....26
    Section 7.08.  Third Party Beneficiaries. ......................................................26

i

SCHEDULES AND ANNEXES

| Schedule I | MORTGAGE LOAN SCHEDULE | Sch-I-1 |
| Schedule II | STANDARD & POOR'S GLOSSARY | Sch-II-1 |
| Annex 1 | ADOPTION ANNEX | Ann-1-1 |

ii

THIS PURCHASE AGREEMENT, dated as of December 21, 2006 (the "*Agreement*"), among FLAGSTAR CAPITAL MARKETS CORPORATION, a Delaware corporation (the "*Seller*"), FLAGSTAR BANK, FSB, a federal savings bank ("*Flagstar*" or the "*Sponsor*"), and FLAGSTAR ABS, LLC, a Delaware limited liability company (the "*Purchaser*"),

### WITNESSETH:

WHEREAS, the Seller is the owner of certain Mortgage Loans and the Related Property; and

WHEREAS, the Seller wants to sell the Mortgage Loans and the Related Property to the Purchaser pursuant to this Agreement; and

WHEREAS, pursuant to the Sale and Servicing Agreement, of even date with this Agreement (the "*Sale and Servicing Agreement*"), among the Purchaser, as depositor, Flagstar, as sponsor and servicer, the Issuer, and The Bank of New York Trust Company, N.A. (the "*Indenture Trustee*"), as indenture trustee and auction administrator, the Purchaser will transfer the Mortgage Loans and the Related Property to the Issuer;

NOW, THEREFORE, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

#### *Section 1.01.   Definitions.*

Capitalized terms used in this Agreement that are not otherwise defined have the meanings given to them in the Glossary of Defined Terms, attached as Annex 1 to the Indenture. In addition, Section 1.04 (Rules of Construction) of the Indenture is incorporated by reference with appropriate substitution of this Agreement for references in that Section to the Indenture so that the language of that Section will read appropriately as applying to this Agreement.

"Adoption Index" shall mean the Adoption Index attached as Annex I hereto.

3

## ARTICLE II

### SALE OF MORTGAGE LOANS; PAYMENT OF PURCHASE PRICE

Section 2.01.  *Sale of the Mortgage Loans.*

(a) .  *The Initial Mortgage Loans.* Concurrently with the execution and delivery of this Agreement, the Seller hereby transfers to the Purchaser, without recourse (expect as set forth herein and in the Sale and Servicing Agreement), all of its right, title, and interest existing now or in the future in:

(1)  each Initial Mortgage Loan, including its Asset Balance (including all Additional Balances arising from time to time after the Initial Cut-off Date), the related Mortgage File, all property that secures the Mortgage Loan, and all Collections received with respect to such Initial Mortgage Loan after the Initial Cut-off Date (excluding payments due prior to the Initial Cut-off Date);

(2)  property that secured each Initial Mortgage Loan that is acquired by foreclosure or deed in lieu of foreclosure;

(3)  the Seller's rights under the hazard insurance policies related to the mortgages that secure the Initial Mortgage Loans;

(4)  all rights under any guaranty executed in connection with the Mortgage Loans; and

(5)  all proceeds of the foregoing (the property described in clauses (2) through (5) with respect to any Mortgage Loan being referred to as the "*Related Property*").

Notwithstanding the foregoing, the Purchaser does not assume the obligation under any Credit Line Agreement to fund draws by the borrower thereunder and the Purchaser shall not be obligated or permitted to fund any such draws, it being agreed that the Seller will retain the obligation to fund all future draws under the Credit Line Agreements relating to the Mortgage Loans.

(b)  *The Additional Mortgage Loans.* On or prior to the end of the Revolving Period, the Purchaser may use the funds in the Funding Account to purchase Additional Mortgage Loans on any Subsequent Transfer Date designated by the Purchaser, subject to satisfaction of the conditions set forth in Section 2.01(b) of the Sale and Servicing Agreement. On each Subsequent Transfer Date, the Seller shall deliver a Subsequent Transfer Agreement (properly completed and executed by the Seller, the Sponsor and the Issuer) to the Purchaser and the Purchaser will execute the Subsequent Transfer Agreement. When a Subsequent Transfer Agreement is executed, the Seller hereby transfers to the Purchaser without recourse, and the Purchaser purchases and shall effect payment for, all of the Seller's right, title and interest in each Additional Mortgage Loan identified in the Subsequent Transfer Agreement, including its Asset Balance (including all Additional Balances arising from time to time after

4

the related Subsequent Transfer Date) and all Collections received with respect to such Additional Mortgage Loans after the relevant Subsequent Cut-off Date (excluding payments due prior to the Subsequent Cut-off Date) and all Related Property with respect to such Additional Mortgage Loans.

(c)     *Additional Balances.* By the sale of a Mortgage Loan and its Additional Balances, the Seller has sold to the Purchaser, and the Purchaser has purchased from the Seller, each future draw of new borrowing under the related Credit Line Agreement. The Purchaser shall pay the Seller for each Additional Balance as it arises in cash using Principal Collections then available pursuant to and in accordance with Sections 2.01(d) and 3.02 (b) of the Sale and Servicing Agreement and, during the Revolving Period, from funds on deposit in the Funding Account in accordance with Section 2.01(b) of the Sale and Servicing Agreement. The Issuer, the Seller and the Purchaser may agree to a netting arrangement in connection with the transactions contemplated by this Agreement and the Sale and Servicing Agreement such that amounts due and owing by the Issuer to the Purchaser under the Sale and Servicing Agreement and by the Purchaser to the Seller hereunder in connection with the purchase of any Additional Balances and Additional Mortgage Loans may be netted against amounts required to be paid by the Seller to the Issuer pursuant to Section 2.07 of the Sale and Servicing Agreement in connection with retransfer of Mortgage Loans and to the Seller pursuant to Sections 2.02 and 2.04 of the Sale and Servicing Agreement.

(d)     The Seller and the Purchaser agree that Collections on the Mortgage Loans will be allocated and applied as provided by the terms of the related Credit Line Agreements. If a Credit Line Agreement relating to a Mortgage Loan does not specify a method of allocation and application for particular Collections, such Collections shall be allocated and applied (i) first to interest in the order of the dates on which such amounts for interest first became due and (ii) then to principal in the order of the dates on which such amounts for principal were first incurred.

Section 2.02.     *Obligations of Seller Upon Sale.*

In connection with the transfers pursuant to Sections 2.01(a) and (b), the Seller further agrees, at its own expense:

(a)     to deliver to the Purchaser by the Closing Date a Mortgage Loan Schedule containing an accurate list of all Initial Mortgage Loans and specifying for each Initial Mortgage Loan, among other things, its account number and its Cut-off Date Asset Balance;

(b)     to indicate in its books and records on or prior to the applicable Transfer Date that the Mortgage Loans have been sold to the Purchaser pursuant to this Agreement and by the Purchaser to the Issuer pursuant to the Sale and Servicing Agreement;

(c)     to deliver to the Purchaser, or at the Purchaser's direction to the Indenture Trustee, the Owner Trustee, and the Note Insurer, on or prior to the applicable Subsequent Transfer Date, an Officer's Certificate confirming the satisfaction of each of the conditions precedent in Section 2.01(b) of the Sale and Servicing Agreement; and

5

NY1 5998523v.10

(d)     to deliver to the Purchaser, or at the Purchaser's direction to the Indenture Trustee, a revised Mortgage Loan Schedule reflecting the Additional Mortgage Loans to be transferred to the Purchaser on such Subsequent Transfer Date prior to each Subsequent Transfer Date.

The Initial Mortgage Loan Schedule is Exhibit A to the Sale and Servicing Agreement and shall also be attached as Schedule I to this Agreement and is hereby incorporated into this Agreement.

The Seller agrees to perfect and protect the Purchaser's interest in each Mortgage Loan and the Related Property transferred by it pursuant to Section 2.01(a) and (b) by causing to be filed a UCC-1 Financing Statement with the Secretary of State in the State of Delaware describing the Mortgage Loans and the Related Property, naming the Seller as debtor, the Purchaser as assignor and the Issuer as secured party covering the Mortgage Loans and the Related Property and all necessary Continuation Statements and any additional UCC-1 Financing Statements due to a change in the name or the state of incorporation of the Seller. The Financing Statement described in the first sentence of this paragraph shall be filed on or prior to the Closing Date. This Financing Statement will state in bold-faced type that a purchase of the Mortgage Loans and the Related Property included in the collateral covered by the Financing Statement from the debtor will violate the rights of the assignor, the secured party and its assignees.

The Purchaser agrees to perfect and protect the Issuer's interest in each Mortgage Loan and the Related Property by causing to be filed a UCC-1 Financing Statement with the Secretary of State in the State of Delaware describing the Mortgage Loans and the Related Property and naming the Purchaser as debtor and the Issuer as assignor and the Indenture Trustee as secured party covering the Mortgage Loans and the Related Property, and all necessary Continuation Statements and any additional UCC-1 Financing Statements due to a change in the name or the charter of the Purchaser. The Financing Statement described in the first sentence of this paragraph shall be filed on or prior to the Closing Date. This Financing Statement will state in bold-faced type that a purchase of the Mortgage Loans and the Related Property included in the collateral covered by the Financing Statement from the debtor will violate the rights of assignor, the secured party and its assignee.

In connection with any transfer of Mortgage Loans by the Seller, the Seller shall deliver to the order of the Purchaser the following documents for each Mortgage Loan (the "*Related Documentation*"):

(1)     the original Mortgage Note with a legend affixed thereto indicating the interest of the Issuer or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from the Seller stating that the original Mortgage Note was lost, misplaced, or destroyed, together with a copy of the related Mortgage Note;

(2)     an original assignment of mortgage in blank;

6

(3)     the original recorded mortgage with evidence of recording on it or, if the original recorded mortgage with evidence of recording on it cannot be delivered by the Closing Date because of a delay caused by the public recording office where the original Mortgage has been delivered for recordation or because the original Mortgage has been lost, the Seller shall deliver to the Indenture Trustee an accurate copy of the mortgage, together with (i) when the delay is caused by the public recording office, an Officer's Certificate of the Seller stating that the original mortgage has been dispatched to the appropriate public recording official or (ii) when the original mortgage has been lost, a certificate by the appropriate county recording office where the mortgage is recorded;

(4)     any original intervening assignments needed for a complete chain of title to Flagstar with evidence of recording on them, or, if any original intervening assignment has not been returned from the applicable recording office or has been lost, an accurate copy of it, together with (i) when the delay is caused by the public recording office, an Officer's Certificate of the Seller stating that the original intervening assignment has been dispatched to the appropriate public recording official for recordation or (ii) when the original intervening assignment has been lost, a certificate by the appropriate county recording office where the mortgage is recorded;

(5)     unless the Seller has indicated it was not obtained, an original title policy or other written evidence of insurance covering the priority of the Lien of the related Mortgage;

(6)     the original of any guaranty executed in connection with the Mortgage Note;

(7)     the original of each assumption, modification, consolidation, or substitution agreement relating to the Mortgage Loan; and

(8)     any security agreement, chattel mortgage, or equivalent instrument executed in connection with the Mortgage.

The Mortgage Notes with a legend affixed thereto indicating the interest of the Issuer shall be delivered no later than the Closing Date, with respect to the Initial Mortgage Loans, and no later than the related Subsequent Transfer Date, with respect to the Additional Mortgage Loans.

The Seller confirms to the Purchaser that, as of the Closing Date, it has caused the portions of the Electronic Ledger relating to the Initial Mortgage Loans maintained by the Seller to be clearly and unambiguously marked to indicate that the Initial Mortgage Loans have been sold to the Purchaser, and sold by the Purchaser to the Issuer, and Granted by the Issuer to the Indenture Trustee and that a purchase of those Mortgage Loans from the Seller or the Purchaser will violate the rights of the Issuer, as secured party with respect to those Mortgage Loans. By the relevant Subsequent Transfer Date or applicable date of substitution, the Seller shall cause the portions of the Electronic Ledger relating to the relevant Additional Mortgage Loans or Eligible Substitute Mortgage Loans, as the case may be, to be clearly and unambiguously

7

marked, and shall make appropriate entries in its general accounting records, to indicate that those Mortgage Loans have been transferred to the Issuer at the direction of the Purchaser and that they have been Granted by the Issuer to the Indenture Trustee, and that a purchase of the Mortgage Loans from the Seller or the Purchaser will violate the rights of the Issuer, as secured party with respect to those Mortgage Loans.

The Purchaser accepts all right, title, and interest of the Seller existing now or in the future in the Mortgage Loans and Related Property with respect thereto transferred to it pursuant to this Section.

The Seller and the Purchaser intend that the transactions set forth herein constitute sales by the Seller to the Purchaser of all of the Seller's right, title and interest in and to the Mortgage Loans, including for accounting purposes, and not a secured borrowing. In the event the transaction set forth herein is deemed not to be a sale, the Seller hereby grants to the Purchaser a security interest in the Mortgage Loans and the Related Property with respect thereto to secure all of the Seller's obligations hereunder, and this Agreement shall and hereby does constitute a security agreement under applicable law.

Section 2.03.   *Payment of Purchase Price for the Mortgage Loans.*

(a)      In consideration of the sale of the Mortgage Loans from the Seller to the Purchaser on the Closing Date, the Purchaser agrees to transfer to the Seller on the Closing Date the purchase price for the Mortgage Loans provided in the Adoption Annex.

(b)      In consideration of the sale of the Additional Mortgage Loans from the Seller to the Purchaser on each Subsequent Transfer Date, the Purchaser agrees to cause the Issuer to pay to the Seller, when the conditions to the release of the purchase price for the Additional Mortgage Loans under the Sale and Servicing Agreement have been met, an amount equal to the aggregate Cut-off Date Asset Balances of such Additional Mortgage Loans.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES; REMEDIES FOR BREACH

Section 3.01.   *Seller and Sponsor Representations and Warranties.*

The Seller represents and warrants to the Purchaser as of the Closing Date:

(a)      The Seller is a Delaware corporation, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power to own its assets and to transact the business in which it is currently engaged. The Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it or any properties owned or leased by it requires such qualification and in which the failure so to qualify would have a material adverse effect on the business, properties, assets, or condition (financial or other) of the Seller;

8

(b)     The Seller has the power and authority to make, execute, deliver, and perform this Agreement and all of the transactions contemplated by this Agreement, and has taken all necessary corporate action to authorize the execution, delivery, and performance of this Agreement. When executed and delivered, this Agreement will constitute the valid and legally binding obligation of the Seller enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws affecting creditors' rights generally and by general principles of equity;

(c)     The Seller is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau, or agency in connection with the execution, delivery, performance, validity, or enforceability of this Agreement, except for any consents, licenses, approvals or authorizations, or registrations or declarations, (i) that have been obtained or filed, as the case may be, before the Closing Date or (ii) the failure of which to file or obtain could not be reasonably expected to have a material adverse effect on (A) the transactions contemplated by this Agreement or (B) the rights or interests of the Purchaser and its assigns;

(d)     The execution, delivery, and performance of this Agreement by the Seller will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Seller or any provision of the certificate of incorporation or bylaws of the Seller, or constitute a material breach of any mortgage, indenture, contract, or other agreement to which the Seller is a party or by which the Seller may be bound; and

(e)     No litigation or administrative proceeding of or before any court, tribunal, or governmental body is currently pending, or to the knowledge of the Seller threatened, against the Seller or any of its properties or with respect to this Agreement or the Notes that in the opinion of the Seller has a reasonable likelihood of resulting in a material adverse effect on the transactions contemplated by this Agreement.

Flagstar represents and warrants to the Purchaser as of the Closing Date:

(a)     Flagstar is a federal savings bank, validly existing and in good standing under the laws of the United States, and has the corporate power to own its assets and to transact the business in which it is currently engaged. Flagstar is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it or any properties owned or leased by it requires such qualification and in which the failure so to qualify would have a material adverse effect on the business, properties, assets, or condition (financial or other) of Flagstar;

(b)     Flagstar has the power and authority to make, execute, deliver, and perform this Agreement and all of the transactions contemplated by this Agreement, and has taken all necessary corporate action to authorize the execution, delivery, and performance of this Agreement. When executed and delivered, this Agreement will constitute the valid and legally binding obligation of Flagstar enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws affecting creditors' rights generally and by general principles of equity;

9

(c)     Flagstar is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau, or agency in connection with the execution, delivery, performance, validity, or enforceability of this Agreement, except for any consents, licenses, approvals or authorizations, or registrations or declarations, (i) that have been obtained or filed, as the case may be, before the Closing Date or (ii) the failure of which to file or obtain could not be reasonably expected to have a material adverse effect on (A) the transactions contemplated by this Agreement or (B) the rights or interests of the Purchaser and its assigns;

(d)     The execution, delivery, and performance of this Agreement by Flagstar will not violate any provision of any existing law or regulation or any order or decree of any court applicable to Flagstar or any provision of the articles of association or bylaws of Flagstar, or constitute a material breach of any mortgage, indenture, contract, or other agreement to which Flagstar is a party or by which Flagstar may be bound; and

(e)     No litigation or administrative proceeding of or before any court, tribunal, or governmental body is currently pending, or to the knowledge of Flagstar threatened, against Flagstar or any of its properties or with respect to this Agreement or the Notes that in the opinion of Flagstar has a reasonable likelihood of resulting in a material adverse effect on the transactions contemplated by this Agreement.

The representations and warranties in this Section 3.01 shall survive the transfer of the Mortgage Loans to the Purchaser.

Section 3.02.   *Representations and Warranties Relating to the Mortgage Loans.*

(a)     Each of the Seller and Flagstar represents and warrants to the Purchaser as of each applicable Transfer Date and with respect to the Mortgage Loans being transferred on such Transfer Date:

(1)     This Agreement constitutes a valid and legally binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws affecting creditors' rights generally and by general principles of equity.

(2)     Either:

(A)     this Agreement constitutes a valid transfer to the Purchaser of all right, title, and interest of the Seller in and to the applicable Mortgage Loans (including all Additional Balances arising from time to time after the Initial Closing Date, in the case of the Initial Mortgage Loans, and the Subsequent Cut-off Date in the case of the Additional Mortgage Loans, and all Related Property with respect thereto, and the Sale and Servicing Agreement constitutes a valid transfer to the Issuer of the foregoing property and all Related Property with respect thereto, such that, on execution of the Sale and Servicing Agreement, it is owned by the Issuer free of all Liens and other Permitted Liens, and is part of the corpus of the Issuer transferred to the Issuer by the

10

Purchaser, and upon transfer of the Additional Balances in accordance with the Sale and Servicing Agreement, this Agreement and the Sale and Servicing Agreement will constitute a valid transfer to the Issuer of all interest of the Seller in the Additional Balances, and all Related Property with respect thereto relating to the Additional Balances free of all Liens other than Permitted Liens, and the Indenture constitutes a valid Grant of a Security Interest to the Indenture Trustee in that property, and the Indenture Trustee has a first priority perfected Security Interest in the property free of all Liens other than Permitted Liens, subject to the effect of Section 9-315 of the UCC with respect to Collections on the Mortgage Loans that are deposited in the Custodial Account in accordance with the next to last paragraph of Section 3.02(b) of the Sale and Servicing Agreement, or

(B) if this Agreement and the Sale and Servicing Agreement do not constitute valid transfers of the property described in clause (A) above, then this Agreement constitutes a Grant of a Security Interest by the Seller to the Purchaser and the Sale and Servicing Agreement constitutes a Grant of a Security Interest by the Purchaser to the Owner Trustee on behalf of the Issuer in the property described in clause (A) above, and the Indenture constitutes a Grant of a Security Interest by the Issuer to the Indenture Trustee in such property, the Indenture Trustee will have a first priority perfected Security Interest in the property free of all Liens other than Permitted Liens, subject to the effect of Section 9-315 of the UCC with respect to Collections on the Mortgage Loans that are deposited in the Custodial Account in accordance with the next to last paragraph of Section 3.02(b) of the Sale and Servicing Agreement. These Security Interests are enforceable as such against creditors of and purchasers from the Issuer, the Purchaser, and the Seller.

(3)     The Seller has not authorized the filing of and is not aware of any financing statements against the Seller that include a description of collateral covering the Collateral other than any financing statement (A) relating to the Security Interests granted to the Depositor, the Issuer, or the Indenture Trustee under this Agreement, pursuant to the Sale and Servicing Agreement, or pursuant to the Indenture, (B) that has been terminated, or (C) that names the Depositor, the Issuer, or the Indenture Trustee as secured party.

(4)     As of the Closing Date, the information in the Mortgage Loan Schedule with respect to the Initial Mortgage Loans is correct in all material respects. As of the applicable date of substitution for an Eligible Substitute Mortgage Loan, the information with respect to the Eligible Substitute Mortgage Loan in the Mortgage Loan Schedule is correct in all material respects. As of the date any Additional Balance is created, the information as to the Mortgage Loan identification number and the amount of such Additional Balance reported for inclusion in the Mortgage Loan Schedule is correct in all material respects. As of each Subsequent Transfer Date, the information in the Mortgage Loan Schedule (as updated) with respect to each Additional Mortgage Loan will be correct in all material respects.

11

(5)     Each Mortgage Loan is being serviced by Flagstar and there was only one originally executed Credit Line Agreement not stamped as a duplicate copy with respect to each such Mortgage Loan;

(6)     The related Mortgage Note and the mortgage for each Mortgage Loan have not been assigned or pledged, and immediately before the sale of the applicable Mortgage Loans and Related Property to the Purchaser, the Seller held good and indefeasable title to and was the sole owner and holder of the Mortgage Loan free of any liens, claims, encumbrances, participation interests, equities, pledges, charges, or Security Interests of any nature (other than, with respect to any Mortgage Loan in a second lien position, the lien of the related first mortgage), and has full authority, under all governmental and regulatory bodies having jurisdiction over the ownership of the Mortgage Loans, to transfer it pursuant to this Agreement.

(7)     As of the applicable Transfer Date, the related mortgage is a valid and subsisting first or second Lien on the property described in it, as shown on the Mortgage Loan Schedule, and the related Mortgaged Property is free of all encumbrances and Liens having priority over the Lien of the related mortgage except for Permitted Encumbrances. If the Mortgage Loan is secured by a first lien, any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, existing and enforceable first lien and first priority security interest on the property described therein, subject to Permitted Encumbrances, and the Seller has full right to sell and assign the same to the Purchaser. The Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secured debt or other security instrument creating a lien subordinate to the lien of the Mortgage.

(8)     No Mortgage Loan or Mortgage is subject to any right of rescission, valid setoff, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Credit Line Agreement or the Mortgage relating to any Mortgage Loan, or the exercise of any right thereunder, render either such Credit Line Agreement or such Mortgage unenforceable in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, except for such rights of recission, setoffs, counterclaims or defenses (collectively, "*Defenses*") as to which Flagstar has taken appropriate steps to extinguish, terminate or otherwise eliminate the ability of the holder of such Defense to effectively assert such Defense against its obligations with respect to such Mortgage Loan or Mortgage, and after such steps, such Defenses do not materially and adversely affect the related Mortgage Loan.

(9)     To the best knowledge of Flagstar, no related Mortgaged Property has any delinquent recording or other tax or fee or assessment lien or governmental charge against it, other than those that have been or will be paid by the Seller.

12

(10)     No proceeding is pending or, to the best knowledge of Flagstar, threatened for the total or partial condemnation of the related Mortgaged Property, and the property is free of material damage and is in good repair.

(11)     To the best knowledge of Flagstar, no mechanics' or similar liens or claims have been filed for work, labor, or material affecting the related Mortgaged Property that are, or may be, liens prior or equal to the lien of the related mortgage, except liens that are fully insured against by the title insurance policy referred to in clause (16).

(12)     No Minimum Monthly Payment on an Initial Mortgage Loan being transferred on the Closing Date remains unpaid for more than 30 days after the original due date for such payment and no Minimum Monthly Payment on any other Mortgage Loan subsequently being transferred remains unpaid for more than 30 days after the original due date for such payment on the relevant transfer date and no more than the applicable percentage of the Initial Mortgage Loans specified in the Adoption Annex being transferred on the Closing Date (by Initial Cut-off Date Loan Balance ) had Minimum Monthly Payments which remained unpaid for more than 30 days after the original due date therefor.

(13)     The Mortgage File for each Mortgage Loan contains each of the documents specified to be included in it.

(14)     At origination, each Mortgage Loan and the related Mortgage Note complied in all material respects with applicable local, state and federal laws, including all applicable predatory and abusive lending laws to which Seller is subject, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loans (collectively, "*Consumer Protection Laws*"), and the servicing practices used by Flagstar or any servicer on its behalf with respect to each Mortgage Loan since origination have been consistent with the practices and the degree of skill and care Flagstar or any servicer on its behalf exercises in servicing for itself loans that it owns that are comparable to the Mortgage Loans.

(15)     Upon origination of such Mortgage Loan and after giving effect to the transfer of such Mortgage Loans from the Seller to the Purchaser and the Purchaser to the Issuer, no Mortgage Loan is a High Cost Loan or Covered Loan, as applicable, and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act; and "*High Cost Loan*" and "*Covered Loan*" have the meaning assigned to them in the Standard & Poor's LEVELS® Glossary attached as Schedule II (the "*Glossary*") or, with respect to Additional Mortgage Loans, the Glossary in effect on the applicable transfer date, where:

     (x) a "*High Cost Loan*" is each loan identified in the column "Category under applicable anti-predatory lending law" of the table entitled "Standard & Poor's High Cost Loan Categorization" in the Glossary as each such loan is defined in the applicable anti-predatory lending law of the state or jurisdiction specified in such table; and

13

(y) *"Covered Loan"* is each loan identified in the column "Category under applicable anti-predatory lending law" of the table entitled "Standard & Poor's Covered Loan Categorization" in the Glossary as each such loan is defined in the applicable anti-predatory lending law of the state or jurisdiction specified in such table.

(16)     None of the Mortgaged Properties is a mobile home or a manufactured housing unit that is not considered or classified as part of the real estate under the laws of the jurisdiction in which it is located.

(17)     No more than the percentage specified in the Adoption Annex of the Initial Mortgage Loans, by aggregate principal balance of the Initial Mortgage Loans, are secured by Mortgaged Properties located in one United States postal zip code.

(18)     The Combined Loan-to-Value Ratio for each Mortgage Loan was not in excess of the percentage specified in the Adoption Annex.

(19)     No selection procedure adverse to the interests of the Purchaser, the Noteholders, or the Note Insurer was used in selecting the Mortgage Loans.

(20)     The Seller has not transferred the Mortgage Loans to the Purchaser to be transferred to the Issuer with any intent to hinder, delay, or defraud any of its creditors.

(21)     As of the Closing Date (or, with respect to any Eligible Substitute Mortgage Loan, the applicable date of substitution), the Minimum Monthly Payment with respect to any Mortgage Loan is not less than the interest accrued at the applicable Loan Rate on the average daily Asset Balance during the interest period relating to the date on which the Minimum Monthly Payment is due.

(22)     The Mortgage Notes constitute either "instruments", "promissory notes" or "payment intangibles" as defined in the UCC.

(23)     On or prior to the Closing Date, UCC-1 financing statements were filed in the proper filing office in the appropriate jurisdiction to perfect the backup Security Interests granted pursuant to this Agreement and the Sale and Servicing Agreement and the Security Interest in the Collateral Granted under the Indenture.

(24)     The Mortgage Notes that constitute or evidence the Collateral do not have any marks or notations indicating that they have been pledged, assigned, or otherwise transferred to any person other than the Purchaser, the Issuer, or the Indenture Trustee. All financing statements filed or to be filed against the Seller in favor of the Purchaser, the Issuer, or the Indenture Trustee in connection with this Agreement, the Sale and Servicing Agreement, or the Indenture describing the Collateral contain a statement to the following effect: "A purchase of the Mortgage Loans included in the collateral covered by this financing statement will violate the rights of the Purchaser, the Issuer, or the Indenture Trustee."

14

NY1 5998523v.10

(25)   Each Credit Line Agreement and each Mortgage Loan is an enforceable obligation of the related borrower, except as enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws affecting creditors' rights generally and to general principles of equity.

(26)   Flagstar has not received a notice of default of any senior mortgage loan related to a Mortgaged Property that has not been cured by a party other than Flagstar.

(27)   The definition of "prime rate" in each Credit Line Agreement relating to a Mortgage Loan does not differ materially from "the highest 'prime rate' as published in the 'Money Rates' table of *The Wall Street Journal* as of the first business day of the calendar month for the applicable interest rate adjustment date."

(28)   The weighted average remaining term to maturity of the Initial Mortgage Loans on a contractual basis as of the Initial Cut-off Date is approximately the number of months specified in the Adoption Annex. On each date that the Loan Rates have been adjusted, interest rate adjustments on the Initial Mortgage Loans were made in compliance with the related Credit Line Agreement. Over the term of each Mortgage Loan, the Loan Rate may not exceed the related Loan Rate Cap. The Loan Rate Cap for the Mortgage Loans ranges between the percentages specified in the Adoption Annex and the weighted average Loan Rate Cap is approximately the percentage specified in the Adoption Annex. The Gross Margins for the Initial Mortgage Loans range between the percentages specified in the Adoption Annex and the weighted average Gross Margin is approximately the percentage specified in the Adoption Annex as of the Initial Cut-off Date. The Loan Rates on the Mortgage Loans range between the percentages specified in the Adoption Annex and the weighted average Loan Rate on the Mortgage Loans is approximately the percentage specified in the Adoption Annex.

(29)   Each Mortgaged Property consists of a single parcel of real property with a one-to-four unit single or double family residence erected on it, or an individual condominium unit, planned unit development unit, or townhouse other than specified in the Adoption Annex.

(30)   No more than the percentage specified in the Adoption Annex (by Initial Cut-off Date Loan Balance) of the Initial Mortgage Loans are secured by real property improved by individual condominium units, units in planned unit developments, townhouses, or two-to-four family residences erected on them, and at least the percentage specified in the Adoption Annex (by Initial Cut-off Date Loan Balance) of the Mortgage Loans are secured by real property with a detached one-family residence erected on them.

(31)   The Credit Limits on the Initial Mortgage Loans range between approximately the dollar amounts specified in the Adoption Annex with an average of approximately the dollar amount specified in the Adoption Annex. As of the Initial Cut-off Date, no Initial Mortgage Loan had a principal balance in excess of approximately the dollar amount specified in the Adoption Annex and the average principal balance of

15

the Initial Mortgage Loans is equal to approximately the dollar amounts specified in the Adoption Annex.

(32)     Approximately the percentages specified in the Adoption Annex of the Initial Mortgage Loans, by aggregate principal balance as of the Initial Cut-off Date, are secured by second liens.

(33)     As of the Closing Date, no more than the percentage specified in the Adoption Annex of the Initial Mortgage Loans, by aggregate principal balance, were appraised electronically.

(34)     There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Credit Line Agreement and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and neither Flagstar nor the Seller has waived any default, breach, violation or event of acceleration.

(35)     Each Mortgage Loan was originated in good faith and in accordance with Flagstar's underwriting guidelines.

(36)     To the best knowledge of Flagstar at the time of origination of each Mortgage Loan, no improvement located on or being part of the Mortgaged Property was in violation of any applicable zoning and subdivision laws or ordinances.

(37)     Any leasehold estate securing a Mortgage Loan has a term of not less than ten years in excess of the term of the related Mortgage Loan. If the Mortgage Loan is secured by a long-term residential lease, unless otherwise specifically disclosed in the Mortgage Loan Schedule, (A) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent (or the lessor's consent has been obtained and such consent is the Mortgage File) and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protection; (B) the terms of such lease do not (x) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default or (y) prohibit the holder of the Mortgage from being insured under the hazard insurance policy relating to the Mortgaged Property; (C) the original term of such lease is not less than 15 years; (D) the term of such lease does not terminate earlier than ten years after the maturity date of the Mortgage Note; and (E) the Mortgaged Property is located in a jurisdiction in which the use of leasehold estates for residential properties is an accepted practice.

(38)     Based on the drawn balances of the Initial Mortgage Loans, the Initial Mortgage Loans had the characteristics set out in the Adoption Annex in respect of the following: weighted average Combined Loan-to-Value Ratio; range of Combined Loan-to-Value Ratios; percentage of primary residences; weighted average FICO score; range of FICO scores; Weighted Average Net Loan Rate; range of net Loan Rates; weighted

16

average original stated term to maturity; range of original term to maturity; range of remaining term to maturity; average drawn balance; weighted average utilization ratio; and percentage of the Initial Mortgage Loans that have their respective Mortgaged Properties located in the top five states, measured by aggregate drawn balances.

(39)     The terms of the Mortgage Note and the Mortgage have not been waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage; the substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the related policy, and is reflected on the Mortgage Loan Schedule, and no borrower has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by the policy, and the terms of which are reflected in the Mortgage Loan Schedule.

(40)     Each Mortgage Loan was originated by an entity that satisfied at the time of origination the requirements of Section 3(a)(41)(A)(ii) of the Securities Exchange Act of 1934.

(41)     The related Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release.

(42)     A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the principal balance of the related Mortgage Loan as of the Initial Cut-off Date or the relevant Subsequent Cut-off Date, as applicable, or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force, and each such policy was issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, which policy insures Flagstar and successor owners of indebtedness secured by the insured Mortgage, as to the Lien of the Mortgage subject to any Permitted Encumbrances. Additionally, such lender's title insurance policy or secondary title insurance policy affirmatively insures ingress and egress to and from the Mortgaged Property, and against encroachments by or upon the Mortgaged Property or any interest therein.

(43)     The improvements on each Mortgaged Property are covered by a valid and existing hazard insurance policy with a generally acceptable carrier that provides for fire and extended coverage and coverage for such other hazards as are customary in the area where the Mortgaged Property is located in an amount that is at least equal to the lesser of (i) the maximum insurable value of the improvements securing the Mortgage Loan or (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds of the policy will be sufficient to prevent the borrower or the mortgagee from becoming a co-insurer. If the Mortgaged Property is a condominium unit, such unit us included under coverage afforded by a blanket policy

17

for the condominium complex. All such individual insurance policies and all flood policies referred to in item (46) below contain a standard mortgagee clause naming Flagstar or the original mortgagee, and its successors in interest, as mortgagee, and Flagstar has received no notice that any premiums due and payable thereon have not been paid, and the Mortgage obligates the borrower thereunder to maintain all such insurance, including flood insurance, at the borrower's expense, and upon the borrower's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the borrower's expenses and to seek reimbursement therefor from the borrower.

(44)    If the Mortgaged Property with respect to any Mortgage Loan is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to the Mortgaged Property with a generally acceptable carrier in an amount representing coverage not less than the least of (A) the outstanding principal balance of the Mortgage Loan and any mortgage loan senior to that Mortgage Loan from time to time, (B) the minimum amount required to compensate for damage or loss on a replacement cost basis, or (C) the maximum amount of insurance that is available under the National Flood Insurance Act of 1968.

(45)    The Mortgagor is a natural person who is a party to the Mortgage Note and the Mortgage is in an individual capacity or family trust that is guaranteed by a natural person. Each Mortgage Note and the related mortgage are genuine, and each is the valid and legally binding obligation of its maker, enforceable in accordance with its terms and under applicable law, except that (a) its enforceability may be limited by bankruptcy, insolvency, moratorium, receivership, and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought. To the best of Flagstar's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties.

(46)    No Mortgage Loan has a shared appreciation feature, or other contingent interest feature.

(47)    To the best of Flagstar's knowledge, all of the improvements that were included for the purpose of determining the appraised value of the Mortgaged Property with respect to any Mortgage Loan lie wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach on the Mortgaged Property.

(48)    To the best of Flagstar's knowledge, all inspections, licenses, and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property with respect to any Mortgage Loan and, with respect to the use and occupancy of the same, including certificates of occupancy and fire underwriting

18

certificates, have been made or obtained from the appropriate authorities, unless their lack would not have a material adverse effect on the value of the Mortgaged Property, and the Mortgaged Property is lawfully occupied under applicable law.

(49)     Each Mortgage with respect to a Mortgage Loan contains customary and enforceable provisions that render the rights and remedies of its holder adequate for the realization against the Mortgaged Property of the benefits of the security intended to be provided by it, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.

(50)     In connection with the approval of the Mortgage Loan application, a collateral evaluation of the related Mortgaged Property was performed using an appraisal, an automated electronic valuation method or other similar valuation method utilized by prudent lending institutions originating mortgage loans of the same type as such Mortgage Loan. Each appraisal has been performed in accordance with the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

(51)     Except for (A) payments in the nature of escrow payments, and (B) interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage proceeds, whichever is later, to the day that precedes by one month the Collection Period of the first installment of principal and interest and taxes and insurance payments, Flagstar has not advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the borrower, directly or indirectly, for the payment of any amount required by the Mortgage.

(52)     No foreclosure proceedings are pending against the related Mortgaged Property and the related borrower is not subject to any pending bankruptcy or insolvency proceeding.

(53)     There is no homestead exemption available and enforceable that materially interferes with the right to sell the related Mortgaged Property at a trustee's sale or the right to foreclose the related Mortgage.

(54)     No borrower was required to purchase any single premium credit insurance policy (e.g., life, disability, accident, unemployment, or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit. No borrower obtained a prepaid single-premium credit insurance policy (e.g., life, disability, accident, unemployment, mortgage, or health insurance) in connection with the origination of a Mortgage Loan. No proceeds from any Mortgage Loan were used to purchase debt cancellation agreements as part of the origination of, or as a condition to closing, the Mortgage Loan.

(55)     The Mortgage Loans, individually and in the aggregate, conform in all material respects to their descriptions in the Offering Circular.

19

(56)     No Mortgage Loan is subject to the Home Ownership and Equity Protection Act of 1994.

(57)     Neither the related Credit Line Agreement nor the related Mortgage Note is or has been secured by any collateral, pledged account or other security except the lien of the corresponding Mortgage.

(58)     The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered with respect to each Mortgage Loan pursuant to the Indenture, have been delivered to the Custodian in compliance with the specific requirements of the Custodial Agreement.

(59)     The Mortgage Loan was acquired by Flagstar directly through loan brokers or correspondents such that (a) the Mortgage Loan was originated in conformity with Flagstar's underwriting guidelines, (b) Flagstar approved the Mortgage Loan prior to funding and (c) Flagstar provided the funds used to originate the Mortgage Loan and acquired the Mortgage Loan on the date of origination thereof.

(60)     With respect to each Mortgage Loan that is not a first mortgage loan, (1) no consent for the Mortgage Loan is required by the holder or holders of the related prior lien or such consent has been obtained and is contained in the related Mortgage File and (2) no consent for the Mortgage Loan was required by relevant law.

(61)     In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor.

(62)     Each Mortgage Loan matures ten years from its date of origination. The Mortgage Note provides for monthly payments of interest and payment of principal upon maturity.

(63)     Any advances made to the borrower prior to the Cut off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term.

(64)     No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan.

(65)     At origination, each Initial Mortgage Loan has a draw period of not more than 120 months.

20

(66)     Other than initial introductory, or "teaser" rates, each Credit Line
Agreement with respect to each Initial Mortgage Loan provides that such Mortgage
Loan bears an adjustable Loan Rate with an index plus a margin that equals a rate *per
annum* of no less than the prime rate minus 1.00%.

(67)     A title search or where a title search is not available, other appropriate
assurance of title customary in such jurisdiction, was obtained with respect to each
Mortgage Loan.

(68)     The Seller or Flagstar, as applicable, has caused to be performed any and
all acts required to be performed to preserve the rights and remedies of the Indenture
Trustee in any Insurance Policies applicable to any Mortgage Loans delivered by the
Seller including, without limitation, any necessary notifications of insurers, assignments
of policies or interests therein, and establishments of co-insured, joint loss payee and
mortgage rights in favor of the Indenture Trustee.

(69)     No instrument of release or waiver has been executed in connection with
the Mortgage Loans.

(70)     Each Mortgage Loan has been serviced since its origination in compliance
with all applicable federal, state and local laws and in accordance with the Mortgage
Note.

(71)     Each Mortgage Loan, and if required by applicable law, the related
Mortgage Note, contains a provision for the acceleration of payment of the unpaid
Principal Balance of the related Mortgage Loan in the event that the property securing
such Mortgage Loan is sold or transferred without the prior written consent of the
Mortgagee thereunder.

(72)     Flagstar and the Seller have complied with all applicable anti-money
laundering laws and regulations, including without limitation the USA Patriot Act of
2001 (collectively, the "Anti-Money Laundering Laws"); Flagstar and the Seller have
established an adequate anti-money laundering compliance program as required by the
Anti-Money Laundering Laws, has conducted the requisite due diligence in connection
with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering
Laws, including with respect to the legitimacy of the applicable borrower and the origin
of the assets used by such borrower to purchase the property in question, and maintains,
and will maintain, sufficient information to identify the applicable borrower for
purposes of the Anti-Money Laundering Laws.

(73)     At the time of origination Flagstar had no knowledge of any fact that would
have led it to expect that any interest in any Mortgage Loan is unlikely to be paid in full
when it becomes due and payable.

(74)     By their terms, none of the Mortgage Loans are assumable.

21

(b)     The representations and warranties in this Section shall survive the transfer and assignment of the Mortgage Loans to the Purchaser. If the substance of any representation or warranty with respect to a Mortgage Loan in Section 3.02(a) made to the best of the Seller's and Flagstar's knowledge or as to which the Seller or Flagstar has no knowledge is inaccurate and the inaccuracy materially and adversely affects the interest of the Purchaser or its assignee in the related Mortgage Loan, then, notwithstanding that the Seller and Flagstar did not know the substance of the representation and warranty was inaccurate at the time the representation or warranty was made, the inaccuracy shall be a breach of the applicable representation or warranty.

(c)     The sole remedy of the Purchaser, the Noteholders, the Indenture Trustee on behalf of Noteholders, and the Note Insurer (other than the indemnification provided pursuant to Section 2.04(f) of the Sale and Servicing Agreement) against the Seller and Flagstar for the breach of a representation or warranty with respect to a Mortgage Loan in Section 3.02(a) is the Seller's obligation (or Flagstar's obligation if the Seller fails to perform as provided in Section 8.10 of the Sale and Servicing Agreement), subject to certain cure periods, to accept a transfer of a Mortgage Loan as to which a breach has occurred and is continuing and to make any required deposit in the Custodial Account or to substitute an Eligible Substitute Mortgage Loan in accordance with the Sale and Servicing Agreement.

(d)     The Purchaser acknowledges that the Servicer, in its sole discretion, may purchase from the Issuer, for its own account, any Mortgage Loan that is 91 days or more delinquent. The price for any such purchased Mortgage Loan shall be calculated in the same manner as set forth in Section 3.06 of the Sale and Servicing Agreement and shall be deposited in the Custodial Account. Upon receipt of a certificate from the Servicer in the form of Exhibit B to the Sale and Servicing Agreement, the Issuer shall release to the Servicer the related Mortgage File and shall execute and deliver any instruments of transfer prepared by the Servicer, without recourse, necessary to vest in the Servicer any Mortgage Loan released pursuant to this Agreement. Upon release of such Mortgage Loan, the Servicer shall succeed to all the Issuer's interest in the Mortgage Loan, and all related security and documents. This assignment shall be an assignment outright and not for security. The Servicer shall then own the Mortgage Loan, and all related security and documents, free of any further obligation to the Issuer, the Owner Trustee, the Indenture Trustee, the Transferor, the Note Insurer, or the Noteholders with respect to it.

(e)     A breach of any one of the representations in Section 3.02(a)(14) and (15) will be considered to materially and adversely affect the interests of the Noteholders.

22

## ARTICLE IV

### SELLER'S COVENANTS

Section 4.01.   *Covenants of the Seller.*

Except as contemplated pursuant to this Agreement, the Seller will not transfer to any other person, or create or suffer to exist any Lien on any Mortgage Loan, other than Permitted Liens. The Seller will notify the Indenture Trustee of the existence of any Lien on any Mortgage Loan, other than Permitted Liens, promptly following discovery thereof; and the Seller will defend the right, title, and interest of the Issuer and the Indenture Trustee in the Mortgage Loans against all claims of third parties claiming through the Seller.

## ARTICLE V

### SERVICING

Section 5.01.   *Servicing.*

Flagstar will be the initial Servicer of the Mortgage Loans pursuant to the Sale and Servicing Agreement.

## ARTICLE VI

### TERMINATION

Section 6.01.   *Termination.*

The respective obligations of the Seller and the Purchaser created by this Agreement shall terminate when the Indenture terminates in accordance with its terms.

23

## ARTICLE VII

### MISCELLANEOUS PROVISIONS

Section 7.01.   *Amendment.*

This Agreement may be amended from time to time by the Seller and the Purchaser, with the written consent of the Note Insurer, by written agreement signed by the Seller and the Purchaser.

Section 7.02.   *Governing Law.*

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER STATE.

Section 7.03.   *Notices.*

All notices, demands, instructions, consents, and other communications required or permitted under this Agreement shall be in writing and signed by the party giving the same and shall be personally delivered or sent by first class or express mail (postage prepaid), national overnight courier service, or by facsimile transmission or other electronic communication device capable of transmitting or creating a written record (confirmed by first class mail) and shall be considered to be given for purposes of this Agreement on the day that the writing is delivered when personally delivered or sent by facsimile or overnight courier or three Business Days after it was sent to its intended recipient if sent by first class mail. A facsimile has been delivered when the sending machine issues an electronic confirmation of transmission. Unless otherwise specified in a notice sent or delivered in accordance with the provisions of this Section, notices, demands, instructions, consents, and other communications in writing shall be given to or made on the respective parties at their respective addresses indicated below:

      (i)    if to the Seller at:

          Flagstar Capital Markets Corporation
          5151 Corporate Drive
          Troy, Michigan 48098-2639
          Attention: Chief Legal Officer
          Telecopy: (866)-748-6978

24

·(ii)    if to the Note Insurer at:

Financial Security Assurance Inc.
31 West 52nd Street
New York, NY 10019
Attention: Transaction Oversight
Re: Flagstar Home Equity Loan Trust 2006-2
Confirmation: (212) 826-0100
Telecopy Nos.: (212) 339-3518, (212) 339-3529

(iii)    if to Flagstar at:

Flagstar Bank, FSB
5151 Corporate Drive
Troy, Michigan 48098-2639
Attention: Chief Legal Officer
Telecopy: (866)-748-6978

and

(iv)    if to the Purchaser at:

Flagstar ABS, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801
Telephone: 866-372-8255

Section 7.04.   *Severability of Provisions.*

Any provisions of this Agreement that are held invalid for any reason or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of the invalidity or unenforceability without invalidating the remaining provisions of this Agreement, and the prohibition or unenforceability in a jurisdiction shall not invalidate or render unenforceable that provision in any other jurisdiction.

Section 7.05.   *Counterparts; Electronic Delivery.*

This Agreement may be executed in any number of copies, and by the different parties on the same or separate counterparts, each of which shall be considered to be an original

25

instrument. Any signature page to this Agreement containing a manual signature may be delivered by facsimile transmission or other electronic communication device capable of transmitting or creating a printable written record, and when so delivered shall have the effect of delivery of an original manually signed signature page.

Section 7.06.   *Further Agreements.*

The Purchaser and the Seller each agree to execute and deliver to the other any additional documents appropriate to effectuate the purposes of this Agreement or in connection with the issuance of the Notes.

Section 7.07.   *Successors and Assigns: Assignment of Purchase Agreement.*

This Agreement shall bind and inure to the benefit of and be enforceable by the Seller, the Purchaser, the Issuer, the Indenture Trustee, and the Note Insurer. The obligations of the Seller under this Agreement cannot be assigned or delegated to a third party without the consent of the Purchaser and the Note Insurer, except that the Seller may assign its obligations under this Agreement to any person into which the Seller is merged or any corporation resulting from any merger, conversion, or consolidation to which the Seller is a party or any person succeeding to the business of the Seller. The Purchaser is acquiring the Mortgage Loans to further transfer them to the Issuer, and the Issuer will Grant a Security Interest in them to the Indenture Trustee under the Indenture pursuant to which the Issuer will issue a series of Notes secured by the Mortgage Loans. As an inducement to the Purchaser to purchase the Mortgage Loans, the Seller consents to the assignment by the Purchaser to the Issuer, and by the Issuer to the Indenture Trustee of all of the Purchaser's rights against it under this Agreement insofar as they relate to Mortgage Loans transferred to the Issuer and to the enforcement or exercise of any right against the Seller pursuant to this Agreement by the Indenture Trustee under the Sale and Servicing Agreement and the Indenture. Enforcement of a right by the Indenture Trustee shall have the same effect as if the right had been exercised by the Purchaser directly.

Section 7.08.   *Third Party Beneficiaries.*

The Note Insurer is a third party beneficiary of this Agreement. No other person, other than as set forth hereunder, and under Section 7.07 of this Agreement, will have any rights under this Agreement.

26

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

FLAGSTAR ABS, LLC
as the Purchaser

By: _____
Name: Matthew Roslin
Title: VP

FLAGSTAR CAPITAL MARKETS CORPORATION
as the Seller

By: _____
Name: Matthew Roslin
Title: EVP

FLAGSTAR BANK, FSB
as the Sponsor

By: _____
Name: Matthew Roslin
Title: EVP

STATE OF Michigan )
COUNTY OF Oakland ) ss.:
)

On the 20th day of December, 2006 before me, a Notary Public in and for said State, personally appeared Matthew Coslin , known to me to be a VP _____ of Flagstar ABS, LLC, the corporation that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Tarsha Nickerson
_____
Notary Public

TARSHA NICKERSON
Notary Public, State of Michigan
County of Oakland
My Commission Expires May 16, 2011
Acting in the County of Oakland

Mortgage Loan Purchase Agreement

STATE OF Michigan )
COUNTY OF Oakland ) ss.:

On the 25 day of December, 2006 before me, a Notary Public in and for said State, personally appeared Matthew Roslin , known to me to be a EVP of Flagstar Capital Markets Corporation, the corporation that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

TARSHA NICKERSON
Notary Public, State of Michigan
County of Oakland
My Commission Expires May 16, 2011
Acting in the County of Oakland

Mortgage Loan Purchase Agreement

STATE OF Michigan
) ss.:
COUNTY OF Oakland

On the 20 day of December, 2006 before me, a Notary Public in and for said State, personally appeared Matthew Kosin , known to me to be a
EVP of Flagstar Bank, FSB, the federal savings bank that executed the within instrument, and also known to me to be the person who executed it on behalf of said federal savings bank, and acknowledged to me that such federal savings bank executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Tarsha Nickerson

Notary Public

TARSHA NICKERSON
Notary Public, State of Michigan
County of Oakland
My Commission Expires May 16, 2011
Acting in the County of Oakland



SCHEDULE I

SCHEDULE OF
MORTGAGE LOANS

[Delivered to the Indenture Trustee only]

Sch-I-1

SCHEDULE II

### STANDARD & POOR'S GLOSSARY

## Standard & Poor's Predatory Lending Categorization

Standard & Poor's has categorized loans governed by anti-predatory lending laws in the jurisdictions listed below into three categories based on a combination of factors that include (a) the risk exposure associated with the assignee liability and (b) the tests and thresholds set forth in those laws. Note that certain loans classified by the relevant statute as Covered are included in Standard & Poor's High Cost Loan category because they included thresholds and tests that are typical of what is generally considered High Cost by the industry.

| Standard & Poor's High-Cost Loan Categorization | |
|---|---|
| State/jurisdiction | Category under applicable anti-predatory lending law |
| Arkansas | High Cost Home Loan |
| Cleveland Heights, Ohio | Covered Loan |
| Colorado | Covered Loan |
| Connecticut | High Cost Home Loan |
| District of Columbia | Covered Loan |
| Florida | High Cost Home Loan |
| Georgia (Oct. 1, 2002 – March 6, 2003) | High Cost Home Loan |
| Georgia as amended (March 7, 2003 – current) | High Cost Home Loan |
| HOEPA Section 32 | High Cost Loan |
| Illinois | High Risk Home Loan |
| Kansas | High Loan-to-Value Consumer Loans and High APR Consumer Loans |
| Kentucky | High Cost Home Loan |
| Los Angeles, Calif. | High Cost Refinance Home Loan |
| Maine | High Rate High Fee mortgage |
| Massachusetts | High Cost Home Loan |
| Nevada | Home Loan |
| New Jersey | High Cost Home Loan |
| New York | High Cost Home Loan |
| New Mexico | High Cost Home Loan |
| North Carolina | High Cost Home Loan |
| Oakland, Calif.. | High Cost Home Loan |
| Ohio | Covered Loan |
| Oklahoma | Subsection 10 Mortgage |
| South Carolina | High Cost Home Loan |
| West Virginia | West Virginia Mortgage Loan Act Loan |

| Standard & Poor's Covered Loan Categorization | |
|---|---|
| State/jurisdiction | Category under applicable anti-predatory lending law |
| Georgia (Oct. 1, 2002 – March 6, 2003) | Covered Loan |
| New Jersey | Covered Home Loan |

Sch-II-1

| Standard & Poor's Home Loan Categorization | |
|---|---|
| State/jurisdiction | Category under applicable anti-predatory lending law |
| Georgia (Oct. 1, 2002- March 6, 2003) | Home Loan |
| New Jersey | Home Loan |
| New Mexico | Home Loan |
| North Carolina | Consumer Home Loan |
| Oakland, Calif. | Home Loan |
| South Carolina | Consumer Home Loan |

Sch-II-2

ANNEX 1

### ADOPTION ANNEX

The purchase price for the Mortgage Loans pursuant to Section 2.03 is the transfer to the Seller on the Closing Date of Transferor Certificates and the proceeds from the sale of the Notes.

The items referred to in the representations and warranties in Section 3.02 are:

(12)     None of the Initial Mortgage Loans being transferred on the Closing Date (by Initial Cut-off Date Loan Balance) had Minimum Monthly Payments which remain unpaid for 30 or more days after the original due date therefor.

(17)     As of the Initial Cut-off Date no more than 1.32% of the Initial Mortgage Loans, by aggregate principal balance, are secured by Mortgaged Properties located in one United States postal zip code.

(18)     The Combined Loan-to-Value Ratio for all of the Initial Mortgage Loans (by Initial Cut-off Date Balance) was not in excess of 100.00%.

(28)     The weighted average remaining term to maturity of the Initial Mortgage Loans on a contractual basis as of the Initial Cut-off Date is approximately 112 months. The Loan Rate Caps for all Mortgage Loans is 18.000% with respect to the Mortgage Loans. The Gross Margins for the Initial Mortgage Loans range between -1.010% and 5.950% with respect to the Initial Mortgage Loans, and the weighted average Gross Margin is approximately 1.182% as of the Initial Cut-off Date for the Initial Mortgage Loans. The Loan Rates on the Mortgage Loans range between 6.000% and 14.200%, and the weighted average Loan Rate on the Mortgage Loans is approximately 9.391%.

(29)     None.

(30)     No more than 35.39% (by Initial Cut-off Date Loan Balance) of the Initial Mortgage Loans are secured by real property improved by individual condominium units, units in planned unit developments, townhouses, or two-to-four family residences erected on them, and at least 64.57% (by Initial Cut-off Date Loan Balance) of the Initial Mortgage Loans are secured by real property with a detached one-family residence erected on them.

(31)     The Credit Limits on the Initial Mortgage Loans range between approximately $3,500 and $2,000,000 with an average of approximately $95,137. As of the Initial Cut-off Date, no Initial Mortgage Loan had a principal balance in excess of approximately $1,270,163 and the average principal balance of the Initial Mortgage Loans is equal to approximately $72,189.

(32)     Approximately 96.52% of the Initial Mortgage Loans, by aggregate principal balance as of the Initial Cut-off Date for the Initial Mortgage Loans are secured by second liens.

(33)     As of the Closing Date, no more than 3.38% of the Mortgage Loans, by aggregate principal balance, were appraised electronically.

(38)    As of the Initial Cut-off Date (based on the drawn balances), the Initial Mortgage Loans had a weighted average Combined Loan-to-Value Ratio of 81.77%; a range of Combined Loan-to-Value Ratios between 4.29% and 100.00%; a percentage of primary residences of 90.93%; a weighted average FICO score of 715; a range of FICO scores between 502 and 819; a Weighted Average Net Loan Rate of 8.881%; a range of net Loan Rates between 5.490% and 13.690%; a weighted average original stated term to maturity of 120 months; all loans have an original term to maturity of 120 months; a range of remaining term to maturity between 92 and 119 months; an average drawn balance of approximately $72,189; a weighted average utilization ratio of 75.88%; and 62.42% of the Initial Mortgage Loans, have their Mortgaged Properties located in the top five states, measured by aggregate drawn balances.

Ann-1-2