UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., <br><br> Plaintiff, <br><br> vs. <br><br> FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, <br><br> Defendants. | 11-CIV-2375 (JSR) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION *IN LIMINE* REGARDING THE USE OF SAMPLING**

Veronica E. Rendón
Daniel M. Kuhn
Monique A. Gaylor
Mary E. Sylvester
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000
Veronica.Rendon@aporter.com
Daniel.Kuhn@aporter.com
Monique.Gaylor@aporter.com
Mary.Sylvester@aporter.com

*Attorneys for Defendants Flagstar Bank,
FSB, Flagstar Capital Markets Corporation
and Flagstar ABS, LLC*

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 2

    A.    The 2005-1 and 2006-2 Securitizations ................................................. 2

    B.    The Trusts' Performance to Date and Implications for Sampling ......................... 3

    C.    Insurer's Pre-Litigation Review of Charged-Off Loans ......................................... 5

    D.    Insurer's Complaint, Flagstar's Motion to Dismiss, and This Purported Motion In Limine ........................................................................................... 6

ARGUMENT ........................................................................................................................ 7

    A.    The Requested Relief Is Vague and Improper ......................................................... 7

    B.    Plaintiff Has Not Presented The Principles and Methods By Which It Would Sample Nor Made Any Effort to Demonstrate Admissibility .............................. 10

    C.    Any Appeal to Efficiency Is Illusory ..................................................................... 14

           1.    Insurer Materially Overstates the Size of the Loan Population at Issue ....... 14

           2.    To Be Statistically Significant, the Sample Size Here Will Have To Comprise a Large Volume of Loans, Thus Decreasing Efficiency ............... 16

    D.    The Use of Sampling to Prove Breach and Damages Would Violate the Exclusive Remedy Provisions  of the Transaction Documents ........................... 18

CONCLUSION .................................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aetna Life Ins. Co. of Hartford v. Haworth*,
   300 U.S. 227 (1937)..............................................................................................8, 9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002).......................................................................................11

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, et al.*,
   11-CV-2375 (July 7, 2011).....................................................................................7, 18

*Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*,
   590 F. Supp. 187 (S.D.N.Y. 1984) ...............................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).............................................................................................10, 11

*In re Pfizer, Inc. Secs. Litig.*,
   584 F. Supp. 2d 621 (S.D.N.Y. 2008).........................................................................10

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   No. 602825/08, 2010 WL 5186702 (Sup. Ct. N.Y. Co., Dec. 22, 2010)..............12, 13, 14, 20

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005).................................................................................10, 11

*Republic Servs., Inc. v. Liberty Mutual Ins. Co.*,
   No. Civ. A. 03-494-KSF, 2006 WL 2844122 (E.D. Ky. Oct. 2, 2006) .............................9, 10

*TVT Records v. Island Def Jam Music Grp.*,
   250 F. Supp. 2d 341 (S.D.N.Y. 2003)........................................................................7, 8

*United States v. Chan*,
   184 F. Supp. 2d 337 (S.D.N.Y. 2002).......................................................................7, 8

**RULE**

Fed. R. Evid. 702 ..................................................................................................10, 11

**OTHER AUTHORITIES**

Federal Judicial Center, *Manual for Complex Litigation* (4th ed. 2010).......................11

Henry R. Rosenblatt & David H. Leroy, *Motion in Limine Practice*, 20 Am. Jur. *Trials*
   441 (2010)..................................................................................................................8

## PRELIMINARY STATEMENT

Improperly styling its request as a motion *in limine*, Insurer asks the Court to "issue an order approving AG's use of sampling in this case." Yet Insurer does not identify an expert, the methodology it would propose using, or the manner in which sampling would be utilized, including how sampling could be harmonized with its exclusive remedy of cure or repurchase. Insurer simply — and erroneously — argues that this case presents an "unmanageable volume of data" and that some form of undefined loan "sampling" is the only possible antidote.

Insurer's motion should be denied. Insurer ignores that the use of statistically valid sampling is a highly contextualized exercise that depends on a vast array of factors — including the homogeneity of the population, the size of the population, the sample size, and the proposed use of the sample. Insurer does not attempt to address these issues and, consequently, does not demand any meaningful relief. Instead Insurer asks the Court to sign a blank check — an order which is essentially an advisory opinion regarding the manner in which Insurer should conduct discovery, manage its experts and present its case at trial, without any underlying support or justification for its approach.

Moreover, Insurer presents the Court with a false dilemma: sample or be "forced to conduct individual trials on up to 15,610 individual loans." Yet, there would never be a need to adjudicate *every loan in the two securitizations* to determine the existence of a material and continuing breach and ensuing damages — the evidentiary standard Insurer must demonstrate. Even Insurer cannot claim that *every loan* contains a material and continuing breach for which it is entitled to damages. This is particularly true because the vast majority of the loans in the two securitizations are presently performing over five years after the first securitization, and 8,467 loans — *well over half of the loan population* — have already been paid-in-full. If one were to exclude the paid-in-full loans as well as other, obviously non-actionable loans, a few hundred

loans would remain, obviating any reason to engage in the time-consuming and costly undertaking of sampling, which, if performed in a statistically valid manner, *would encompass review of nearly the entire population of loans*. Thus, the entire premise that "sampling" somehow provides the most efficient and economical approach to adjudicating this case is simply untrue.

To the contrary, a much more valid and manageable approach would be to: (1) define the potentially actionable loan population, which should exclude, without limitation, paid-in-full loans, loans that are current in their payments, as well as charged-off loans (for which no cure or repurchase remedy exists as previously briefed for the Court); (2) perform individual loan review; (3) determine whether a material and continuing breach is present; (4) notify Flagstar to cure or repurchase any such loans; and (5) if Flagstar fails to do so; (6) pursue a claim for damages. Not only would this process distill the issues to be presented at trial, it would also be consistent with the exclusive remedy by which Insurer is bound under the Transaction Documents, as previously ruled by this Court in its July 7, 2011 Order on Flagstar's Motion to Dismiss. While Insurer claims that "Flagstar's rights in no way would be impinged by granting the current motion," Insurer fails to reconcile how its request for sampling is consistent with the cure and repurchase provisions set forth in the Transaction Documents, which contemplate a loan-by-loan review and remedy. Insurer's motion is flawed on numerous grounds and should be denied.

## FACTUAL BACKGROUND

### A.    The 2005-1 and 2006-2 Securitizations

In 2005, Flagstar Bank, FSB (in conjunction with Flagstar Capital Markets Corporation, and Flagstar ABS, LLC, collectively "Flagstar") collaterized 8,155 home equity line of credit

loans ("HELOCs")[1] into the Flagstar Home Equity Loan Trust 2005-1 ("2005-1 Trust").  *See* Decl. of Veronica E. Rendón, dated May 23, 2011 ("Rendón 5/23/11 Decl.") (attached hereto as Exhibit 1), Ex. D, Flagstar Home Equity Loan Trust 2005-1 Offering Circular, p. 9.  In 2006, Flagstar completed a second non-agency securitization backed by 4,186 HELOCs.  *See* Rendón 5/23/11 Decl., Ex. F, Flagstar Home Equity Loan Trust 2006-2 Offering Circular, p. 2.[2]  Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc. ("Insurer"), issued policies guaranteeing certain payments of principal and interest to the holders of the notes issued in the 2005-1 Trust and 2006-1 Trust (collectively, the "Trusts").  *See* Rendón 5/23/11 Decl., Ex. A, Compl. ¶ 2.  In return, Insurer is paid a premium out of the cash flows generated by the underlying mortgages in the Trusts.  *See* Rendón 5/23/11 Decl., Ex. G, Flagstar Home Equity Loan Trust 2006-2 Indenture ("2006-2 Indenture"), § 8.03.

### B.    The Trusts' Performance to Date and Implications for Sampling

While Insurer goes to great lengths to imply the two securitizations at issue are problematic, Insurer consistently avoids mention of loan performance, which paints a very different picture.  In fact, the majority of loans have been paid-in-full, and a majority of the remaining, active loans are current in their payments.

Based on reports provided to Flagstar by the company currently servicing the securitization trusts, the vast majority of the collateralized loans are either currently performing or have already been paid-in-full.  As discussed in the declaration of expert statistician Brendan

---

[1]  This brief will use the defined terms as set forth in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed May 23, 2011.

[2]  As contemplated by the Transaction Documents and as disclosed in the Offering Circulars, Flagstar collaterized additional loans after the close of the Transactions.  *See* Rendón 5/23/11 Decl., Ex. M, Flagstar Home Equity Loan Trust 2006-2 Purchase Agreement ("2006-2 MLPA"), §2.01(b).  There are approximately 15,610 loans total in both of the Transactions.  *See* Declaration of Brendan P. Burke, dated August 8, 2011 ("Burke Decl."), ¶ 6.

Burke, of the 10,028 loans comprising the 2005-1 Trust, 6,303 — or nearly 63% —have been paid-in-full as of June 2011.  *See* Burke Decl. ¶ 17.  An additional 2,767 loans are still active, of which 2,650 were current in their payments as of June 2011.  *Id.*  Moreover, of the 5,586 loans which were collateralized in the 2006-2 Trust, 2,164 loans — or nearly 40% — have been paid-in-full as of June 2011, another 2,171 are still active, and 2,053 are current in their payments as of June 2011.  *Id.*  Thus, contrary to Insurer's characterizations of egregious underwriting, in reality, the two Trusts have performed relatively well after a significant period of time, despite a deep recession that has affected all corners of the economy, caused historic levels of unemployment and otherwise rocked the housing industry.

More importantly, these performance statistics demonstrate that Insurer's claim that this Court has the option of permitting sampling or deciding whether material and continuing breaches exist on 15,610 loans — the evidentiary showing that Insurer must meet in order to establish a claim[3] — is without foundation.

Most obviously, Insurer cannot claim the existence of material and continuing breaches on the 8,467 loans that have paid-in-full.  The elimination of just those loans alone reduces the population of potentially actionable loans by 54%, to 7,143.  If one were to further discount the loan population by the 4,708 loans that are current in their payments — because any breach that may have occurred five years ago at the time of origination can hardly be characterized as material and continuing — reduces the potentially actionable loans to a mere 2,435 loans.  If one

---

[3]  *See* Rendón 5/23/11 Decl., Ex. N, Sale and Servicing Agreement of the Home Equity Loan Asset Backed Notes, Series 2006-2 ("2006-2 SSA"), § 2.04(c) (parties must notify one another of any breach that "*materially and adversely* affects the interests of the Issuer, the Indenture Trustee under the Indenture, the Noteholders or the Note Insurer in the Mortgage Loan") (emphasis supplied);  Rendón 5/23/11 Decl., Ex. M, 2006-2 MLPA § 3.02(c) (Insurer's sole remedy is Flagstar's obligation, "subject to certain cure periods, to accept a transfer of a Mortgage Loan to which a breach has occurred *and is continuing*") (emphasis supplied).

were to further reduce this loan population by the 2,180 loans that are charged-off because, as previously addressed in Flagstar's Motion to Dismiss and further discussed below, Insurer has no remedy with respect to that loan population, the potentially actionable loan population becomes a mere 264 loans.

### C.     Insurer's Pre-Litigation Review of Charged-Off Loans

Insurer claims that in 2008 it "investigated a sample of loan files it had received from Flagstar and identified significant breaches in the 'vast majority of the loans'" it audited.  Mem. of Law in Support of Pl.'s Mot. *In Limine* Regarding the Use of Sampling ("Pl.'s Mot.") at 3. Insurer never quantifies its claim, however, notwithstanding its review was not a scientific sampling of loans and encompassed only charged-off loans.  *See* Rendón 5/23/11 Decl., Ex. A, Compl. ¶ 41.  Insurer has never alleged that it investigated non-charged-off loans, nor has it done so.

In connection with the charged-off loans it reviewed, Insurer claims that in January 2009 and July 2010, it requested that Flagstar repurchase over 900 loans from the loan files it had reviewed, and that Flagstar refused to repurchase any of the loans.  Pl.'s Mot. at 3.  Insurer fails to mention that Flagstar replied in great detail and supplied Insurer with voluminous materials that Flagstar believed cured the claimed deficiencies.  *See* Rendón 5/23/11 Decl., Ex. L, Ltr. Fm. J. Sopha to L. Kobrin dtd. Nov. 30, 2010.  After its submissions, Flagstar never heard back from Insurer, nor did it receive notification of continuing, material breaches; it did not receive a Notice of Event of Default; it did not get a notice of retransfer of defective loans; nor did it receive notice of a calculated Transfer Deficiency and Transfer Deposit Amount from the Indenture Trustee, as required under the Transaction Documents.  *See* Flagstar's Mem. Of Law in Supp. of Mot. to Dismiss ("Flagstar Mot. to Dismiss") at 6-7, 10.

As set forth in Flagstar's Motion to Dismiss, this is likely due to the fact that under the plain language of the Transaction Documents, Insurer is not entitled to the repurchase or cure of any charged-off loans, and as such, cannot attribute any damages to the charged-off loan population. *See* Flagstar Mot. to Dismiss at 10-11; Flagstar's Reply Mem. of Law in Supp. of Mot. to Dismiss at 3, 7; Rendón 5/23/11 Decl., Ex. N, 2006-2 SSA, §2.07(a); Rendón 5/23/11 Decl., Ex. O, Glossary of Defined Terms, at 2, 13, 19-20, 27.  Briefly stated, under the plain language of the Transaction Documents, the Asset Balance of a charged-off loan is "zero," since no further payments are expected on charged-off loans.  *See* Rendón 5/23/11 Decl., Ex. O, Glossary of Defined Terms, at 2.  In turn, the Transfer Deficiency of a charged-off loan — the amount Flagstar must pay into the Trusts, and which is directly based on the loan's Asset Balance—must also equal "zero."  *Id.* at 19-20 & 27.  It follows  that the Trustee would not require Flagstar to pay any Transfer Deposit Amount into the Trusts, so that Insurer cannot claim any damages resulting from Flagstar's failure to do so.  *See* Flagstar Mot. to Dismiss. at 10; Rendón 5/23/11 Decl., Ex. N, 2006-2 SSA, §2.07(a).  For this reason, the charged-off loan population should not be included in the pool of potentially actionable loans.

As noted above, when the charged-off loan population is excluded from the pool of potentially actionable loans, the number of loans to be reviewed and potentially tried is reduced to 264, an undisputedly smaller amount of loans than any sample Insurer may propose at a future point in time.

### D.   Insurer's Complaint, Flagstar's Motion to Dismiss, and This Purported Motion *In Limine*

Insurer filed this suit on April 7, 2011.  On July 7, 2011, the Court granted in part Flagstar's Motion to Dismiss.  The Court dismissed Counts 3 and 4 of the Complaint, which sought reimbursement and indemnification under the Transaction Documents, and held that

Insurer's "remedies with respect to its remaining [breach of contract] claims are limited to those related to enforcing Flagstar's 'cure or repurchase' obligations set forth in the Transaction Documents."  Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, et al.*, 11-CV-2375, at 1-2 (July 7, 2011) ("July 7, 2011 Order") (citing Rendón 5/23/11 Decl., Ex. M, 2006-2 MLPA, § 3.02(c)). This provision anticipates an individual loan-level review and cure process that is inconsistent with Insurer's broad and undefined request for sampling.  This is particularly true because Insurer fails to explain how its request for sampling can be harmonized with the exclusive remedy provisions of the Transaction Documents.

Indeed, very little about Insurer's request for sampling can be understood from Insurer's motion.  In its moving brief, Insurer repeatedly concedes that it is *not* "seeking this Court's final approval as to the <u>particular</u> sampling methodology that [it] intends to use at trial," Pl.'s Mot. at 2 (emphasis in original), and that it is *not* addressing the admissibility of any specific evidence, but that at some point in the future, the parties will "ultimately present the Court with their specific methodologies for proving damages."  Pl.'s Mot. at 9.  "The only question here is whether the general approach is sound in the context of this case."  Pl.'s Mot. at 2.  Such a generalized request, however, is improper and does not constitute a motion *in limine* upon which the Court can issue a ruling.

## ARGUMENT

### A.     The Requested Relief Is Vague and Improper

Insurer's present motion is not a proper motion *in limine*.  "The purpose of a motion *in limine* is to enable the Court to rule on disputes over the admissibility of discrete items of evidence."  *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003) (citation omitted); *see also United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y.

7

2002) ("The purpose of a motion *in limine* is to allow the trial court to rule in advance on the admissibility and relevance of certain forecasted evidence.").  It is not meant to function as a "preemptive weapon[ ] with which [a party may] endeavor to strike in shotgun fashion at whole topics and sources of prospective evidence … ."  *TVT Records*, 250 F. Supp. 2d at 344.  Nor is it a means to advise a party on *how* to best present its evidence at trial.  Insurer does not cite to any authority to the contrary, but simply notes that "[e]ither party may file a permissive motion *in limine* seeking an order of admissibility and/or inclusion of certain disputed evidence at trial."  Pl.'s Mot. at 5 (citing Henry R. Rosenblatt & David H. Leroy, *Motion in Limine Practice*, 20 Am. Jur. *Trials* 441, § 6 (2010)).

In requesting the Court to issue an order "approving [Insurer's] use of sampling in this case," Pl.'s Mot. at 14, Insurer admits that it is not seeking a ruling on the admissibility of evidence gained from any specific sampling process.  Instead, it simply asks "whether a sampling approach is permissible in the first place."  Pl.'s Mot. at 13.  Plaintiff's request for the Court's blessing to sample, without addressing the admissibility of any specific evidence, is not properly presented in a motion *in limine*.  Further, Insurer's requested relief is far too vague and ambiguous to be considered a proper motion *in limine*.  For that reason alone, the motion should be denied.

In essence, Insurer requests an advisory opinion on how to manage its experts and present its case at trial.  For the same concerns that caution courts against issuing advisory opinions, this Court should deny Insurer's motion.  *See Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 590 F. Supp. 187, 193 (S.D.N.Y. 1984) ("[T]he requirements of justiciability are not met if the complainant merely alleges that he is at a loss to know what course to pursue.") (citation and internal quotation marks omitted); *see also Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S.

227, 240-41 (1937) (a justiciable controversy "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts").  Here, Insurer does not even present a clear picture of what it hopes to gain from the Court's determination that "the general approach is sound in the context of this case."  Pl.'s Mot. at 2.  Even if Insurer is permitted to sample using some as-yet-undetermined methodology by an as-yet-unqualified expert, Insurer recognizes that Flagstar will then have the right to challenge that methodology and expert testimony.  *See* Pl.'s Mot. at 13.  Thus, Insurer has not shown that it will gain anything from the present motion, aside from reassurance that its evidentiary strategy *might* be held acceptable at some point down the road.  Without a full understanding of how Insurer intends to conduct the sample and how specifically it intends to use the results at trial, the Court cannot determine whether the general process of sampling will be useful or is even appropriate in this case.  As Insurer concedes, Insurer is seeking an opinion on "whether the general approach is sound in the context of this case," (Pl.'s Mot. at 2); is not "seeking this Court's final approval as to the particular sampling methodology," (*id.* (emphasis in original)); and will "ultimately present the Court with [its] specific methodologies for proving damages."  *Id.* at 9.  In this set of circumstances, the Court should abstain from ruling without having a crystallized issue before it.

Indeed, the authority cited by Insurer undermines its own argument.  The plaintiff in *Republic Services, Inc. v. Liberty Mutual Insurance Co.*, No. Civ. A. 03-494-KSF, 2006 WL 2844122 (E.D. Ky. Oct. 2, 2006), sued the defendant insurer for improper management of the plaintiff's worker's compensation program, and employed an expert statistician to sample 187 of the 745 total claims to determine breach and damages.  *Republic Servs., Inc.*, 2006 WL 2844122, at *1.  The plaintiff thereafter moved the court to take judicial notice that the expert was

qualified and that his sampling methodology provided a sufficient representation of the total

claim population for purposes of proving breach.  *Id.* at *2.  While the court found that a review

of the entire population would be "unduly burdensome," the court declined to take judicial notice

as requested by the plaintiff.  *Id.*  The court held that the plaintiff "is entitled to organize its proof

at trial in any manner allowed by the Federal Rules of Evidence.  The [defendant] may challenge

the admissibility, methodology and qualifications of [the plaintiff's] experts and the statistical

sampling method employed and results obtained during cross-examination and during

presentation of its defense. "  *Id.* at *2.  Preemptive judicial notice, however, was neither

necessary nor advisable.  *Id.*; *see also In re Pfizer, Inc. Secs. Litig.*, 584 F. Supp. 2d 621, 634

(S.D.N.Y. 2008) (declining to take judicial notice of the meaning of "statistical significance").

Here, Insurer's request is even more nebulous and its sought-after relief even less meaningful —

Insurer has neither identified an expert nor proposed a valid methodology for sampling the loan

population at issue.

### B.  Plaintiff Has Not Presented The Principles and Methods By Which It Would Sample Nor Made Any Effort to Demonstrate Admissibility

The Federal Rules of Evidence permit the use of expert testimony to "assist the trier of

fact to understand the evidence or to determine a fact in issue … if (1) the testimony is based

upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed.

R. Evid. 702.  A trial court charged with determining whether an expert will assist the trier of

fact must make "a preliminary assessment of whether the reasoning or methodology underlying

the testimony is scientifically valid and of whether that reasoning or methodology properly can

be applied to the facts in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93

(1993); s*ee also Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) ("[R]eliability

10

within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions."); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

In its motion, Insurer itself acknowledges, "Sampling is appropriate proof *if* the sampled population is properly chosen and defined, the sample chosen is representative of that population, the data gathered regarding the sample are accurately reported, and the data are analyzed in accordance with accepted statistical principles." Pl.'s Mot. at 6 (citing Federal Judicial Center, *Manual for Complex Litigation* §11.493 (4th ed. 2010) (emphasis supplied)). As further stated by Insurer, "In fact, New York federal and state courts frequently have permitted the use of sampling to prove both liability and damages, *provided that* the sample is representative of the total population *and the product of reliable statistical methods*." Pl.'s Mot. at 6 (citing various authorities) (emphasis supplied).

Nonetheless, Insurer makes no effort to set forth the principles and methods by which it would attempt to sample, nor has it explained the reasoning or methodology underlying its proposed expert testimony. Rather, according to Insurer "[t]he only question here is whether *the general approach* is sound in the context of this case," Pl.'s Mot. at 2, notwithstanding that such a generalized approach is in direct contravention of the exact inquiry the Court must make in order to decide whether to permit sampling.

Moreover, while Insurer talks generally about how a proposed sample will be developed by "an expert statistician," Insurer openly admits that it "is <u>not</u> presently requesting that the Court give approval to any particular sampling methodology," and claims that "[t]he only

11

question is whether a sampling approach is permissible in the first place …. If this motion is granted, plaintiff will furnish Flagstar with its expert report and proposed methodology in the course of discovery, and if Flagstar chooses to challenge the reliability of [Insurer's] expert's methods, it may file a motion *in limine* at the appropriate time before trial." Pl.'s Mot. at 13. But, this two-step approach demonstrates the futility and inappropriateness of the current motion. How can this Court possibly "issue an order approving of statistical sampling as a method of presenting evidence at trial of Flagstar's liability and the damages sustained by [Insurer]," Pl.'s Mot. at 4-5, without having in front of it the proper evidence and submissions that would permit it to make the requested ruling? Essentially, Insurer wants the Court to order its requested relief now, based on nothing more than a promise to make the proper evidentiary showing at some future point in time. That is, however, putting the cart before the horse. Insurer has neither presented a sound methodology for its proposed sampling, nor even named the "statistics expert" who will conduct the sample and extrapolate therefrom. Without this showing, the motion should be denied.

This is additionally true because Insurer's reliance on the recent New York Supreme Court decision in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2010 WL 5186702 (Sup. Ct. N.Y. Co., Dec. 22, 2010) is misplaced. Similar to this case, MBIA submitted a motion *in limine* seeking permission to utilize sampling at trial. As the *MBIA* decision demonstrates, however, Justice Bransten permitted MBIA to "use statistical sampling to present evidence to prove its causes of action for fraud and breach of contract and to prove damages" only after extensive briefing by both parties, consideration of both parties' proffered expert opinions, and multiple evidentiary hearings in which the plaintiff's expert testified to his proposed methodology, and was subject to cross-examination and rebuttal by defendant. *See*

*MBIA Ins. Corp.*, 2010 WL 5186702, at *1. The court relied on the plaintiff's expert's testimony in concluding that the methodology was provisionally acceptable, citing to the sections of his affidavit which established the specific design of his intended sampling analysis. *Id.* at *5. The court then reviewed the testimony of the defense experts, finding that it raised "significant valid challenges to Plaintiff's methodology," but ultimately holding that it addressed "the weight, rather than the acceptability, of the evidence." *Id.* at *5. The court noted, however, that it made "no finding that Plaintiff's method is the only method by which Plaintiff (or Defendant) may present evidence or that Plaintiff's method is without flaw or unsusceptible to challenge." *Id.*

In sharp contrast, Insurer asks this Court to issue an order permitting sampling without identifying an expert or even proposing a methodology, much less providing the Court with the proper evidentiary submissions to permit it to render a ruling. Insurer here purports to emulate the *MBIA* plaintiff by claiming that its "methodology is precisely the same as that which Justice Bransten accepted for use at trial." Pl.'s Mot. at 12. To the contrary, the differences between Insurer's approach and the detailed plan advanced by MBIA only undermine Insurer's argument. Insurer wishes to emulate the outcome in *MBIA* without emulating the work performed by MBIA to justify that outcome.

Moreover, Insurer cannot make it's showing by claiming that if sampling is permitted in MBIA, it should be permitted here, too. *MBIA* involves claims against Countrywide, a different financial institution, which underwrote to its unique standards and involves entirely different loan populations than are at issue here. And, prior to bringing its claims, MBIA conducted a comprehensive review of the loans, including non-charged-off loans, and alleged that 91% of the defaulted or delinquent loans in the 15 securitizations contained material discrepancies from the defendant's underwriting guidelines. *See* Kuhn Decl., Ex. A, *MBIA Insurance Corp. v.*

13

*Countrywide Home Loans, Inc.,* First Am. Compl. ¶ 80. Based on that prelitigation review, MBIA brought claims for fraud in addition to breach of contract, and MBIA sought to use sampling primarily to support its allegations of *scienter* in relation to its fraud claims, in addition to its claim for breach of contract. As this Court knows, no fraud claim has been alleged here, nor could it be.

Moreover, MBIA's claims against Countrywide related to over 368,000 loans across 15 different securitizations. *See* Kuhn Decl., Ex. B, *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, Pl.'s Mot. *In Limine*, Apr. 30, 2010, at 1. Even after the court permitted sampling, MBIA had to review 400 loans from each of the 15 securitizations — a total of 6,000 loans. *MBIA Ins. Corp.*, 2010 WL 5186702, at *5. The loan population that is at issue here is substantially more limited and does not even begin to approach the magnitude of the population in *MBIA*. And, as discussed below, loans are not commodities in which "one size fits all."

### C. Any Appeal to Efficiency Is Illusory

#### 1. Insurer Materially Overstates the Size of the Loan Population at Issue

Insurer presents the Court with a false dilemma: either permit sampling (however abstract), or "conduct individual trials on up to 15,610 individual loans." Pl's. Mot. at 4. This second option, Insurer threatens, may force the parties to move for a continuance of the trial date. Pl.'s Mot. at 13. Even if such a threat were appropriate, Insurer misconstrues the true population of loans at issue here. As discussed above, Insurer cannot claim the existence of material and continuing breaches on the vast majority of the 15,610 loans in the two Trusts. If one were to distill the total loan population to only those for which a colorable claim for material and ongoing breach can be said to exist, the remaining loan population is more than manageable, and appropriately subject to individual loan review and potential dispute. Not only is this a more

manageable approach, it is also clearly consistent with the exclusive remedy of cure or repurchase under the Transaction Documents.

In considering how to distill the loan population, the performance statistics for the two Trusts should be taken into account. First, of the approximately 15,610 loans, at least 8,467 loans (well over half) have already been paid-in-full. Burke Decl. ¶ 17. Paid-in-full loans need not be included in Insurer's review, as any breach of a representation and warranty ("R&W") could not have "materially and adversely" affected the Insurer's interest or caused Insurer any damages. Under the Transaction Documents, any Transfer Deficiency is calculated based on the loan's unpaid principal balance, which for a loan that has been entirely paid off must logically equal zero. *See* Rendón 5/23/11 Decl., Ex. O, Glossary of Defined Terms, at 2, 27. To conduct "individual trials" on these 8,467 loans that cannot possibly result in a loss to Insurer would be nonsensical and unnecessary. These loans are therefore not at issue.[4] Eliminating these loans, reduces the potentially actionable loan population by nearly 55% to only 7,147 loans.

Second, an additional 4,938 loans are still active, of which 4,703 were current in their payments as of June 2011. *See* Burke Decl. ¶ 17. Insurer's ability to claim a material and continuing breach on loans that were originated approximately five years ago, have gone through a significant economic and broad-ranging downturn and which are nonetheless current in their payments, is remote to non-existent. A default now on the underlying loan, logically, cannot be attributed to a five-year-old breach of a representation or warranty, even if demonstrably false at the time. Thus, these loans should also be excluded from the population of potentially actionable

---

[4]  Should Insurer be permitted to proceed by sampling, however, these loans must be included in the sampled  population.  Otherwise the results of such a sample necessarily would be skewed by changing the denominator of any statistical ratio.

loans.  If one were to deduct the 4,703 loans that are current in their payments, the number of potentially actionable loans is further reduced to a mere 2,444 loans.

Finally, a total of approximately 2,180 loans had been "charged-off" as of June 11, 2011. Burke Decl. ¶ 17.  If one were to further reduce the potentially actionable population by the 2,180 loans that are charged-off because, as previously addressed in Flagstar's Motion to Dismiss and discussed above, Insurer has no remedy with respect to that loan population, the potentially actionable loan population becomes a mere 264 loans.

In sum, at most, the heart of this dispute concerns loans that have gone into delinquency and are no longer performing, which as of June 11, 2011, is 264 loans.  Rather than order sampling of the entire 15,610 loan population, which is an onerous, expensive and time consuming exercise in and of itself, a much more efficient approach to trial would be to filter out fictitious disputes on non-actionable loans and crystallize disputes on the remaining loan population, adopting a loan review process required by the Transaction Documents.

2.      To Be Statistically Significant, the Sample Size Here Will Have To Comprise a Large Volume of Loans, Thus Decreasing Efficiency

Even if sampling were used here, in order to derive a statistically valid sample Insurer would have to review the vast majority of the loans at issue.  Insurer itself recognizes that the loans in the Transactions are not homogeneous, that the "applicable underwriting and servicing guidelines for these loans went through multiple revisions during the period in which these loans were originated and serviced by Flagstar," and that "the parties will need to determine the accuracy of more than 30 data fields in the Mortgage Loan Schedules."  Pl.'s Mot. at 4.  Rather than supporting sampling, these factors demonstrate why such analysis will not be appropriate here. *See* Burke Decl. ¶¶ 10-12.  Further, any statistically valid sample that represents all of the unique combinations of these various factors and that would allow Insurer to reliably extrapolate

16

the samples' characteristics to the entire pool would encompass nearly all of those loans.  *See* Burke Decl. ¶ 19.

Consider the limited allegations made with respect to one portion of the charged-off loan population.  On January 13, 2009, Insurer wrote Flagstar, alleging various breaches in a total of 196 charged-off loans.  *See* Rendón 5/23/11 Decl., Ex. I, Ltr. Fm. E. Uhr to Flagstar Bank, dtd. Jan. 13, 2009.  Insurer identified, at a categorical level, 88 distinct types of claimed deficiencies. Burke Decl. ¶ 15.  In many instances, Insurer claimed that a single loan contained multiple alleged deficiencies.  *Id.*  With respect to this limited population of only 196 loans, Insurer made a total of 957 individual loan-specific claims referencing 13 different sections of the MLPA. Burke Decl. ¶ 16.  Insurer identified 191 unique combinations of categorical claims and corresponding alleged breaches.  Burke Decl. ¶ 16.  Accordingly, Insurer's own analysis suggests that virtually no two loans are the same, even before accounting for what Insurer has identified as "key loan characteristics," including such variables as geographic area, combined loan-to-value ratio, payment status, gross coupon rate, loan purpose, and original loan amount. Pl.'s Mot. at 12.[5]  These are but a few of the "the hundreds of thousands of data fields on the Mortgage Loan Schedules" referenced by Insurer in its present motion.  Pl.'s Mot. at 4.

Given the variables among Insurer's limited loan population, its assertion that "it is a virtual certainty that a substantial percentage of the remaining 14,710 total loans in the securitizations have similar breaches" to those alleged in its notices should not be countenanced. Pl.'s Mot. at 3.  In fact, Insurer's failure to identify "similar [alleged] breaches," according to its own categorizations and within the limited loan population it has reviewed to date, belies this

---

[5]  Insurer notes that payment status is a crucial variable when discussing the characteristics of a given loan, but fails to mention that the payment status of the securitized loans is overwhelmingly strong.  *See supra* at 15-16.

17

assertion.  Given the scores of different alleged breaches purportedly identified by Insurer's own limited review, Insurer has completely failed to demonstrate that a statistically valid sample would in fact "conserve the time and resources of the parties and the Court, and result in an efficient disposition" of this matter.  Pl.'s Mot. at 1.

### D.    The Use of Sampling to Prove Breach and Damages Would Violate the Exclusive Remedy Provisions of the Transaction Documents

Following consideration of Flagstar's Motion to Dismiss, the Court has explicitly limited Insurer's remedies "to those related to enforcing Flagstar's 'cure or repurchase' obligations set forth in the Transaction Documents."   July 7, 2011 Order at 2 (citing Rendón 5/23/11 Decl., Ex. M, 2006-2  MLPA, § 3.02(c)).  As established by the Transaction Documents, the cure-or-retransfer process must necessarily occur on a loan-by-loan basis.  While Insurer half-heartedly attempts to reargue its opposition to Flagstar's Motion to Dismiss, it makes no effort to reconcile the Court's ultimate decision with its proposed use of sampling.  Pl.'s Mot. at 11.

Under the sole remedy provision recently upheld by the Court, if any party "discovers" a breach of the loan-level R&Ws that "materially and adversely affects the interests of the Issuer, the Indenture Trustee under the Indenture, the Noteholders, or the Note Insurer in the Mortgage Loan, the party discovering the breach shall give prompt notice to the other parties."  Rendón 5/23/11 Decl., Ex. N, 2006-2 SSA, § 2.04(c).  Flagstar must "use all reasonable efforts to cure in all material respects any breach [of an R&W]…within 90 days of becoming aware of it," or must accept a retransfer of the breaching loan.  *Id*. at § 2.04(d).  The Trustee then calculates any deficiency which Flagstar must deposit into the Trust.  *Id.* at § 2.07(a).  This is the process to which Insurer agreed in signing the Transaction Documents, and to which it is held pursuant to the Court's July 7, 2011 Order.

The use of sampling will be ineffective to prove either that Flagstar has breached its obligations under the contracts or that Flagstar owes Insurer a specific amount in monetary damages.  It also will be ineffective for determining which loans, if any, are subject to retransfer to Flagstar, an important consideration.  Additionally, no matter what Insurer's sample ultimately might demonstrate with regard to the total number of purported breaches, sampling will not be able to show when an alleged breach was "discovered."  Additionally, Flagstar would still be entitled to a 90-day cure period for *each individual breaching loan*.  Only thereafter would the Trustee, and not the Insurer, calculate the amount, if any, that Flagstar must pay into the Trust, and retransfer the loan back to Flagstar.  This process simply cannot be performed via sampling the entire loan population and extrapolating therefrom, nor does Insurer attempt to argue otherwise.

Insurer instead tries to revisit issues that have already been fully briefed and addressed by this Court, by claiming that sampling will "demonstrate the pervasiveness of Flagstar's breaches, and will show that Flagstar…became aware of these pervasive breaches long before this action was filed or [Insurer] made a single specific repurchase request."  Pl.'s Mot. at 10.  To the extent that Insurer seeks to prove constructive knowledge of breaches across the loan pools via sampling, the concept of constructive knowledge is totally absent from, and in fact contradicted by, the Transaction Documents.  The cure and repurchase remedy, to which both parties agreed, was designed to remediate any issues at the loan level.  *See* Rendón Decl., Ex. N, 2006-2 SSA, § 2.04(d) (providing that Flagstar will make reasonable efforts to cure any continuing and material breach of a loan-level R&W); *id.* at § 2.07(a) (providing mandatory process and formula by which Indenture Trustee calculates a Transfer Deficiency).

19

Moreover, unlike in the *MBIA* lawsuit discussed above, there is no allegation of fraud in this action.  Scienter is not at issue in this breach of contract case, and Insurer's futile attempt to imply some level of fraud is improper now, as it was at the motion to dismiss stage.  *See* Flagstar's Mot. to Dismiss at 2.  Whether Flagstar "became aware" of a breach as to any individual loan is a distinct factual issue that is not presently before the Court.  The use of sampling will be ineffective to prove that Flagstar has breached its obligations under the contracts, that Flagstar owes Insurer a specific amount in monetary damages, which specific loans are subject to retransfer, and whether Flagstar "discovered a purported breach," an inherently factual question not subject to sampling and extrapolation.

20

## **CONCLUSION**

For the many reasons set forth above, this Court should deny Insurer's request for an ill-defined and over-reaching order approving the general use of sampling.

Dated: August 8, 2011
      New York, New York

                ARNOLD & PORTER LLP


                By:   /s/ Veronica E. Rendón
                      Veronica E. Rendón
                      Daniel M. Kuhn
                      Monique A. Gaylor
                      Mary E. Sylvester
                      399 Park Avenue
                      New York, New York  10022
                      Tel:  (212) 715-1000
                      Fax:  (212) 715-1399
                      veronica.rendon@aporter.com
                      daniel.kuhn@aporter.com
                      monique.gaylor@aporter.com
                      mary.sylvester@aporter.com

                      *Attorneys for Defendants Flagstar Bank, FSB,*
                      *Flagstar Capital Markets Corporation and Flagstar*
                      *ABS, LLC*