## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ASSURED GUARANTY MUNICIPAL CORP.,
f/k/a FINANCIAL SECURITY ASSURANCE
INC.,

               Plaintiff,

   vs.

FLAGSTAR BANK, FSB; FLAGSTAR
CAPITAL MARKETS CORPORATION; and
FLAGSTAR ABS, LLC,

               Defendants.

Case No. 11–CV–2375



## PLAINTIFF'S FIRST AMENDED COMPLAINT

Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc. ("AGM" or the "Note Insurer"), through its attorneys Susman Godfrey LLP, alleges as follows.

### NATURE OF ACTION

1.    AGM brings this suit against Flagstar Bank, FSB ("Flagstar Bank," "Bank," or the "Seller"), Flagstar Capital Markets Corporation ("FCMC"), and Flagstar ABS, LLC ("Flagstar ABS" or the "Depositor") (collectively, the "Flagstar Entities" or "Flagstar") for breach of contract, reimbursement and indemnification under New York law.

2.    AGM is a leading provider of financial guaranties and credit enhancement products to investors, financial institutions, and other participants in the global capital markets. In 2005 and 2006, the Flagstar Entities requested that AGM provide financial guaranty insurance policies ("Policies") for nearly one billion dollars in securities backed by thousands of home equity loans. The Policies guaranteed certain payments of principal and interest to the securities holders.

- 1 -

3.      In connection with these Policies, the Flagstar Entities made a number of explicit contractual representations concerning the home equity loans underlying the securities, the accuracy of information provided with regard to those loans, the origination and underwriting of the loans, and the related mortgagors and mortgaged properties. The Flagstar Entities promised that (amongst other things) the loans were originated in accordance with Flagstar's underwriting guidelines, and that the loan files were complete and contained all documentation needed to (amongst other things) verify the quality and characteristics of the loan, the mortgagor, and the mortgaged property. They also promised that the loans were not originated through fraud, misrepresentation, error, omissions, or negligence. The Flagstar Entities breached each of these representations and warranties.

4.      The Flagstar Entities' representations and warranties were crucial to AGM's decision to issue the financial guaranty policies. Loans with substandard characteristics, or which lack critical documentation, bear a higher expected default rate, and upon default, bear a higher expected loss. Such loans thus pose a higher risk to insurers such as AGM. AGM relied on the truth and accuracy of the Flagstar Entities' contractual representations and the remedies provided in the transaction documents for breach of those representations in agreeing to provide insurance. AGM has paid out millions under the Policies on account of certain shortfalls in payments to security holders, which resulted from shortfalls in payments made on the underlying mortgage loans. Those loans were originated in violation of Flagstar's underwriting guidelines, and/or through fraud, misrepresentation, error, omission or negligence.

5.      Notwithstanding contractual requirements to cure these breaches or repurchase the related defective loans, the Flagstar Entities have refused to honor their obligations, and Flagstar's contractual cure or repurchase period has expired.

6.     Flagstar promised that "[t]he representations and warranties of [the Flagstar Entities] in this Agreement," including the entirety of the representations concerning the characteristics and documentation supporting the loans, "shall be true and correct in all material respects." 2005-1 Insurance and Indemnity Agreement ("2005-1 I&I") § 2.01(k). In fact, Flagstar's promise was an express condition precedent to the issuance of the Policies. 2005-1 I&I §3.01, and Appendix A. Flagstar's representations were false. Because the representations were false, the Flagstar Entities have breached their agreements with AGM and are liable for all damages resulting from their breach.

7.     As of July 26, 2011, the 2005-1 securitization transaction already has suffered more than $69.3 million in collateral losses, resulting in more than $14.7 million in insurance claims paid by AGM. Similarly, as of July 26, 2011, the 2006-2 securitization transaction already has suffered more than $129.8 million in collateral losses, resulting in more than $72.3 million in insurance claims paid by AGM.

8.     Flagstar fundamentally frustrated the parties' bargains through its material and pervasive breaches of its representations and warranties, its contractual loan-level repurchase obligations, other conditions precedent and covenants, and the parties' contracts as a whole. Flagstar's breaches have inflicted and continue to inflict tremendous harm on AGM, including AGM's payment of the aggregate $87 million in claims in the two securitization transactions (collectively, the "Transactions"), and potentially tens of millions of dollars more in claims AGM may be required to pay in the future. AGM brings this action to address this harm.

9.     AGM also seeks reimbursement and indemnity for all of its costs, expenses, and losses resulting and that may in the future result from the Flagstar Entities' breaches, including Policy claim payments, related expenses, and attorneys' fees.

- 3 -

## THE PARTIES

10.    AGM is a New York corporation with its principal place of business at 31 West 52nd Street, New York, New York 10019.

11.    Flagstar Bank is a federally chartered savings bank organized under the laws of the state of Michigan with its principal place of business at 5151 Corporate Drive, Troy, Michigan 48098.

12.    FCMC is a Delaware corporation and wholly owned subsidiary of Flagstar Bank. Its principal place of business is at 5151 Corporate Drive, Troy, Michigan 48098.

13.    Flagstar ABS is a Delaware corporation and wholly owned subsidiary of FCMC. Its principal place of business is at 5151 Corporate Drive, Troy, Michigan 48098.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

15.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2) and 1391(a)(3) and as contractually agreed to by the parties in this action.

## FACTUAL ALLEGATIONS

16.    This case involves nearly one billion dollars in home equity loan backed securities sponsored by Flagstar in 2005 and 2006.  Through the Policies, AGM guaranteed certain payments of principal and interest on the securities.  AGM brings this suit because Flagstar Bank, FCMC, and Flagstar ABS breached their representations, warranties, and obligations— including, but not limited to, their obligations to administer and service the home equity loans underlying the securities—under the 2005-1 I&I, the 2006-2 I&I and related Transaction Documents (as defined therein), causing AGM significant and continuing injury.

- 4 -

**Flagstar Home Equity Loan Trust 2005-1**

17.    In late 2005, defendant Flagstar Bank sponsored $600 million in securities backed by home equity loans it had originated or purchased.  AGM agreed to issue a financial guaranty insurance policy related to the securities based on explicit representations by Flagstar Bank and the other defendants as to the loans backing those securities.

**2005-1 Mortgage Loan Purchase Agreement**

18.    Through a Mortgage Loan Purchase Agreement ("2005-1 MLPA") dated December 8, 2005, Flagstar Bank sold a pool containing thousands of home equity loan mortgages to Flagstar ABS.

19.    In contracting with AGM to offer insurance on the securities, Flagstar Bank made a number of representations concerning the quality and characteristics of the loans underlying the transaction.  These representations were materially false, and, based on information obtained by AGM on samples of loans to date, the misrepresentations affected the overwhelming majority of loans in the portfolio.  Flagstar misrepresented that:

(a)    "As of the Closing Date, the information in the Mortgage Loan Schedule with respect to the Initial Mortgage Loans is correct in all material respects," 2005-1 MLPA § 3.02(a)(4);

(b)    "No Mortgage Loan or Mortgage is subject to any right of rescission, valid setoff, counterclaim or defense." 2005-1 MLPA § 3.02(a)(8);

(c)    "The Mortgage File for each Mortgage Loan contains each of the documents specified to be included within it." 2005-1 MLPA § 3.02(a)(13);

(d)    "At origination, each Mortgage Loan and the related Mortgage Note complied in all material respects with applicable local, state and federal laws [including all relevant consumer protection laws.]" 2005-1 MLPA § 3.02(a)(14);

- 5 -

(e)     "No selection procedure adverse to the interests of the Purchaser, the Noteholders, or the Note Insurer was used in selecting the Mortgage Loans." 2005-1 MLPA § 3.02(a)(19);

(f)     "There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Credit Line Agreement." 2005-1 MLPA § 3.02(a)(35);

(g)     "Each Mortgage Loan was originated in good faith and in accordance with the Seller's underwriting guidelines." 2005-1 MLPA § 3.02(a)(36);

(h)     "The Mortgage Loans, individually and in the aggregate, conform in all material respects to their descriptions in the Offering Circular." 2005-1 MLPA § 3.02(a)(56);

(i)     "The Mortgage Loan was acquired by the Seller directly through loan brokers or correspondents such that (a) the Mortgage Loan was originated in conformity with the Seller's underwriting guidelines, (b) the Seller approved the Mortgage Loan prior to funding and (c) the Seller provided the funds used to originate the Mortgage Loan and acquired the Mortgage Loan on the date of origination thereof." 2005-1 MLPA § 3.02(a)(60);

(j)     "No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan." 2005-1 MLPA § 3.02(a)(65);

(k)     "Each Mortgage Loan has been serviced since its origination in compliance with all applicable federal, state and local laws and in accordance with the Mortgage Note." 2005-1 MLPA § 3.02(a)(71); and

- 6 -

(l)     "[At] the time of origination [Flagstar Bank] had no knowledge of any fact that would have led it to expect that any interest in any Mortgage Loan is unlikely to be paid in full when it becomes due and payable." 2005-1 MLPA § 3.02(a)(74).

20.     The preceding provisions are only indicative examples of the scores of representations Flagstar and its affiliates made in the transaction documents concerning the quality and characteristics of the loans at issue and Flagstar's servicing thereof.    These representations were *essential* to AGM's agreement to issue financial guaranty insurance.    In fact, as noted above, *an express condition precedent* to AGM providing the policies was Flagstar's *certification*, through an authorized corporate officer, that each and every one of those representations was true and correct. 2005-1 I&I, Appx. A.

21.     Flagstar, as the sponsor, servicer, loan originator and depositor, assumed the risk and the burden of assessing the characteristics and attributes of those loans and Flagstar's servicing thereof.    Accordingly, Flagstar represented and warranted that (amongst other things) the loans were originated pursuant to the appropriate underwriting guidelines and were not originated by means of any fraud, misrepresentation, error, omission, or negligence.    Flagstar further assumed the obligation of verifying the accuracy of the representations concerning the loans and loan documentation and the sufficiency of the documentation pertaining to the loans, which backed the securities AGM was to insure.    In turn, AGM, as the Note Insurer, bore the burden of evaluating whether loans bearing the characteristics, attributes, loan documentation and other items as represented and warranted by Flagstar would perform as AGM had projected, despite economic variables that might change post-closing.

22.     This explicit division of responsibility was a reasoned risk allocation.    Flagstar, its affiliates, and its correspondents originated the loans and prepared and finalized the loan documentation and loan files before conveying the loans to the trusts that issued the securities

- 7 -

AGM insured.  Flagstar owned and serviced the loans and held the loan files, which afforded it access and control over information required to evaluate the loans.  Flagstar thus had the means to assess the quality of the prospective and actual mortgagors, mortgaged properties and other related loan characteristics and attributes, as well as the accuracy and sufficiency of the loan documentation, and – in the event a defect was discovered – refuse to originate that loan, or seek other recourse.  In contrast, AGM did not originate or service any of the underlying loans, has never been in privity with the loan brokers and correspondents with whom Flagstar originated the loans, did not prepare or finalize the loan documentation and loan files, never owned the loans or the loan files, and lacks direct recourse against the loan brokers and correspondents with whom Flagstar originated the loans.  It therefore made sense for these sophisticated contracting parties to agree that Flagstar would bear the risk and the burden of assessing the validity, sufficiency, and accuracy of the loan documentation and characteristics and attributes of the loans it originated and conveyed to the owning trusts, and AGM would bear the burden of evaluating whether loans bearing (amongst other things) these characteristics, attributes, and loan documentation would perform after the closing of the transactions as it had projected.

23.     Flagstar Bank's breach of any of its representations or warranties (absent a cure of such breach in all material respects within the requisite time period), obligated it "to accept a transfer of a Mortgage Loan as to which a breach has occurred and is continuing and to make any required deposit in the Custodial Account or to substitute an Eligible Substitute Mortgage Loan in accordance with the Sale and Servicing Agreement."  2005-1 MLPA § 3.02(c).

24.     This provision was designed to allow Flagstar to flush out the occasional deficient loan that Flagstar had inadvertently placed in the portfolio.  It was not designed to be a remedy for Flagstar's widespread misrepresentations and breaches affecting an overwhelming proportion of the loans in the portfolio.  Even so, Flagstar has adamantly refused to comply with its cure-or-

- 8 -

repurchase obligations under the documents governing the Transactions, as discussed further below.

25.     The 2005-1 MLPA expressly defined the Note Insurer as AGM.   The 2005-1 MLPA further provided that AGM is a third-party beneficiary under the agreement, and that the agreement runs to AGM's benefit and is enforceable by AGM.  2005-1 MLPA §§ 7.07 and 7.08.

**2005-1 Sale and Servicing Agreement**

26.     On December 8, 2005, Flagstar Bank and Flagstar ABS entered into a Sale and Servicing Agreement ("2005-1 SSA") whereby Flagstar ABS deposited the loans with the Flagstar Home Equity Loan Trust 2005-1.  Again, the 2005-1 SSA designated AGM as a third-party beneficiary to the agreement.  2005-1 SSA § 8.06.

27.     Under the terms of the 2005-1 SSA, Flagstar Bank repeated and incorporated the representations and warranties listed in the 2005-1 MLPA.  2005-1 SSA § 2.04(a).

28.     The SSA expressly disclaimed any requirement that Flagstar Bank have actual or constructive knowledge of the inaccuracy of those representations and warranties for there to be a breach.  The SSA provided:

> If the substance of any representation and warranty with respect to a Mortgage Loan in this Section made to the best of the Seller's knowledge or as to which the Seller has no knowledge is inaccurate and the inaccuracy materially and adversely affects the interest of the Trust, the Noteholders or the Note Insurer in the related Mortgage Loan then, _**notwithstanding that the Seller did not know the substance of the representation and warranty was inaccurate at the time the representation or warranty was made**_, the inaccuracy shall be a breach of the applicable representation or warranty.

2005-1 SSA § 2.04(b) (emphasis added).

29.     As it did in the 2005-1 MLPA, Flagstar Bank promised under the terms of the 2005-1 SSA "to accept a transfer of a Mortgage Loan as to which a breach has occurred and is continuing and to make any required deposit in the Custodial Account or to substitute an Eligible

- 9 -

Substitute Mortgage Loan." 2005-1 SSA § 2.04(e). Flagstar Bank further agreed that, if the breach of representation or warranty related to characteristics of the mortgage loans in the aggregate, it would repurchase or substitute as many loans as necessary to cure the breach. 2005-1 SSA § 2.04(d). The SSA further provides that Flagstar is obligated to repurchase any "Defective Mortgage Loan," which by definition includes mortgage loans that have a missing or defective document in the related Mortgage File and mortgage loans that fail to comply with Flagstar's representations and warranties in section 3.02 of the 2005-1 MLPA detailed above. 2005-1 SSA § 2.02(b) and Annex 1.

**2005-1 Insurance and Indemnity Agreement**

30.    Concurrent with the 2005-1 MLPA and 2005-1 SSA, Flagstar Bank, Flagstar ABS, and AGM entered into an Insurance and Indemnity Agreement ("2005-1 I&I").

31.    The 2005-1 I&I defined "Transaction Documents" to include the 2005-1 MLPA and the 2005-1 SSA. 2005-1 I&I App. I.

32.    Under the 2005-1 I&I, Flagstar Bank and Flagstar ABS each represented and warranted that:

> Each of the representations and warranties of the Bank or the Depositor contained in the Transaction Documents is true and correct in all material respects and the Bank and the Depositor hereby makes each such representation and warranty to, and for the benefit of, [AGM] as if the same were set forth in full herein.

2005 I&I § 2.01(k).

33.    Flagstar Bank and Flagstar ABS further acknowledged AGM's position as a third-party beneficiary of the 2005-1 MLPA and 2005-1 SSA: "The Bank and the Depositor agree that [AGM] shall have all rights of a third-party beneficiary in respect of the Transaction Documents and hereby incorporate and restate their representations, warranties and covenants as set forth therein for the benefit of [AGM]."

- 10 -

34.     The 2005-1 I&I contains *additional* representations and covenants, many of which bolster those discussed above, that Flagstar employed to persuade AGM to issue the requested financial guaranty insurance.  These include Flagstar's representations that "[n]one of the Provided Documents [including the Transaction Documents] contain any statement of a material fact with respect to . . . the Mortgage Loans that was untrue or misleading in any material respect," 2005-1 I&I § 2.01(i), that the offering circular, which (amongst other things) described the ostensible characteristics of the loans in the portfolio, "does not contain any untrue statement of a material fact and does not omit to state a material fact required to [render the statement not misleading]", 2005-1 I&I § 2.01(j), that the information provided to the ratings agencies that put their imprimatur on the issued securities "did not contain any untrue statement of a material fact or omit to state any material fact required to be stated in order to make such information not misleading," 2005-1 I&I § 2.01(q), and most basically, that "[n]o practice, procedure or policy employed or proposed to be employed by [Flagstar] in the conduct of its business violates any law." 2005-1 I&I § 2.01(o).

35.     The 2005-1 I&I contains broad provisions defining events of default and AGM's remedies for any such defaults.  The 2005-1 I&I defined an event of default to include circumstances where "any representation or warranty made by any party hereto under this Agreement, or any such party, the Owner Trustee or any other Person under ***any of the Transaction Documents***, or in any certificate or report furnished under any of the Transaction Documents, shall prove to be untrue or incorrect in any material respect." 2005-1 I&I § 5.01(a) (emphasis added). The 2005-1 I&I likewise defined an event of default to include the failure by "any party hereto, the Owner Trustee or any other Person . . . to perform or observe any other covenant or agreement contained herein or in any of the Transaction Documents." 2005-1 I&I § 5.01(c).

- 11 -

36.     Should an event of default occur, the 2005-1 I&I grants AGM broad remedies. AGM may "exercise any rights and remedies available under the Transaction Documents in its own capacity or in its capacity as the Person entitled to exercise the rights of the Noteholders in respect of the Securities." 2005-1 I&I § 5.02(a)(i). Further, Flagstar Bank and Flagstar ABS are jointly and severally liable for the obligations running to either of them. 2005-1 I&I § 4.02(b). The 2005-1 I&I also permits AGM to "take whatever action at law or in equity that may appear necessary or desirable in its judgment to enforce performance of any obligation of the Bank or the Depositor under the Transaction Documents." 2005-1 I&I § 5.02(a)(ii).

37.     In addition, Flagstar Bank and Flagstar ABS agreed to indemnify AGM for all losses arising out of or related to their own breach of the Transaction Documents. 2005-1 I&I § 3.04(a).

38.     Although the 2005-1 MLPA and 2005-1 SSA attempt to limit any remedy for the breach of representations and warranties to repurchase or substitution of affected loans, the 2005-1 I&I makes clear that this limitation is only applicable where Flagstar Bank is in compliance with its repurchase obligation. 2005-1 I&I § 2.03(h). Flagstar has willfully breached and repudiated this obligation, thus rendering any such limitation for breach nugatory.

**Flagstar Home Equity Loan Trust 2006-2**

39.     In 2006, the Flagstar Entities again sought to issue over $300 million in securities backed by home equity loans. AGM agreed to issue a second financial guaranty insurance policy covering these securities. The transaction documents for this transaction (with FCMC acting as seller, Flagstar Bank as sponsor, and Flagstar ABS as depositor) are materially identical to those executed in connection with the 2005-1 transaction (2006-2 Purchase Agreement ("2006-2 PA"), 2006-2 Sale and Servicing Agreement ("2006-2 SSA"), and 2006-2 Insurance and Indemnity

Agreement ("2006-2 I&I"), and as with that earlier transaction, the Flagstar Entities have breached numerous representations and warranties contained in these documents.

### Flagstar Has Breached the Insurance and Indemnity Agreements and Transaction Documents

40.     In the years since the 2005-1 I&I and the 2006-2 I&I were executed, the performance of the loans in the securitized pools has dramatically deteriorated.

41.     Starting in 2008, after AGM declared a "Rapid Amortization Event" due to the poor performance of loans in the 2005-1 and 2006-2 portfolios, AGM requested and received files for charged-off loans from Flagstar Bank, and compared the information in those files to Flagstar Bank's underwriting guidelines and the representations and warranties in the contractual documents. What it found was extremely disturbing. The vast majority of the loans AGM audited violated Flagstar Bank's underwriting guidelines, in direct contravention of the Flagstar Entities' representations and warranties in the relevant agreements. Many contained evidence of fraud or negligence in the origination process. AGM's investigation further revealed substantial deficiencies and inaccuracies in the representations and warranties provided by the Flagstar Entities with regard to the mortgage loans, the mortgaged properties, Flagstar's original underwriting, servicing and origination processes, and the identity, financial means, and occupational status of the mortgagors, as well as missing, deficient and defective loan documentation. A subsequent investigation of Flagstar's servicing practices has revealed substantial defects even in Flagstar's *servicing* of the loans backing the securities AGM insured.

### AGM Has Uncovered Egregious Defects and Deficiencies in the Origination of the Loans

42.     Through its investigation of origination files for the loans included in the Transactions, AGM has discovered numerous instances of misrepresentation, fraud, and

- 13 -

underwriting guideline violations in the loans backing the notes in the 2005-1 and 2006-2 transactions, as well as widespread failures to appropriately account for and maintain required loan documentation.  These defects and deficiencies represent material breaches of Flagstar's representations and warranties in the relevant contractual documents.

43.     **Borrower Misrepresentation of Income** – In its review of origination files for the loans included in the Transactions, AGM identified numerous instances where the borrower misrepresented his or her income at the time of loan origination.  In one instance, Flagstar made a $116,500 loan to a borrower who claimed that he was a district finance manager at a consumer finance company earning $17,000 per month.  In its investigation, AGM determined that the borrower's actual monthly income was under $5,000.

44.     Flagstar represented and warranted that "[n]o error, omission, <u>misrepresentation</u>, negligence, <u>fraud</u> or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan." 2005-1 MLPA § 3.02(a)(65)(emphasis added).   The borrower's fraudulent misstatements detailed above constitute a breach of Flagstar's representation and warranty.

45.     Flagstar further represented and warranted that "[t]here is no default, breach, violation or event of acceleration existing under the Mortgage or the related Credit Line Agreement." 2005-1 MLPA § 3.02(a)(35).  The borrower's misrepresentation constituted a default under the relevant mortgage documents.   Consequently, the incorporation of the borrower's loan in the pool collateral further constituted a breach of Flagstar's representations and warranties.

46.     **Misrepresentation of Employment** – Through its investigation (which has been ongoing since 2008) of origination files for the loans included in the Transactions, AGM

- 14 -

likewise identified numerous instances where borrowers misrepresented their employment during the loan origination process. In one such case, Flagstar made a $210,000 loan under a Stated Income/Stated Asset documentation program to a borrower. The borrower claimed to be the Owner/Operator of a masonry business in New York. As evidence of self-employment, the borrower provided a tax preparer's letter.

47.    During its investigation, AGM contacted the party who purportedly drafted the letter verifying self-employment. The tax preparer stated that the signature on the document was not his. In a follow up communication, the tax preparer stated he had discovered that the brother of the borrower, who is a mortgage loan broker, had signed and drafted the original letter. The same brother was the broker for the subject loan.

48.    Thus, the borrower fraudulently misrepresented his employment and related verification documentation, which rendered the borrower in default under the relevant mortgage documents. Accordingly, the inclusion of this loan in the pool collateral further constituted a breach of the representations and warranties Flagstar made to AGM.   2005-1 MLPA § 3.02(a)(35) & (65) (quoted above).

49.    **Misrepresentation of the Borrower's Debt Obligations** – Through its ongoing post-closing investigation of origination files for the loans included in the Transactions, AGM has discovered that in numerous loan file documents, borrowers misrepresented or omitted the nature and/or extent of their debt obligations. For example, AGM reviewed the loan file and circumstances surrounding the origination of a $300,000 loan Flagstar made under a stated income documentation program. The borrower failed to disclose in his loan application all of the properties he owned or was in the process of acquiring at the time the loan was originated. In its investigation, AGM discovered that six months prior to the subject loan's close, the borrower

- 15 -

obtained a mortgage to purchase another property. The borrower failed to disclose his ownership of this property and its attendant debt obligations.

50.     Flagstar represented and warranted that "Each Mortgage Loan was originated in good faith and in accordance with the Seller's underwriting guidelines." 2005-1 MLPA § 3.02(a)(36). Had information concerning the borrower's ownership of the property and its attendant debt obligations been included in the loan application, it would have materially impacted the borrower's debt-to-income ("DTI") ratio, rendering the loan non-compliant with applicable underwriting guidelines. Furthermore, the borrower's failure to include this property ownership and debt information in his loan application rendered the loan in default under the relevant mortgage documents.    Thus, inclusion of the loan in the pool collateral breached Flagstar's representations and warranties in its agreements with AGM.   2005-1 MLPA § 3.02(a)(35), (36) & (65) (quoted above).

51.     **DTI Ratios Exceed Program Guidelines** – As part of its ongoing investigation of origination files for the loans included in the Transactions, AGM discovered numerous loans where misstatements related to income dramatically affected the borrower's DTI. Once DTI is recalculated to arrive at the true DTI ratio at the time of origination, it is clear that the loans were not originated in compliance with applicable underwriting guidelines.

52.     For example, AGM investigated the loan file and circumstances surrounding the origination of a $150,000 loan Flagstar made under a stated income documentation program. The borrower claimed a monthly income of $9,350. The applicable underwriting guidelines permit a maximum DTI of 45 percent. AGM determined during its investigation that the borrower's monthly income was actually $2,000 at the time the loan was originated. The DTI ratio based on the borrower's corrected actual income was 189 percent at the time of origination, far above the 45 percent maximum DTI permitted under the applicable underwriting guidelines.

- 16 -

The borrower's misrepresentation further constituted a default under the relevant mortgage documents. Thus, inclusion of the loan in the pool collateral breached Flagstar's representations and warranties in its agreements with AGM. 2005-1 MLPA § 3.02(a)(35), (36) & (65) (quoted above).

53.     **Combined Loan to Value Ratios Exceed Program Guidelines** – Combined Loan to Value ("CLTV") ratios are an important measure of the risk that a mortgage loan will default, as well as the severity of loss in the event of default. CLTV ratios typically compare the combined value of multiple mortgages to the appraised value or purchase price of the subject property. Flagstar represented and warranted in its agreements with AGM that "[a]s of the Closing Date, the information in the Mortgage Loan Schedule with respect to the Initial Mortgage Loans is correct in all material respects," 2005-1 MLPA § 3.02(a)(4). The Mortgage Loan Schedule included CLTV ratios for each of the loans included in the Transactions.

54.     Through its ongoing investigation of origination files for the loans included in the Transactions, AGM has discovered numerous loans where the CLTV ratios set forth in the loan applications and on the relevant Mortgage Loan Schedule were misstated or miscalculated. For example, AGM investigated the loan file and circumstances surrounding the origination of a $301,000 second-lien loan that Flagstar made on May 17, 2006, under a stated income/stated asset documentation program. The Mortgage Loan Schedule stated that the CLTV ratio for this loan was 57 percent. Under the applicable underwriting guidelines, the maximum CLTV for the loan was 95 percent; however, per the applicable underwriting guidelines, for properties that are owned by the mortgagor for less than 12 months, the CLTV must be calculated using the lesser of the current appraised value or the original sales price, plus any documented improvements. In addition, per Flagstar's agreements with AGM, for properties that are owned by the mortgagor for less than 12 months, the CLTV set forth on the Mortgage Loan Schedule must be calculated

- 17 -

using the lesser of the current appraised value or the original sales price, and not including any documented improvements.  In late July 2005, the borrower purchased the subject property for $562,110, and entered into a $400,000 first-lien loan on the subject property.  The May 2006 origination file for the Flagstar loan did not contain documentation of any improvements made to the subject property since the original July 2005 purchase date.  When the original July 2005 purchase price is used, as required under the applicable underwriting guidelines and Flagstar's agreements with AGM, the CLTV of the Flagstar loan is actually 125%, and not 57%.  Thus, the loan failed to comply with the relevant underwriting guidelines, and reflects an error, omission, misrepresentation, negligence, fraud or similar occurrence in its origination.  In addition, the Mortgage Loan Schedule set forth an incorrect CLTV for that loan.  Accordingly, Flagstar breached its  representations and warranties in its agreements with AGM. See 2005-1 MLPA §3.02(a)(4), (36) & (65) (quoted above).

55.   **Missing Loan File Documentation** – Flagstar represented and warranted to AGM that "the Mortgage File for each Mortgage Loan contains each of the documents specified to be included within it."  2005-1 MLPA § 3.02(a)(13).  Yet, in many cases, AGM discovered (during the course of its investigation of origination files for the loans included in the Transactions) that the loan files did not contain critical pieces of required information and/or contained deficient or defective loan documentation.

56.   For example, AGM investigated the loan file and circumstances surrounding the origination of a $500,000 loan Flagstar made under a full income documentation program.  The loan file did not contain a qualified appraisal, as required under the relevant guidelines.  Nor did the file contain an automated valuation model report to support the appraisal of the value of the property.  In further contravention of the relevant underwriting guidelines, the loan file did not include a verification of the borrower's self-employment.  The loan file also did not include a

- 18 -

final loan application or a hazard insurance declaration. Thus, inclusion of the loan in the pool collateral breached Flagstar's representations and warranties in its agreements with AGM. 2005-1 MLPA § 3.02(a)(13), (36) & (65) (quoted above).

**Flagstar Has Refused to Cure or Repurchase Hundreds of Defective Loans**

57.     Gross defects and deficiencies similar to those in the preceding examples recur repeatedly in the hundreds of loans AGM has investigated to date.     Notwithstanding its contractual promise to cure or repurchase such loans, Flagstar has categorically refused to honor its obligations. In two separate rounds of correspondence, the first exchange beginning in January 2009 and the second commencing in July 2010, AGM notified the Flagstar Entities concerning breaches of representations and warranties affecting over 900 loans in the 2005-1 and 2006-2 transactions. Through its notices, AGM documented numerous underwriting violations and fraud, errors, omissions, misrepresentations, and negligence attending the mortgage loans, the origination and underwriting processes, and in the information provided by the Flagstar Entities with regard to the mortgage loans. AGM further documented widespread deficiencies and defects in the loan documentation and in Flagstar's delivery and retention of complete mortgage file documentation. In all, AGM's review demonstrated that an overwhelming percentage of the loans AGM had analyzed were plagued by a material breach of one brand or another. AGM demanded that the Flagstar Entities comply with the repurchase, reimbursement, and indemnification provisions in the relevant agreements as to these affected loans.

58.     Flagstar twice rejected AGM's demands, and has refused to repurchase *even a single* loan.  Flagstar's deadline to comply with its cure-or-repurchase obligations under the 2005-1 and 2006-2 transaction documents has expired.

- 19 -

59.     Given the high incidence of underwriting violations and misrepresentations found in the loans that AGM has investigated to date, as well as deficiencies and defects in the loan documentation, it is a virtual certainty that a significant percentage of the loans from the 2005-1 and 2006-2 securitized pools that AGM has not yet investigated to date have the same breaches. AGM's inquiry in this regard is continuing.

**Widespread Deficiencies in the Servicing of the Loans**

60.     On or about December 1, 2010, AGM terminated Flagstar Bank as the servicer, and the Trustees appointed Specialized Loan Servicing LLC as the new entity engaged in the servicing and administering of the home equity loans underlying the securities.

61.     While Flagstar Bank was servicing the loans underlying the Transactions, there were numerous and widespread instances of deficient servicing that violated the Transaction Documents, including but not limited to failing to properly track the senior liens and failing to properly represent the best interests of the second lien, often by providing preferential treatment to a first-lien loan originated and serviced by Flagstar over a second-lien loan owned by the Flagstar Trusts and serviced by Flagstar Bank on behalf and for the benefit of the Trusts, Trustees, AGM, and the Noteholders.

62.     For example, in the case of one $34,550 second lien loan underlying the 2005-1 securitization transaction that Flagstar originated and serviced, Flagstar had also originated and serviced the first-lien loan. When the borrower asked to make payments on the second lien first, Flagstar Bank instead instructed the borrower to stop making payments on the second lien, so that the borrower could instead make payments on the first lien. In addition, the servicing file contained notes indicating that, despite serious issues concerning the likelihood of collecting on the second-lien loan, Flagstar neither foreclosed on the loan nor took any meaningful steps to collect the loan for a year before the loan was finally charged off in April 2009.

- 20 -

63.    Moreover, Flagstar Bank's servicing files and servicing notes reveal that Flagstar Bank routinely failed to advise the senior-lien holder to notify Flagstar if and when the senior lien defaulted, and that Flagstar Bank generally failed to service the loans in the best interest of the Trusts, AGM, or Noteholders. Moreover, annotations in the servicing notes and servicing files that would be expected had Flagstar Bank properly performed its duties (such as the initiation of collection efforts on a timely basis) are largely absent. In addition, basic loan loss-mitigation information regarding reasons for default, right-party contact details, and delinquency status of the first liens were not included in Flagstar Bank's servicing files.

64.    The deficiencies described in the preceding paragraphs and examples represent material breaches of Flagstar Bank's obligations contained in the relevant contractual documents. These servicing breaches have reduced the value of the collateral in the securitizations and have thereby caused AGM to suffer damages.

65.    Given the high incidence of servicing breaches found in the loans that AGM has investigated to date, it is a virtual certainty that a significant percentage of the loans from the 2005-1 and 2006-2 securitized pools that AGM has not yet investigated have the same breaches.

## CAUSES OF ACTION

### Claim 1: Breach of Contract Against Flagstar Bank and Flagstar ABS

66.    AGM re-alleges and incorporates by reference each paragraph above.

67.    The 2005-1 I&I is a valid contract entered between AGM, and Flagstar Bank and Flagstar ABS. By its terms, the 2005-1 I&I incorporates the representations, covenants and warranties made by the Flagstar Entities in the 2005-1 MLPA and the 2005-1 SSA.

68.    AGM has performed all of its obligations under the 2005-1 I&I.

69.    As detailed more fully above, Flagstar Bank and Flagstar ABS failed to perform under the 2005-1 I&I, the 2005-1 MLPA, and the 2005-1 SSA by, amongst other things:

breaching certain representations and warranties contained in section 3.02(a) of the 2005-1 MLPA, section 2.04(a) of the 2005-1 SSA, and section 2.01(k) of the 2005-1 I&I; breaching the repurchase/cure provisions in section 3.02(c) of the 2005-1 MLPA and section 2.04(e) of the 2005-1 SSA; and breaching the reimbursement and indemnification provisions found in sections 3.03 and 3.04(a) of the 2005-1 I&I. This list is not exhaustive of the breaches that, on a full record, Flagstar Bank and Flagstar ABS will be shown to have committed.

70. As a result, AGM has suffered damages in an amount to be determined at trial, but which include, at a minimum, any payments made to holders of the 2005-1 securities covered by the governing Policy.

**Claim 2: Breach of Contract Against Flagstar Bank, FCMC, and Flagstar ABS**

71. AGM re-alleges and incorporates by reference each paragraph above.

72. The 2006-2 I&I is a valid contract entered between AGM, and Flagstar Bank, FCMC, and Flagstar ABS. By its terms, the 2006-2 I&I incorporates the representations and warranties of the 2006-2 PA and 2006-2 SSA.

73. AGM has performed all of its obligations under the 2006-2 I&I.

74. As detailed more fully above, Flagstar Bank, FCMC, and Flagstar ABS have failed to perform under the 2006-2 I&I by, amongst other things:  breaching certain representations and warranties contained in section 3.02(a) of the 2006-2 PA, section 2.04(a) of the 2006-2 SSA, and section 2.01(k) of the 2006-2 I&I; breaching the repurchase/substitution provisions in section 3.02(c) of the 2006-2 PA and 2.04(e) of the 2006-2 SSA; and breaching the indemnification provision found in section 3.04(a) of the 2006-2 I&I. This list is not exhaustive of the breaches that, on a full record, the Flagstar Entities will be shown to have committed.

- 22 -

75.    As a result, AGM has suffered damages in an amount to be determined at trial, but which include, at a minimum, any payments made to holders of the 2006-2 securities covered by the governing Policy.

### Claim 3:  Reimbursement and Indemnification Against Flagstar Bank and Flagstar ABS

76.    AGM re-alleges and incorporates by reference each paragraph above.

77.    Pursuant to Section 3 of the 2005-1 I&I, AGM is entitled to reimbursement and indemnification for all of its claims, losses, liabilities, demands, damages, costs, and expenses of any nature whatsoever relating to Flagstar Bank's and Flagstar ABS's breaches of representations, warranties, or covenants contained in the 2005-1 MLPA, 2005-1 SSA, and 2005-1 I&I.

78.    As detailed more fully above and as will be presented at trial, Flagstar Bank and Flagstar ABS have breached numerous representations, warranties, and covenants that have caused and will cause AGM to incur losses, costs, and/or expenses, in an amount to be determined at trial. AGM's costs and expenses include attorneys' fees and expert fees, incurred and to be incurred in order to enforce, defend, and preserve AGM's rights under the 2005-1 MLPA, 2005-1 SSA, and 2005-1 I&I.

### Claim 4:  Reimbursement and Indemnification Against Flagstar Bank, FCMC, and Flagstar ABS

79.    AGM re-alleges and incorporates by reference each paragraph above.

80.    Pursuant to Section 3 of the 2006-2 I&I, AGM is entitled to reimbursement and indemnification for all of its claims, losses, liabilities, demands, damages, costs, and expenses of any nature whatsoever relating to Flagstar Bank's, FCMC's, and Flagstar ABS's breaches of

representations, warranties, or covenants contained in the 2006-2 PA, 2006-2 SSA, and 2006-2 I&I.

81.    As detailed more fully above and as will be presented at trial, Flagstar Bank, FCMC and Flagstar ABS have breached numerous representations, warranties, and covenants that have caused and will cause AGM to incur losses, costs, and/or expenses, in an amount to be determined at trial. AGM's costs and expenses include attorneys' fees and expert fees, incurred and to be incurred in order to enforce, defend, and preserve AGM's rights under the 2006-2 PA, 2006-2 SSA, and 2006-2 I&I.

### Claim 5:  Breach of Contract Against Flagstar Bank

82.    AGM re-alleges and incorporates by reference each paragraph above.

83.    The 2005-1 SSA is a valid contract that designates in § 8.06 that AGM is an express third-party beneficiary thereof.

84.    AGM has performed all of its obligations under the 2005-1 SSA.

85.    Under the 2005-1 SSA, Flagstar Bank promised to administer and service the related Mortgage Loans in accordance with the terms of the SSA and with Customary Servicing Practices.

86.    As detailed more fully above, Flagstar Bank has failed to perform under the 2005-1 SSA by, amongst other things:  breaching the terms of the Customary Servicing Practices referred to in section 3.01(a); breaching the terms of the collection provision found in section 3.02(a); and breaching the terms in sections 3.01 and 3.06 by not timely charging-off delinquent loans.  This list is not exhaustive of the breaches that, on a full record, Flagstar Bank will be shown to have committed.

87.    Each of Flagstar Bank's acts of breaching its servicing obligations under the 2005-1 SSA was committed with misfeasance, bad faith, or gross negligence in the performance

- 24 -

of its duties as Servicer or with reckless disregard of the obligations of the Servicer. In addition, each of Flagstar Bank's acts that breached its servicing obligations under the SSA also breached sections § 2.03(b) and § 2.05(b) of the 2005-1 I&I. This list is not exhaustive of the breaches that, on a full record, Flagstar Bank will be shown to have committed, in violation of the 2005-1 I&I.

88.    As a result, AGM has suffered damages in an amount to be determined at trial, but which include, at a minimum, any payments made to holders of the 2005-1 securities covered by the governing Policy.

### Claim 6: Breach of Contract Against Flagstar Bank

89.    AGM re-alleges and incorporates by reference each paragraph above.

90.    The 2006-2 SSA is a valid contract that designates in § 8.06 that AGM is an express third-party beneficiary thereof.

91.    AGM has performed all of its obligations under the 2006-2 SSA.

92.    Under the 2006-2 SSA, Flagstar Bank promised to administer and service the related Mortgage Loans in accordance with the terms of the SSA and with Customary Servicing Practices.

93.    As detailed more fully above, Flagstar Bank has failed to perform under the 2006-2 SSA by, amongst other things: breaching the terms of the Customary Servicing Practices referred to in section 3.01(a); breaching the terms of the collection provision found in section 3.02(a); and breaching the terms of sections 3.01 and 3.06 by not timely charging-off delinquent loans. This list is not exhaustive of the breaches that, on a full record, Flagstar Bank will be shown to have committed.

94.    Each of the Flagstar Bank's acts of breaching its servicing obligations under the 2006-2 SSA were committed with misfeasance, bad faith, or gross negligence in the performance

- 25 -

of its duties as Servicer or with reckless disregard of the obligations of the Servicer. In addition, each of Flagstar Bank's acts that breached its servicing obligations under the SSA also breached sections § 2.03(b) and § 2.05(b) of the 2006-2 I&I. This list is not exhaustive of the breaches that, on a full record, Flagstar Bank will be shown to have committed, in violation of the 2006-2 I&I.

95.     As a result, AGM has suffered damages in an amount to be determined at trial, but which include, at a minimum, any payments made to holders of the 2006-2 securities covered by the governing Policy.

### PRAYER FOR RELIEF

96.     AGM respectfully prays that this Court, cumulatively or alternatively:

(a)     Award compensatory and consequential damages, and any other present and future damages to be proven at trial;

(b)     Award a sum to be determined at trial to compensate AGM for the issuance of Policies resulting from the Defendants' misrepresentations in the documents underlying the 2005-1 and 2006-2 securitizations and compensation for AGM's guarantee of certain payments of principal and interest on securities backed by a substantial number of mortgage loans that were underwritten in violation of relevant underwriting guidelines; were originated through fraud, misrepresentations, error, omissions, or negligence; and/or concerning which there were defects or deficiencies in the underlying loan documents;

(c)     Award a sum to be determined at trial to compensate AGM for the losses it suffered resulting from Flagstar Bank's breaches of its servicing obligations under the Transaction Documents;

(d)     Order Flagstar Bank, FCMC, and/or Flagstar ABS to comply with the reimbursement and indemnification provisions of the relevant agreements;

- 26 -

(e)    Order reimbursement and indemnification for AGM's losses and expenses related to Flagstar Bank's, FCMC's, and/or Flagstar ABS's breaches of representations, warranties, or covenants, including attorneys' fees, expert expenses, and other costs;

(f)    Order prejudgment interest pursuant to federal law and New York Civil Practice Law & Rules §§ 5001-5004;

(g)    Order such other legal and equitable relief as this Court deems proper.

Dated:  August 18, 2011

SUSMAN GODFREY L.L.P.

By: _Jaml W Buchdell_

Stephen D. Susman
Jacob W. Buchdahl
Arun S. Subramanian
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone:212-336-8330
Facsimile: 212-336-8340

Manmeet S. Walia (*Pro Hac Vice)*
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: 713-651-9366
Facsimile: 713-654-6666

*Attorneys for Plaintiffs*

1645608v1/011967

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC.<br><br>                         Plaintiff,<br><br>        vs.<br><br>FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC,<br><br>                         Defendants. | Case No. 11-CV-2375 (JSR)<br><br><br><br>**CERTIFICATE OF SERVICE** |

I, Jacob W. Buchdahl, am over 18 years of age, live in New York, New York and am not a party to this action.

I hereby certify that I have, this 18th day of August, 2011, caused true and complete copies of Plaintiff's First Amended Complaint, to be served on all attorneys registered via the Court's electronic case filing system or electronic mail.

_____
Jacob W. Buchdahl