# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., <br><br> Plaintiff, <br><br> vs. <br><br> FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, <br><br> Defendants. | Civil Action No. 11–CIV–2375 (JSR) |

**REPLY IN FURTHER SUPPORT OF**
**PLAINTIFF'S MOTION *IN LIMINE* REGARDING THE USE OF SAMPLING**

Stephen D. Susman
Jacob W. Buchdahl
Arun Subramanian
SUSMAN GODFREY LLP
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 336-8330
ssusman@susmangodfrey.com
jbuchdahl@susmangodfrey.com

*Attorneys for Plaintiff Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc.*

1649902v1/011967

# TABLE OF CONTENTS

**Page**

I.   The Propriety of Sampling Should Be Decided Now ............................................................ 2

II.  Assured's Proposed Methodology is Statistically Sound ...................................................... 4

III. Flagstar is Wrong About The Loans At Issue in This Case .................................................. 5

IV.  Sampling is Fully Consistent With the Transaction Documents ......................................... 9

# TABLE OF AUTHORITIES

**Cases**

*City of Chicago v. Reliable Truck Parts Co., Inc.*,
    822 F. Supp. 1288 (N.D. Ill. 1993) .................................................................................. 1

*In re Homeowners Mort. and Equity, Inc.*,
    354 F.3d 372 (5th Cir. 2003) .......................................................................................... 8

*Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*,
    No. 04-CV-1432, 2007 WL 2904591 (S.D. Ind. Sept. 28, 2007) ................................... 9

*MBIA v. Countrywide*,
    No. 08/602825 (N.Y. Sup. Ct. June 16, 2010) ....................................................... 1, 3, 5

*Oracle Corp. v. SAP AG*,
    No. C-07-01658 PJH (N.D. Cal. Jul. 3, 2008) ................................................................ 3

*Orix Real Estate Capital Mkts. v. Superior Bank*,
    127 F. Supp. 2d 981 (N.D. Ill. 2000) ............................................................................. 9

*Republic Servs., Inc. v. Liberty Mut. Ins. Co.*,
    No. Civ. A. 03-494-KSF, 2006 WL 2844122 (E.D. Ky. Oct. 2, 2006) ..................... 1, 2

*Resolution Trust Corp. v. Key Fin. Servs., Inc.*,
    280 F.3d 12 (1st Cir. 2002) ......................................................................................... 8, 9

*Syncora Guarantee Inc. v. EMC Mortgage Corp.*,
    No. 09 Civ. 3106 (PAC) (S.D.N.Y. Mar. 15, 2011) ....................................................... 1

*TVT Records v. Island Def Jam Music Group*,
    250 F. Supp. 2d 341 (S.D.N.Y. 2003) ........................................................................ 2, 3

**Other Authorities**

Michael Cavendish, *New Analysis of the Repurchase Obligation in Participation
    Agreements*, 127 Banking L.J. 417 (2010) ................................................................... 9

Neither Flagstar nor its expert disagrees that sampling is a statistically valid method of proof in cases with an otherwise unmanageable amount of data. Flagstar also does not dispute the law cited by Assured demonstrating that sampling has been an accepted methodology for over a century, including in mortgage-backed securities cases involving repurchase and servicing-breach claims. Flagstar nevertheless maintains that the Court should say nothing about the propriety of sampling until it is presented with the precise methodology Assured will use at trial. Courts, however, have not hesitated to signal their approval of sampling without passing judgment on a particular methodology.[1] Waiting to address this threshold issue until after the parties' experts have performed their respective analyses and trial is around the corner threatens extreme prejudice to Assured and compromises judicial efficiency. The motion is ripe for decision because Flagstar has taken the position that regardless of methodology, sampling is categorically unwarranted.

That misguided position should be rejected now. Flagstar first argues that the universe of loans at issue is in the "hundreds," and thus that sampling would not yield efficiency gains, but Flagstar improperly excludes from its analysis over 2,000 charged-off loans—loans so bad that Flagstar itself concluded that they are uncollectable. In the case of the 2006-2 deal, the Trustee

---

[1] *See, e.g.*, Reply Decl. of Jacob Buchdahl, Ex. A, *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09 Civ. 3106 (PAC), at 18, 32 (S.D.N.Y. Mar. 15, 2011) ("You've been practicing a long time. Do you agree with me, no judge in his right mind would sit there and referee on 9800 or 1800 or 1300 separate mortgage loans?" and "Can you think of a single judge . . . who would sit here and go through 9800 separate transactions to find out whether there was or was not a material breach of the representations and warranties?"); *Republic Servs., Inc. v. Liberty Mut. Ins. Co.*, No. Civ. A. 03-494-KSF, 2006 WL 2844122, at *2–3 (E.D. Ky. Oct. 2, 2006) ("The Court agrees with [plaintiff] Republic . . . that some form of statistical sampling will be necessary to resolve issues related to the Liberty Companies' liability and damages incurred by Republic"); *cf.* Reply Buchdahl Decl., Ex. B, *MBIA v. Countrywide*, No. 08/602825, at 33 (N.Y. Sup. Ct. June 16, 2010) (while deferring judgment on motion, stating "I think it makes all the sense in the world that you can use a sample to prove the case," and "it is going to be a sample in the end"); *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F. Supp. 1288, 1302 (N.D. Ill. 1993) (while disagreeing with proposed method, opining on the propriety of numerous "sampling technique[s]" to determine damages and suggesting the parameters of acceptable analyses).

has reported losses from liquidated loans in excess of $129 million. Flagstar's argument that it can shield itself from liability for its false warranties on these loans, and foreclose any remedy for the enormous losses suffered by Assured, is sophistry. Flagstar also suggests that thousands of other loans need not be analyzed because they are "current." But regardless of whether a loan is currently performing, the loan's failure to conform to Flagstar's representations and warranties is a breach that forced Assured to take on more risk than it bargained for, and unfairly exposes it to potential future losses. No complete analysis could exclude the broad categories of loans Flagstar wishes to ignore, and absent sampling, the volume of data at trial will be overwhelming.

Flagstar's contention that sampling is inconsistent with the transaction documents—in particular the repurchase remedy set forth in the Sale & Servicing Agreements ("SSA")—is based on several misinterpretations of the contracts, and ignores the fact that the repurchase remedy is inapplicable to Flagstar's servicing breaches and its breaches of the Insurance & Indemnity Agreements ("I&I").

## I. The Propriety of Sampling Should Be Decided Now

Flagstar contends that Assured's current request is "improper" and "does not constitute a motion *in limine* upon which the Court can issue a ruling," but cites no authority to support that conclusion. In *TVT Records v. Island Def Jam Music Group*, 250 F. Supp. 2d 341 (S.D.N.Y. 2003), the court disapproved of abusive *in limine* practice in which a party tried to preemptively eliminate the other side's evidence before specific objections were raised, in order to gut the other side's case or "obviate a trial altogether." *Id.* at 344. Assured, on the other hand, filed this motion because Flagstar made clear at the outset that it objects to any use of sampling. A ruling on this motion will dictate how the parties conduct discovery, use experts, and prepare for trial. Flagstar also misleadingly cites *Republic Services, Inc. v. Liberty Mutual Ins. Co.* to suggest that the Court in that case declined to decide whether sampling, as a general approach, was

permissible on a motion *in limine*. The <u>opposite</u> is true. The court in that case declined to evaluate the specific <u>methodology</u> proposed by the plaintiff on its motion for judicial notice, but the Court expressly acknowledged in its opinion that it "agree[d] . . . that some form of statistical sampling will be necessary to resolve issues related to the [defendants'] liability and damages" and it <u>denied</u> the defendants' motion *in limine* to exclude sampling as a general matter on constitutional grounds. 2006 WL 2844122, at *3.[2]  Similarly, in *MBIA*, MBIA advanced repurchase and servicing claims virtually identical to Assured's claims here, and Justice Bransten authorized the use of sampling to determine liability and damages as to those claims. Justice Bransten made clear on the record before any proposed methodology was presented that "it makes all the sense in the world that you can use a sample," and that although she wanted the proposed sample to be "properly defined" before she made a final decision, "it is going to be a sample in the end."[3]  Assured seeks the same relief in this case.

The precise analysis and methodology used by Assured's expert will be subject to scrutiny for scientific validity, but that does not mean that the threshold issue of whether sampling is permissible at all cannot be answered now. Contrary to Flagstar's flippant use of the term "advisory opinion," this motion presents a ripe dispute and serious questions about the conduct of this litigation that should be answered now. If Flagstar has its way, the parties will spend hundreds of hours (and hundreds of thousands of dollars) on statistical analyses and

---

[2] In addition to the authorities cited *supra* in note 2, *see also Oracle Corp. v. SAP AG*, No. C-07-01658 PJH, at *4 (N.D. Cal. Jul. 3, 2008) (prior to presentation of specific sample type, size, or methodology, court "urged the parties to consider sampling of the voluminous evidence, to provide a basis for the parties' experts to extrapolate the extent of illegal activity and associated damages, in lieu of a likely futile and undoubtedly exorbitantly costly and labor-intensive attempt to produce and review all of it."), *available at* http://docs.justia.com/cases/federal/district-courts/california/candce/3:2007cv01658/190451/107/.

[3] Reply Buchdahl Decl., Ex. B, at 33. In *MBIA* the defendant took the position at that hearing that "[w]e're not saying at this point that sampling is inappropriate to use. We may want to use some samplings ourselves." *Id.* at 40-41. Flagstar, however, is taking the position that sampling of any kind is inappropriate. A decision on the threshold question of whether sampling is categorically prohibited is therefore especially warranted here.

3

reports only for Flagstar to argue that regardless of Assured's methodology, sampling cannot be used at all.

Finally, Flagstar's inability to produce the loan files relevant to this litigation on a timely basis further demonstrates the need for sampling. There are two securitizations at issue in this case, each of which involves thousands of individual loans. And despite months of notice since this action was filed, Flagstar has advised that it is unable to complete production of the individual loan files until weeks <u>after</u> the date on which Assured's expert reports are due (November 7, 2011, just 60 days after argument on this motion). Thus, were Assured compelled to litigate its claims in the absence of sampling, Flagstar's inability to make a timely production would compromise Assured's ability to meet this Court's deadlines. Yet, Flagstar <u>has</u> agreed to produce by next month the loan files corresponding to the 800 loans Assured intends to use for its sample, in time for Assured's expert to perform her analysis. While Flagstar protests that "[a]ny appeal to efficiency is illusory" and that Assured's current request for relief is premature, its own litigation conduct speaks volumes about both the necessity of sampling in this case and the need for a prompt, preliminary ruling on its permissibility.

## II.     Assured's Proposed Methodology is Statistically Sound

While Assured does not now seek final approval of the methodology it plans to present at trial, after the filing of this motion and in light of the rapidly approaching trial date, Assured asked its expert Dr. Nelson Lipshutz to develop and implement a methodology to select a statistically valid random sample of loans from each of the securitizations and to extrapolate the results from each sample to the general population of loans. Dr. Lipshutz has 39 years of experience in economic, financial, and statistical studies involving the collection and analysis of data, and has extensive experience in the design of statistical samples.

4

Dr. Lipshutz's proposed samples are randomly selected to ensure they are representative; are sufficiently large (400 loans for each securitization) to draw conclusions about the total population of loans; and will result in confidence levels with an appropriate margin of error.[4] In reaching this conclusion, Dr. Lipshutz compared the distributions of the relevant variables in the sample and total populations to ensure that the distributions are representative.[5]

Flagstar's expert expresses concerns that the "combinations" of variables that will need to be determined will render any acceptable sample too large to be useful. However, neither Flagstar nor its expert describe what these "combinations" are or why sampling would not be useful, as it was held to be in the *MBIA* case, which involved highly similar loans and claims. The loans in the portfolios at issue share common general characteristics, there are common types of breaches (as described in the complaint), the guidelines applicable to the loans are similar, and the "combinations" cited by Flagstar are not relevant to the straightforward question of whether for any particular loan Flagstar breached a representation or warranty.[6] In any event, the vague concerns outlined in Flagstar's papers do not go to the general approach of sampling, but rather to the sufficiency and weight of the particular analyses to be conducted by the parties.

### III. Flagstar is Wrong About The Loans At Issue in This Case

Flagstar improperly excludes so-called "charged off" and "current" loans to reach the unfounded conclusion that sampling would not provide efficiency gains in this case. Flagstar attempts to revive its unsuccessful argument from its motion to dismiss that the damages available to Assured due to charged-off loans—the worst loans in the pool—equal "zero." This argument is wrong for a host of reasons.

---

[4] Decl. of Dr. Nelson R. Lipshutz in Supp. Motion *In Limine*, ¶¶ 5-7, 23-24.
[5] *Id.*, ¶¶ 11-22.
[6] *Id.*, ¶¶ 25-27.

First, Flagstar's argument regarding charged-off loans relies on a sly manipulation of the definition of "Asset Balance." The Asset Balance for a charged-off loan is appropriately zero when measuring the overall adequacy of the collateral supporting repayment of the notes, where it would be wholly improper to inflate the value of the collateral by the uncollectable principal balance of a charged-off loan.[7] In other contexts, the parties made clear that—despite the definitional language parroted by Flagstar—the Asset Balance for Liquidated Mortgage Loans (what Flagstar refers to as "charged-off" loans) is the outstanding principal balance of the loan, and cannot be "zero."[8] Flagstar's obligation to address a "Transfer Deficiency" is designed to restore the proper level of overcollateralization and compensate for the removal of defective loans from the pool. Assigning zero value to the Asset Balance of a charged-off loan leads to the perverse result that when the worst performing loans are removed, no Transfer Deficiency could ever exist.

Flagstar's constrained reading of the repurchase remedy is also flatly contradicted by the terms of the Offering Documents describing the securities—terms that Flagstar represented to Assured were true and "not misleading." *Id*., Ex. P, I&I, § 2.01(j). In explaining the repurchase remedy, the Offering Documents define "Transfer Deficiency" without <u>any</u> reference to Asset Balance, but instead with reference to the "principal balance of the mortgage loan transferred

---

[7] Specifically, the transaction's "Overcollateralization Amount" (and therefore whether the "Overcollateralization Target Amount" has been maintained) is calculated based on the ratio of the "Loan Pool Balance" (the pool-wide sum of all Asset Balances) to the Note Principal Balance. Rendón Decl., Dkt. No. 14, Ex. O, Glossary of Defined Terms, at 20.

[8] For instance, the definition of "Liquidation Loss Amount" for any Liquidated Mortgage Loan is its "unrecovered Asset Balance." Rendón Decl., Ex. O, at 14. On Flagstar's absurd construction of the agreements, that "Asset Balance," and thus the "Liquidation Loss Amount," would always be <u>zero</u>. That is plainly not what the parties intended. Further, when determining Principal Collections on mortgage loans, foreclosure profits on a "Liquidated Mortgage Loan" are defined as the excess of liquidation proceeds over "the Asset Balance of the Mortgage Loan before the final recovery on it," and the parties clearly did not intend the Asset Balance to be zero, but rather to be the remaining principal balance on the loan. *Id*., at 22.

6

from the Trust."[9]  In contrast to this description of the repurchase mechanism, Flagstar's insistence that a charged-off loan could never give rise to a Transfer Deficiency in the securitization defies common sense.[10]

Flagstar's effort to exclude charged-off loans from this case is patently absurd. These loans are responsible for the bulk of the losses suffered by the Trusts and Assured. As of July 2011, the Trustee reports that in the 2005-1 securitization, $69.3 in losses on liquidated loans were incurred, and in the 2006-2 securitization, that figure stands at $129.8 million. These loans are a principal reason why Assured has paid over $86 million in claims to date to noteholders. Flagstar's cavalier suggestion in its brief that "the two Trusts have performed relatively well after a significant amount of time" is either willful blindness or magical thinking.

Second, as observed in Assured's opening brief, if Flagstar was "aware" of any breaches prior to this lawsuit, it is in breach of the requirements of the repurchase remedy and, under the I&I, can no longer argue that repurchase is the exclusive remedy for the loan-level breaches. Rendón Decl., Dkt. No. 14, Ex. P, I&I, § 2.03(h). Given that Flagstar was involved in all phases of the origination, underwriting, sale, and servicing of the loans at issue, Flagstar must have been aware from day one of the endemic breaches alleged in this case. Flagstar certainly became aware of these breaches when Assured brought hundreds of defective loans to its attention in 2009 and 2010, and Flagstar declined to repurchase even a single loan.

---

[9] Reply Buchdahl Decl., Ex. C, December 19, 2006 Offering Circular, at 37. In fact, Flagstar, at page 15 of its own brief in opposition to this motion, concedes that "any Transfer Deficiency is calculated based on the loan's unpaid principal balance." If, contrary to the description in the Offering Circular, this remedy was worth zero, the Offering Documents for these deals were materially misleading and Flagstar breached § 2.01(j) of the I&I, the remedy for which is not limited to the repurchase of non-conforming loans.

[10] Moreover, the definition of Asset Balance in the glossary for the 2005-1 transaction omits the "zero" language on which Flagstar so heavily relies in its discussion of the 2006-2 transaction, and Flagstar does not account for this distinction. See Reply Buchdahl Decl., Ex. D, at 2.

7

Flagstar's argument against sampling also has no relevance to Assured's claims that Flagstar breached the servicing provisions in the transaction documents, because the repurchase remedy, and thus the definition of "Asset Balance" that Flagstar's argument hinges on, does <u>not</u> apply to these claims. That remedy is further inapplicable to determining damages based on Flagstar's breach of separate representations it made in the I&I.[11]

As for loans that Flagstar claims are "current," Flagstar makes the startling assertion that any breach at the time of origination "can hardly be characterized as material and continuing." This is fundamentally incorrect. Any breach by Flagstar of its representations and warranties with regard to a particular loan increases the risk of default on that loan beyond what Assured agreed to accept when it issued the Policies, and therefore increases the likelihood of Assured paying claims on the Policies. That is why Flagstar must repurchase loans for which a representation and warranty is breached regardless of delinquency. Rendón Decl., Ex. N, SSA §2.04(d) (Flagstar must cure or repurchase "in all material respects ***any*** breach of any of the foregoing representations and warranties" (emphasis added)).[12]  Contrary to Flagstar's preposterous claim that "the potentially actionable loan population becomes a mere 264 loans," it is clear that this trial will involve thousands of loans—7,118 just considering "current,"

---

[11] Rendón Decl. Ex. P, I&I § 2.01(i) ("None of the Provided Documents contain any statement of material fact with respect to . . . [the] Mortgage Loans that was untrue or misleading in any material respect when made," "there has been no change, nor any development or event involving a prospective change known to [Flagstar] that would render any of the Provided Documents untrue or misleading in any material respect," and that no fact was known to Flagstar that "could be reasonably expected to cause a Material Adverse Change with respect to . . . the Mortgage Loans").

[12] *See, e.g., In re Homeowners Mort. and Equity, Inc.*, 354 F.3d 372, 376 (5th Cir. 2003) (loan purchase agreement gave buyer right to demand repurchase of any loan that violated agreement, without regard to whether the loans ultimately went into default, and thus seller's argument that buyer could not seek damages for breach of repurchase agreement absent evidence of harm was meritless); *Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 17 & n.10 (1st Cir. 2002) (seller breached express warranties that loans would be Fannie Mae and Freddie Mac compliant, and thus seller's repurchase remedy was triggered, without regard to whether loans had gone into default or buyer had been harmed).

"delinquent" and "charged off" loans—and millions of pages of data. The proposed sample of 400 loans per securitization, just as in other RMBS cases, will yield substantial efficiency gains.

IV. **Sampling is Fully Consistent With the Transaction Documents**

Flagstar contends that Assured cannot use sampling in this case because "the cure or retransfer process must necessarily occur on a loan-by-loan basis." Flagstar's contentions are based on a cavalcade of interpretive errors. First of all, Flagstar falsely suggests once again that there is a "demand" or "notice" requirement to Flagstar's obligation to repurchase loans. While the SSAs provide that any party that discovers breaches, including Flagstar, should notify the other parties (and Assured) of those breaches, *id*., Ex. N, SSA, § 2.03(c), that requirement is independent of Flagstar's obligation to cure or repurchase any loan that is in breach of "any of the foregoing representations and warranties" within "90 days of becoming aware of it." *Id*. § 2.03(d).[13] These obligations are particularly appropriate because Flagstar (as originator, securitizer, sponsor and servicer) was the party best suited to detect breaches in the portfolios.

Flagstar suggests that it would not be possible to determine the "deficiency which Flagstar must deposit into the Trust" upon repurchase, but this amount of money is a damages figure readily amenable to expert extrapolation.[14] Flagstar contends that the Trustee must

---

[13] *See Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*, No. 04-CV-1432, 2007 WL 2904591, at *13 (S.D. Ind. Sept. 28, 2007) (under New York law, notice provision "is not a condition precedent to Laureate's duty to cure or repurchase. Laureate's obligation to cure or repurchase . . . is triggered in either of two situations—upon notice of or when it discovers on its own a material defect in a mortgage loan or a breach of its representations or warranties").

[14] *See Resolution Trust Corp.*, 280 F.3d at 18–19 & n.15 (affirming the district court's calculation of damages, which "merely represents what Key would have paid Home Owners had it repurchased the loans when it was supposed to have done so"); *Orix Real Estate Capital Mkts. v. Superior Bank*, 127 F. Supp. 2d 981, 983 (N.D. Ill. 2000) (under New York law, awarding damages under repurchase provision as "[t]here is no practical difference between this repurchase remedy and compensatory damages"); Michael Cavendish, *New Analysis of the Repurchase Obligation in Participation Agreements*, 127 Banking L.J. 417, 419 (2010) (noting that courts treat repurchase clauses "as mere liquidated obligations to pay money, without practical distinction against any other manner of contract clause providing for compensatory or liquidated damages," but that litigants (like Flagstar) "attempt to characterize the remedy as a

9

specifically determine the deficiency, but Assured is affirmatively empowered to "exercise any rights and remedies available under the Transaction Documents in its own capacity or in its capacity as the Person entitled to exercise the rights of the Noteholders in respect of the Securities" and can enforce this provision through this lawsuit. *Id.*, Ex. P, I&I § 5.02(a). Flagstar also contends that repurchase must move forward as a "loan-by-loan" process, but nothing in the transaction documents requires this. In fact, the very provision describing the remedy recognizes that there can be "breach[es] of a representation and warranty relating to the characteristics of the Mortgage Loans in the <u>aggregate</u>." *Id.*, Ex. N, SSA § 2.04(d).

In any event, sampling may be used for a number of other purposes, including to present evidence on Assured's servicing-breach claims, and on liability issues such as the pervasiveness of defects, and Flagstar's knowledge and notice of defects (important to establishing that Flagstar breached its repurchase obligation and therefore eliminated the exclusivity of the repurchase remedy), issues unaffected by Flagstar's flawed construction of the repurchase remedy.

For the reasons stated above, as well as those set forth in Assured's opening brief, Assured respectfully requests this Court to grant Assured's motion *in limine*.

Dated:  August 22, 2011
        New York, NY                                  Respectfully Submitted,

                                                      **SUSMAN GODFREY L.L.P.**


                                                      By:   /s/ Arun Subramanian
                                                            Stephen D. Susman
                                                            Jacob W. Buchdahl
                                                            Arun S. Subramanian
                                                            SUSMAN GODFREY L.L.P.
                                                            560 Lexington Ave., 15th Floor
                                                            New York, NY 10022
                                                            (212) 336-8330

---

specific performance in order to create a heightened burden for the plaintiff or a general aura of exoticism").

10