```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
ASSURED GUARANTY MUNICIPAL CORP.      :
f/k/a FINANCIAL SECURITY ASSURANCE    :
INC.,                                 :
                                      :
                 Plaintiff,           :     11 Civ. 2375 (JSR)
                                      :
           -v-                        :     AMENDED MEMORANDUM
                                      :
FLAGSTAR BANK, FSB, FLAGSTAR CAPITAL  :
MARKETS CORP., and FLAGSTAR ABS, LLC, :
                                      :
                 Defendants.          :
------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff Assured Guaranty Municipal Corp. ("AGM") brings this action alleging that defendants Flagstar Bank, FSB, Flagstar Capital Markets Corp., and Flagstar ABS, LLC (collectively, "Flagstar") breached a series of contracts between the parties relating to financial guaranty insurance. Flagstar moved to dismiss the Complaint in its entirety, and, after receiving full briefing and hearing oral arguments from the parties, the Court, by Order dated July 7, 2011, granted in part and denied in part the motion. In particular, the Court: (a) denied the motion insofar as it sought dismissal of the Complaint's breach of contract claims, (b) granted the motion insofar as it sought dismissal of the Complaint's reimbursement and indemnification claims, and (c) limited AGM's remedies with respect to its remaining breach of contract claims to those related to enforcing Flagstar's "cure or repurchase" obligation. This Memorandum explains the reasons for those rulings.

The pertinent facts, taken from the Complaint and documents expressly incorporated therein, are as follows. In two separate transactions, executed in 2005 and 2006 respectively, AGM agreed to provide Flagstar with financial guaranty insurance for approximately $1 billion worth of Flagstar-issued securities, which were backed by several thousand home equity loans (i.e., mortgage backed securities). Complaint ("Compl.") ¶ 2. The parties' agreements were memorialized in a set of three, simultaneously-executed contracts: the Sale and Servicing Agreements ("SSAs"), the Mortgage Loan Purchasing Agreements ("MLPAs"), and the Insurance and Indemnity Agreements ("I&Is") (collectively, the "Transaction Documents").[1] Id. ¶¶ 6, 18, 26.

Through the MLPAs, defendant Flagstar Bank sold a pool of home equity loan mortgages to one of its wholly owned subsidiaries, defendant Flagstar ABS. See Declaration of Veronica E. Rendon, dated May 23, 2011 ("Rendon Decl.") Ex. M. (the "MLPAs"). The MLPAs identify AGM as the "Note Insurer" of the loans, and as a third-party beneficiary of the contracts. Id. §§ 7.07, 7.08. Flagstar made numerous representations and warranties in the MLPAs concerning the quality and characteristics of the underlying mortgages, including that: (1) "Each Mortgage Loan was originated in good faith and in

---

[1] The contractual terms of the 2005 and 2006 versions of these documents are "materially identical" to one another, see Compl. ¶ 39, and, accordingly, they will not be discussed separately.

2

accordance with the [Flagstar's] underwriting guidelines;" (2) "No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person," and (3) At "the time of origination [Flagstar] had no knowledge of any fact that would have led it to expect that any interest in any Mortgage Loan is unlikely to be paid in full when it becomes due and payable." Id. § 3.02(a). With regard to the remedies available to AGM in the event that Flagstar was found to have breached any of the above-described representations and warranties, the MLPAs provide that:

> The sole remedy of . . . [AGM] . . . against . . . Flagstar for the breach of a representation or warranty with respect to a Mortgage Loan . . . is [Flagstar's] obligation . . . , subject to certain cure periods, to accept a transfer of a Mortgage Loan as to which a breach has occurred and is continuing . . . or to substitute an Eligible Substitute Mortgage Loan [for the defective loan].

Id. § 3.02(c).

Through the SSAs, Flagstar Bank deposited the applicable mortgage loans with its affiliate Flagstar Home Equity Loan Trust. Compl. ¶ 26. The SSAs also designate AGM as a third-party beneficiary, and they repeat and incorporate Flagstar's representations and warranties from the MPLAs. See Rendon Decl. Ex. N (the "SSAs") §§ 2.04(a), 8.06. Further, the SSAs provide that Flagstar is liable for any material breach of those warranties, regardless of whether or not Flagstar knew that "[its] substance . .

3

. was inaccurate at the time [it] was made." See id. § 2.04(b). With respect to remedies, the SSAs first state that if any party "discovers a [material] breach of any of the foregoing representations and warranties . . . [it] shall give prompt notice to the other parties" of that breach. Id. § 2.04(c). Moreover, in the event a breach is discovered, the SSAs require Flagstar to "use all reasonable efforts to cure in all material respects any breach . . . within 90 days of becoming aware of it." Id. § 2.04(d). If Flagstar fails in its obligations to cure a breach within the applicable 90 day notice period, the SSAs state that "all interest . . . in the Defective Mortgage Loan shall . . . automatically be retransferred . . . to [Flagstar]." Id.

The SSAs also set forth the process by which AGM's damages, if any, are to be calculated in the event of a repurchase. The "Indenture Trustee," which the SSAs identify as the Bank of New York, see id. at 45, "shall determine" if the repurchase "would cause a Transfer Deficiency" in the loan pools. Id. § 2.07(a). "If so, the Indenture Trustee shall notify [Flagstar] of the deficiency, and [Flagstar] shall transfer to the [Trust] . . . Eligible Substitute Mortgage Loans or deposit . . . an amount in immediately available funds equal to the amount of the Transfer Deficiency." Id. Annex 1 to the SSAs defines the Transfer Deficiency as the lesser of (a) "the Asset Balance of the Defective Mortgage Loan" or (b) the difference

4

between the overcollateralization target and the actual overcollateralization amount. Rendon Decl. Ex. O at 20. The Asset Balance of a mortgage loan is generally defined under the Transaction Documents, along with some nuances not relevant here, as the loan's "unpaid principal balance . . . ." See id. at 2, 13. However, the documents also state that for "charged off" loans -- i.e., a loan for which a determination has been made that further repayment is unlikely, see Black's Law Dictionary 227 (7th ed. 1999) -- the Asset Balance "means zero." Id. at 2. But see id. at 14 (defining the "Liquidation Loss Amount" for charged off loans as its "unrecovered Asset Balance").

Finally, like the MLPAs, the SSAs specify that "[AGM's] sole remedy against [Flagstar] for the breach of a representation or warranty with respect to a Mortgage Loan . . . is [Flagstar's] obligation . . . to accept a transfer of a Mortgage Loan as to which a breach has occurred . . . or to substitute an Eligible Substitute Mortgage Loan." Id. § 2.04(e).

Through the I&Is, AGM agreed to insure certain mortgage-backed securities owned by Flagstar. See Compl. ¶ 30. In addition to incorporating the representations and warranties made by Flagstar in the SSAs and MLPAs, see Rendon Decl. Ex. P ("I&Is") § 2.03(h), the I&Is contain several additional representations and covenants by Flagstar, including that: (1) "[N]one of the [Transaction] Documents

5

contain any statement of a material fact with respect to . . . the Mortgage Loans that was untrue or misleading in any material respect," (2) "The information supplied by [Flagstar] to [independent ratings agencies] . . . did not contain any untrue statement of a material fact or omit to state any material fact," and (3) "No practice, procedure or policy employed or proposed to be employed by [Flagstar] in the conduct of its business violates any law." See id. § 2.01. The I&Is define an "Event of Default" as, inter alia, where "any representation or warranty made by any party hereto under this Agreement . . . shall prove to be untrue or incorrect in any material respect" or where "any party hereto . . . shall fail to perform or observe any other covenant or agreement contained . . . in any of the Transaction Documents . . . and such failure shall continue for a period of 30 days after written notice . . . ." Id. § 5.01.

As to the remedies available to AGM in connection with an Event of Default, the I&Is state that "[AGM] may . . . exercise any rights and remedies available under the Transaction Documents," id. § 5.02(a), but expressly clarifies that these are "subject to the limitations as to remedies as set forth in the Transaction Documents (so long as [Flagstar] is in compliance with its repurchase obligation thereunder)," id. § 2.03(h) (parentheses in original). In addition, the I&Is state that "[AGM] may . . . take whatever action at law or in equity that may appear necessary or desirable in its

6

judgment to enforce performance of any obligation of [Flagstar] under the Transaction Documents," and that "[u]nless otherwise expressly provided, no remedy herein conferred . . . is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under the Transaction Documents or existing at law or in equity." Id. § 5.02(a)-(b).

Separately, in the I&Is, Flagstar agreed to indemnify AGM for "any and all claims, losses, liabilities . . . suits, judgments, demands, damages, costs, or expenses. . . of any nature . . . relating to the transactions contemplated by the Transaction Documents" that result from "the breach by [Flagstar] of any representation, warranty or covenant under any of the Transaction Documents." Id. § 3.04(a). The SSAs similarly state that "[Flagstar] . . . shall defend and indemnify . . . [AGM] against all . . . losses, damages, claims, and liabilities" that occur "as a result of any third-party action arising out of any breach of a representation and warranty by [Flagstar]." SSAs § 2.04(g). To invoke these indemnification obligations, AGM is directed to "promptly notify [Flagstar] in writing . . . [i]f any action or proceeding (including any governmental investigation) [is to] be brought or asserted against [AGM] . . . in respect of which indemnity

may be sought," in which case, "[Flagstar] shall assume the defense thereof." Id. § 3.04(b).

Starting in 2008, the performance of the home equity loans underlying Flagstar's mortgage-backed securities began to deteriorate badly, and numerous loans went into default. Compl. ¶ 41. As a result, AGM, as the insurer of those securities, was required under the Transaction Documents to pay more than $82.4 million in claims to third-party investors. Id. In the wake of these losses, AGM conducted an internal review of a sample of charged off loans that revealed that Flagstar had breached several of the above-described representations and warranties. Compl. ¶ 41. For example, AGM's review revealed that "the vast majority of the loans in the sample violated Flagstar's underwriting guidelines," that several loan files had "missing, deficient and defective loan documentation," and that "many [loan files] contained evidence of fraud or negligence in the loan origination process." Id.; see also id. ¶¶ 42-56.

In two separate rounds of correspondence, occurring around January 2009 and July 2010 respectively, AGM notified Flagstar that it had discovered breaches of representations and warranties affecting over 900 individual Flagstar loans that AGM had insured pursuant to the Transaction Documents. Id. ¶ 57. Further, AGM communicated to Flagstar that it had found such breaches with respect to "an overwhelming percentage of the loans" included in its review.

Id. As a result, AGM "demanded that [Flagstar] comply with the repurchase, reimbursement, and indemnification provisions" contained in the Transaction Documents." Id. ¶ 57-58. Flagstar rejected AGM's demand in its entirety, and the deadline for Flagstar to either cure the breaches identified by AGM or repurchase the noncompliant loans expired. Id. ¶ 58. Moreover, the Complaint alleges that "[g]iven the high incidence of underwriting violations and misrepresentations found in the [charged off] loans that AGM has investigated to date . . . it is a virtual certainty that a significant percentage of [non-charged off] loans from the . . . securitized pools . . . have the same breaches." Id. ¶ 59. Accordingly, AGM expects that it may in the future be required to pay "potentially tens of millions of dollars more in claims" under the Transaction Documents. Id. ¶ 8.

On the basis of the foregoing, AGM brings claims for breach of contract under both the 2005 and 2006 iterations of the Transaction Documents, and claims for "reimbursement and indemnification," again under each set of Transaction Documents.

The Court first moves to consider Flagstar's argument that AGM is contractually limited to the "cure or repurchase" remedy articulated in the SSAs and MLPAs. See MLPAs § 3.02(c); SSA § 2.04(e). As noted above, both the SSAs and MLPAs state that the "sole remedy" available to AGM in the event Flagstar breaches a representation or warranty made in the Transaction Documents is its

"obligation . . . subject to certain cure periods" to either repurchase the noncompliant loan or substitute a new compliant loan into the loan pool. Id. As AGM notes, however, the I&Is provide that the repurchase or substitution remedy applies only "so long as [Flagstar] is in compliance with its repurchase obligation[s]." I&Is § 2.03(h). Accordingly, given that the Complaint specifically alleges that Flagstar has failed to honor its repurchase obligations and that the contractually specified cure period has expired, AGM broadly argues that Flagstar "ha[s] forfeited any contractual limit on AGM's remedies." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 10. Further, AGM points to the I&Is' direction that "[u]nless otherwise expressly provided, no remedy . . . is intended to be exclusive" but rather that remedies "shall be cumulative . . . to other remedies given under the Transaction Documents or existing at law or in equity." See I&Is § 5.02(b). According to AGM, this language indicates that the I&Is "contemplate[] that AGM will enjoy remedies above and beyond the remedies in the underlying Transaction Documents." Pl. Mem. at 12. Finally, AGM argues that the broadly worded indemnity provisions in the Transaction Documents -- whereby Flagstar agreed to indemnify AGM for, inter alia, "any and all claims" resulting from Flagstar's "breach . . . of any representation [or] warranty" in the Transaction Documents, I&Is § 3.04(a) -- require Flagstar to indemnify it for all

10

insurance claims paid by AGM to third-parties if those claims arose as a result of Flagstar's breach of an applicable representation or warranty.

These arguments are premised, however, on reading each of the provisions emphasized by AGM in isolation. But it is black letter law that the provisions of a contract or a related set of contracts should be read as a whole and every effort should be made to give them consistent meaning in their overall context. See, e.g., Perreca v. Gluck, 295 F.3d 215, 224 (2d Cir. 2002) (it is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other," and, accordingly, "all provisions of a contract [should] be read together as a harmonious whole, if possible."). So read, the combined effect of these provisions is to restrict AGM's remedies to (a) enforcing Flagstar's obligation to either cure its breaches or repurchase the defective loans, and (b) damages in an amount equivalent to the "Transfer Deficiency," as calculated in the SSAs, discussed further below. Most notably, the MPLAs and SSAs both explicitly state these are the "sole" remedies available to AGM under the Transaction Documents for Flagstar's breach of a representation or warranty contained therein. In light of the Transaction Documents' specificity in this regard, the Court finds unconvincing AGM's contention that these limitations on their remedies completely

11

dissolve in the event that, as alleged here, Flagstar fails to "cure or repurchase" the defective loans within the applicable 30 day period. The I&Is' statement that it incorporates these limitations only "(so long as [Flagstar] is in compliance with its repurchase obligation . . .)," I&Is § 2.03(h), is not to the contrary. Instead, reading this caveat in tandem with the I&Is' provision that AGM may "take whatever action at law or in equity that may appear necessary . . . to enforce [Flagstar's] obligation" under the Transaction Documents, see id. § 5.02, the Court construes § 2.03(h) of the I&Is as indicating that the "sole remedy" provisions of the Transaction Documents do not preclude AGM from bringing suit against Flagstar in the event that, as alleged here, Flagstar refuses to comply with its repurchase obligations.[2] Moreover, this ruling is fully consistent with the I&Is' provision that the remedies available under the Transaction Documents are not intended to be exclusive "[u]nless otherwise expressly provided." Id. § 5.02. The SSAs and MPLAs do "expressly provide[]" for Flagstar's "cure or repurchase" obligation to be the exclusive remedy available to AGM for Flagstar's breach of a representation or warranty. See MLPAs § 3.02(c); SSA § 2.04(e).

Separately, the Court concludes that the indemnity provisions of the I&Is and SSAs relate solely to claims brought by third-parties

---

[2] Not only is this reading of the I&Is consistent with common sense, but the applicable language of I&I § 2.03(h) is set out in parentheses, thereby indicating that it was not intended to have independent force, but rather to clarify a contractual right or obligation delineated elsewhere in the Transaction Documents.

against AGM, not claims, such as those asserted here, that AGM commences on its own behalf. It is true that § 3.04(a) of the I&Is -- which states that Flagstar shall indemnify AGM for "any and all claims" that result from "the breach by [Flagstar] of any representation, warranty or covenant under any of the Transaction Documents," I&Is § 3.04(a) -- could, if viewed in narrow isolation, be read as establishing the sweeping indemnification rights AGM asserts in this action. However, § 3.04(b) clarifies that Flagstar's indemnification obligations only apply with regard to "action[s] or proceeding[s] (including any governmental investigation) [that are] brought or asserted against [AGM]" by a third-party. Id. § 3.04(b) (also noting that if an action "in respect of which indemnity may be sought . . . [AGM] shall promptly notify [Flagstar] in writing"). Moreover, the Court concludes that AGM's expansive interpretation of the Transaction Documents' indemnification provisions would be irreconcilably inconsistent with, and therefore render superfluous, the more-particularized "sole remedy" provisions discussed above. See Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible") (internal citation omitted); see also HSH Nordbank AG N.Y. Branch v. Street, 2011 WL 1667118, at *4 (2d Cir. May 4, 2011) (it is a "basic canon of construction of

13

contract law that 'specific language in a contract will prevail over general language where there is an[y] inconsistency between two provisions'"). Finally, the Court notes that contractual indemnification clauses are "strictly construed" under New York law, "so as not to read into them any obligations the parties never intended to assume." Haynes v. Kleinewefers & Lembo Corp., 921 F.2d 453, 456 (2d Cir. 1990); see also BNP Paribas Mortgage Corp. v. Bank of Am., N.A., 2011 WL 1210208, at *36 (S.D.N.Y. Mar. 23, 2011). Accordingly, the Court concludes that "[c]onstruing the indemnification clause as pertaining only to third-party suits" is the only way to "afford[] a fair meaning to all of the language employed by the parties in the contract and leave[] no provision without force and effect." Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491-93 (N.Y. 1989).

For the foregoing reasons, the Court concludes that AGM's claims seeking indemnification and reimbursement must be dismissed, and that, with respect to AGM's breach of contract claims, AGM is limited to remedies that are commensurate with Flagstar's alleged breach of its "cure or repurchase" obligation under § 2.04(e) of the SSAs and § 3.02(c) of the MLPAs.

The Court turns next to consider Flagstar's contention that the Complaint must be dismissed for failure to adequately allege damages. In this respect, Flagstar first contends that the Complaint does not

14

plausibly direct any of its allegations to "non-charged off loans" -- i.e., loans for which further payment is expected. In response, AGM notes that the Complaint, on its face, clearly alleges that Flagstar's breaches reach wide swaths of the loan portfolio, specifically stating that:

> Given the high incidence of underwriting violations and misrepresentations found in the loans that AGM has investigated to date, as well as deficiencies and defects in the loan documentation, it is a virtual certainty that a significant percentage of [all the underlying loans] that AGM has not yet investigated to date have the same breaches.

Compl. ¶ 59. Flagstar argues that this allegation is inadequately substantiated, however, because the Complaint also makes clear that AGM has only reviewed the loan documentation, and made repurchase demands, with respect to charged off loans. See Compl. ¶¶ 41-56.

However, in contending that AGM must independently review samples of non-charged off loans before it can state a plausible claim for relief with respect to those loans, Flagstar misunderstands federal pleading standards. To meet the strictures of Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's pleadings must "allege a plausible set of facts sufficient to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). This standard demands that a plaintiff set forth factual allegations that, if accepted as true, are sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal,

129 S. Ct. 1937, 1949 (2009). Here, AGM plausibly alleges that, after reviewing the documents associated with large samples of Flagstar's securitized mortgage loans, it discovered that Flagstar had pervasively and materially breached representations and warranties with respect to those loans. Given that the overall mortgage loan population underlying Flagstar's securities is substantially uniform in many material respects, see Compl. ¶¶ 42-56, the Court concludes that it is reasonable to infer that these breaches also occurred with respect to the non-charged off loan population that AGM has yet to review. While Flagstar argues that this inference is not a plausible one under Iqbal because AGM's review was limited to charged off loans, the Court finds this argument unconvincing. Critically, there is no necessary ex ante distinction between a charged off and non-charged off loan. Rather, by definition, these two loan populations are only delineated as separate categories based on an ex post determination as to the relative prospect that a given loan will be repaid. As such, the Court concludes that one can reasonably infer that the attributes of the two loan populations would be in many respects identical at the time of origination, and that breaches affecting one loan population would therefore also likely exist with respect to the other.

Next, the Court considers Flagstar's assertion that, to the extent the Complaint makes allegations regarding non-charged off

16

loans, these allegations are not yet ripe for adjudication. Specifically, Flagstar interprets the Transaction Documents as prescribing a mandatory procedure by which AGM must affirmatively notify Flagstar of particular breaches affecting certain loans and then may only bring suit if Flagstar does not repurchase or cure the defective loans within 90 days. See SSA § 2.04(c)-(d) (stating that when any party to the Transaction Documents "discovers a [material] breach of any of the foregoing representations and warranties . . . [it] shall give prompt notice to the other parties," and that Flagstar "shall use all reasonable efforts to cure in all material respects any breach . . . within 90 days of becoming aware of it."). However, unlike the "sole remedy" provisions discussed supra, notably absent in SSA § 2.04 is any indication that the parties intended this "notice and opportunity to cure" process to be the exclusive means by which AGM may enforce its rights under the Transaction Documents. Instead, the I&Is state that AGM may "take whatever action at law or in equity that may appear necessary to enforce any obligation of [Flagstar's] . . . ." I&Is § 5.02(a).

Accordingly, despite Flagstar's assertions to the contrary, SSA § 2.04 does not impose an affirmative obligation on AGM to review or audit its insured loans in search of specific Flagstar breaches. Rather, Flagstar's cure or repurchase obligations are triggered merely by Flagstar "becoming aware of" a breach. See SSA § 2.04(d).

In that vein, given the material uniformity of the underlying loan population, AGM contends that its "notification [to Flagstar] of pervasive breaches" affecting the charged off loans that were the subject of AGM's internal review, see Pl. Mem. at 15, rendered Flagstar constructively "aware" -- or, at minimum, put Flagstar on inquiry notice -- of the substantial likelihood that these breaches extended beyond the charged off loan population and into the broader loan portfolio. For purposes of the instant motion, the Court agrees.

Accordingly, the Court concludes that the Complaint plausibly alleges portfolio-wide breaches of representations and warranties on the part of Flagstar, and that these allegations are ripe for adjudication.

Finally, the Court turns to address Flagstar's contention that AGM is not entitled to any damages with respect to the charged off loan population. The Court first notes that the Asset Balance of a given mortgage loan is, as a general matter, equal to the loan's "unpaid principal balance." See Rendon Decl. Ex. O at 2, 13. As Flagstar notes, however, Annex 1 to the SSAs states that the Asset Balance for any charged off loan "means zero," see id. at 2, which Flagstar interprets as meaning that the damages available to AGM with respect to any such loan must also be "zero." The Court finds this argument unconvincing. Under the Transaction Documents, after

Flagstar repurchases a given loan, it is obligated to compensate the
Trust for any resulting Transfer Deficiency by conveying to the
Custodial Account an amount of funds equivalent to either "the Asset
Balance of the Defective Loan" or, as is not relevant here, an amount
sufficient to bring the loan pool back to a proper level of
overcollateralization. See id. at 27. However, if the Asset Balance
of a charged off loan is defined as "zero" for purposes of
calculating the Transfer Deficiency, as Flagstar asserts here, then
the Transfer Deficiency would also always necessarily be "zero."
This proves too much. Adopting Flagstar's construction would render
broad swaths of the Transaction Documents -- which explain in detail
the circumstances in which Flagstar must convey the Transfer
Deficiency to AGM, and the process by which it must do so, see, e.g.,
SSAs § 2.07 -- wholly superfluous. If the Transfer Deficiency is, by
definition, "zero", then there would never be any Transfer Deficiency
to convey. See also Galli, 973 F.2d at 149 (contractual
interpretations that render contract provisions superfluous are
disfavored). More broadly, the Court notes the peculiarity of
Flagstar's argument in another critical respect: Because the
identification of a loan as "charged off" is one that it appears from
the allegations of the Complaint Flagstar can make at its
contrivance, and because the classification of a loan as either
"charged off" or "non-charged off" merely reflects a discretionary

19

prediction as to whether or not any further payments will be made on that loan, see Rendon Decl., Ex. O at 13, under Flagstar's logic it would have the unilateral ability to insulate itself from damages with respect to any breach of its contractual obligations by simply charging off the offending loan. That cannot have been what the parties intended when they entered into their agreements.

Accordingly, based on the allegations in the Complaint, the Court concludes that the "Transfer Deficiency" for the charged off loan population must be made by reference to the loans as they existed during the applicable repurchase period. In effect, this means that, assuming the truth of the allegations made in the Complaint, the proper measure of damages for a charged off loan is the amount of the outstanding principal balance on that loan at the time it was "charged off" by Flagstar. See id. at 14 (defining the "Liquidation Loss Amount" for charged off loans as the "unrecovered Asset Balance" of those loans).

For the foregoing reasons, the Court hereby reconfirms its Order dated July 7, 2011 granting in part and denying in part Flagstar's motion to dismiss.

Dated: New York, NY
      October 27, 2011

                              JED S. RAKOFF, U.S.D.J.