# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


ASSURED GUARANTY MUNICIPAL )
CORP., f/k/a FINANCIAL )
SECURITY ASSURANCE INC., )
                Plaintiff, )
                              ) Case No.
        vs.                   ) 11-CV-2375 (JSR)
                              )
                              )
FLAGSTAR BANK, FSB; )
FLAGSTAR CAPITAL MARKETS )
CORPORATION; and FLAGSTAR )
ABS, LLC, )
                Defendants. )
                              )


DEPOSITION OF DAVID BEARD

New York, New York

November 1, 2011, 2011


Reported By:

CATHI IRISH, RPR, CLVS, CCR

```
 1                        BEARD
 2    to provide this type of guaranty insurance?
 3         A.   It's generally an issuer of securities.
 4         Q.   So to -- is it fair to say that there
 5    is an issuer of securities and they retain the
 6    bond insurer here, FSA, to provide insurance
 7    insure the timely payment of interest and
 8    principal to bondholders?
 9         A.   Timely payment of interest and ultimate
10    principal or modified Freddie Mac principal
11    schedule.
12         Q.   And with that minor clarification, you
13    agree that's an --
14         A.   Yes.
15         Q.   -- accurate statement?
16              Okay.  Not to be a pain in the neck but
17    just let me finish my question and then you can
18    answer after me, just to make sure that we're
19    not -- we're getting an accurate transcription.
20    Hard to do, I know, especially when you know what
21    the question is going to be.
22              The -- you said that in the
23    corporate -- you worked in the corporate finance
24    group of FSA; is that correct?
25         A.   That's correct.
```

1                                BEARD

2          Q.    So that would include residential

3     mortgages?

4          A.    That's correct.

5          Q.    Like a house mortgage is what we're

6     talking about?

7.         A.    Uh-huh.

8          Q.    And when you say that FSA wrapped

9     residential mortgage-backed securities, just to be

10    clear, the wrap is the concept of providing the

11    insurance that we talked about earlier, correct?

12         A.    Yes.

13         Q.    Okay.   When you say it was your

14    responsibility to seek opportunities to originate

15    wrap opportunities for mortgage-backed securities,

16    what was it -- what does that actually mean?  What

17    was your job responsibility?  What did you do?

18         A.    We engaged issuers.  We discussed

19    benefits of wrap.  We facilitated the underwriting

20    of the security issuance.

21         Q.    When you say you engaged an issuer,

22    what does that mean?

23         A.    We asked for their business.

24         Q.    In the period of -- well, who is FSA's

25    primary competitors, let's say in the time period

Page 16

1                            BEARD

2   2004 through early 2007?

3        A.    MBIA and AMBAC.

4        Q.    So those two companies, MBIA and AMBAC,

5   were in the same business as FSA of wrapping

6   mortgage-backed securities?

7        A.    Yes, they wrap mortgage-backed

8   securities.

9        Q.    Well, when you say -- I just want to

10  make sure I understand when you say the primary

11  competitors of FSA in this time period of 2004

12  through early 2007 was MBIA versus AMBAC, what do

13  you mean that they were the primary competitors?

14            MR. BUCHDAHL:   Not MBIA versus AMBAC.

15            MS. RENDON:   Did I say versus AMBAC?

16       Why don't I restate the question.   Thank you

17       for catching that.

18  BY MS. RENDON:

19       Q.    When you say that FSA's primary

20  competitors were MBIA and AMBAC, what did you mean

21  by that, sir?   And again, I'm talking the time

22  period of 2004 through early 2007.

23       A.    I don't know how I can elaborate on

24  that.   They were our primary competitors.

25       Q.    And that's because both MBIA and AMBAC

```
 1                           BEARD
 2          Q.    Okay.  So you have no knowledge whether
 3     or not FSA --
 4          A.    I just --
 5                MR. BUCHDAHL:  Mr. Beard, give it time
 6          even if a question is repeated, wait until you
 7          hear the whole question.
 8                THE WITNESS:  Okay, sorry.
 9     BY MS. RENDON:
10          Q.    So my question is:  Do you have any
11     understanding, understanding you weren't tracking
12     the various bond insurers, do you have any
13     understanding as to whether FSA had a AAA at the
14     time it was acquired by Assured Guaranty?
15          A.    I don't know.  I'd have to look it up.
16          Q.    Going back to the time period of 2004
17     through 2007, so I'm going to focus on that time
18     period.  We were -- and you were describing for me
19     FSA, MBIA and AMBAC being competitors of one
20     another in the world of wrapping residential
21     mortgage-backed securities.
22                Did FSA specialize in first time
23     issuers or have a focus on working with first time
24     issuers?
25          A.    We worked with repeat issuers and first
```

1                        BEARD

2    has a lot of experience. I'm just trying to make

3    sure when I'm going back and explaining it for

4    folks who may not appreciate this, they understand

5    what you mean with some of your shorthand.

6              When you say that FSA would go in and

7    pick a sample, do you mean that FSA would go in

8    and pick a sample of mortgages for purposes of

9    having a firm reunderwrite those mortgages?

10       A.    No, not exactly. We would select -- we

11   would generally select a random sample from the

12   tape which was a listing of each loan that was

13   proposed -- that was in the portfolio and its

14   major characteristics.

15       Q.    And then what?

16       A.    And then we would send it to the

17   underwriters for review.

18       Q.    You'd send the tape to the underwriters

19   for review or --

20       A.    We would request the loan files which

21   were generally reviewed on site, sometimes

22   electronically.

23       Q.    And then -- and when you would say we

24   would request, so FSA would take a random

25   sample -- using the loan tape, FSA would select a

1                          BEARD

2              Is that because if the structure didn't

3     provide coverage for the estimated losses, it

4     would be FSA's responsibility to cover those

5     losses?

6         A.    No.

7         Q.    What was the purpose of understanding

8     the loss estimate then?

9         A.    To assure that there was a multiple of

10    loss coverage.

11        Q.    So maybe you can walk me through this

12    on a more elementary basis.  I would appreciate

13    it.

14        A.    The objective was to make sure that

15    there was adequate structure so that there weren't

16    scenarios where you had to pay a claim.  So we

17    tested the first dollar claim and that was the

18    amount of coverage that was provided, and the

19    objective was to avoid any scenarios where you

20    didn't have a cushion two, three times the loss

21    expectations.

22              MS. RENDON:  Can you read that last

23         answer back to me, please?

24              (Record read.)

25              MS. RENDON:  Can I just ask a couple

...

```
 1                        BEARD
 2       more questions and then we'll take a short
 3       break?
 4              MR. BUCHDAHL:  Sure.
 5   BY MS. RENDON:
 6       Q.   I wanted to make sure I understood.
 7              So is it your testimony, Mr. Beard,
 8   that effectively what FSA was trying to accomplish
 9   through this transaction due diligence was to
10   understand the collateral, understand the loss
11   potential of the collateral, and then engage in
12   insuring that there was structuring of the
13   transaction to create cushions within the
14   transaction so that FSA wouldn't have to pay a
15   claim?
16       A.   Yes.
17              MS. RENDON:  Sure, we can take a short
18       break.
19              THE VIDEOGRAPHER:  The time is 9:37
20       a.m., November 1, 2011.  This is the end of
21       tape 1.  We're off the record.
22              (Recess taken from 9:38 a.m. to
23       9:45 a.m.)
24              THE VIDEOGRAPHER:  The time is 9:45
25       a.m., November 1, 2011.  This is tape 2.
```

1                    BEARD

2    ability to approve or disapprove of a transaction?

3         A.    I don't know.

4         Q.    You said earlier that you were a

5    director in the corporate finance group, correct?

6         A.    Uh-huh.

7         Q.    And you said that you were -- part of

8    your responsibilities was originating these types

9    of transactions we've been talking about?

10        A.    Uh-huh.

11        Q.    What more specifically, maybe you can

12   talk to us about what your role was kind of from

13   the beginning to the closing of a transaction, can

14   you give us a better idea of what your individual

15   role was on transactions that you helped

16   originate?

17        A.    Sure.   Generally, we would, you know,

18   learn of an impending issuance or receive a call

19   from an investment banker or receive a call from

20   an issuer that indicated that there was business

21   coming to market.   Sometimes we would, you know,

22   be in competition with another firm for the -- you

23   know, because of -- for a wrap.   We would discuss

24   the parameters of the transaction typically with

25   the investment banker who was leading the deal.

1                          BEARD

2              We would -- if their expectations for

3     attachment point and the profile of the deal made

4     sense, we would do a number of things, among which

5     would be getting the tape, getting the detail of

6     the portfolio, and some understanding of what the

7     structure might look like.  And you know, that

8     would be refined to its final form over a period

9     of weeks.

10             If we made an initial proposal and it

11    was accepted, we would perform additional work

12    that involved, you know, the sampling, the loan

13    file, the deal structure, and ultimately writing a

14    credit committee memo.  We wouldn't write a credit

15    committee memo if we didn't want to do the deal

16    but if we decided we wanted to wrap the

17    transaction, we would prepare and present a credit

18    committee memo describing the transaction.

19        Q.    And then -- thank you.  That was

20    helpful.

21             And that credit committee memo, to whom

22    was it presented, the credit committee?

23        A.    Uh-huh.

24        Q.    And who in this time period of 2004

25    through early 2007 sat on the credit committee?

Page 64

```
 1                        BEARD
 2    Williams might have been involved.  It just
 3    depends on the discussion.
 4        Q.    What was Mr. Williams's role at FSA
 5    during this time period during 2004 through 2007?
 6        A.    He was responsible for the
 7    mortgage-backed group.
 8        Q.    And when you say he was responsible for
 9    that group, is there any more specifics you can
10    make?
11        A.    He was -- he was -- he was -- I believe
12    he was a managing director responsible for the
13    mortgage-backed group.
14        Q.    As managing -- was Mr. Williams
15    effectively your boss?
16        A.    Uh-huh.
17        Q.    Did you work closely with Mr. Williams
18    during the course of your time at FSA?
19        A.    Yes.
20        Q.    When you say it was his responsibility
21    as managing director for the MBS group, what did
22    you understand his responsibilities included?
23        A.    This is suppositions to some extent
24    because I didn't have that job but he was
25    responsible for, you know, reviewing transactions,
```

```
 1                         BEARD

 2    less risky on first liens?

 3         A.    Well, your collateral interest is

 4    subordinated to the first lien.

 5         Q.    For folks who are lay people, what do

 6    you mean by that?

 7         A.    I mean the first lienholder has first

 8    claim on the proceeds of the sale of the property.

 9         Q.    What happens in a market in your mind

10    where property value decreases; is that an

11    environment that's particularly risky to a second

12    lien position?

13         A.    Because the second lien is behind the

14    first lien, any decline in value of the property,

15    whether it relates to the particular property

16    itself or the market at large, reduces the

17    potential for recovery from the -- from the

18    property value.

19         Q.    And that would be -- in effect, that

20    would be magnified on a second lien position as

21    compared to the first lien position?

22         A.    Yes.

23         Q.    And that's because the second lien is

24    subordinate to the interests of the first lien?

25         A.    That's correct.
```

```
 1                         BEARD
 2    on in the -- in Michigan.
 3         Q.    Why would that be a concern to you or
 4    FSA?
 5         A.    If it affected the portfolio in terms
 6    of the, you know, employment and that affects the
 7    ability to pay, that would be a concern.
 8         Q.    So if a mortgage went into the
 9    portfolio and the borrower were to lose his job,
10    that could cause the borrower to default on the
11    loan, correct?
12         A.    That's correct.
13         Q.    And that would be a loss that
14    ultimately FSA may have to pay on, correct?
15         A.    The -- you know, any losses on the
16    portfolio could contribute to, you know, lower
17    cushion or potential claim.
18         Q.    And I think I understand it but just to
19    put it on the record, when you say could result in
20    a lower cushion, in other words, there are
21    mechanisms in the securitization structure that
22    provide cash flows so -- that could be available
23    so that FSA wouldn't have to pay a claim, correct?
24         A.    There's -- there's -- there's current
25    cash and other forms of credit enhancement,
```

1                         BEARD

2    curtains of reserve, and other interests that

3    conspire to create the credit enhancement below

4    the bonds that are guaranteed.

5         Q.    So just to be clear, it's not as though

6    automatically just because a borrower defaults on

7    a loan, FSA automatically has to pay a claim,

8    correct?

9         A.    That's correct.

10        Q.    In other words, it's not this kind of

11   one-for-one type deal where borrower defaults, FSA

12   has to pay; that's not correct?

13        A.    That's -- it's -- that's right, it's

14   not correct.

15        Q.    My statement was correct?

16        A.    Sorry, that's fine.

17        Q.    It's left, right?

18        A.    Yeah.

19        Q.    Rather FSA's role is to ensure that

20   there is sufficient cash flow in the revenue

21   stream of the securitization, and if there's not,

22   then FSA would have to pay into the securitization

23   structure?

24        A.    The combination of excess interest,

25   reserves and other forms of credit enhancement

Page 93

1                              \      BEARD

2      represent the structure and the cushion against a

3      claims payment.

4           Q.   So in other words, it's a more

5      complicated equation, one has to look at the

6      overall cash flows of the entire structure in

7      order to both project potential claims FSA may

8      have to pay, and even in the reality of the living

9      structure itself of what have FSA will have to

10     pay?

11          A.   That sounds about right, yeah.

12          Q.   And the kinds of other -- the

13     structural cushions that we've talked about, does

14     that include things like an excess spread account?

15          A.   Yes.

16          Q.   What is an excess --

17          A.   Well, was there an excess spread

18     account?  An excess spread account would capture

19     excess spread in a reserve so the interest, the

20     interest cash flow less monthly costs and

21     expenses, fees, you know, servicing fees, guaranty

22     fees, trustee fees and bondholder interests, not

23     necessarily in that order, what's left at the end

24     of that is excess interest, and depending on the

25     structure, the excess interest could be captured

Page 94

1                        BEARD

2     in a reserve or be used to pay down senior bonds

3     in order that essentially the existing reserve

4     gets to a higher percentage.

5          Q.    So in other words, an excess spread

6     reserve can function as effectively interest

7     money, excess interest money coming in on any

8     particular month being put aside for a rainy day?

9          A.    As credit enhancement.

10         Q.    What about overcollateralization?  Are

11    you familiar with that term?

12         A.    Yes.

13         Q.    What does that mean?

14         A.    Overcollateralization would be having

15    collateral, loan collateral in excess of the bonds

16    issued.

17         Q.    And why would that provide structural

18    protection to, for instance, FSA?

19         A.    Because if everything -- if you had a

20    higher bond balance and a higher interest rate

21    than the bond balance and the bond interest rate,

22    there would be additional -- that provides for

23    additional cushion.

24         Q.    What about the concept of

25    subordination, is that another structural

1                         BEARD

2    mechanism to try to build additional cushion into

3    the securitization structure for the benefit of

4    FSA?

5         A.    In HELOCs, it can be.

6         Q.    What about -- when you say in HELOCs it

7    can be, what do you mean?

8         A.    Well, there's a couple of elements in

9    that.  New advances could be made by the issuer

10   and which would be subordinated.  There could be

11   an issuer interest that is say 5 or 10 percent of

12   the transaction, which is subordinated to the

13   senior bondholders, so that was what that

14   subordination would mean, would mean to me anyway.

15        Q.    Are you familiar with a term

16   liquidation loan loss amount?

17        A.    Yes, I believe I am.

18        Q.    Lucky man that you are.

19              What do you understand liquidation loan

20   loss amount to mean?

21        A.    Generally I would think the liquidation

22   loan loss amount would be the amount of loss to a

23   trust upon the completion, upon the exercise of

24   repossession, foreclosure, collection efforts on

25   the part of the servicer.

1                          BEARD

2          whether it happened in any kind of large

3          measure.

4     BY MS. RENDON:

5          Q.    So if it were level 2, it would be okay

6     for those to be included in the transaction from

7     FSA's point of view?

8          A.    Yes.

9                MR. BUCHDAHL:  Objection to form.

10    BY MS. RENDON:

11         Q.    Because effectively whatever's wrong

12    with them isn't significant or material?

13               MR. BUCHDAHL:  Objection to form.

14               THE WITNESS:  It wouldn't be unusual

15          to -- we didn't -- we didn't -- we weren't

16          kicking loans out of the pool, the sample

17          pool.  We were really just trying to assess

18          whether the sample generally was

19          representative of what we would expect to see

20          in a -- in the transaction.

21    BY MS. RENDON:

22         Q.    And if there were level 2 -- if there

23    were level 2 type loans that were represented

24    within the transaction, that would not be a reason

25    in FSA's mind not to proceed with the transaction?

```
 1                           BEARD
 2        A.    That's correct.
 3        Q.    As compared to level 3, that might be
 4   more problematic?
 5        A.    If they appeared in declining
 6   percentages, the level 3 should be small.  Level 2
 7   could be not insignificant but wouldn't create a
 8   concern until it got to be really quite large.
 9        Q.    I see.  And level 1, of course --
10        A.    Level 1 is in compliance, so that's
11   kind of what you would expect.
12        Q.    Okay.  And did FSA typically have --
13   strike that.
14             So just to go back to our geography,
15   this is all being determined as part of the loan
16   level review before FSA has committed to the
17   transaction, correct?
18        A.    That's correct.
19        Q.    If there were, let's say, level 3
20   assets, did FSA have the right to say we don't
21   want that particular loan in our transaction?
22             MR. BUCHDAHL:  Objection to form.
23             THE WITNESS:  There was no commitment
24        so any -- we could certainly think about that.
25        It was a question of whether it was
```

```
 1                         BEARD
 2    being said here?
 3         A.    No, it's not.
 4         Q.    Okay.  What is your understanding of,
 5    just to make sure I understand, of what's being
 6    said here?
 7              MR. BUCHDAHL:  Objection to form.
 8              THE WITNESS:  Doug's referring to the
 9         market environment in '96 and '97.
10    BY MS. RENDON:
11         Q.    Do you have -- separate and distinct
12    from this document, do you have any belief that
13    FSA had stressed the market environment going into
14    2005 for second lien -- the second lien mortgage
15    market?
16              MR. BUCHDAHL:  Objection to form.
17              THE WITNESS:  I believe we stressed
18         every transaction we looked at in terms of the
19         analytics that are presented in the credit
20         committee memo.
21    BY MS. RENDON:
22         Q.    Okay.  It says in the -- if you go down
23    two -- two more paragraphs, it starts out with
24    Mr. Newman inquired about the status of diligence.
25              Do you see that?
```

```
 1                       BEARD
 2          transaction, and 3.1 was right in line with
 3          what we would expect to get.
 4     BY MS. RENDON:
 5          Q.    And what is it that you're trying to --
 6     what events or what phenomena are you trying to
 7     get safety from by creating such a multiple?
 8                MR. BUCHDAHL:  Objection to form.
 9                THE WITNESS:  You know, all the risks
10          associated with the portfolio performance.
11     BY MS. RENDON:
12          Q.    And I'm not trying to be a pain in the
13     neck but what kinds of risks would those typically
14     be that you create a 3.1 multiple?
15          A.    Higher losses.
16          Q.    Resulting from what?
17          A.    From wherever they came.
18          Q.    What would be the kinds of things that
19     would create losses?
20          A.    Everything potentially could create
21     losses, job loss, job, you know, curtailment,
22     medical problems, accidents, you know, there's a
23     whole array of factors.
24          Q.    Life events basically?
25          A.    Life events.
```

1                           BEARD

2        Q.    Of a borrower?

3        A.    Right.

4        Q.    Post-closing of the transaction?

5        A.    Correct.

6        Q.    What about adverse economic

7   circumstances like in the state economic or the

8   federal economy?

9        A.    They affect borrowers, too.

10       Q.    So that 3.1 multiple is also designed

11  to help cover those types of events?

12             MR. BUCHDAHL:   Objection to form.

13             THE WITNESS:    The multiple is there to

14        cover in the risk that the projection is not

15        accurate.

16             MS. RENDON:    Let me -- I think we're

17        about to run out of time.   Do we have a couple

18        more minutes left?

19             THE VIDEOGRAPHER:   You've got three

20        minutes.

21  BY MS. RENDON:

22       Q.    Just to run out the notes, right

23  beneath that on the same page that we were just

24  looking at, it says summary of the notes.  Do you

25  see that kind of in the top left there?

1                          BEARD

2    suggesting expected losses in the 10 percent

3    arena, how is it that FSA ended up utilizing an

4    expected loss rate of only 4.32 percent?

5         A.    You go to the next page.

6         Q.    What does that tell us on the next

7    page?

8         A.    There's three different data points.

9    Calculated a FICO based model of expected losses.

10   Looked at a historical estimation of losses which

11   could have been, and I don't recall in this deal

12   whether it was based on the genre, whether it was

13   bank loss or Flagstar loss. And then the model

14   expectational loss. So take the average of those

15   to get 4.32.

16        Q.    Was -- if the 10 percent had been used

17   as compared to this 4.32 percent, just for the

18   sake of thinking it through, that would have

19   created -- and that were the base expected loss

20   number, that would have created a much bigger

21   cushion for -- strike that.

22             If the 10 percent expected loss number

23   had been utilized by FSA and the structure had

24   been created around a 10 percent expected loss

25   number as compared to a 4.32 percent expected loss

```
 1                          BEARD
 2    number, that would have created a lot more cushion
 3    for FSA, correct?
 4         A.    No.
 5               MR. BUCHDAHL:  Objection to form.
 6    BY MS. RENDON:
 7         Q.    Why do you say no?
 8         A.    AMBAC would have done the deal.  I mean
 9    it was not -- it wouldn't have been -- it just
10    wouldn't happen.
11         Q.    What do you mean by that?
12         A.    It would have been -- it would have
13    been too expensive.
14         Q.    You mean Flagstar wouldn't have
15    accepted those terms?
16         A.    Right, and that wasn't our methodology.
17         Q.    But when you say AMBAC would have done
18    the deal, what you mean is someone would have --
19    another competitor would have come in and come in
20    lower than you guys?
21         A.    Or it wouldn't have happened.
22         Q.    Or it wouldn't have happened?
23         A.    So to conjecture of the 10, that wasn't
24    one of the things on the table.
25         Q.    Was that something if -- well, strike
```

1                           BEARD

2           A.     This is -- I believe this is the

3     results of a file review that Bohan did.

4           Q.     And Bohan would have been retained by

5     FSA for that purpose?

6           A.     Could have been.  I don't recall

7     specifically.  Would have been retained by

8     either -- I would expect Bohan was retained by us

9     but I don't recall specifically.

10          Q.     Either way, it would appear from this

11    memo that FSA got the benefit of the loan file

12    diligence that Bohan did; is that correct?

13                 MR. BUCHDAHL:  Objection to form.

14                 THE WITNESS:  Yes, we had the results

15          of Bohan's analysis.

16    BY MS. RENDON:

17          Q.     And, in fact, that's what the first

18    line under section 3 would indicate, right, RMG,

19    and that's the risk management group within FSA;

20    is that correct?

21          A.     Uh-huh.

22          Q.     Has received the results from Bohan's

23    due diligence on the 250 loans reviewed in

24    October.  It says there a hundred percent of the

25    sample was randomly selected and the grades of the