# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ASSURED GUARANTY MUNICIPAL   )
CORP., f/k/a FINANCIAL       )
SECURITY ASSURANCE INC.,     )
            Plaintiff,       )
                             )   Case No.
      vs.                    )   11-CV-2375 (JSR)
                             )
                             )
FLAGSTAR BANK, FSB;          )
FLAGSTAR CAPITAL MARKETS     )
CORPORATION; and FLAGSTAR    )
ABS, LLC,                    )
            Defendants.      )
_____ )

DEPOSITION OF DAVID WILLIAMS

New York, New York

November 8, 2011

Reported By:

CATHI IRISH, RPR, CLVS, CCR

Page 41

1        WILLIAMS

2   setting aside sufficient capital in order to cover

3   any losses it may incur over transactions that it

4   was insuring?

5           MR. BUCHDAHL:  Objection to form.

6           THE WITNESS:  Yeah, I think that's not

7       exactly correct.  The -- the business model

8       was not set up to absorb losses.  It was a

9       zero loss underwriting model so the rating

10      agencies, every deal was rated at least BBB,

11      which under the rating agency's own

12      assumptions were effectively, you know, base

13      case zero loss scenarios.  So I think your

14      question is not completely accurate.

15  BY MS. RENDON:

16      Q.    I appreciate that clarification.  So

17  let's go back to where I think you were pointing

18  out the inaccuracy, which I think what you were

19  referring to is the FSA's business model was not

20  designed to actually absorb losses; is that

21  correct?

22      A.    I did not say that.  I said it was a

23  zero loss underwriting model.

24      Q.    Okay.  And what does that mean?

25      A.    Unlike a property and casualty company

Page 42

1                   WILLIAMS

2 that has a certain amount of loss based in their

3 model, we were assuming zero loss on every

4 transaction that we did.

5     Q.   How did FSA feel comfortable assuming

6 zero loss on every transaction that it did?

7     A.   Comfortable?  What does that mean?

8     Q.   I'm assuming that -- you said FSA

9 assumed a zero loss on every transaction that you

10 insured; is that correct?

11         MR. BUCHDAHL:  Objection to form.

12         THE WITNESS:  That was the

13     structuring/underwriting position that the

14     firm took.

15     Said another way, we never did a deal

16     assuming we were going to take loss on it and

17     say oh, that's great, you know, blah, blah,

18     you know, there's three reasons why this is

19     okay.  That was never the case.

20 BY MS. RENDON:

21     Q.   Ultimately when the housing market

22 turned though, FSA did start taking losses on

23 transactions that it insured, correct?

24         MR. BUCHDAHL:  Objection, form.

25         THE WITNESS:  Yes.

1                      WILLIAMS

2    of FSA?

3        A.    As a direct report?

4        Q.    No, or you can explain to me as

5    indirect or direct.

6        A.    I mean the president of the company,

7    ultimately I reported to him.

8        Q.    Maybe you can explain the lines of

9    reporting.

10       A.    Sure.  My boss was a gentleman by the

11   name of Rick Holzinger.  He was in charge of the

12   four structured finance groups and he reported to

13   the president of the company.

14       Q.    And RMG was one of the four structured

15   finance groups Mr. Holzinger was managing?

16       A.    Correct.

17       Q.    And then you were the head of RMG?

18       A.    Correct.

19       Q.    Do you recall Mr. Holzinger ever

20   consulting you or seeking your opinion about what

21   was transpiring in the housing market in 2007 and

22   2008?

23       A.    No.

24       Q.    You don't recall him ever asking you

25   that question?

1               WILLIAMS

2   BY MS. RENDON:

3       Q.   You said that what does the collateral
4   look like.  What would FSA do to understand what
5   the collateral would look like?

6       A.   We would get a tape and our tape guy
7   would split this up into various categories.  The
8   normal things, geography, lien status.  Obviously
9   on these deals they are second liens, but lien
10  status, debt to income ratio, LTV, credit score,
11  owner occupancy, I'm trying to -- that's
12  probably -- those are probably some of the big
13  things.  That's probably -- those are probably the
14  big items.

15      Q.   And would the group just accept what
16  was on the data tape that came in the door from
17  the issuer or would FSA do more work to verify the
18  accuracy of that information?

19      A.   Well, two things.  The accountants on
20  the deal would generally do a sample for data
21  accuracy only.  And then we would have a file
22  diligence that would do data accuracy as well as
23  underwriting, does it meet the guidelines, those
24  kinds of things.

25           MR. BUCHDAHL:  We need to take a break

1              WILLIAMS

2    for data accuracy as well.  In addition, would be

3    checking the validity of the issuer's own

4    underwriting.  And we would also map out our own

5    -- FSA's own credit underwriting guidelines.

6        Q.    What do you mean by that last component

7    there, FSA would also map out its own credit

8    underwriting guidelines, what do you mean by that?

9        A.    FSA had its own guidelines that we

10   liked to underwrite loans to, mainly to map

11   portfolios against our database.

12       Q.    And what would -- and I understand you

13   can't sit here right now and cite to me chapter

14   and verse of what those underwriting guidelines

15   contain but can you give me an idea what were the

16   kinds of things those underwriting guidelines

17   covered?  And now I'm talking about the internal

18   FSA underwriting guidelines.

19       A.    Sure.  We assigned grades to

20   collateral, ability to pay, and credit, and an

21   overall loan grade.

22       Q.    And I guess that -- and that would be

23   the final result of this -- -- well, strike that.

24             In coming up with the overall loan

25   grade and grading collateral, ability to pay,

Page 92

1  WILLIAMS

2  credit, was that based solely on FSA's own

3  internal credit underwriting guidelines or a

4  combination of the due diligence that was

5  performed on the issuer's guidelines as well as

6  the FSA's own underwriting guidelines?

7  A. Generally speaking, the FSA

8  underwriting guidelines would produce grades based

9  on the FSA underwriting guidelines.

10 Q. And I guess my question is: What are

11 the FSA underwriting guidelines? Can you describe

12 those for me? What were the kinds of things that

13 were covered by them?

14     MR. BUCHDAHL: Objection to form, asked

15     and answered.

16     THE WITNESS: I think I answered that.

17     We would give a credit grade, we would assign

18     a collateral grade, and we would assign an

19     ability to pay grade.

20 BY MS. RENDON:

21 Q. I appreciate -- I understand that. So

22 I guess my question is: Did the guidelines give

23 guidance as to what your contract underwriter was

24 supposed to be looking at in assigning those

25 grades?

1          WILLIAMS

2     Q.    Who drafted them?

3     A.    People before me.

4     Q.    And they would be provided to the
5  contract underwriters that were assigned to do due
6  diligence on the collateral in a transaction?

7     A.    I don't know that to be a fact but that
8  is a reasonable assumption.

9     Q.    You'd assume that?

10    A.    That's correct.

11    Q.    And was it your understanding that the
12 contract underwriters would also get the
13 underwriting guidelines of the issuer?

14    A.    That's my understanding.

15    Q.    And they would underwrite both sets of
16 loans -- well, re-underwrite the loans to the
17 issuer's underwriting guidelines and then
18 separately look at the loans through the lens of
19 FSA's own internal underwriting guidelines?

20    A.    That is correct.

21    Q.    You indicated that they would do that
22 type of re-underwriting to the issuer guidelines
23 as well as underwriting to FSA's only internal
24 credit underwriting guidelines on a sample of
25 loans; is that correct?

Page 95

1         WILLIAMS

2    A.    Yes.

3    Q.    And you said it was typically 2- to

4    300; is that right?

5    A.    It was a general comment. I don't know

6    what it was. That seems reasonable.

7    Q.    Okay.

8          The sample, how do you understand the

9    sample of loans was selected?

10   A.    On this deal, I don't know the

11   specifics. General commentary would be there

12   would be a random selection and targeted --

13   targeted loans selected.

14   Q.    And the targeted loans, would that be

15   what I think I've seen referred to as an adverse

16   selection of loans?

17   A.    It -- it -- it -- broadly speaking,

18   yes.

19   Q.    What is it that I don't seem to be

20   capturing?

21   A.    Well -- well, there were -- and let's

22   call it beginning in 2003 or what have you,

23   many -- many states, county, cities,

24   jurisdictions, started producing their own high

25   cost statutes and so the TILA rules of reg Z were

1          WILLIAMS

2  no longer the only standard to be met for high

3  cost loans. So there were targeted sampling to

4  deal with whatever the various jurisdictions were.

5  The first state was Georgia. After that, I can't

6  remember what other states started doing things.

7      Q.    Okay. The sample that was chosen

8  through the random process, as compared to what I

9  think you called the targeted selection, the

10 random selection, that was designed to be

11 representative of the loans in the broader

12 transaction?

13     A.    Yes.

14     Q.    And how was that achieved? How was

15 that done to your knowledge?

16     A.    Like physically?

17     Q.    What I mean is how would -- was there a

18 computer process that would -- a random number

19 generator or something that would occur that would

20 help generate a random representative sample?

21     A.    Yes, I believe that is -- I don't know

22 the computer model but yes, our collateral analyst

23 would select the loan sample through a computer

24 model of some sort.

25     Q.    And it was designed to be a random

Page 97

```
 1                    WILLIAMS
 2   representative sample of the broader collateral in
 3   the transaction?
 4       A.   It was designed to be random.
 5       Q.   Was it designed to also be
 6   representative?
 7            MR. BUCHDAHL:  Objection to form.
 8            THE WITNESS:  I believe that to be the
 9       case.
10   BY MS. RENDON:
11       Q.   Who was -- oh, and that's
12   Mr. Hachikian, is that the collateral analyst who
13   you think --
14       A.   Yes.
15       Q.   -- was responsible for doing that?
16       A.   Yes.
17       Q.   Okay.  Do you know if Mr. Hachikian
18   worked on the Flag -- the two Flagstar
19   transactions?
20       A.   I don't know for sure.
21       Q.   Okay.
22            I'm going to show you a -- our first
23   document.  How about that?
24       A.   Wonderful.
25            MS. RENDON:  A new deposition
```

```
 1                     WILLIAMS
 2      experience so you can say you've had the whole
 3      array.  I'm going to show you, and I guess
 4      we're marking each exhibit as the witness's
 5      name with an exhibit number; is that correct,
 6      Jacob?
 7           MR. BUCHDAHL:  That's what you did last
 8      time.
 9           MS. RENDON:  So we'll call this
10      Williams 1.
11           (Williams Exhibit 1, document Bates
12      labeled AGM06167887 through 936, marked for
13      identification.)
14 BY MS. RENDON:
15      Q.   And Mr. Beard, if you could kind of
16 take a look at that and just familiarize yourself
17 generally with the e-mail and the attachments to
18 the e-mail.
19           And just while Mr. -- I think I just
20 called you Mr. Beard.  While Mr. Williams looks at
21 this document, which we've marked as Williams 1,
22 I'll just identify it for the record as a cover
23 e-mail bearing Bates number AGM06167887, and
24 including an attachment that begins at AGM06167888
25 and running through 67932.
```

Page 278

1                    WILLIAMS

2        Q.    And the base case break even is the
3   highest percentage of defaults the structure can
4   withstand before FSA has to start paying out
5   claims; is that correct?
6        A.    That is correct.
7        Q.    So effectively you had 3.1 percent
8   additional coverage above your worse case
9   scenario?
10            MR. BUCHDAHL:  Objection to form.
11            THE WITNESS:  Not correct.  We had 3.1
12       times the 4.31.
13  BY MS. RENDON:
14       Q.    Okay.  To protect against -- and
15  this -- well, strike that.
16            Was that form of coverage designed --
17  or strike that.
18            Was that form of coverage part of what
19  you referred to I think before as the zero loss
20  underwriting model of FSA?
21       A.    Yes.
22       Q.    If you had used solely the RMG loss
23  model of 9.94 percent, that would have caused
24  there to have been additional loss coverage and
25  first loss protection built into the structure?

```
 1                      WILLIAMS
 2      A.    That's one conclusion, yes.  The other
 3 conclusion would be there would have been 1.4
 4 times coverage.
 5      Q.    Would you have done a deal at 1.4 times
 6 coverage?
 7      A.    Probably not.
 8      Q.    Let me ask you to turn to what we've
 9 marked as Williams Exhibit 11.  You should have
10 that premarked in front of you.
11      A.    Yes.
12      Q.    Can I ask you to identify for me what
13 you understand this document to be?
14      A.    These would be the minutes from the MRC
15 for the 2005-1 transaction.
16      Q.    And what do you understand is reflected
17 in the minutes?
18      A.    Generally speaking, there's a brief
19 description of the transaction and the discussion
20 regarding the salient points.
21      Q.    And it's your understanding that these
22 minutes are created in the regular course of FSA's
23 business?
24      A.    Yes.
25      Q.    Let me ask you to -- well, it says
```