# EXHIBIT H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., Plaintiff, | ) | |
| vs. | ) | Case No. 11-CV-2375 (JSR) |
| FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, Defendants. | ) | |

November 17, 2011

9:50 a.m.

Videopated deposition of GEORGE STIEHL, held at the offices of Arnold & Porter, 399 Park Avenue, New York, New York, pursuant to notice, before Barbara Driscoll, a Notary Public of the State of New York.

STIEHL

occurred after 2009?

MR. BUCHDAHL: Objection to the form.

A. I actually don't remember if it was last summer or the summer before.

Q. Let's go back to 1999 when you started working at FSA.

What was your job responsibilities when you came on board?

A. My job responsibilities was working in the residential mortgage group.

Q. What was your title at the time you came on board?

A. Either associate or analyst.

Q. Are those two titles effectively synonymous with one another?

A. No. I don't know if I came in as -- analyst is generally below an associate. So I don't know if I came in as an associate or analyst. I think it was analyst.

Q. Your best recollection is that you came in as an analyst in 1999?

A. Yes.

Q. What were your job responsibilities as an analyst in the RMG group?

STIEHL

A. I was responsible for analyzing the collateral for the securitizations --

Q. When you refer to the RMG group, what are you referring to? What is RMG?

MR. BUCHDAHL: Objection to the form.

A. RMG is the acronym for the group I worked in.

Q. What does it stand for, RMG?

A. Residential mortgage group.

Q. When you joined in 1999, you were analyst, to the best of your recollection, in the residential mortgage group of FSA?

A. Yes.

Q. Your job was to analyze collateral for securitizations?

A. Correct.

Q. What do you mean by analyzing collateral for securitization?

A. We were sent mortgage loan tapes which is an Excel spreadsheet containing loans that were part of the securitization that we were contemplating involving ourselves in.

Q. Who would send you those tapes?

A. Bankers, originators. It wasn't just

STIEHL

A. I don't think that you can make that assessment. I think it is more on an individual assessment.

Q. I understand -- I think I understand what you're saying, but my question is, when the Access model is considering LTV for purposes of determining foreclosure frequency and loss severity, my question is in what manner do you understand the Access data base is taking the LTV into consideration?

A. The Access model includes a higher foreclosure frequency factor for higher loss severities and -- for higher LTV's.

Q. Why is that?

A. I didn't set up the model.

Q. Do you have an educated guess as to why it is?

MR. BUCHDAHL: Objection to the form.

A. Do I have an educated guess? My -- yeah. If a borrower has less -- my thinking is the reason why there is a higher factor, and this might not be the reason why this was intended in the model, I am just guessing, would be because a borrower that has no equity, no skin in the game,

can input any money down on the property; has less incentive to -- has less incentive to pay -- it is easier for that borrower to walk away from the property because they have less -- they are not losing anything.

Q. They have less skin in the game?

A. Right.

Q. You referred to, as another credit quality of the loans that would be considered on the Access data base --

A. Can I just -- I am sorry, not to interrupt you. I want to go back to that point.

But again, that is what the model uses as a predict -- it is a higher LTV equates to a higher factor, but it really -- it is still dependent upon other factors, other -- it is an aspect of the model, but other -- it is not the only aspect of the model.

The borrower's FICO score and the level of documentation affect the foreclosure factor that is established for that loan. So it is not the only driver of foreclosure frequency in the model.

Q. Understood. It is one of different

STIEHL

Q. What was the purpose of FSA using the Access model; why would it do that?

A. Why would we -- to assess -- to try to understand the risk profile of a mortgage portfolio.

Q. What was the purpose? How would that be utilized by FSA? So the Access -- you get the loan data tape. It would be run through the Access model. It would generate a foreclosure frequency and loss severity of loans calculation, correct?

A. Yes.

Q. What you think you were earlier calling an expected loss calculation; is that correct?

A. That is correct.

Q. My question for you is, what was the purpose of FSA coming to this expected loss number based upon risk factors associated with the collateral?

A. Because we were -- the -- part of our business was writing insurance policies on certificates that were backed by pools of mortgages.

Q. It is okay. It is a little unnatural.

STIEHL

If you can keep your voice because it is important --

A. I am not trying to not keep it up. I am just forgetting.

Q. That is okay. That is one of the reasons this is a fun exercise; you get to talk louder than you normally do.

At what point in the process did you understand the Access model was being utilized by FSA in connection with it considering underwriting insurance for a securitization transaction?

MR. BUCHDAHL: Objection to the form.

A. Can you say that in another way? I don't think I understood.

Q. At what point in the insurance underwriting process was the Access model used by FSA?

A. It could have been used throughout the process of doing analysis on a deal, but it was generally one of the first things that we would -- it was generally one of the first things that we analyzed, but like I said, it could have been used throughout the whole process.

Q. But in a typical transaction, it would

STIEHL

happen earlier in the process as compared to later in the process?

A. Transactions would sometimes not -- would grow, would shrink, would change a little bit, so it was really deal dependent.

Q. What would allow -- what expected loss was in an acceptable tolerance range for FSA in HELOC transactions versus an unacceptable tolerance level on HELOC transactions?

MR. BUCHDAHL: Objection to the form.

A. I don't think that the words acceptable tolerance, that is not -- there was never that threshold.

Q. I will ask you in your words, Access would generate an expected loss figure, correct?

A. Correct.

Q. How would FSA take that into consideration as far as determining whether to underwrite a transaction or not?

A. It was a piece of the analysis, but the expected loss is just one piece. It is also dependent upon the level of protection that the structure provides.

Q. When you say it is also dependent on

the level of protection that the structure would provide, now you're talking about the securitization structure?

A. Correct.

Q. Was there ever an expected loss that was too high to build what would be a market -- what the market would accept as far as a structuring of a securitization?

MR. BUCHDAHL: Objection to the form.

A. I couldn't answer that question.

Q. When we talk about level of protection within the securitization structure, we are talking about such things as creating, in a deal, over-collateralization, excess spread, those kinds of mechanisms, correct?

A. Those are -- yeah, those are two of a bunch of different stuff.

Q. Those would be examples of the way you can structure a transaction to create what I would call a cushion within the transaction?

A. Correct.

Q. The idea of creating a cushion, from FSA's perspective, was to achieve a zero loss underwriting model, correct?

STIEHL

Q. Then you said FSA, as part of its decision making as to whether to underwrite a securitization transaction or not, would take into consideration a level of protection that could be provided by securitization structure, correct?

A. That is correct, but it is not the only -- but it wouldn't be the only consideration but yes, that is correct.

Q. What other considerations would there be?

A. Another example of a consideration would be the premium and the return on equity that we would receive for participating in a transaction.

Q. Did FSA in deciding whether or not to underwrite a transaction, the process by which expected loss, level of protection within a securitization structure, what premium could be charged and what return on equity could be expected from a transaction, those are the different components of FSA's underwriting decision making process, correct?

MR. BUCHDAHL: Objection to the form.

A. I am not sure. Did you include the

assessing the protection of the transaction?

Q. I did.

A. Those are a big picture, yes, but there were other considerations that someone like me would not have been a part of.

Q. But in the big picture that we just talked about, expected loss, level of protections afforded by securitization structure, what premium could be charged and what return on equity would be expected, is that the basic big picture components that FSA would consider in deciding whether or not to underwrite a transaction in your mind?

A. I can't say that is true -- that is 100 percent true.

Q. What is inaccurate about it?

A. An assessment of the originator and an assessment of the servicer. There were -- I mean, there were a lot of -- there was a lot of analysis done when determining whether or not to involve ourselves in the transaction.

Q. There also would be file diligence, correct?

A. Correct.

STIEHL

Q. All of those considerations, expected loss, level of protection within a securitization, premium return on equity, assessment of the originator, assessment of the servicer and file diligence, were those the basic components of the underwriting process for FSA during the period of time when you got there through, let's say, 2007?

A. I think there were also some legal requirements, but I can't talk to what those were or what they encompassed, but I know our legal department was very involved in doing analysis on transactions that we were thinking about doing or we were currently working on.

Q. With that addition, I just want to make sure that we are talking about a process that was in place from 1999 through 2007, so we can be comfortable in time periods that we are speaking in.

Do you agree that all of the considerations we have just articulated are the considerations that would go into FSA's underwriting process from 1999 through 2007?

A. It was part of my underwriting transaction process, but I was one person on a

deal team and there might have been more analysis that was being done by other members of my deal team that I was not privy to.

Q. You worked on two Flagstar transactions, correct?

A. I did.

Q. The 2005-1 and 2006-2?

A. I did.

Q. If I refer to the transactions by those terms, you will understand what I am referring to?

A. I will.

Q. Were these the various considerations that went into the two Flagstar transactions?

MR. BUCHDAHL: Objection to the form.

A. Can you just repeat exactly what I said?

Q. Sure. Expected loss, level of protection within securitization structure, premium, return on equity, assessment of the originator, assessment of the servicer and file diligence.

MR. BUCHDAHL: Objection to the form.

A. From my recollection, that is what I remember; that is the analysis that I remember

being performed on the transaction.

I need to take a break.

THE VIDEOGRAPHER: This marks the end of tape number 1 in the videotape deposition of George Stiehl. We are going off the record the time is 10:49.

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of tape number 2 in the videotape deposition of George Stiehl. We are going on the record. The time is 10:56.

Q. Mr. Stiehl, just because you haven't done this before, even though you haven't been re-sworn in, every time you begin to testify again, you're under the same oath to testify truthfully under penalty of perjury.

A. I understand.

Q. A number of times in your answer, we made reference to file diligence.

What do you mean when you talk about FSA engaging in file diligence?

A. On this transaction or in general?

Q. Would it be different if you talked about this transaction versus in general?

A. Sure.

Q. Why don't you tell me in general and then we can talk about this transaction.

A. This in general depends upon what time period that you're talking about.

When I first started file diligence, we were taking -- we were guaranteeing a bigger portion of the portfolios -- of the certificates, not the portfolios, of the certificates that were backed by the mortgage portfolios and so we conducted file diligences.

Q. When you said you first started doing file diligence, when was that?

A. Within the first couple of years of my employment.

Q. So somewhere in the 2002, 2003 time arena?

MR. BUCHDAHL: Objection to the form.

A. I don't remember exactly when I started, but it would have been -- I started in 1999. It would have been within two years, so two -- but it could have been six months out of the gate, but I am saying within two years it is safe to say I was working on file diligences.

Q. When you first started doing file diligences, what was your personal role in performing them?

A. It was going out to actually participate in the process, watching underwriters underwrite loans -- watching auditors underwrite loans -- re-underwrite loans.

Q. You said when you were first involved in the process, you would actually go out and watch auditors re-underwrite loans; is that correct?

A. That is correct.

Q. When you refer to auditors, what do you mean by that phrase?

A. Members of the diligence firm.

Q. When you would go -- when we are talking about diligence firms, those are the firms that would go and re-underwrite the loans that could be included in a securitization that FSA may wrap?

MR. BUCHDAHL: Objection to the form.

A. I lost you in the middle.

Q. I just want to make sure we are on the same page. When you talk about auditors or

STIEHL

diligence firms re-underwriting loans, what we are talking about is a third party company that would go and re-underwrite loans that could be included in a securitization transactions that FSA was considering wrapping with insurance; is that correct?

A. That is correct.

Q. What diligence firms, when you would go out and watch them re-underwriting loans, what diligence firms do you recall working with?

A. Mortgage -- MDMC, Mortgage Data Management Company, I think that is the name of the firm that the acronym stands for, but it is definitely MDMC.

I think that was the firm I worked with the most. That is the one I remember.

Q. Have you ever worked with Bohan?

MR. BUCHDAHL: Objection to the form.

A. When? I mean, throughout my career?

Q. No. Now I am talking about when you go out and watch auditors re-underwriting loans, did you ever work with Bohan?

A. I might. I don't remember.

Q. Did you ever go out and watch Clayton

transactions that FSA wrapped?

A. I received the diligence results from a few auditing firms.

I don't remember if I ever participated in a diligence visit where I was on the ground.

Q. Would you help or at least oversee the selection of the random sample of loans that would be used in the file diligence?

A. Oversee it? I am not trying to be difficult. What do you mean by oversee? I was involved in giving the direction to generate a random sample.

Q. What did that involve, giving direction to generate a random sample?

MR. BUCHDAHL: Objection to the form. We are speaking generally.

MS. RENDON: We are speaking about HELOC securitizations?

MR. BUCHDAHL: But not our deals.

MS. RENDON: For the moment, yes.

A. Can we start over?

Q. You said that your involvement on HELOC securitizations's file diligence included giving direction to generate a random sample. My

STIEHL

question is, what do you mean by that?

A. I mean asking the person that -- asking someone to calculate -- to provide me a list of loans that were randomly selected from the pool.

I thought we were talking about this deal when you -- we were -- I would like to make that clear. I don't think I was involved in any other HELOC transactions and so I was not involved in any other HELOC diligences.

Q. Fair point. So the only HELOC file diligences you recall being involved in were for the two Flagstar transactions; is that correct?

A. My recollection right now, that is correct.

Q. When you said you gave direction to generate a random sample and you said that involved asking someone to give a list of loans randomly selected, that was a direction you recall giving in connection with these two different transactions, the 05-1 and 06-2 Flagstar transactions?

MR. BUCHDAHL: Objection.

A. I don't remember actually giving the direction, but I know that we generated a random

sample. So I am guessing that I gave that direction, but I don't actually remember giving that direction.

Q. I will show you e-mails later on that might refresh your recollection in that regard.

Was it to Ryan Ashley that you recall giving that direction?

A. I don't remember giving that direction. I just -- I know that we did select a random sample of loans. I don't actually remember giving that direction.

Q. When you said I know we did select a random sample of loans, what do you mean by that? Explain that better to me by what you mean by that.

MR. BUCHDAHL: Objection to the form.

A. I remember that the diligence process at least for the 05-1 transaction involved two samples, and from my recollection, I remember us selecting the loans in the second sample.

Q. On a random basis?

A. On a random basis.

Q. When you say selecting on a random basis, what was the purpose of selecting on a

random basis?

A. The purpose for selecting on a random basis is so that we get a sense of the pool as a whole. If there are any issues with a sample that is selected randomly, you would think that -- our thinking was that it would represent issues that could be found in a portfolio.

Q. In other words, by selecting randomly, you were trying to get a sample that was representative of the collateral that would be submitted to the securitization as a whole?

A. That is correct.

Q. On the 2006-2 transaction, do you recall going through that same exercise, having a -- giving direction for a random selection of loans?

A. I don't recall that.

Q. What do you recall once a random -- I will say a random representative sample was selected, what was the purpose of -- what then happened to those loans?

MR. BUCHDAHL: Objection to the form.

A. What happened to those loans, meaning what did we do?

Q. Yes. I am sorry. That's right.

So a random representative sample you recall being selected for -- you recall random representative sample being selected for 2005-1 Flagstar transaction; is that correct?

A. Yes.

Q. Once that selection was made, what happened with those loans?

A. What did I do with those loans?

Q. Or just what was the idea of what was going to happen to those loans, whether it was to be performed by you personally or more generally?

A. That those loans would be selected for review by the diligence firm.

Q. When you say that, what did you understand they were going to do?

A. We never gave them -- I don't -- according to my recollection, I don't remember ever giving them direction other than to -- by they, I mean the diligence firm and I am not sure I ever gave the diligence firm direction.

I might have given the banker direction who was -- who had hired the diligence firm for this transaction -- these transactions.

STIEHL

The only direction that I remember giving them is that we would like to have the loans underwritten to our guidelines.

Q. When you say underwritten to our guidelines, are you referring to FSA guidelines?

A. That is correct.

Q. What does that mean -- what was the expectation in giving the direction that the diligence firm would underwrite to FSA guidelines? What with more detail -- what was your expectation that that would entail?

A. We have a set of guidelines that creates grades based upon credit quality of the loans.

Q. When you say that a direction was given for the diligence firm to underwrite to FSA's guidelines, what did you actually expect them to do? How were they supposed to underwrite to FSA's guidelines?

A. Our guidelines are a set of rules that when an auditor is reviewing certain documents of the loan, that they evaluate, for example, the credit report to come up with a credit grade.

Q. What other things?

STIEHL

A. I believe the borrower's debt-to-income is used as far as the LTV.

Q. But give me more detail of what you expect the diligence firm to do in evaluating debt-to-income or LTV what do you actually expect them to do?

A. I expect them to re-calculate the borrower's -- the borrower provides information to the underwriters, so recalculating the borrower's debt over the borrower's reported income and that is it. That would be for DTI. LTV is just calculating the loan over the appraised property price.

Q. Did you expect them to use only the information contained in the loan files they received from the originator or to obtain additional information, if necessary, for them to underwrite to FSA's guidelines?

MR. BUCHDAHL: Objection to the form.

A. My -- I can't speak for everybody else. My personal opinion is that it was based upon the information in the loan file, but I don't know if that was everybody's expectation.

Q. Did you understand that the diligence

STIEHL

firm on the 2005-1 Flagstar transaction was also going to underwrite to the originator's underwriting guidelines, not just FSA's?

MR. BUCHDAHL: Objection to the form.

A. That is correct.

Q. Describe for me what you understand that process to entail.

A. The underwriter is -- the diligence firm is provided the underwriter's guidelines and tries to make sure that the loan was originated under the originator's guidelines and that the loan is in compliance with various laws that I am not familiar with.

Q. Was there, both in this underwriting to the underwriters guidelines or I will say the originator's guidelines -- are you comfortable with me using that phrase?

A. Sure.

Q. And here the originator would be Flagstar, correct?

A. Correct.

Q. When the diligence firm was underwriting to Flagstar's guidelines, did you understand they were both underwriting for

STIEHL

diligence was being performed, correct?

MR. BUCHDAHL: Objection to the form.

You asked this question now four times. The witness has given you his answer.

Q. You can answer, Mr. Stiehl.

MR. BUCHDAHL: If you have anything else to say.

A. I don't know how else to say what I meant.

Q. We talked about the firm -- the diligence firm looking for compliance with the originator's underwriting guidelines, correct?

A. Correct.

Q. There were different levels that the FSA system asked the diligence firm to utilize in grading or looking at compliance with originator guidelines, correct?

MR. BUCHDAHL: Objection to the form.

A. That is not correct.

Q. I will ask you this.

Are you familiar with the phrases event level 1, 2 and 3?

A. Yes.

Q. What do you understand those phrases to

STIEHL

firms their guidelines on how -- what qualifies a loan to be originated and so the originator should have loans conform to those guidelines.

Q. If they do comply in 100 percent, that is an event level 1, correct?

A. Comply 100 percent without any exception, I think that is -- yeah, that is my understanding.

Q. Of what an event level 1 is?

A. Yes.

Q. So event level 2 is where there is a finding of an exception to the originator's underwriting guidelines by the diligence firm?

A. That is correct, but an exception with some type of compensating factor, not an exception though that -- an exception that the diligence firm, for lack of a better word, viewed as not a major exception.

Q. It was not a material exception; is that what you mean?

A. That is what I mean.

MR. BUCHDAHL: Objection to the form.

Q. I am sorry. You said that is what you meant?

allowed an originator to get comfortable with going outside their guidelines.

Q. An event level 3 would be an exception to the guidelines according to the diligence firm who is now looking at a loan originated by the originator that had an exception to the underwriting guidelines that was material and there wasn't an adequate compensating factor; is that correct?

MR. BUCHDAHL: Objection to the form.

A. The way I looked at it, it was an issue that an event level 3 -- I needed -- for my job I needed to assess the level of event level 3's in a diligence.

I wouldn't have to assess the level of event level 1's or 2's in a diligence and by assess, I needed to understand what the issues were of the event level 3's and communicate that in my presentation.

Q. Why was it that you would have to develop an understanding to make sure to communicate in your presentation the occurrence of an event level 3?

A. Because the loan was flagged for some

STIEHL

reason that the third party wanted us to see. They wanted us to understand what is in the diligence.

Q. It was a material problem potentially with that loan?

MR. BUCHDAHL: Objection to the form.

A. I don't -- I can't say for every event level 3, that was the case, but the possibility was there.

Q. I see. So you would need to look at it and understand it better because it was possible there could be a material problem with the loan?

MR. BUCHDAHL: Objection to the form.

A. I don't know if it would be a material problem with the loan. I don't -- there was some issue with the underwriting that the auditor wanted me to focus on.

I don't know if they or I were making an assessment of the consequence of that issue.

Q. Did anybody ever make an assessment of the consequence of that issue?

MR. BUCHDAHL: Objection to the form.

A. Did anybody?

Q. Yes. At FSA.

STIEHL

MR. BUCHDAHL: What issue?

Q. You can answer the question.

A. Were event level 3's discussed at FSA? Yes.

Q. Why were they discussed, to your understanding?

A. Because the auditor had -- because a diligence -- a third party diligence firm had reviewed loans and found that these loans, for whatever reason, there was an issue related to it. And it could have been -- it wasn't just adhering to the originator's guidelines.

It depended upon what the reason they flagged for it -- for us was, but I don't think that every event level 3 loan that was ever flagged was a material -- could lead to a material consequence to us as a bond insurer. We would identify the loans and understand -- talk about what the reason was for it to be coded as that.

Q. The reason why you would go and give that harder look at the loans that had been identified as event level 3 was in order to determine if, in fact, there was a material problem with that loan or whether it was

STIEHL

Q. If there was a determination of materiality by FSA on an event level 3 coded loan what would happen to that loan?

MR. BUCHDAHL: Objection to the form.

A. It wouldn't -- it wouldn't be consistent -- it would really depend upon what the issue was. It would depend upon what the reason for the event level 3 was.

Q. Can you explain -- give me the range of possibilities of what might happen in the scenarios that you're describing?

MR. BUCHDAHL: Objection to the form.

A. We had done diligences that we found issues where we no longer wanted to participate in the transaction and we found issues where we didn't think there was any -- they would have no effect to -- I don't even know -- I just know that we had completed diligences in which we have found issues with loans that we didn't want to participate in.

I don't think that we removed loans. There is no reason to remove loans if you're doing a sample because this issue will be present in the rest of the portfolio. This is just my

STIEHL

recollection of instances where we removed loans. Just generally.

I am going to need a food break, something soon. I am getting weary.

MS. RENDON: We can stop here and we can take a lunch break or I can go for another half an hour and take a lunch break. Up to you, Mr. Stiehl.

MR. BUCHDAHL: Just for what it is worth, I asked them to bring sandwiches over at 12:30.

MS. RENDON: Off the record.

THE VIDEOGRAPHER: This marks the end of tape number 2 in the videotape deposition of George Stiehl. We are going off the record. The time is 11:55.

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of tape number 3 in the videotape deposition of George Stiehl. We are going on the record. The time is 12:04.

Q. We have been referring to Clayton and Bohan, correct?

A. Yes, for the diligences.

STIEHL

make sure I was getting everything. Can you break it up?

Q. I will ask you to say it so it is not my words. It is yours.

When Clayton and Bohan were re-underwriting the loans to look at -- under Flagstar's originator's underwriting guidelines, what did you understand they were supposed to do?

A. They were supposed to match up the guidelines that the originator had provided them with a loan file, so that they could make sure that they adhered to the guidelines.

Q. When they found there was an exception to those guidelines, they would then look for -- the diligence firm would then look for compensating factors in the file?

A. Yeah -- I don't know if it was done after or during the process, but if there was an exception to the guidelines, compensating factors were looked for, yes.

Q. By the diligence firm?

A. By the diligence firm, yes, by the auditor underwriting the auditing loan.

Q. That is when they would make the level

2 or level 3 determination that we were talking about previously?

A. I don't think that -- I mean, there were a lot of iterations of level 1, level 2. The way a diligence would proceed, they would do their initial review and then have findings and then discuss the findings with the originator and there was a lot of back and forth related to the initial review; exceptions were being presented -- sorry, compensating factors would be presented; exceptions would be cleared.

So it was a lot of back and forth. It wasn't just, we did a review and then these are the event levels. There was a lot of interaction between the diligence firm and the originator.

Q. The diligence firm would make initial assessments; come up with certain exceptions and then go back to the originator to see if the exceptions could be cleared?

A. To see if -- yeah. It might not have been just issues that they could have been cleared. It could have been they were looking at the wrong document. There was some type of -- there was a mistake in the auditors -- it was just

STIEHL

Q. Was that problematic in your mind?

MR. BUCHDAHL: Objection to the form.

A. It wasn't problematic because of my experience with how diligences usually proceed.

It is sometimes -- at times can be a logistical nightmare with the number of files and papers that are being passed along.

Q. When you say it was not problematic, given your experience with how diligences proceed, is it fair to say it wasn't uncommon to have a high level of initial findings of event level 3 and then there being a process by which those issues that cause it to be identified as event level 3 were cleared?

MR. BUCHDAHL: Objection to the form.

A. It really is dependent upon the originator and how the files were sent over and how the process went. It is not just a -- every diligence encompasses a bunch of, you know, event level 3's that get cleared. Sometimes that is the case and sometimes not.

I am just saying because I know of how granular it gets, it didn't bring up a problem in my mind because I know it was a possibility.

believe it was the only Flagstar transaction that we looked at in 2005. I am not 100 percent sure, but that would be my guess.

Q. I represent to you that is consistent with my understanding as well.

What was your role on the Flagstar 2005-1 transaction?

A. My role was to review the results from the Access model and to prepare the presentation for our credit committee, to review the diligence results and to set up the cash flow, the -- to help to set up the cash flow model.

Q. What do you mean by to set up the cash flow model?

A. So the structure -- to model the structure in an Excel spreadsheet.

Q. When you say to review diligence results, that ties back to the conversation we were having earlier. You're referring to reviewing the file diligence results?

A. Yes.

Q. When you said to prepare a presentation, can you describe in more detail what you mean by that?

A. In order for us to participate in a transaction, we would have to write a -- we would have to write a credit package -- not a credit package, but an MRC package, management review committee, and that would be presented to our credit committee who had the final decision as to if we participate in the transaction or not.

Q. In this e-mail, the original one, it is from Paul White to David Beard.

What did you understand Mr. Beard's role -- Mr. Beard was an employee of FSA at this time, correct?

A. He was.

Q. What did you understand Mr. Beard's role to be on the Flagstar 2005-1 transaction?

A. His role was to -- he was my manager and so he was the overseer of any analysis that I produced on the deal.

Q. The original e-mail is from Paul White to David Beard. Do you know who Mr. White is?

A. I believe he was the banker from JP Morgan.

Q. The original e-mail says, and this is on AGM 042286653, we would like to invite you to

STIEHL

access to all the underwriting guidelines.

Q. Your original e-mail says, I am reviewing your HELOC guidelines. So it appears from your original e-mail that you had access to Flagstar's HELOC underwriting guidelines?

A. Yeah. You asked me if I was getting access to all their second liens and first liens. In the e-mail Brian provided to me, I don't know if I am getting all access to the first and second liens.

At a prior period of time, I might have been handed the second lien underwriting guidelines, but I am not sure if he was giving me access in the directions of his e-mail.

Q. So just to simplify even the question I asked of you, your original e-mail indicates that you have access to the Flagstar's HELOC underwriting guidelines, correct?

A. It appears that is the case, although I don't remember doing -- performing such a task, but yes, it looks like I had them.

Q. Then in the e-mail that Mr. Boike sent you on October 6 at 2005 at 5:50, he refers to there being a product description for the agency

STIEHL

attachment. I can't pick out the 125 loans. I don't know what their loan ID's -- I didn't memorize them because you're saying they are attachment to this, I would assume they are the 125 loans.

Q. Look at Stiehl 9. The top e-mail appears to be an e-mail from yourself to Paul H. White at JP Morgan sending him the Flagstar 125 random selection from the 10/05 tape with attachment to it. It says, here is our diligence sample.

What do you understand you're doing in that e-mail?

A. Providing JP Morgan our 125 randomly selected loans.

Q. What was the expectation that you had in providing that to JP Morgan?

A. My expectation that was JP Morgan was going to forward this sample to a diligence firm. I guess Clayton was the diligence firm that worked on the first diligence. I can't say that we were assuming that Clayton would do the second diligence, but -- that is what I would assume was the point of this.

STIEHL

figure as of December 2005, assuming the HELOC's in the portfolio were fully drawn?

A. It appears to be that way.

Q. The adjusted expected loss which we talked about previously, correct?

A. Correct.

Q. Reflects a tape grade of 8.23 percent?

A. Reflects a -- no. It reflects -- can you repeat?

Q. I will ask that again. Sure.

This page 3688 reflects adjusted expected loss off the tape grade of 8.23 percent, correct?

A. Correct.

Q. And a tape grade minus 1 adjusted expected loss of 13.2 percent?

A. Correct.

Q. Then adjusted expected loss with 10 percent M. What does that mean, minimum?

A. Yeah -- I mean we talked about this earlier. I was unsure what that meant.

Q. The second attachment to this document is a FICO loss and I believe that starts at AGM 4313714.

A. Yes.

Q. Would it be your expectation that this would reflect what FSA's FICO loss model was reflecting for the 2005-1 securitization as of December 5, 2005?

A. It appears to be the same analysis that we discussed earlier, just on the 2005 tape -- I mean, the December 5 tape.

THE VIDEOGRAPHER: This is the end of tape number 5 in the videotape deposition of George Stiehl. We are going off the record at 5:25.

(Recess taken.)

MS. RENDON: We are marking Exhibit 25 which is Bates AGM 04329220 through 9272.

(Stiehl Exhibit 25, Bates AGM 04329220 through 9272, marked for identification, as of this date.)

THE VIDEOGRAPHER: This marks the beginning of tape number 6 in the videotape deposition of George Stiehl. We are going on the record. Time is it 5:42.

Q. While we were off the record, we marked Exhibit 25. This is from Mr. Hachikian to a

STIEHL

number of people, including yourself, related to Flagstar 2006-2. On 8720 it says, 250 dil sample.

What do you understand Mr. Hachikian is sending to you and others on December 15, 2006?

A. It appears to be a diligence sample for the Flagstar 2006-2 transaction.

Q. This appears to be the attachments to this or at least the attachment beginning at AGM 4329248 to 22972. Does this appear to be a listing of randomly selected loans for the file diligence on the 2006-2 transaction?

A. I am guessing that is what this appears to be.

MR. BUCHDAHL: You said 249 --

THE WITNESS: 9248 --

Q. I said 9248 through the end of the document. Does that appear to be a listing of the 250 randomly selected loans?

A. It looks to be more than 250 loans starting on 9428.

Q. The list of loans that appears starting on 9249 to the end of the document, does that appear to be --

A. I have no idea if these are the loans.

STIEHL

Q. I will ask you to look at AGM 43229267.

A. Sorry.

Q. I know you're getting tired. I need to authenticate this stuff so we can understand what these are.

On the pages appearing on AGM 4329249 to the end of the document, does this appear to be a list of the 250 randomly selected loans?

A. I don't know if -- you asked me -- your first question is the information on 248 was the 250 loans and it is showing 3,675 loans --

Q. Which I understand to be the amount of loans proposed for the transaction.

A. So I don't know if the next pages represent the loans that are the 3,000 or the 250.

Q. Understanding that this starting at AGM 4329249 to the end of the document is, in its native form, an Excel spreadsheet, do you see on the first page beginning at 249, it says match and there is a number 1 through 69 on the first page?

A. Yes.

Q. Then if I ask you to turn to Bates stamp 267, that match column goes down to 250?

A. Okay.

STIEHL

Q. Does that cause you to believe that this is a list -- if we had printed it in Excel, that would show a list of 250 randomly selected loans?

A. It is a reason to believe that, yeah, sure.

Q. I will ask you to turn to Stiehl Exhibit 26, please.

(Stiehl Exhibit 26, AGM 04140675 through 676, marked for identification, as of this date.)

MS. RENDON: Exhibit 26 is an e-mail stream bearing AGM 04140675 through 676.

Q. The bottom is from Ryan Ashley to Brian Boike at Flagstar copying yourself and Mr. Beard on September 15, 2006 and says, please find attached FSA's 250 loan random due diligence pool list for the Flagstar 2006-2 transaction. Then at the top it says, sorry this was returned the first time.

Is it your belief that by this e-mail Mr. Ashley was transmitting to Mr. Boike at Flagstar the list of the 250 randomly selected loans for the 06-2 transaction.

A. Appears to be the case.

(Stiehl Exhibit 27, Bates number 04140402 through 0405, marked for identification, as of this date.)

Q. I will ask you to turn to Stiehl Exhibit 27, Bates number 04140402 through 0405. It contains an e-mail string on -- all of which occur on September 21, 2006. The original e-mail is from Joel C. Readance at JPM to folks at the Bohan group, Mr. Boike at Flagstar and Paul White at JP Morgan Chase.

Does it appear to be that Mr. Readance in his e-mail is explaining to folks at the Bohan group what the expectation is for their diligence of the 250 loan files?

MR. BUCHDAHL: Objection to the form.

A. It appears it is directions to Bohan from Mr. Readance.

Q. I will ask you to look at what is being marked as Stiehl Exhibit 28.

(Stiehl Exhibit 28, Bates AGM 04621901 through 910, marked for identification, as of this date.)

Q. Look at Exhibit Stiehl 28. I will read