# EXHIBIT AA

FINANCIAL SECURITY ASSURANCE INC.

### Minutes of Meeting of Management Review Committee

Date of Meeting:      Wednesday, November 23, 2005

Agenda Item:          1.   Approximately $628 Million Flagstar Home Equity Loan Trust 2005-1

Members Present:      R. Cochran
                      R. Brewer
                      S. McCarthy
                      E. Newman
                      B. Stern
                      D. Watson

Members Absent:       T. McCormick

Final policy number: 51XXX-N

CONFIDENTIAL

page 2
Draft Minutes of the 11/23/05 Meeting of the MRC
**PLEASE RELAY COMMENTS DIRECTLY TO N. PFEFFER**

1. **Approximately $628 Million Flagstar Home Equity Loan Trust, Series 2005-1**

Presenting Party:   D. Beard
Others Present:     D. Williams, C. Campbell, G. Stiehl, E. Uhr, R. Bauerfeld, M. Gilhuley, J. Meyers, N. Pfeffer

Summary:

1.  <u>Transaction Description</u>.  FSA has been asked to guarantee approximately $628 million of LIBOR-based asset-backed notes backed by revolving prime-based home equity lines of credit originated and serviced by Flagstar Bank, FSB ("Flagstar").  Flagstar, a subsidiary of Flagstar Bancorp, Inc., is the 13th largest mortgage lender in the country.  The subject transaction involves certain major approval issues.  First, Flagstar has recently made several accounting-related public announcements – specifically, a restatement of fourth quarter 2004 financial statements (announced in March 2005), retirement of its CFO (announced in April, effective June 2005), resignation of its accounting firm, Grant Thornton (announced in June 2005), and hiring of a non-Big Four accounting firm (September 2005).  Second, the credit and compliance review by Clayton in April 2005 identified a technical TILA violation on approximately 73% of the sample. Flagstar has completed a mailing of notices (via first class mail) to all the borrowers in the pool re-disclosing the fees and reopening the rescission period.  Flagstar provided opinions of Morrison Foerster and Kirkpatrick & Lockhart regarding the effectiveness of the mailing.  Finally, the HELOC loans have a 10 year draw period, and are "interest only" over their entire term with a bullet maturity at year 10.  FSA has required that the notes have a guaranteed 12.5 year legal final maturity, thus giving the servicer an additional 30 month period to manage defaulted loans by demanding payment, liquidating loans, or modifying the lines into term loans and selling them as performing assets at auction.  As a consequence of these issues, FSA will receive an above-market premium of 15 b.p.'s and a commitment for the next $900 million of securitized HELOC product.

Flagstar will have three months in which to complete a $157 million prefunding.  FSA will have consent rights for the prefunded loans prior to their addition to the trust.  FSA has requested that Clayton conduct an additional due diligence on 50 random prefunded loans.  The current outstanding balance of HELOC loans is approximately $472 million, with a maximum outstanding balance of $561 million (84.2% utilization ratio).  The HELOC loans are primarily (96.8%) second liens, with an average FICO score of 742/716 (first/second lien).  The transaction has a 60-month managed amortization period (MAP), during which principal collections may be used to fund draws on existing lines.  Following the MAP is the rapid amortization period (RAP), during which all principal collections are applied to the notes.  There will be a 50 b.p. minimum spread carveout beginning in month 6.  FSA's first loss protection will be provided by (i) overcollateralization, initially equal to 0.00% growing to 2.65% of the initial pool balance plus 100% of loans that are 180 days past due, to be funded through excess spread; and (ii) periodic excess spread initially equal to 272 b.p.'s and expected to increase to 332 b.p.'s as the loans roll out of their initial teaser rates.  FSA projects expected losses of 4.32%, based on the average of the FICO model, historical estimation (based on broker originated HELOC transactions only) and the RMG loss model, and loss coverage multiple of 3.1x.  The transaction is expected to have a shadow rating of BBB/Baa3.  The premium will be 15 b.p.'s per annum, with a present value of approximately $2,601,432, and a ROE of 12.5% (without reinsurance).  This is Flagstar's first HELOC securitization.  J.P. Morgan Securities Inc. will underwrite this transaction.

2.  <u>Discussion</u>.  (a) <u>Accounting-related issues</u>.  Mr. Beard reviewed FSA's involvement in the transaction, noting that the transaction was significantly delayed due to the

CONFIDENTIAL                                                                                       AGM06152983

discovery, analysis and curing of the TILA violation. Mr. Beard reviewed the accounting-related issues that surfaced during this period, including Flagstar's disclosure that its internal controls were not effective. The Committee discussed the extent to which financial restatements indicate weaknesses in internal controls. Mr. Stern explained the interplay between restatements and internal controls, in light of his recent experience with a restatement of FSA's and Financial Security Assurance Holdings Ltd.'s financial statements. Mr. Beard reviewed the departure of Flagstar's CFO and resignation of Grant Thornton. The Committee expressed concern with these interrelated events, and pressed for further diligence. Mr. Beard stated that Flagstar desires to be in the market in the middle of the following week, with a closing towards the beginning of the second week of December. The Committee determined that its approval is subject to arranging a diligence call with both the departing and new accounting firms, with Flagstar issuing a directive to both firms to cooperate with the diligence call openly and honestly. The Committee requested that Mr. Stern participate on these diligence calls. [A diligence call was held on 11/28/05 – see attachment A.]  (b) <u>Compliance issue</u>. The Committee questioned whether Flagstar's failure to have originated the HELOC loans in compliance with law indicates another aspect of weakness in internal controls. Mr. Beard described the error in the loan documents, noting that Flagstar believed that it had properly presented fees and charges because they were included in "HUD-1" statements, which are typically provided only for first lien mortgages but had been provided for all the loans in the pool. However, the notes did not include or reference the amount of such fees and charges, and Flagstar could not prove that the HUD-1's had been "stapled" to the notes, which would constitute adequate disclosure. The Committee reviewed the possible legal ramifications, including possibility of actual damages (which Flagstar believes unlikely, given that the error is only a technical violation and that no detrimental reliance can be proved); class actions (subject to statutory limitations); and rescission. The Committee reviewed the remedy of rescission and the potential magnitude of exercise of this right. Mr. Newman noted that, in addition to the disclosure issue already discussed, there was an additional potential violation for a number of loans whereby Flagstar had not properly completed some of the notices of right of rescission, by failing to insert the expiration of the rescission period. The Committee discussed the steps taken by Flagstar to cure these defects, which consisted of sending notices via first class mail that reopened the right of rescission for 100% of the loans in the pool. The Committee discussed the opinions of counsel confirming that the rescission period could be extinguished through this action. Mr. Williams stated that Flagstar could have achieved absolute certainty only by refunding all the fees and charges; however, that would not be a financially practical solution and would likely not be utilized by similarly situated originators. Mr. Beard reviewed evidence confirming that the cure letters were sent, which includes (i) certification by a third party mailer that it had delivered the packages to the U.S. postal service, (ii) verification by a diligence firm on a sample of cure packages that names and amounts were properly completed, and (iii) results indicating that the mailings were received (there was a small number of returned mail and 19 rescissions; all of such loans, together with any loans which had a draw in the interim period or became delinquent, were removed from the sample). Mr. Beard stated that there may be some affected loans in the prefunding, but would expect this problem to be eliminated by the time that subsequent transactions are completed. Mr. Beard noted that the subject transaction is Flagstar's first HELOC securitization, and that he believes that technical violations would not necessarily be uncommon for first time issuers.  (c) <u>Predatory lending</u>. Mr. Beard stated that, in light of the low fees, charges and interest rates for these loans, the risk of any loans in the pool being "high cost" is small. Flagstar will provide the customary "S&P-style" high cost loan representation and indemnity.  (d) <u>Michigan concentration</u>. The Committee reviewed the 17% concentration of loans in Michigan, in light of recently announced layoffs by GM. Mr. Beard stated that RMG reviewed employer information for borrowers located in Lansing and adjacent counties. He further noted that the Michigan loans may be somewhat better than the pool on average, given that Michigan loans are 60% retail as compared with 20% for the remainder of the pool.  (e) <u>Bullet maturities</u>. The Committee discussed the 10-year bullet maturity of the loans, noting that this was also the case for the Morgan Stanley HELOC transactions previously wrapped by FSA. Mr. Beard stated that the transaction provides a 2-1/2

year-period after the final loan matures during which time the servicer may work out delinquent loans. The Committee noted that, as currently proposed, FSA would not be able to exercise any remedy until after the expiration of the 2-1/2 year period and maturity of the guaranteed securities. The Committee requested that FSA obtain earlier control rights in future Flagstar transactions, or that the workout period be extended. (f) Transaction mechanics. Mr. Beard stated that the rapid amortization events will include a cumulative loss trigger. The Committee discussed whether all cash is captured following a rapid amortization event and whether the floating allocation percentage of interest collections is available to turbo the notes. Mr. Brewer stated that he believes that, following a rapid amortization event, all principal collections would turbo the notes; however, excess spread from interest collections allocated to the investors would only be available to build o/c to the targeted amount and interest collections allocated to the seller's interest would continue to be payable to the seller. The Committee questioned whether all interest could be available to turbo the guaranteed securities if the deal has not paid off in 10 years. The Committee reviewed projections of the balance of the guaranteed securities at year 10 under various prepayment speeds. Mr. Stiehl noted that the balances shown do not assume the occurrence of a rapid amortization event. The Committee requested additional information showing the balances at 12-1/2 years and also assuming the occurrence of a rapid amortization event. (g) Expected loss analysis. The Committee discussed the derivation of the expected loss. Mr. Cochran reiterated his concern about the validity of the averaging approach, given the disparate results of the RMG model and other measures. Mr. McCarthy stated that Mr. Buteau has undertaken to prepare a model for predicting expected loss on HELOC transactions.

   3.  Recommendation. The MRC approved the transaction as presented, subject to the conditions stated above and final documentation satisfactory to FSA.

**Recipients of Draft Minutes:**

| | |
|---|---|
| MRC: | R. Cochran, R. Brewer, S. McCarthy, T. McCormick, E. Newman, B. Stem, D. Watson |
| FSA: | D. Beard, D. Williams, C. Campbell, G. Stiehl, E. Uhr, R. Bauerfeld, M. Gilhuley, J. Meyers, N. Pfeffer |
| Outside Counsel: | J. Cotins (Thacher Proffitt & Wood) |

**Recipients of Minutes:**

| | |
|---|---|
| MRC: | R. Cochran, R. Brewer, S. McCarthy, T. McCormick, E. Newman, B. Stem, D. Watson |
| FSA: | Via Intranet |
| Outside Counsel: | J. Cotins (Thacher Proffitt & Wood) |

                                 Nancy S. Pfeffer

L:\LEGAL\NPF\MRCMIN\2005\MRCM11-23-05.DOC

CONFIDENTIAL
AGM06152985

Attachment A

**Doug Watson/NYC/FSA**

11/29/2005 03:38 PM

To    Robert Cochran/NYC/FSA@FSA, Sean McCarthy/NYC/FSA@FSA, rbrewer@fsa.com, Thomas McCormick/NYC/FSA@FSA, Ed Newman/NYC/FSA@FSA

Cc    Bruce Stern/NYC/FSA@FSA, Michael Gilhuley/NYC/FSA@FSA, Nancy Pfeffer/NYC/FSA@FSA, David Beard/NYC/FSA@FSA

Subject  Re: Flagstar Call


fyi. I agree with Dave's conclusion. Doug.


**David Beard/NYC/FSA**

11/29/2005 10:28 AM

To    Doug Watson/NYC/FSA@FSA

Cc    Bruce Stern/NYC/FSA@FSA, Nancy Pfeffer/NYC/FSA@FSA, Michael Gilhuley/NYC/FSA@FSA

Subject  Flagstar Call


Bruce Stern, Mike Gilhuley and I spoke by phone yesterday to Christine Fenske the Audit Partner on the Flagstar account for current auditors, Virchow-Krause. Ms Fenske has 14 years prior experience with Ernst and Young.

Virchow performed due diligence before accepting the Flagstar engagement through a series of interviews with management as well as with the outgoing auditor Grant Thornton. She made the following observations: 1) They concluded that the SOX difficulty and the restatement were a result of rapid growth out-running internal resources , 2) they found no reason to believe there were any integrity issues with management, 3) consistent with what we have been told, there had been some deterioration in the communication between the former CFO, Mike Carrie, and Grant Thornton, 4) Grant Thornton's decision to resign was based in part on a lack of appropriate resources at Grant Thornton, 5) Flagstar has a plan to rectify the SOX deficiencies and is implementing a comprehensive solution. 6) the new CFO, Paul Borja, has hired 5 strong financial professionals to provide more effective accounting and financial reporting process.

Based on this conversation, we concluded that further inquiry would be unnecessary.

CONFIDENTIAL

AGM06152986