PORTIONS OF THIS BRIEF HAS
BEEN REDACTED PURSUANT
TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., <br><br>                  Plaintiff, <br><br> vs. <br><br> FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, <br><br>                  Defendants. | 11-CIV-2375 (JSR) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Veronica E. Rendón
Susan L. Shin
Daniel M. Kuhn
Mary E. Sylvester
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000
Veronica.Rendon@aporter.com
Susan.Shin@aporter.com
Daniel.Kuhn@aporter.com
Mary.Sylvester@aporter.com

*Attorneys for Defendants Flagstar Bank,
FSB, Flagstar Capital Markets Corporation
and Flagstar ABS, LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS........................................................................................... 2

I.    FSA'S BUSINESS MODEL ............................................................................ 2

II.   FSA'S 2005-1 AND 2006-2 TRANSACTION TEAMS ................................. 3

III.  FSA'S PRE-TRANSACTION DUE DILIGENCE ......................................... 4

  A.  Random and Representative Sample ......................................................... 4

  B.  Loan File Review....................................................................................... 5

IV.   PLAINTIFF'S EXPERT TESTIMONY AND LITIGATION SAMPLES
      DEMONSTRATE THE NON-EXISTENCE OF MATERIAL BREACHES............. 8

V.    FSA WATERED DOWN ITS PROPRIETARY RMG LOSS MODEL
      PROJECTIONS, WHICH WAS A PRIMARY AND SUBSTANTIAL CAUSE FOR
      ITS LOSSES ................................................................................................ 10

ARGUMENT............................................................................................................. 14

I.    IN ORDER TO PREVAIL, PLAINTIFF MUST ESTABLISH BREACHES OF
      REPRESENTATIONS AND WARRANTIES THAT ARE MATERIAL AND
      ADVERSE TO THE INTERESTS OF PLAINTIFF.................................... 14

  A.  The Materiality Requirement Limits Plaintiff To Seeking Remedies For Breaches That
      Would Have Affected FSA's Decision To Insure ......................................... 16

  B.  A Breach Must Be Adverse, Such That It Actually Results In Loss to AGM.................. 17

II.   PLAINTIFF DEFINED MATERIALITY IN THE COURSE OF ITS DUE
      DILIGENCE, AND FOUND NO MATERIAL ISSUES EXISTED ........................... 19

III.  ALTERNATIVELY, PLAINTIFF HAS WAIVED ANY CLAIM OF MATERIAL
      BREACH .................................................................................................... 20

IV.   PLAINTIFF HAS NOT SUFFERED AN ADVERSITY OF INTEREST ON LOANS
      THAT ARE PAID IN FULL OR ARE CURRENTLY PERFORMING ................. 23

  A.  Paid in Full and Current loans are not material and adverse to Insurer's interest and should
      be Eliminated from any potential recovery....................................................... 23

  B.  Eliminating paid-in-full and current loans and loans that performed for over 12 months
      drastically reduces the population of loans at issue .......................................... 27

V.     THE UNDISPUTED EVIDENCE SHOWS THAT PLAINTIFF'S FLAWED LOSS
       MODEL IS RESPONSIBLE FOR ITS LOSSES.........................................................28

VI.    EVEN IF PLAINTIFF COULD ESTABLISH A MATERIAL AND ADVERSE
       BREACH, IT HAS NOT SUFFERED DAMAGES....................................................29

VII.   PLAINTIFF'S CALCULATION OF DAMAGES IS FLAWED AND IS
       INCONSISTENT WITH THE TRANSACTION DOCUMENTS.............................30

VIII.  PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF SERVICING........32

CONCLUSION .................................................................................................................36

## Table of Authorities

Page(s)

Cases:

*Aetna Ins. Co v. Henry Du Bois Sons Co.*,
144 F.2d 262 (2d Cir. 1944),
*cert. denied*, 323 U.S. 797 (1945)..................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................................14

*Anjay Corp. v. Those Certain Underwriters at Lloyd's of London*,
33 A.D.3d 323 (1st Dep't 2006) .......................................................................16

*AT&T v. City of New York*,
83 F.3d 549 (2d Cir. 1996).................................................................................33

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital Ins.*,
No. 11 Civ. 0505, 2011WL 2610661 (S.D.N.Y. June 27, 2011).....................17, 18

*Bd. of Trustees of N.J. Carpenters Annuity & Pension Funds v. Bank of N.Y. Mellon*,
No. 11 CIV. 1555, 2011 WL 4916302 (S.D.N.Y. Oct. 14, 2011) ........................15

*Bernard Nat'l Loan Investors, Ltd. v. Traditions Mgmt., LLC*,
688 F. Supp. 2d 347 (S.D.N.Y. 2010)................................................................16

*Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.*,
10 F. Supp. 2d 345 (S.D.N.Y. 1998)..............................................................22, 23

*Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*,
81 N.Y.2d 821 (1993)........................................................................................33

*D'Amico v. City of N.Y.*,
132 F.3d 145 (2d Cir.),
*cert. denied*, 524 U.S. 911 (1998)......................................................................14

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992)...............................................................................21

*Gerrish Corp. v. Universal Underwriters Ins. Co.*,
947 F.2d 1023, 1028 (2d Cir. 1991),
*cert. denied*, 504 U.S. 973 (1992)......................................................................28

*Indus. Risk Ins. v. Port Auth. of N.Y.*,
387 F. Supp. 2d 299 (S.D.N.Y. 2005)................................................................33

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005)............................................................................................32

*Johnson v. Metz*,
   No. 87-cv-973, 1993 WL 481395 (N.D.N.Y. Nov. 18, 1993)............................................22

*La Salle Bank Nat'l Ass'n v. CIBC Inc.*,
   No. 08 CIV. 8426, 2011 WL 4943341 (S.D.N.Y. Oct. 17, 2011) .......................................18

*LaSalle Bank, N.A. v. Citicorp Real Estate, Inc.*,
   No. 01 CIV. 4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002).........................................17

*Liona Corp. v. PCH Assocs. (In Re PCH Assocs.)*,
   949 F.2d 585 (2d Cir. 1991)............................................................................................30

*MBIA Ins. Corp. v. Countrywide Home Loans Inc., et al.*,
   Index No.602825/2008 (N.Y. Supr. Ct. Jan. 3, 2012) ........................................................18

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004).............................................................................14, 23, 28, 29

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
   442 F.3d 101 (2d Cir.2006)..............................................................................................16

*Rogath v. Siebenmann*,
   129 F.3d 261 (2d Cir. 1997)........................................................................................21, 22

*Rojas v. Roman Catholic Diocese of Rochester*,
   660 F.3d 98 (2d Cir. 2011)..........................................................................................14, 32

*Syncora Guarantee Inc. v. Countrywide Home Loans Inc., et al.*,
   Index No. 650042/2009 (N.Y. Supr. Ct. Jan. 3, 2012) ......................................................18

*U.S. Bank Nat. Ass'n v. Black Diamond CLO 2005-1 Adviser, L.L.C.*,
   No. 11 CIV. 5675, 2011 WL 6880723 (S.D.N.Y. Dec. 30, 2011)......................................15

*Wells Fargo Bank, N.A. v. LaSalle Bank, N.A*,
   No 3:07-cv-449, 2009 WL 3600331 (S.D. Ohio Oct. 27, 2009) .........................................18

## **Statutes, Rules & Other Authorities:**

Fed. R. Civ. P. 56(a) ..................................................................................................1, 14

Black's Law Dictionary (7th ed. 1999).............................................................................16

Moody's Investors Service, "*Moody's Approach to Rating Residential Mortgage-Backed
   Securities,*" at 13 (Dec. 31, 2008)..................................................................................12

The Flagstar Defendants (collectively, "Flagstar") submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 56(a) for summary judgment dismissing the First Amended Complaint of Plaintiff on the ground that there is no genuine dispute as to any material fact and Flagstar is entitled to judgment as a matter of law.

## PRELIMINARY STATEMENT

The infirmities in Plaintiff's case have been demonstrated during the course of discovery and summary judgment should be granted for the following reasons:

o First, Plaintiff has failed to demonstrate the existence of material and adverse breaches of representations and warranties such that it can sustain its breach of contract claims. Prior to the closing of the two transactions at issue, Plaintiff performed extensive due diligence, and specifically determined, based on loan file reviews performed on random, representative samples of loans, that no material issues existed in the collateral. Years later, Plaintiff has attempted to recreate that same exercise. Yet, Plaintiff cannot now change its materiality parameters and has waived its right to re-characterize as material collateral issues of which it was previously aware.

o Second, Plaintiff has failed to demonstrate materiality or adversity of interest on 99% of the loans included in their litigation samples. Over 80% of the loans in Plaintiff's samples have either paid in full or are current in their payments, and only 8 loans, or 1% of the entire sample, failed to perform within 12 months from the date of origination. This is critical since, as testified by *Plaintiff's* liability expert, "the loans that have mistakes that are going to impact performance of the loans, those mistakes are felt during the first year of performance. That would include fraud or any other kind of mistake."

o Third, by choosing to ignore its expected loss projections so that it could work within the pricing parameters of the transactions, Plaintiff caused its own losses. This is the real issue confronting Plaintiff but it is not a basis on which Flagstar can be deemed liable.

o Fourth, Plaintiff has failed to demonstrate it has suffered damages. Plaintiff stands to be reimbursed for *all* claims it has paid on the 2005-1 transaction, and its entire approach to calculating damages for both transactions is flawed and entirely inconsistent with the transaction documents and exclusive repurchase remedy.

o Finally, Plaintiff's servicing claim is frivolous. Not only should it be dismissed but Flagstar should be indemnified for the costs and fees associated with its defense. By Plaintiff's expert's own admission, 98.25% of the loans which were subjected to review were deemed "compliant," and this is when subjected to a "best practices" review, and not the required standard of "gross negligence, misfeasance, recklessness or bad faith."

## STATEMENT OF FACTS

### I.    FSA's Business Model

AGM, formerly known as Financial Security Assurance, Inc., or "FSA," provided bond

insurance for or "wrapped" Residential Backed Mortgage Securitizations, or "RMBS." As a

bond insurer, FSA guaranteed the timely payment of interest and principal to bondholders in the

RMBS on each payment date. *See* Declaration of Veronica E. Rendón, dated January 9, 2012

("Decl."), Ex. C, Expert Report of Thomas J. Adams (Dec. 22, 2011) ("Adams Rep.), at ¶¶ 23,

52; Decl. Ex. D, Deposition of David Beard (Nov. 1, 2011) ("Beard Dep.") at 13:4-11. FSA's

goal in structuring transactions was to recover 100% of its premium by structuring transactions

such that the cash flows from the collateral and the credit enhancements within the Transaction

would cover all payments to the bondholders, something FSA referred to as its "zero loss"

insurance model. *See* Decl., Ex. E, Deposition of David Williams (Nov. 8, 2011) ("Williams

Dep."), at 41:16-42:19; *and* Decl., Ex. C, Adams ¶26. The "zero-loss" model required that FSA

accurately project expected losses on a transaction so that it could determine whether the deal

was structured to provide sufficient credit enhancement, or a "cushion," against having to pay

claims if the cash flows generated by the collateral were insufficient. *See* Decl., Ex. D, Beard

Dep., at 47:11-48:16; Ex. C, Adams Rep., at ¶¶26-27. FSA's cushion or credit enhancement was

derived by mechanisms such as excess spread accounts and structural subordination. *See* Decl.,

Ex. D, Beard Dep., at 91:8-95:14; *see also* Ex. F, Executive Summary Flagstar Home Equity

Loan Trust 2005-1 ("Exec. Summ. 2005-1"), at 7-9. Thus Plaintiff only suffered actual loss

when it was forced to pay claims due to inadequacy of revenue streams and structural credit

enhancement. *See also* Decl., Ex. D, Beard Dep., at 92:5-93:11. In deciding whether to insure a

transaction and how much credit enhancement was necessary, FSA considered the operations of

the originator (here, Flagstar), the quality of the underlying collateral, which was the subject of

2

extensive due diligence, and the output of FSA's expected loss models, which predicted the

likelihood and extent of expected losses that would arise over the course of the transactions. *See*

Decl Ex. F, Exec. Summ. 2005-1; Ex. G, Executive Summary Flagstar Home Equity Loan Trust

2006-2 ("Exec. Summ. 2006-2").

## II.    FSA's 2005-1 and 2006-2 Transaction Teams

The group within FSA that identified and underwrote RMBS transactions for FSA to

insure was the Residential Mortgage Group, or "RMG." *See* Decl., Ex H, Deposition of George

Stiehl (Nov. 17, 2011) ("Stiehl Dep."), at 11:24-12:10. David Beard oversaw FSA's insurance

underwriting process for the 2005-1 Flagstar Transaction and the 2006-2 Flagstar Transaction

(the "Transactions") and submitted them for executive approval by FSA's Management Review

Committee ("MRC" or "Credit Committee"). *See* Decl., Ex. E, Williams Dep., at 55:14-18; *and*

Ex. D Beard Dep. at 64:14-19. George Stiehl oversaw the detailed loan file and collateral

review, an integral part of FSA's pre-transactional due diligence, the outcome of which drove the

MRC's consideration of the Transactions. *See* Decl. Ex. H, Stiehl Dep. at 52:13-53:8; 61:7-

62:15; 124:15-19; Ex. F, Exec. Summ. 2005-1, at 17; Ex. G, Exec. Summ. 2006-2, at 16.

Mr. Beard and Mr. Stiehl prepared Executive Summaries for each of the Transactions

which were submitted to the MRC for their consideration in deciding whether to wrap the two

Transactions. *See* Decl., Ex. H, Stiehl Dep., at 123:23-124:8; Ex. D, Beard Dep. at 55:11-56:18.

The Executive Summaries provided a detailed and contemporaneous account not only of FSA's

understanding of the Transactions, but also of the thorough due diligence it performed prior to

each Transaction. The 2005-1 Executive Summary and the 2006-2 Executive Summary,

respectively, detail the proposed Transaction, point out major risk issues; describe Flagstar and

its underwriting and servicing operations; provide a detailed description of the extensive due

diligence and results of loan file review that was performed on random, representative samples

3

of the loans collateralizing the Transactions; and describe the loss models RMG ran to anticipate expected losses within the Transactions, which formed the basis for how the Transactions would be structured in order to achieve FSA's goal of 100% loss coverage under its "zero loss" insurance underwriting model. *See generally* Decl., Ex. F, 2005-1 Exec. Summ.; and Decl., Ex. G, 2006-2 Exec. Summ.

## III.    FSA's Pre-Transaction Due Diligence

FSA performed extensive pre-transaction due diligence on the Flagstar Transactions in order to decide whether to wrap the deals. *See* Decl., Ex. H, Stiehl Dep., at 44:2-44:18, 47:16-48:6. According to its General Underwriting Guidelines, FSA believed that based on the ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*See* Decl., Ex. I, FSA General Underwriting Guidelines, at 37.

The due diligence performed on the Flagstar Transactions is detailed in the 2005-1 and 2006-2 Executive Summaries submitted to the MRC. The Clayton Group ("Clayton") performed diligence on the 2005-1 deal, and The Bohan Group ("Bohan") diligenced the 2006-2 deal. *See* Decl., Ex. F, 2005-1 Exec. Summ., at 4; *and* Ex. G, 2006-2 Exec. Summ., at 2. FSA gave both diligence firms clear instruction, communicated frequently with them, and internally discussed and utilized the results of the diligence firms' work in deciding whether to insure the Transactions. *See* Decl., Ex. H, Stiehl Dep., at 237:24-241:197; *and* Exs. J, K, L, Stiehl Deposition Exhibits ("Stiehl Ex.") 25, 26, *and* 27; *and* Ex. H, Stiehl Dep., at 181:16-22, 184:7-25, 241:6-19; Ex. D, Beard Dep., at 281:4-15.

### A.    Random and Representative Sample

FSA directed Clayton and Bohan to review random, representative samples of the loans in each of the loan pools which FSA selected. *See* Decl., Ex. H, Stiehl Dep., at 53:24-54:8; 65:8-

66:4; *see also* Ex. D, Beard Dep., at 30:10-22 ("... we would generally select a random sample

from the tape which was a listing of each loan that was proposed -- that was in the portfolio and

its major characteristics ... and then we would send it to the underwriters for review."); *see also*

Ex. E, Williams Dep., at 95:8-97:9. "The purpose for selecting on a random basis is so that we

get a sense of the pool as a whole. If there are any issues with a sample that is selected

randomly, you would think that -- our thinking was that it would represent issues that could be

found in a portfolio." Decl., Ex. H, Stiehl Dep., at 63:24-64:13. The purpose of reviewing

random, representative samples was to develop a 95% confidence level that no material issues

existed on the loans that would form the collateral for the Transactions. *See* Decl., Ex. I, FSA

General Underwriting Guidelines, at 29.

**B.    Loan File Review**

    1.    FSA Reviewed The Loans To Determine If Material Issues Existed

    FSA directed Clayton and Bohan to review the random, representative samples for

compliance with both Flagstar's underwriting guidelines and FSA's underwriting guidelines.

*See* Decl., Ex. D, Williams Dep., at 88:15-24; 91:6-92:9; 94:21-95:2. The purpose was to

determine if material issues existed with the collateral. *See* Decl., Ex. F, 2005-1 Exec. Summ., at

3; Ex. G, 2006-2 Exec. Summ., at 3; *See* Ex. M, Deposition of Vicki Beal ("Beal Dep."), at 40:9-

42:14. Loans which had no "exceptions" were designated Event Level 1; loans which had some

"exceptions" but otherwise had adequate compensating factors were called "Event Level 2," and

loans which had material, non-qualifying attributes were designated "Event Level 3." The

Executive Summaries defined Event Levels as follows:



*See* Decl., Ex. F *and* G, 2005-1 Exec. Summ., at 3, 2006-2 Exec. Summ., at 3.

While Event Level 1 indicates the presence of no issues or exceptions, as Mr. Stiehl put

it, an Event Level 2 indicates an exception that is, "for lack of a better word, viewed as not a

major exceptions.  Q:  It was not a *material exception,* is that what you mean?  A: That is what I

mean."  *See* Decl., Ex. H, Stiehl Dep., at 82:5-22.  By comparison, Event Level 3 represented the

presence of potentially material issues.  According to Mr. Stiehl, Event Level 3's were the

subject of internal discussion at FSA because they could lead to "a material consequence to us as

a bond insurer," *see* Decl., Ex. H, Stiehl Dep., at 88:6-20, although not all Event Level 3's would

necessarily lead to default:

> Q:  Why was it that you would have to develop an understanding to make sure to
> communicate in your presentation [to the MRC] the occurrence of an event level
> 3?
>
> A: Because the loan was flagged for some reason that the third party wanted us to
> see.  They wanted us to understand what is in the diligence.
>
> Q: It was a material problem potentially with that loan?
>
> A: I don't -- I can't say for every event level 3 that was the case, but the
> possibility was there.

*Id.* at 86:21-87:10.  Stiehl added that if there were a large number of Event Level 3's, FSA would

consider not wrapping the deal at all.  *Id.* at  90:10-91:3.

## 2. File Review Is An Iterative Process

Due diligence is an iterative process involving a great deal of communication between

the insurer, the originator, and the diligence firm:

> [T]he way a diligence would proceed, they would do their initial review and then
> have findings and then discuss the findings with the originator and there was a lot
> of back and forth related to the initial review; exceptions were being presented --
> sorry, compensating factors would be presented; exceptions would be cleared. So
> it was a lot of back and forth. It wasn't just, we did a review and then these are
> the event levels. There was a lot of interaction between the diligence firm and the
> originator.

*See* Decl., Ex. N, Stiehl Dep., at 95:25-96:18; *see also* Ex. N, Stiehl Ex. 19 (███████████

████████████████████████████████████████████████████████

███ ).

Given the iterative nature of the process, the cure rate increased over time. Mr. Stiehl

testified that it was not problematic for there to be a number of Event Level 3's discovered in the

initial stages of due diligence because "every diligence encompasses a bunch of, you know, even

level 3's that get cleared." Decl., Ex. H, Stiehl Dep., at 102:9-25. Indeed, during the course of

Clayton and Bohan's loan file review for the 2005-1 and 2006-2 Transactions, a number of Event

Level 3's were found initially and through the process described above, were eventually cleared.

*See* Decl., Ex. M, Beal Dep. at 108:17-129:16; Decl., Exs. O - Q, (emails from Clayton to FSA

reporting on Event Level clearances); Exs. R - Y (emails and "Loan Disposition Reports" from

Bohan to FSA reporting on Event Level clearances); *see also* Ex.Z, Expert Report of Jeffrey

Nielsen (Dec. 22, 2011) ("Nielsen Rep."), at ¶¶ 78, 80.

3.     The Resulting Event Levels From FSA's Loan File Review

According to the 2005-1 Executive Summary, there were zero Event Level 3's in the random representative sample.[1]  *See* Decl., Ex. F, 2005-1 Exec. Summ., at 3.  For the 2006-2 Transaction, Bohan reviewed a 250 loan random, representative sample and found 6 Event Level 3's at the time of MRC consideration, although FSA stated that it believed all would be cleared by the time of closing.  *See* Decl., Ex. G, 2006-2 Exec. Summ., at 3.  All material Event Level 3's were cleared prior to closing.  *See* Decl., Exs. X & V (email and final "Loan Disposition Report" from Bohan to FSA (Dec. 20, 2006).  Thus, at the time of the closing of the two Flagstar Transactions, no material issues were deemed to be present on the random, representative loan samples that had been reviewed.

## IV.   PLAINTIFF'S EXPERT TESTIMONY AND LITIGATION SAMPLES DEMONSTRATE THE NON-EXISTENCE OF MATERIAL BREACHES

Plaintiff intends to try its case by sample, and to that end, created what purport to be two random, representative samples of 400 loans each, drawn from the 2005-1 and 2006-2 Transactions.  *See* Decl., Ex. AA Expert Report of Nelson R. Lipshutz, PhD ("Lipshutz Rep."), at 2-3.  Another one of Plaintiff's experts, Rebecca Walzak, then reviewed the 800 loan files within the samples, and now asserts that 610 of those loans contain breaches of representations and warranties.  *See* Decl., Ex. BB, Expert Report of Rebecca B. Walzak (Dec. 2, 2011) ("Walzak Rep."), at 2.

Within this population of 610 loans, *316 have been paid in full.*  Decl., Ex. __, Nielsen Rep., at ¶ 36.  Thus, *over half* of those loans it identifies as containing breaches have already

---

[1]     The Executive Summary explains there were Event Level 3's that were the result of a potential infraction of the Truth In Lending Act.  This issue, however, was identified early during the course of due diligence and remediated to the satisfaction of FSA.  *See* Decl., Ex. F, 2005-1 Exec. Summ., at 2-3.

8

been fully repaid into the Trusts. Further, *168* of the allegedly breaching loans had a payment

status of current as of October 31, 2011, meaning these borrowers are currently meeting their

payment obligations regardless of any purported origination issue. *See* Decl. Ex. Z, Nielsen Rep.

at ¶ 36. While Ms. Walzak did not review the performance of the loans in her samples, *see* Decl.

Ex. CC, Deposition of Rebecca Walzak (Dec. 19, 2011) ("Walzak 12/19 Dep."), at 184:20-22,

185:3-7, she agrees that a performing loan does not result in any loss to Plaintiff: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Walzak 12/19 Dep. at 199: 13-17.

    As shown in the table below, as to the remaining 126 loans out of the 610 which Ms.

Walzak asserts contain breaches, only 8 failed to perform for at least twelve months before

becoming delinquent. *See* Decl. Ex. Z, Nielsen Rep., at ¶ 40-41.

| Months | 2005-1 | | 2006-2 | | Total | |
|--------|--------|--------|--------|--------|--------|--------|
| | No. | % of | No. | % of | No. | % of |
| 0-6 | 0 | 0% | 0 | 0% | 0 | 0% |
| 7-12 | 2 | 4% | 6 | 7% | 8 | 6% |
| 13-18 | 1 | 2% | 10 | 12% | 11 | 9% |
| 19-24 | 2 | 4% | 13 | 16% | 15 | 12% |
| 25+ | 38 | 84% | 51 | 63% | 89 | 71% |
| Not 90+ | 2 | 4% | 1 | 1% | 3 | 2% |
| Total | 45 | 100% | 81 | 100% | 126 | 100% |

    As recognized by Ms. Walzak, fraud and origination mistakes that impact upon a loan's

performance surface during the first year of performance:



Decl., Ex. CC, Walzak Dep. at 108: 5-12 (emphasis supplied). Ms. Walzak further testified that

a proprietary model which she developed, which correlates underwriting mistakes to the

probability of default, demonstrates ███████████████████████████

█████████████████ *Id.* at 108:13-16. As discussed below, other experts and fact

witnesses in this matter concur.

As shown in the chart above, when Ms. Walzak's testimony is applied to the performance

of the loans in her samples, *at most only 8 loans or 1% of the loans in Plaintiff's samples contain*

*fraud or mistakes in the origination process that could be deemed actionable.* This small amount

is entirely consistent with FSA's contemporaneous due diligence which did not show any

material issues to exist at the time of the closing of the Transactions.

## V.   FSA Watered Down Its Proprietary RMG Loss Model Projections, Which Was A Primary And Substantial Cause for Its Losses

To design an adequate cushion to protect against unexpected loss, FSA engaged in

extensive loss modeling. The objective of loss modeling "was to make sure that there was

adequate structure so that there weren't scenarios where you had to pay a claim. ... the objective

was to avoid any scenarios where you didn't have a cushion two, three times the loss

expectation." Decl., Ex. D, Beard Dep., at 47:7-21.

The final expected loss figures that drove FSA's insurance decision was actually derived

by taking the average of three separate loss models: the "RMG Model," the "FICO Model," and

the "Historic Model." *See* Decl., Ex. F, 2005-1 Exec. Summ., at 5-6, 14-15; *and* Ex. G, 2006-2

Exec. Summ., at 5, 13-15. The result of using this "averaging" approach resulted in significantly

watering down to less than half the expected loss figure generated by FSA's proprietary RMG

loss model.[2]

---

[2]   For the 2005-1 Transaction, the FICO Model produced an expected loss of 1.28%, as a
percent of the aggregate mortgage loan pool. Decl., Ex. F, 2005-1 Exec. Summ., at 6. The
Historical Model produced an expected loss of 1.74%. *Id.* Yet, the RMG model produced an
expected loss of 9.94%. *Id.* When averaged, the total expected loss figure was 4.32%, *less than*
Footnote continued on next page

FSA's "averaging" approach was unorthodox and not common in the bond insurer industry. *See* Decl., Ex. C, Adams Rep., ¶ 91. Indeed, at the MRC meeting for the Flagstar 2005-1 Transaction, the Chairman of FSA Robert Cochran voiced concern about using the "averaging" approach because it diluted the findings of FSA's RMG Loss Model. Decl., Ex. DD, FSA Minutes of Meeting of the Management Review Committee (Nov. 23, 2005), at 4



If, FSA had not employed the unorthodox "averaging approach" and instead relied on its proprietary RMG Model, FSA would not have approved or been awarded the Transactions. As indicated by the lead analyst for the Transactions, David Beard:

> Q: "If the 10 percent expected loss number [generated by the RMG Loss Model] had been utilized by FSA and the structure had been created around a 10 percent expected loss number as compared to a 4.32 percent expected loss number [generated from the averaging approach], that would have created a lot more cushion for FSA, correct?
>
> A: No.
>
> Q: Why do you say no?
>
> A: Ambac would have done the deal. I mean it was not -- it wouldn't have been -- it just wouldn't happen."[3]

---

Footnote continued from previous page
*half of the expected losses predicted by the RMG model. Id.* Similarly, for the 2006-2 Transaction, FSA's FICO Model produced an expected loss of 1.10%, the Historical Model produced an expected loss of 1.74%, and the RMG Model produced an expected loss of 8.05%. Decl., Ex. G, 2006-2 Exec. Summ., at 5. By taking the average of the three models, FSA calculated an expected loss for the 2006-2 Transaction of 3.63%, again *less than half of the expected loss amount predicted by the RMG Loss Model. Id.* at 5, 13.

[3]   Earlier in his deposition, Mr. Beard identified AMBAC and MBIA as FSA's two primarily competitors from 2004 through 2007. *See* Decl., Ex. D, Beard Dep., at 15:24-16:24.

Decl., Exs. D and E, Beard Dep. at 186:22-187:10; Williams Dep., at 278:22-279:7 ("Q: If you had used solely the RMG loss model of 9.94 percent, that would have caused there to have been additional loss coverage and first loss protection built into the structure? A: That's one conclusion, yes. The other conclusion would be there would have been 1.4 times coverage. Q: Would you have done a deal at 1.4 times coverage? A: Probably not.").

The RMG Model was the only model of the three to be based on the results of FSA's extensive loan file review of the loans to be included in the 2005-1 and 2006-2 Transactions. It was also the only model to examine and weigh key credit risk characteristics of each of the mortgage loans, including Combined Loan To Value ("CLTV"), borrower credit quality, geographic location of the mortgaged property, loan documentation, and property type, and assign risk weightings to each of the key characteristics for each of the loans. *See, e.g.,* Decl., Ex. F, 2005-1 Exec. Summ., at 15. As discussed in the accompanying expert report of Tom Adams, each one of these items is a key risk factor in evaluating expected losses on HELOCs. Decl., Ex. C, Adams Rep. at ¶¶79, 80, 87, 111. This is particularly true of CLTV, the primary risk factor for second lien loans in an inflated housing market environment, as it measures the equity a borrower has in her home which provides protection against declines in home property values. As testified by Mr. Stiehl, high CLTV increases foreclosure and loss severity because a "borrower that has no equity, no skin in the game, ... has less incentive ... to pay -- it is easier for that borrower to walk away from the property because they have less -- they are not losing anything." "Q: They have less skin in the game." "A: Right." Decl., Ex. H, Stiehl Dep., at 28:15-29:8; *see also* Ex. C, Adams Rep. at 26, fn 24, quoting Moody's Investors Service, "Moody's Approach to Rating Residential Mortgage-Backed Securities," at 13 (Dec. 31, 2008) ("Borrowers with positive equity in their properties are likely to have stronger incentives, and be

12

better able, to avoid default in the event of job loss or other economic stress – even if it means

selling the property and retaining the net proceeds."). Even Rebecca Walzak, Plaintiff's liability

expert, testified that HELOCs are subject to risk in a falling housing market resulting from

strategic defaults. Decl., Ex. CC, Walzak Dep., at 118:21-119:11. She further testified this is

particularly true in California, Florida and Michigan, the states in which the loans in the

Transactions are concentrated. *Id.* at 203:17-205:10.[4]

Unlike the RMG Loss Model, neither the FICO Loss Model nor the Historic Model were

based on FSA's due diligence/loan file review information, neither were tailored to the primary

risk factors present in the collateral, and both were strongly historically biased to periods of time

when the housing market and the economy were strong. *See* Decl., Ex. F, 2005-1 Exec. Summ.,

at 14-15; *See.*, Ex. G, 2006-2 Exec. Summ., at 13-15; *and see* Ex. C, Adams Rep., at ¶¶ 79, 80.

FSA watered down its expected loss projections by averaging the RMG Loss Model

projections with the much lower projections of the other two models. FSA did so despite having

knowledge shortly prior to the approval of the 2005-1 Transaction that there was a "housing

bubble" in this country. *See, e.g.*, Decl., Ex. EE, FSA Board Minutes, (Sep. 14, 2005) at p. 1.

As testified to by Mr. Adams, FSA's unorthodox "averaging" approach was a primary and

substantial cause of FSA's losses, particularly in light of the events that have transpired in the

economy and the significant weakening of the housing market. FSA assumed the risk of a

declining housing market by muting its proprietary loss model so as to be awarded the business.

FSA is responsible for that decision and any attempt to conjure up phantom materiality issues 5-

---

[4]      Tellingly, however, Ms. Walzak never took geographic distribution nor falling market
values nor ultimate loan performance into account when she performed her analysis. Decl.,
Ex. CC, Walzak Dep., at 184:20-185:7.

13

6 years after the closing of the Transactions -- when materiality issues were specifically examined and accepted at the time of closing -- should be rejected.

## ARGUMENT

A court should grant summary judgment where, "construing the evidence in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (emphasis added). Further, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir., cert. denied, 524 U.S. 911 (1998) (citations omitted).

## I.   IN ORDER TO PREVAIL, PLAINTIFF MUST ESTABLISH BREACHES OF REPRESENTATIONS AND WARRANTIES THAT ARE MATERIAL AND ADVERSE TO THE INTERESTS OF PLAINTIFF

To recover for a breach of contract, a plaintiff must prove "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach … Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original) (citations omitted). Moreover, under the express provisions of the Transaction Documents, Flagstar's cure or repurchase obligations arise only for breaches of representations and warranties on HELOCs that are material and adversely affect AGM's interests:

14

The representations and warranties in this Section shall survive the transfer of the Mortgage Loans to the Issuer. Upon discovery of a breach of any such representation or warranty that materially and adversely affects the interests of the Transferor, the Noteholders, or the Note Insurer, the person discovering the breach shall give prompt notice to the other parties and to the Note Insurer. The Servicer shall cure in all material respects any breach of any such representation or warranty within 90 days of becoming aware of it or, with the consent of the Note Insurer and a Responsible Officer of the Indenture Trustee, any longer period specified in the consent.

Decl., Ex. FF, 2006-2 Sale and Servicing Agreement ("SSA"), § 2.04 (emphasis added). The SSA consistently uses similar "material and adverse" language. *Id.* at § 2.04(b). Other Transaction Documents use the same language. *See, e.g.*, Decl., Ex. GG, 2006-2 Purchase Agreement ("MLPA") § 3.02(b) ("If the substance of any representation or warranty ... made to the best of the [Flagstar's] knowledge or as to which the Seller or Flagstar has no knowledge is inaccurate *and the inaccuracy materially and adversely affects the interest of* the Purchaser or its assignee in the related Mortgage Loan, ... the inaccuracy shall be a breach of the applicable representation or warranty.").

The "material and adverse" language is not superfluous. *U.S. Bank Nat. Ass'n v. Black Diamond CLO 2005-1 Adviser, L.L.C.*, No. 11 CIV. 5675, 2011 WL 6880723, at *5 (S.D.N.Y. Dec. 30, 2011) (Rakoff, J.) ("Under New York law, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]'"); *see also, Bd. of Trustees of N.J. Carpenters Annuity & Pension Funds v. Bank of N.Y. Mellon*, No. 11 CIV. 1555, 2011 WL 4916302, at *4 (S.D.N.Y. Oct. 14, 2011) (Rakoff, J.). Not every breach of a representation and warranty gives rise to Flagstar's cure or repurchase obligation. Only those breaches of representations and warranties that are both material (i.e, important to AGM's decision to insure the Transaction), and adverse, (i.e., the breach of which causes AGM actual loss), are actionable.

15

### A.   The Materiality Requirement Limits Plaintiff To Seeking Remedies For Breaches That Would Have Affected FSA's Decision To Insure

Only breaches of representations and warranties that would have affected FSA's decision to insure are material. "Material" means "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." Black's Law Dictionary (7th ed. 1999); *see also Bernard Nat. Loan Investors, Ltd. v. Traditions Mgmt., LLC*, 688 F. Supp. 2d 347, 360-61 (S.D.N.Y. 2010) quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir.2006) ("For a breach of contract to be material, it must go to the root or essence of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.").

Moreover, only breaches of representations and warranties that bear upon the ultimate cause of loss to FSA is material. In *Anjay Corp. v. Those Certain Underwriters at Lloyd's of London*, the plaintiff insured its jewelry store against loss or damage resulting from "Fire, [L]ightning, Explosion, Aircraft, Storm, Tempest, Flood, Burst Pipes, Impact, Hold-up …, Robbery …." 33 A.D.3d 323, 323 (1st Dep't 2006). Following an accidental explosion the plaintiff made a claim. *Id.* The policy contained several warranties, including one requiring the plaintiff to maintain video tapes for a minimum of seven days or until the tapes had been reviewed by a loss adjuster. *Id.* The plaintiff failed to maintain the tapes, and the insurance company sought to avoid the contract based on the breach. *Id.* The court held, "That a video surveillance system decreases the risk of loss generally . . . [and] is irrelevant when the loss is caused by an event the occurrence of which cannot possibly be affected by such a system." *Id.* at 324. The court went on to note, "Presumably, all insurers regard as important the warranties for which they negotiate. The importance of a warranty, however, does not establish anything about the materiality of a particular breach." *Id.*

16

**B.    A Breach Must Be Adverse, Such That It Actually Results In Loss to AGM**

As noted above, Flagstar's obligation to cure or repurchase arises only from material

breaches that "adversely affects" AGM's interests. A breach is only adverse if it causes actual

loss to the insurer. Thus, AGM is not entitled to a remedy for breaches from which it suffered no

damages, or which, stated a different way, did not result in the payment of claims.

In *LaSalle Bank, N.A. v. Citicorp Real Estate, Inc.*, the court held that similar "material

and adverse" language required that the plaintiff alleging a breach of representations and

warranties causally link its loss to the breach. No. 01 CIV. 4389 (AGS) 2002 WL 181703 at *3

(S.D.N.Y. Feb. 5, 2002). Citicorp sold a number of loans into a LaSalle trust by a Pooling and

Servicing Agreement which included representations and warranties and contained a provision

that required cure upon notice of a breach that "*materially and adversely affects* the value of such

Mortgage Loan or the interests of the Certificateholders therein . . . ." *Id.* (emphasis added).

LaSalle brought suit, alleging that Citicorp breached several representations and warranties

contained in the PSA. *Id.* at 1-2. The court, quoting the "material and adverse" language of the

cure and repurchase provision, noted that the plaintiff's claim required a showing of "(ii) a

material and adverse effect *caused by the breach*," establishing that there be a causal link

between the breach and the material adverse effect. *Id.* (emphasis added). *See also Bank of N.Y.*

*Mellon Trust Co. v. Morgan Stanley Mortg. Capital Ins.*, Slip Op., No. 11 Civ. 0505(CM FM),

2011 WL 2610661 at **2, 3, 7 (S.D.N.Y. June 27, 2011) (where the trustee on a pool of

mortgages sued the lender for breach of warranty under repurchase provisions triggered only

upon a breach that "materially and adversely affect[ed] the value of the Mortgage Loan ...," the

court held that the proximate cause requirement for breach of warranty actions "generally

mirrors that for tort liability" and causation is measured by whether "the damages that result

17

from breach are those that result from the risks that are warranted against.") Id. at *7 (emphasis in original and citation omitted).

Similarly, in *Wells Fargo Bank, N.A. v. LaSalle Bank, N.A.*, the court, in considering similar language in a Mortgage Loan Purchase Agreement, distinguished between material information and material effect:

> ... the fact that an investor might have made a different decision had he or she had different information may make that information material to the investor's decision, but it does not make the omission of that information cause a material and adverse effect on the loan. 'Material information' and 'material effect' are not the same thing.

Slip Op. No 3:07-cv-449, 2009 WL 3600331, at *2 (S.D. Ohio Oct. 27, 2009) (applying New York law). *See also, La Salle Bank Nat'l Ass'n v. CIBC Inc.*, Slip op., No. 08 CIV. 8426 (WHP), 2011 WL 4943341, at *6 (S.D.N.Y. Oct. 17, 2011), (the appropriate inquiry for a breach of warranty claim requiring similar "material and adverse" language includes determining whether "any underwriting deficiencies *caused* a material and adverse effect." (emphasis added). Thus, in order to demonstrate materiality and adversity, Plaintiff must demonstrate a breach that would have affected its original decision to insure and which ultimately caused it loss. Plaintiff has failed to make this showing.[5]

---

[5]     In two recent non-binding decisions, Justice Eileen Bransten of the Supreme Court of the State of New York addressed the partial summary judgment motions of two monoline insurers who allege that Countrywide Home Loans, Inc. ("Countrywide") and related entities fraudulently induced them into issuing insurance policies and breached representations and warranties in the related transaction documents. *See Syncora Guarantee Inc. v. Countrywide Home Loans Inc., et al.*, Index No. 650042/2009 (N.Y. Supr. Ct. Jan. 3, 2012); *MBIA Ins. Corp. v. Countrywide Home Loans Inc., et al.*, Index No.602825/2008 (N.Y. Supr. Ct. Jan. 3, 2012). In both decisions, Justice Bransten denied plaintiff's motions seeking a declaration that they need not prove that any breach of representation or warranty caused a default. *See Syncora*, No. 650042/09, at 9-11; *MBIA*, 602825/2008, at 24. She further decided, in analysis that appears to conflate plaintiffs' fraud and breach of contract claims, that the insurers need not show a causal link between Countrywide's alleged misrepresentations and the insurers' claims payments. *See Syncora*, No. 650042/09, at 23; *MBIA*, 602825/2008, at 14. In so holding, Justice Bransten relied on two New York statutes governing claims for rescission of insurance contracts which are inapplicable here to Plaintiff's breach of contract claims where rescission is not properly sought, where Plaintiff

Footnote continued on next page

18

## II.   PLAINTIFF DEFINED MATERIALITY IN THE COURSE OF ITS DUE DILIGENCE, AND FOUND NO MATERIAL ISSUES EXISTED

As discussed in the Statement of Facts, Plaintiff performed extensive pre-Transaction due diligence, including reunderwriting random, representative samples of loans to Flagstar's underwriting guidelines and grading the loans to FSA's own internal guidelines. "The purpose for selecting on a random basis is so that we get a sense of the pool as a whole. If there are any issues with a sample that is selected randomly, you would think that -- our thinking was that it would represent issues that could be found in a portfolio." Decl., Ex. H, Stiehl Dep., at 63:24-64:13. Both diligence firms on both Transactions re-underwrote the loans in the random and representative sample to Flagstar's guidelines, (*Id.* at 68:7-22, 80:11-14), and to FSA's underwriting guidelines, which assigned grades based on the credit quality of the loans. *Id.* at 66:5-66:15. These guidelines required that the diligence firm review the loan files for the loans in the pool, and re-calculate certain credit criteria of the borrowers, such as their DTI, and LTV. *Id.* at 67:4-24.

In the course of that exercise, FSA defined materiality, in particular in determining what constituted Event Level 3 issues, as potentially material to FSA's decision to insure: According to Mr. Stiehl, Event Level 3s were what he and the MRC focused on in deciding whether to insure the 2005-1 and 2006-2 Transactions because they could lead to "a material consequence to us as a bond insurer.". Decl. Ex. H, at 88:6-20. Mr. Stiehl further testified that if serious Event Level 3 issues were discovered in pre-transactional due diligence, it would result in a reason to not insure the transaction.

Footnote continued from previous page
has not alleged fraud, and where the Court has previously held that Plaintiff is limited to exclusive remedy of cure or repurchase. Flagstar also notes that Syncora is appealing Justice Bransten's decision.

Q. Can you explain -- give me the range of possibilities of what might happen in the scenarios [where there was a determination of materiality by FSA on an event level 3]?

A. We had done diligences that we found issues where we no longer wanted to participate in the transaction and we found issues where we didn't think there was any -- they would have no effect to -- I don't even know -- I just know that we had completed diligences in which we have found issues with loans that we didn't want to participate in.

*Id.* 86:21-87:10.  In deciding to wrap the two Transactions, FSA determined that no material Event Level 3 issues were present in the random, representative samples for either Transaction and that only Event Level 1s and 2s were present, which were not material. *Id.* 82:5-22; *see also* Decl., Ex. D, Beard Dep. 117:22-118:2.  Plaintiff's pre-transaction due diligence findings are indisputably the only evidence that reflects a contemporaneous evaluation of the risk profile, and frequency of material breaches, as understood at the time.  More than five years later, AGM cannot seek to redefine "materiality" in an attempt to obtain recoveries on loans that have been subjected to extraordinary economic and housing market conditions that FSA knowingly downplayed in its pre-transaction loss modeling.  Plaintiff's complaint should be dismissed in its entirety.

## III.   ALTERNATIVELY, PLAINTIFF HAS WAIVED ANY CLAIM OF MATERIAL BREACH

Notwithstanding that it engaged in the exact exercise at the time of the closing of the Transactions, in order to establish its case, Plaintiff proposes to analyze random, representative samples of the loans in the two Transactions five to six years after the closing of the Transactions in order to determine if there were material breaches that existed at the time of closing.  In so doing, Plaintiff redefines materiality and claims that a substantial number of representations and warranties were materially breached.  As discussed in Jeff Nielsen's expert report, this is most clearly shown by the fact that there are 19 loans present in both Ms. Walzak's samples and the

Clayton/Bohan contemporaneous diligence samples. Decl., Ex. Z, Nielsen Rep. at 30-36. Of these loans, Ms. Walzak concluded 17 or 89% had material and adverse breaches associated with them. In sharp contrast, all 17 of these loans were ultimately deemed by FSA to have no material issues associated with them and each were rated Event Level 1 at the time of closing. Moreover, 13 of the 17 loans have paid-off or are current as of October 31, 2011. The only conclusion that can be drawn is that Ms. Walzak is, on behalf of AGM, applying a diametrically different standard of materiality than was applied contemporaneously. Plaintiff should not be allowed to get away with this approach.

Under New York law, a plaintiff waives his right to recover for any purported breach of representations and warranties "[w]here a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract." *Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992). As part of its pre-transactional due diligence, Insurer required and Flagstar provided detailed loan information for random, representative samples of loans. Because Insurer understood to a 95% confidence level the nature of the collateral, and agreed to insure the Transactions, any current claim that the collateral is materially defective is waived. The Second Circuit articulated this rule in *Galli*:

> Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights under the warranties, we think the buyer has waived the breach.

*Id.* at 151. Thus, to assess the validity of a plaintiff's breach of representation and warranty claim, "a court must evaluate both the extent and the source of the buyer's knowledge about the truth of what the seller is warranting." *Rogath v. Sibenmann*, 129 F.3d 261, 264 (2d Cir. 1997).

In *Galli*, the buyers of a corporation brought a breach of contract claim premised, among other things, on allegations that sellers had breached their warranty that they had no knowledge

of facts "'which might adversely affect the business or condition…'" of property owned by the

corporation. 973 F.2d at 150. The sellers conceded that they knew of contamination of specified

property owned by the corporation. *Id.* The buyer was also aware of this contamination, but

argued on appeal that such awareness was irrelevant under New York law of breach of warranty.

*Id.* The Second Circuit disagreed, remanding for further factual development as to the question

of whether sellers revealed to buyer the existence of the contamination. *See id.* at 151 ("Thus,

whether [the buyer's] knowledge of the Catskill contamination vitiates his warranty breach claim

depends on the circumstances in which [the buyer] learned of the problem."). On remand, the

district court found that sellers had, in fact, disclosed the contamination information to the buyer

and the buyer's claim was therefore waived. *See Johnson v. Metz*, No. 87-CV-973, 1993 WL

481395, at *5 (N.D.N.Y. Nov. 18, 1993). In *Rogath*, the Second Circuit reaffirmed the waiver

rule, remanding for further fact finding, noting that the "critical questions" were "what the buyer

knew and, most importantly, whether he got that knowledge from the seller …." 129 F.3d at 265

(citation omitted).

Following *Rogath*, a court in this District revisited its summary judgment decision

against the sellers of a corporation on the buyers' breach of warranty claims, reexamining what

the sellers told the buyers prior to the sale date regarding the imperiled status of certain insurance

covering corporate property and modifications to the property that would likely be necessary to

retain such coverage. *See Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.*, 10 F.

Supp. 2d 345, 360-63 (S.D.N.Y. 1998) (aff'd, 182 F.3d 163 (2d Cir. 1999). The court found that,

based on information provided by the sellers, the buyer was informed of facts that constituted

breaches of its warranties. *Id.* at 361-62. Because the buyers received factual information

22

emanating from the sellers that demonstrated the purported breach of warranty, the court held

that the breach claims were waived and entered judgment in the sellers' favor. *Id.* at 372.

Here, Flagstar served as a "reservoir of information" about the loans underlying the

Transactions, including loans on which Plaintiff currently claims breach. FSA nevertheless

entered into the Transactions. By becoming intimately familiar with the collateral underlying the

Transactions, and nonetheless agreeing to insure the Transactions, Plaintiff has waived its claims

and summary judgment should be entered in Flagstar's favor.

## IV. PLAINTIFF HAS NOT SUFFERED AN ADVERSITY OF INTEREST ON LOANS THAT ARE PAID IN FULL OR ARE CURRENTLY PERFORMING

In New York, causation is an element of every breach of contract claim. *See Nat'l*

*Market Share*, 392 F.3d at 525 "Causation is an essential element of damages in a breach of

contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and*

*proximately caused* his or her damages."). Just as Plaintiff can only contractually seek

repurchase for "material and adverse" breaches, Plaintiff only has a legal cause of action if it can

prove a causal link between the alleged material and adverse breach and its alleged losses.

### A.    Paid in Full and Current loans are not material and adverse to Insurer's interest and should be Eliminated from any potential recovery

Plaintiff is attempting to prove its case based upon purportedly random, representative

samples of 800 loans, 400 per Transaction. As set forth in the expert report of Jeffrey Nielsen, of

the 610 loans in its sample on which Plaintiff claims material breaches, *484* (or approximately

80%) have either paid in full or have a current payment status as of October 31, 2011. Decl. Ex.

Z, Nielsen Rep. at ¶ 36. Plaintiff has benefited from the performance of these loans, and cannot

claim to have suffered any losses on them. These loans cannot support a claim for breach of

contract as a matter of law, and Plaintiff has thus failed to make its case on 80% of its purported

claims.

23

1.     Insurer cannot prove damages on paid-in-full loans

Of the 610 loans in the 800 loan sample for which Ms. Walzak claims a breach exists,

316, *or over half*, have been paid in full. Decl., Ex. Z, Nielsen Rep. at ¶ 36. As the

securitization trusts have already recovered the entire balance of such loans on behalf of the

Noteholders, it is fundamental that Plaintiff cannot establish loss or any adversity of interest on

these loans. Indeed, Plaintiff's own underwriting expert, Rebecca Walzak, concurs that a loan

which has performed does not result in any loss to Plaintiff: ████████████████████████

████ Decl., Ex. CC, Walzak 12/19/2011 Dep. at 199: 13-17.

2.     Plaintiff cannot prove continuing, material and adverse breaches on
       currently-performing loans

One hundred and sixty-eight of the allegedly breaching loans, 79 in the 2005-1 Trust and

89 loans from the 2006-2 Trust, were current as of October 31, 2011. Decl., Ex. Z, Nielsen Rep.

at ¶ 36. The borrowers on these loans are currently paying, and meeting their obligations. Thus

even if one were to assume arguendo that there had been a breach at the time of origination 5-6

years ago, that issue has not materially nor adversely impacted upon the performance of the loan,

and at this point in time, based on all expert testimony on this case, including Plaintiff's liability

expert, can no longer be deemed a substantial cause of default .

Expert testimony in this case overwhelmingly shows that a default occurring one year

after origination is no longer due to mistake or fraud in the origination process, but rather is

attributable to some intervening life event. Even Plaintiff's liability expert, Ms. Walzak, agrees

that fraud or mistakes in the origination process that will effect a loan's performance will surface

within the first year following origination:

24



Decl., Ex. CC, Walzak Dep. at 108:5-12 (emphasis supplied).  Indeed, Ms. Walzak testified that

she has developed a proprietary model that correlates underwriting mistakes to the probability of

default, and that her own model demonstrates ████████████████████████████████████

███████████████████████ *Id.* at 108: 13-16.[6]

All other expert testimony in this case concurs that any material origination issue or fraud

will show itself in the first twelve months of the loan's life. *See* Decl., Ex. HH, Expert Report of

John Griggs (Dec. 22, 2011) ("Griggs Rep.") at ¶ 4 (████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████); *id.* at 4 (████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████); Decl. Ex. C, Adams Rep. at ¶ 136 (████████████████████████████

████████████████████████████████████████████████████

---

[6]   Notably, Ms. Walzak did not utilize that model in her analysis here, Decl. Ex. CC at 108:
18-20, nor did she even consider loan performance. *Id.* 184:20 – 185:7 (████████████████████
████████████████████).

██████████████████████████████████████████████

███████████████████████).

    Even AGM's Chief Executive Officer has publicly stated that defaults on 2005 and 2006

loans will be the result of traumatic economic factors, not lurking origination issues:

> [T]hese are very seasoned. ... [A]s you look at the portfolio today, the majority of
> the vintages are '05, '06, '07. So even the '07 year is now four years old. And if
> people have made the decision to defend their mortgage and defend their house
> for that four-year period, we're confident that their default rate, other than if
> there's a huge spike in unemployment, should proceed on a lot less dramatic
> result that what we've seen in the past.

Decl. Ex. II, Plaintiff's Response to Flagstar's First Requests for Admission, quoting Assured

Guaranty Municipal Corp., second quarter 2011 analyst call, statement by Dominic Frederico

(Aug. 9, 2011). Plaintiff held the same position when the Transactions closed, noting that "the

fact that as a portfolio of loans seasons and obligor payments are actually received by the

servicer, the likelihood of losses developing due to origination fraud is diminished significantly."

Decl., Ex. JJ, FSA Operating Guidelines, Risk Management (Oct. 27, 2005), at 12; Decl., Ex.

KK, FSA Operating Guidelines, Risk Management (Feb. 15, 2007), at 11. Underwriting and

fraud representatives at Flagstar similarly concur. *See* Decl., Ex. LL, Dep. L. Terrasi (Dec. 19,

2011), at 141:15 142:11 ("Industry standard is pretty much if a loan performs for over 12

months, then what happened at the origination of that loan really did not have a total bearing on

the loan"); *see also* Decl. Ex. MM, Dep. M. Scott, 111:13-25 ("very early defaults is generally

what the industry considers tied to underwriting").

    Industry standard further recognizes that defaults occurring after the 12-month mark are

most likely attributable to intervening forces such as life events and/or widespread economic

downturns such as have occurred in the last five years. *See* Decl., Ex. Z, Nielsen Rep. at ¶ 45-51.

As Ms. Walzak noted, ████████████ such as ████████████████████████

██████ may render a borrower unable to pay and generally increase the likelihood of default. *See* Decl., Ex. CC, Walzak Dep. at 118: 15-20. Indeed, expert analysis here revealed instances where debtors had made timely payments for several years, but defaulted due to job loss, reduced income, divorce or unexpected medical expenses. *See* Decl., Ex. HH, Griggs Rep. at ¶ 39.

████████████████████████████████████

████████████████████████ *Id.* The correlation between external forces and default is particularly conspicuous here, where, within a short time from the closing of the Transactions, the housing market crashed, home values plummeted and unemployment became rampant. *Id.* at ¶ 40; *and see* Decl., Ex. Z, Nielsen Rep. at ¶ 45-51. These are the types of risk against which AGM insures. *See* Decl., Ex. D, Beard Dep. at 149:18-150:9.

### B.    Eliminating paid-in-full and current loans and loans that performed for over 12 months drastically reduces the population of loans at issue

As stated above, Insurer alleges one or more breaches on a total of 610 loans from its 800-loan sample. Four hundred and eighty-four of these allegedly breaching loans were paid in full or current as of October 31, 2011. If the Court determines that the alleged breaches on such loans are not material and have not adversely affected Insurer's interests, the Court will be left to adjudicate a mere 126 loans in the Insurer's sample, or 16% of Plaintiff's sample. If the Court further eliminates loans which performed for over 12 months, as it should based even on the testimony of Ms. Walzak, AGM's own liability expert, the Court will be left to adjudicate a total of *eight* loans or 1% of Plaintiff's sample.

This elimination of superfluous and patently fruitless claims will expedite trial and enable the parties to focus on the loans which are truly of interest. It will also be an outcome consistent with Plaintiff's original loan file review, which properly determined to a 95% confidence level, that no material issues were present within the loans collateralizing the Transactions.

27

## V.   THE UNDISPUTED EVIDENCE SHOWS THAT PLAINTIFF'S FLAWED LOSS MODEL IS RESPONSIBLE FOR ITS LOSSES

A plaintiff seeking to recover for breach of contract must prove "damages resulting from the breach … Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original and citations omitted). Insurers by their very nature assume a certain amount of risk. *See Aetna Ins. Co v. Henry Du Bois Sons Co.*, 144 F.2d 262, 264 (2d Cir. 1944) ("The risk those insurers assumed under their policy was the risk upon which the premium they received was based and there is no inequity in requiring them to perform that which they undertook and for which they were paid."); *see also Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1028 (2d Cir. 1991) (by providing coverage, "the insurer agrees to assume the risks enunciated in the policy.").

Plaintiffs understood and assumed the risk of insuring these Transactions. To the extent that Plaintiff complains that it will be left to cover significant losses should the Court exclude paid in full, current and those loans which defaulted after 12 months from origination, it can only blame itself. FSA's "zero-loss" model required an accurate estimate of expected losses. Yet, Plaintiff's ultimate loss model was intentionally optimistic in that it knowingly watered down the expected losses projected from its proprietary RMG loss model, the only model that was tailored to the risk characteristics of the actual collateral supporting the Transactions, factored in the significant risk factors for HELOCs, including high CLTV, and which was not historically biased in favor of prior periods of time in which the economy and housing market was strong. Because this loss model projected losses that would have prevented FSA from wrapping the Transactions, FSA watered down the results by taking a heavy-handed "averaging" approach that

28

was unorthodox and was even questioned by FSA's Chairman in connection with the

consideration of the 2005-1 Transaction ███████████████████████████████████

██████ Decl., Ex. DD, FSA Minutes of Meeting of the Management Review Committee

(Nov. 23, 2005), at Y. Moreover, FSA did so in a period of time when it had significant

concerns about the "housing bubble." FSA made this business decision with its eyes wide open,

and is responsible for the consequences of that decision. This is another reason to grant

summary judgment.

## VI.    EVEN IF PLAINTIFF COULD ESTABLISH A MATERIAL AND ADVERSE BREACH, IT HAS NOT SUFFERED DAMAGES

In order to recover in breach of contract, Plaintiff mush show that any breached caused it

damages. *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). In

the case of the 2005-1 Transaction, Plaintiff has failed to demonstrate it will suffer any losses, let

alone damages casually related to material breaches of representations and warranties. Expert

Anne Rutledge concludes that Plaintiff will not suffer any ultimate losses for the 2005-1

Transaction based upon the predicted cash flows of the Transaction.

The Transferor's Interest is a tranche in the transaction that represents Flagstar's residual

interest in the Transactions. *See* Decl. Ex. NN, Expert Report of Ann Rutledge (Dec. 22, 2011)

("Rutledge Rep."), at ¶ 19. Because the Transferor's Interest is subordinated to reimbursement

of the Plaintiff's claims on the Transaction's cash flows, it can only have a positive value if

Plaintiff is fully reimbursed at the end of the Transaction for all claims it has paid. *See* Decl. Ex.

OO, Deposition of Stanley Jursek (Oct. 28, 2011) ("Jursek Dep."), at 102:20-103:9. In its form

10Q filed for the third quarter of 2011, Flagstar reported that the Transferor's Interest for the

2005-1 Transaction was valued at over $11 million. *See* Decl., Ex. PP, Flagstar Bancorp Form

10Q, period ended September 30, 2011, at 32.

Further, Ann Rutledge, Flagstar's valuation expert, independently analyzed and modeled the 2005-1 Transaction to determine the transaction's value at its termination and determined that Plaintiff will be fully reimbursed for all the claims it has paid. *See* Decl., Ex. NN, Rutledge Rep., at ¶¶ 5-6. Using a sophisticated modeling simulation and the Transaction's historic cash flows, Ms. Rutledge valued the 2005-1 Transaction at termination in 172,500 separate scenarios. *See id.* at ¶ 5 & Ex. 17. The product of this simulation showed that there was ***no scenario*** in which Plaintiff would not be fully reimbursed for all claims it has paid with respect to 2005-1 Transaction. *Id.* at ¶¶ 5-6 & 24, & Ex. 16. If Plaintiff suffers no losses, it cannot claim to have suffered any damages on the 2005-1 Transaction, warranting summary judgment.

## VII.   PLAINTIFF'S CALCULATION OF DAMAGES IS FLAWED AND IS INCONSISTENT WITH THE TRANSACTION DOCUMENTS

This Court has held that Plaintiff's remedies for its breach of contract claims premised upon alleged breaches of representations and warranties "are limited to those related to enforcing Flagstar's 'cure or repurchase' obligations set forth in the Transaction Documents." Order of July 7, 2011. Plaintiff's recovery is therefore limited to only those damages which it can prove consistent with relevant contractual limitations. *See Liona Corp. v. PCH Assocs. (In Re PCH Assocs.)*, 949 F.2d 585, 592 (2d Cir.1991).

Plaintiff's damages theory is fatally flawed because it is inconsistent with the sole remedy prescribed in the Transactions' documents. First, Plaintiff's theory of calculating damages by extrapolating alleged breaches in its sample to the balance of the loans in the Transactions completely deprives Flagstar of its bargained for right to cure such alleged breaches which it is permitted to do under the SSA. Decl. Ex. FF, 2006-2 SSA § 2.04(d). The existence of alleged breaches in Plaintiff's samples does nothing to identify which of the other approximately 14,800 loans in the Transactions may contain breaches and what those breaches

30

may be. At best, Plaintiff's analysis does no more than alert Flagstar that Rebecca Walzak might

find instances of what she would characterize as a material breach in the remaining loans. Given

the numerous inaccuracies in Ms. Walzak's analysis, however, Flagstar would likely be able to

successfully cure or rebut the vast majority of any alleged breaches in the remaining loans, as it

already has for loans in Plaintiff's litigation samples. *See* Decl., Ex. HH, Expert Report of

Solutions Associates LLC, (Dec. 22, 2011) ( "Griggs Rep."), ¶¶ 26-39.

Additionally, Plaintiff's damages expert, Joseph Mason, further improperly calculates

damages because he does not make exceptions for loans that have paid in full or are current.

These loans have not caused Plaintiff damages.[7]

Plaintiff's calculation of damages is further flawed in that Mr. Mason's use of New York

State's statutory pre-judgment interest rate completely ignores the Transaction Documents.

Section 6.03 of the 2006-2 I&I states that "Payments to be made to FSA under this Agreement

shall bear interest at the Late Payment Rate from the date when due to the date paid, and shall

include interest on overdue interest, compounded monthly." Decl. Ex. QQ, 2006-2 I&I § 6.03.

The "Late Payment Rate" is defined as:

> the lesser of (a) the greater of (i) the per annum rate of interest, publicly
> announced from time to time by JPMorgan Chase Bank, N.A. at its principal
> office in the City of New York, as its prime or base lending rate (any change in
> such rate of interest to be effective on the date such change is announced by
> JPMorgan Chase Bank, N.A.) plus 2%, and (ii) the then applicable rate of interest
> on the Securities and (b) the maximum rate permissible under applicable usury or
> similar laws limiting interest rates. The Late Payment Rate shall be computed on
> the basis of the actual number of days elapsed over a year of 360 days.

*Id.* Appendix I to 2006-2 I&I, p. 2. Mr. Mason's prejudgment interest calculations, which pile

on millions of extra dollars in a requested recovery, are based on a flat 9% rate. *See* Decl., Ex.

---

[7]    For the same reasons, Plaintiff, or more properly the Transactions' Trusts, is not entitled to
reimbursement of the servicing fees for these loans. *See* Decl., Ex. SS, Supplemental Expert
Report of Joseph Mason (Nov. 29, 2011) ("Mason Supp. Rep."), at ¶¶ 2-5.

31

RR, Expert Report of Joseph Mason (Nov. 14, 2011) ("Mason Rep."), ¶ 26.  Thus, Mr. Mason's

prejudgment interest calculations are completely at odds with the Parties' contracted for interest

rate, and appear to vastly overstate the requested recovery given the sharp decline in interest

rates since the end of 2005.

Furthermore, Plaintiff's damages theory is predicated on an assumption about risk

allocation that is patently at odds with the facts of this case, as demonstrated incontrovertibly by

Plaintiff's documents and testimony of Plaintiff's current and former employees.  *See Rojas v.

Roman Catholic Diocese of Rochester*, 660 F.3d 98, 101, 108 (2d Cir. 2011) (affirming summary

judgment where the plaintiff's allegations were inconsistent with her previous testimony);

*Jeffreys v. City of N.Y.*, 426 F.3d 549, 552-55 (2d Cir. 2005) (affirming summary judgment

where the plaintiff's allegations were contradicted by testimonial and documentary evidence).

Mr. Mason's assertion that

is belied by the extensive pre-Transaction

due diligence performed by Plaintiff.  Decl. Ex. RR, Mason Rep., at ¶ 16.  It is simply incorrect

that Plaintiff                                                                                    : not only

was Plaintiff able to do so, it went ahead and guaranteed both Transactions after doing so.  *See*

Decl. Ex. F, 2005-1 Exec. Summ., and Decl. Ex. G, 2006-2 Exec. Summ.  Plaintiff's damages

theory is flawed and summary judgment should be granted.

## VIII. PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF SERVICING

Plaintiff's own proof demonstrates that its servicing claim is wholly frivolous and that

Flagstar's conduct did not rise anywhere near the level of gross negligence, misfeasance,

recklessness or bad faith required to state a claim -- a standard its expert admittedly did not even

attempt to apply.  Not only should this claim be dismissed in its entirety, under the terms of the

32

SSA, Flagstar should be indemnified for the costs and fees it incurred defending the claim.

Flagstar's potential liability is limited to bad faith and grossly negligent conduct:

> Neither the Servicer nor any of its directors, officers, employees, or agents is liable to the Trust, the Owner Trustee, the Transferor, or the Noteholders for the Servicer's taking any action or refraining from taking any action in good faith pursuant to this Agreement, or for errors in judgment. This provision shall not protect the Servicer or any of its directors, officers, employees, or agents against any liability that would otherwise be imposed for misfeasance, bad faith, or gross negligence in the performance of the duties of the Servicer or for reckless disregard of the obligations of the Servicer.

Decl. Ex. FF, 2006 SSA, at § 5.03.

Gross negligence is "'conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.'" *AT&T v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996), quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993); *see also Industrial Risk Ins. v. Port Auth. of N.Y.*, 387 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) ("New York courts applying the *Colnaghi* rule take this distinction seriously. ... Ordinary mistakes or miscalculations in performing a task will not meet this standard.").

The only evidence Plaintiff proffered in support of its servicing claim is the report and testimony of its mortgage servicing expert, Ms. Walzak. *See* Decl., Ex WW. However, Ms. Walzak testified that she was not even asked to consider the gross negligence, misfeasance or bad faith standard set forth in the SSA. Decl. Ex VV Walzak Dep., at 77:14-78:15. She further testified that she did not apply this standard, but instead applied a "Customary Servicing Practices" standard, which is a compilation of "best practices" that she has heard discussed at professional conferences. Decl. Ex. VV, Walzak Dep., at 137:13-138:10. Based on this alone, summary judgment should be granted dismissing Plaintiff's servicing claim against Flagstar.

Demonstrating the sheer frivolousness of the claim, however, is that even under these home-made "Customary Servicing Practices", Ms. Walzak concluded that 786 of the 800 loans

in her sample (or 98.25%) were "Compliant" and contained purported errors that, in Ms.
Walzak's own words, were "not significant enough" to lead to any "complications or problems,"
and/or were paid in full or current. Decl., Ex. VV, Walzak Dep. at 166:10-24; *see also* Decl. Ex.
XX, Corrected Supplemental Expert Report of Rebecca Walzak (Dec. 2, 2011) ("Walzak Supp.
Rep.), at 7.

Remarkably, virtually every one of the issues discussed in the text of Plaintiff's expert
report on servicing was categorized as Code 2, which according to her testimony, meant that
"based on the notes and pay history that the information that -- or the variance from the standard
was not significant enough that I thought there were going to be further complications or
problems" or that in her judgment, something else in the file "remediated in some fashion or
another." Decl. Ex. VV, Walzak Dep. 167:10-15. In addition, six of the 20 total assets that were
categorized as Code 3 (instead of Code 2) were so designated only by virtue of the fact that the
loan contained more than one "error" or "issue" that alone, would have otherwise been
categorized as Code 2. The insignificant nature of those issues, while designated Code 3,
remains the same as those designated Code 2. Decl., Ex. XX, Walzak Supp. Rep., at 7. Five of
the 25 total assets that were categorized as Code 3 or Code 4 were paid in full or current. *See*
Decl. Ex. YY, Expert Report of Russell Pleasants (Dec. 22, 2011), at 64. These account for 786
of the 800 loans (or 98.25%) of her sample.

Further, the 14 loans (1.75%) that received a Code 3 or Code 4 rating do not serve a basis
to support plaintiff's serving claim. Four of the five total Code 4 "errors" involve the nature or
position of the loans themselves and have nothing to do with Flagstar's servicing. Decl., Ex.
XX, Walzak Supp. Rep., at 4-7. The remaining 10 Code 3 or Code 4 designations out of the 800
loan sample involved judgment calls, such as hiring a third party to assist in the collection of

34

loans or foreclosure or accepting $2,000 as a settlement in a short sale. Decl., Ex. VV, Walzak Dep., at 179:3-186:22, 202:4-203:22. At worst, these could be no more than "errors in judgment" that the SSA and case law specifically exclude as a basis for liability. Plaintiff's expert's findings, therefore, provide no support for her conclusion that Flagstar fell short of its servicing obligations, let alone in a manner that was grossly negligent, reckless or in bad faith. And, in any event, Plaintiff has completely failed to connect any payment made by Plaintiff to any alleged instance of Flagstar's improper servicing and Plaintiff's expert admitted that she had not even attempted to do so. *See id.*, 166:25-169:9.

Given that Plaintiff has forced Flagstar to defend this claim for which there is no basis, not only should the claim be dismissed but Flagstar should be indemnified pursuant to §5.03 of the SSA, which provides that Flagstar "shall be indemnified by the Issuer and held harmless against any loss, liability, or expense incurred in connection with any legal action" relating to its obligations as servicer unless such "loss, liability, or expense is due to its willful misfeasance, bad faith or gross negligence in the performance of its duties ... or due to its reckless disregard of its obligations." Decl., Ex. FF, 2006-2 SSA, § 5.03. Accordingly, in addition to dismissal of the Plaintiff's servicing claim, Flagstar requests that the Court order such indemnification of all fees and expenses incurred in defending against Plaintiff's frivolous allegation of improper servicing.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: January 9, 2012
New York, New York

ARNOLD & PORTER LLP

By:    /s/ Veronica E. Rendón
      Veronica E. Rendón
      Susan L. Shin
      Daniel M. Kuhn
      Mary E. Sylvester
      399 Park Avenue
      New York, New York  10022
      Tel: (212) 715-1000
      Fax: (212) 715-1399
      *Veronica.Rendon@aporter.com*
      *Susan.Shin@aporter.com*
      *Daniel.Kuhn@aporter.com*
      *Mary.Sylvester@aporter.com*

      *Attorneys for Defendants Flagstar Bank, FSB,*
      *Flagstar Capital Markets Corporation and Flagstar*
      *ABS, LLC*