| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | CONFIDENTIAL<br>INFORMATION<br>REDACTED |

ASSURED GUARANTY MUNICIPAL CORP.,
f/k/a FINANCIAL SECURITY ASSURANCE
INC.,

               vs.                                    11-CIV-2375 (JSR)

FLAGSTAR BANK, FSB; FLAGSTAR
CAPITAL MARKETS CORPORATION; and
FLAGSTAR ABS, LLC,

                      Defendants.

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF REBECCA WALZAK CONCERNING ALLEGED SERVICING BREACHES

Veronica E. Rendón
Stewart D. Aaron
Susan L. Shin
Arnold & Porter LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000
*Veronica.Rendon@aporter.com*
*Stewart.Aaron@aporter.com*
*Susan.Shin@aporter.com*

*Attorneys for Defendants Flagstar Bank,*
*FSB, Flagstar Capital Markets Corporation*
*and Flagstar ABS, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. ii

BACKGROUND ............................................................................................................................1

ARGUMENT ..................................................................................................................................3

I.   *DAUBERT* REQUIRES A RIGOROUS INQUIRY INTO THE RELIABILITY OF EXPERT TESTIMONY .............................................................................................3

II.  WALZAK'S OPINION THAT FLAGSTAR BREACHED THE TRANSACTION DOCUMENTS LACKS ANY RELIABLE FOUNDATION OR SUPPORT ..........................................................................................................................4

III. WALZAK'S PROCESSES AND METHODS ARE UNRELIABLE .................................7

IV.  WALZAK FAILS TO ACCOUNT FOR NUMEROUS DETERMINATIVE FACTS, RENDERING HER OPINION IRRELEVANT .....................................................8

   A. Walzak Applies the Incorrect Standard Under the SSA ............................................8

   B. Walzak Ignores the Economic Collapse That Greatly Affected Servicing of Second-Lien Loans ................................................................................11

   C. Walzak Disregards Restrictions on Flagstar's Loss Mitigation Options ....................................................................................................................12

   D. Ms. Walzak Fails to Consider the Pre-Transaction Servicing Review ......................................................................................................................13

V.   WALZAK FAILS TO DEMONSTRATE CAUSATION ..................................................14

CONCLUSION .............................................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
  303 F.3d 256 (2d Cir. 2002)..................................................................................4

*Astra Aktiebolag v. Andrx Pharms., Inc.,*
  222 F. Supp. 2d 423 (S.D.N.Y. 2002).................................................................4, 8

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,*
  650 F. Supp. 2d 314 (S.D.N.Y. 2009) (Rakoff, J.) ............................................3, 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)......................................................................................1, 3, 4

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997)..............................................................................................7

*Primavera Familienstifung v. Askin,*
  130 F. Supp. 2d 450 (S.D.N.Y. 2001)...................................................................8

*U.S. Information Sys., Inc. v. Int'l Brotherhood of Elec. Workers,*
  313 F. Supp. 2d 213 (S.D.N.Y. 2004)...................................................................4

**OTHER AUTHORITIES**

Federal Rule of Evidence 401 ...................................................................................1, 8

Federal Rule of Evidence 702 ................................................................................1, 3, 7

## PRELIMINARY STATEMENT

Pursuant to Federal Rules of Evidence 401 and 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants Flagstar Bank, FSB, Flagstar Capital Markets Corporation, and Flagstar ABS, LLC (collectively, "Flagstar" or the "Defendants") move to preclude the testimony of Plaintiff's expert Rebecca Walzak concerning alleged servicing breaches. Ms. Walzak's opinions are unreliable, based on incomplete and insufficient information, and fail to satisfy the requirements of Rule 702. Ms. Walzak is unable to articulate the basis for her opinions and the processes and methods she used are haphazard and inconsistent. Furthermore, Ms. Walzak fails to account for a number of highly relevant facts and issues — including the standard by which Flagstar may be held liable under the SSA. Finally, even if one were to assume that, through her faulty analysis, she correctly identified a servicing error, she has failed to consider causation or to meaningfully demonstrate that her purported servicing "errors" had any effect on the Securitization Trusts or plaintiff Assured Guaranty ("AGM" or "Assured"). Indeed, under the inappropriately lax standard applied by Ms. Walzak, 98% of the loans in her samples were either (i) paid in full or current; (ii) found to be "compliant" or — just as mundane — (iii) found to contain purported errors that, in Ms. Walzak's own words, were "[REDACTED]" *to lead to any* "[REDACTED]" Ms. Walzak's opinions are thus irrelevant to the issues before the Court and should be struck.[1]

## BACKGROUND

Plaintiff claims Flagstar has breached its obligations as servicer under the Transaction Documents by failing "to service the loans in the best interests of the Trusts, AGM, or Noteholders," and that these alleged breaches were "committed with misfeasance, bad faith, or

---

[1] Flagstar is filing concurrently herewith a motion to exclude Ms. Walzak's testimony concerning alleged breaches of representations and warranties.

1

gross negligence in the performance of its duties as Servicer or with reckless disregard of the obligations of the Servicer." Declaration of Susan Shin, dated May 25, 2012 (hereinafter "Shin Decl."), Ex. A, at ¶¶ 63, 87, 94. In an attempt to prove these allegations, Plaintiff engaged Rebecca Walzak "█████████████████████████████████████████████ █████████████████████" in the 2005-1 and 2006-2 Sale and Servicing Agreements (the "SSAs"). Shin Decl. Ex. B, at 4. Counsel for Plaintiff then retained a team of auditors from the Weston Portfolio Group, LLC, to assist Ms. Walzak in reviewing the 800-loan sample. Shin Decl. Ex. B, at 6-7. The auditors were instructed to "█████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███" Shin Decl. Ex. C, at 233:7-15.

Ms. Walzak categorized the alleged breaches from Code 1 to Code 4, based on the seriousness of the breach and the "█████████" to the Trust. Shin Decl. Ex. D, at 4-7; Ex. E, at 4-7:

- A Code 1 violation, accounting for 469 of the 800 loan files reviewed, signifies "████████████████████████████████████████ █████" or *was* "█████████" *Id.*

- Code 2 violations, totaling 304 of the 800-loan sample, mean that "███████ ████████████████████████████████████ ███████████████████" *Id.*

- Code 3 violations, accounting for only 20 of the 800-loan sample, signify that "█ ████████████████████████████████████████████████████ ███████████████████████████████████" *Id.*

- Finally, Code 4 violations, which Ms. Walzak found on a total of *only 5 loans*, demonstrate that "████████████████████████████████████ █████" *Id.*

While Ms. Walzak ultimately claims that Flagstar failed to properly service 32% of the HELOCs in the 2005-1 sample, and 50.2% of the HELOCs in the 2006-2 sample, Shin Decl. Ex.

2

B, at 14, Ms. Walzak's analysis and findings do not support this conclusion. As shown above, even if one were to accept Ms. Walzak's "Customary Servicing Practices," which are flawed and unreliable as discussed below, Ms. Walzak concluded that *786 of the 800 loans in her sample (or 98.25%)* were "███████" contained purported errors that were "█████████████" to lead to any "████████████████" or were paid in full or current. Shin Decl. Ex. C, at 166:10-24; *see also* Shin Decl. Ex. D, at 4-7, Ex. E, at 4-7. Moreover, as demonstrated by her Codes, Ms. Walzak has not opined on what *are* servicing issues that have affected the interests of the Trusts — as compared to what "████" or "████████" might be actionable servicing issues. Her opinions are, as a result, irrelevant and should be excluded.

## ARGUMENT

### I. *DAUBERT* REQUIRES A RIGOROUS INQUIRY INTO THE RELIABILITY OF EXPERT TESTIMONY

Expert testimony is admissible only if it comports with Rule 702. *See* Fed. R. Evid. 702. Rule 702 prohibits the admission of expert testimony unless it "will held the trier of fact to understand the evidence or determine a fact in issue," "is the product of reliable principles and methods," "based upon sufficient facts or data," and "the expert has reliably applied the principles and methods to the facts of the case." *Id.*; *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589-91 (1993); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314 (S.D.N.Y. 2009) (Rakoff, J.) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."). *Daubert* requires that the expert's reasoning and methodology be reliable, and that they assist the trier of fact to understand the facts. *Daubert,* 509 U.S. at 592. *Daubert's* "overarching subject" is the "evidentiary relevance and reliability [ ] of the principles that underlie a proposed submission."

3

*Id.* at 594-95. Among other things, *Daubert* requires that "[p]roposed testimony ... be supported by appropriate validation--i.e., 'good grounds,' based on what is known." *Id.* at 590 (citation omitted). The party offering the expert bears the "burden to demonstrate the reliability of [the expert's] data." *U.S. Information Sys., Inc. v. Int'l Brotherhood of Elec. Workers*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004). The court must evaluate each step and must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). If any single step renders the expert's analysis unreliable, the testimony should be deemed inadmissible. *Id.*, citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994); *see also Compania Embotelladora.*, 650 F. Supp. 2d at 319.

Likewise, the court must evaluate the "fit" or relevancy of the proffered expert's opinions. *Daubert*, 509 U.S. at 591. "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) (citation omitted).

II.   **WALZAK'S OPINION THAT FLAGSTAR BREACHED THE TRANSACTION DOCUMENTS LACKS ANY RELIABLE FOUNDATION OR SUPPORT**

Ms. Walzak has allegedly identified breaches of Flagstar's servicing obligations based on her review of the servicing loan files, which include: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"

Shin Decl. Ex. B, at 6. Ms. Walzak's opinions are based primarily on her understanding of

"Customary Servicing Practices," and her assertion that Flagstar did not apply such practices here. As set forth in the Glossary of Defined Terms associated with the SSAs:

> 'Customary Servicing Practices' means procedures that the Servicer customarily employs and exercises in servicing, administrating and collecting Mortgage Loans for its own account and which are in accordance with accepted mortgage servicing practices of prudent lending institutions servicing Mortgage Loans of the same type as the Mortgage Loans in the jurisdictions in which the related Mortgage Properties are located.

Shin Decl. Ex. F, at 4. As an initial matter, Ms. Walzak entirely neglects to consider the first component of this definition, based on the procedures that Flagstar itself "customarily employs and exercises." As discussed further below, Assured conducted a pre-transaction review of Flagstar's servicing operations and accepted Flagstar's customary servicing procedures; Ms. Walzak at no point alleges that Flagstar discriminated against loans in the Trust versus those that it held on its own books, nor could she. Thus, she has not and cannot claim that Flagstar did not apply the "procedures that [it] customarily employs and exercises in servicing, administrating and collecting Mortgage Loans for its own account."

More importantly, however, Ms. Walzak fails to set forth any reliable basis for her definition of "Customary Servicing Practices." She admits that her subjective definition is not published or documented anywhere. Shin Decl. Ex. C, at 79:24-80:06. Instead, she purportedly derived her standard from a vague compilation of Fannie Mae and Freddie Mac servicing guidelines and what she deems to be the "███████████████████████ ███████████████" Shin Decl. Ex. C, at 93:4-94:3.

Notably, Ms. Walzak has not been employed as a servicer since the mid-1980s, when she managed origination and servicing operations for People's Westchester Bank for one year. Shin Decl. Ex. C, at 8:16-9:25. Moreover, Ms. Walzak has not had a single servicing-related

5

consulting engagement since March 2007 — *before* the economic collapse which caused unprecedented changes in the mortgage industry, including in the field of servicing. Shin Decl. Ex. C, at 21:25-24:13. Nor were Ms. Walzak's "Customary Servicing Practices" based on any operational reviews of servicers during the 2007-2010 time period. Shin Decl. Ex. C, at 104:19-105:17. Instead, Ms. Walzak apparently based her standard on the practices of a specialty servicer (Ocwen) that she claims followed each of the "█████████" set forth in her report.[2] Shin Decl. Ex. C, at 98:10-99:10. But Ms. Walzak did not conduct even an informal review of Ocwen's servicing operations during the relevant time period to ensure that they were actually following these standards. Shin Decl. Ex. C, at 98: 18-99:10. Instead, she derived her opinion on what constitutes a "Customary Servicing Practice" in 2007-2010 simply from informal conversations with specialty servicers such as Ocwen; when asked how she confirmed that they were in fact abiding by their published procedures, Ms. Walzak stated: "██████████ ██████████████████████████████████████████████████████████████ ███████████████" Shin Decl. Ex. C, at 105:14-17.

Ms. Walzak's definition of a "Customary Servicing Practice" lacks any reliable or verifiable basis. She is unable to articulate how she derived this definition, nor did she confirm the veracity and reliability of her alleged sources. Her application of this nebulous standard to the facts here does not support her conclusion that "████████████████████████ ████████████████████████████████████████████████████████████████████"

---

[2] Notably, unlike Flagstar which provided general loan servicing, Ocwen is a "specialty servicer," *i.e.*, one that focuses on default management and loss mitigation. *See* Shin Decl. Ex. G, 5; *see also* Shin Decl. Ex. H ("Through the years, Ocwen has gained national reputation as a servicer specializing in the management of sub-performing and non-performing assets, including severely-delinquent and labor-intensive mortgage loans and REO assets requiring a 'hands-on' approach."). Given Ocwen's particularized focus on specialty servicing, any comparison to Flagstar's is an unreliable "apples to oranges" approach.

6

████████████████████████████████████████" Shin Decl. Ex. B at 2-3. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Plaintiff asks the Court to adopt Ms. Walzak's standards on pure faith, based on nothing more than her alleged conversations with parties in the servicing field. *Daubert* and Rule 702 require more.

### III.   WALZAK'S PROCESSES AND METHODS ARE UNRELIABLE

Ms. Walzak testified that employees of the Weston Portfolio Group were asked to review the servicing files of the sampled loans and "████████████████████████████████████████████████████████████████████████████" Shin Decl. Ex. C, 231:5-10. She stated that the number of Weston employees fluctuated, but that between four and eight reviewers worked on the project at any given time. *Id.*, at 231:13-16. She further stated that she did not review any of their résumés, but left the decision of whom to employ up to her primary contact at Weston. *Id.*, at 231:25-232:16.

Neither did Ms. Walzak provide the reviewers with any standards for "Customary Servicing Practices." *Id.* at 233: 16-234:4. Indeed, she did not provide them with any instructions or guidance at all. *Id.* at 233: 23-234:4 ("████████████████████████████████████████████████████████████████████████████████████████████████████████"). She stated: "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.* at 233:18-22. She essentially left it up to each individual reviewer to distill each of these varied sources and to

7

subjectively determine: (a) what comprised a "Customary Industry Practice" and (b) whether Flagstar complied with said practice.

This haphazard and unreliable process resulted in findings that neither the Court nor Flagstar can verify in any meaningful way. Ms. Walzak's lack of standardization or oversight of the reviewers—whose qualifications even she has not evaluated—resulted in an unreliable process, the results of which must be excluded.

IV.  **WALZAK FAILS TO ACCOUNT FOR NUMEROUS DETERMINATIVE FACTS, RENDERING HER OPINION IRRELEVANT**

Basing her opinion almost entirely on what she considers to be "Customary Servicing Practices," Ms. Walzak fails to account for a number of critical facts, rendering her opinion irrelevant to the issue of whether Flagstar breached its contractual obligations as servicer. An expert's testimony will fail to meet the *Daubert* standard and the relevancy requirements of Rule 401 if "the data relied upon by the expert is materially different from the data relevant to the facts of the case." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002), citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 67–68 (2d Cir.1997). "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Id.* (citation omitted).

A.  **Walzak Applies the Incorrect Standard Under the SSA**

Throughout her report, Ms. Walzak makes a number of impermissible legal conclusions, based on her interpretation of the Transaction Documents. These conclusions fall outside her purview as an expert witness, and should be excluded.[3] See *Primavera Familienstifung v. Askin*,

---

[3] For instance, Walzak states that her assignment was to "███████████████████████████████████████████" Shin Decl. Ex. B, at 4. She also states that she and the Weston Group "███████████████████████████████████████

Footnote continued on next page

8

130 F. Supp. 2d 450, 528-29 (S.D.N.Y. 2001) (holding inadmissible the testimony of finance expert who "was asked to reach legal conclusions regarding [ ] ultimate issues," including whether the defendants complied with the terms of the contracts). Even then, she cherry-picks those provisions most favorable to Plaintiff while patently ignoring the standard to which Flagstar is held under the SSA. Section 5.03 of the SSA states:

> Neither the Servicer nor any of its directors, officers, employees, or agents is liable the Issuer, the Owner Trustee, the Transferor, or the Noteholders for the Servicer's taking any action or refraining *from taking any action in good faith pursuant to this Agreement, or for errors in judgment*. This provision shall not protect the Servicer or any of its directors, officers, employees, or agents against any liability that would otherwise be imposed for *misfeasance, bad faith, or gross negligence* in the performance of the duties of the Servicer or for *reckless disregard* of the obligations of the Servicer. The Servicer and any of its directors, officers, employees, or agents may rely in good faith on any document of any kind *prima facie* properly executed and submitted by any person about anything arising under this Agreement.

Shin Decl. Ex. I, at § 5.03 (emphasis supplied). Thus, as Plaintiff recognized in its Complaint, to state an actionable breach of the SSA, Ms. Walzak would have to demonstrate that Flagstar's alleged deficiencies fell to the level of misfeasance, bad faith, gross negligence or recklessness. Yet, Ms. Walzak applied the "Customary Servicing Practices" discussed above, which was based on purported best practices, and not something well beneath that. Ms. Walzak should not be permitted to provide her opinion on the meaning of legal terms when it suits her, but otherwise refuse to consider the applicable contractual standard.

---

Footnote continued from previous page

[redacted]" *Id.* at 6-7. She then goes on to list certain sections of the Transaction Documents that she considered, namely SSA §§ 3.01(a), 3.02(a), 3.06, the Glossary of Defined Terms, and the I&I § 2.05(b). *See id.* at 4-6. Finally, each of her exemplars note the ways in which Flagstar allegedly breached the terms of the SSAs.

Regardless, Ms. Walzak's findings, whether they are characterized by contractual language or otherwise, do not approach the level of "misfeasance, bad faith, gross negligence" or "recklessness" necessary for Plaintiff to state a claim for breach of the SSA. Under Ms. Walzak's so-called "Customary Servicing Standard," she purports to have uncovered servicing breaches on 32% of the 2005-1 sample and 50.2% of the 2006-2 sample. These figures, however, include her designated Code 2, 3 and 4 breaches. By the plain language of these classifications, none of them even articulate a finding of liability. (Code 2:"█████ ███████████████████████████████████████████████████ ███"; Code 3: "█████████████████████████████████ █████████████████████████████████████"; Code 4: "█████ ████████████████████████████"). If Ms. Walzak cannot commit to a liability determination after her review, actionable misfeasance, bad faith, gross negligence or recklessness has not occurred.

Moreover, virtually all of the defects Ms. Walzak identified in her report were categorized as Code 2, which according to her testimony, meant that "██████████ ██████████████████████████████████████████ █████████████████████████████" or that in her judgment, something else in the file "████████████████" Shin Decl. Ex. C, at 167:10-15. In addition, six of the 20 total assets that were categorized as Code 3 were so designated only because the loan allegedly contained more than one "███" or "███" that alone would have otherwise been categorized as Code 2. The insignificant nature of those issues remains the same as those designated Code 2. Shin Decl., Ex. B, at 7. Additionally, five of the 25 total

10

assets that were categorized as Code 3 or Code 4 were paid in full or current. *See* Shin Decl. Ex. G, at 64. Together, these account for 786 of the 800 loans (or 98.25%).

Further, the 14 loans (1.75% of her sample) that received a Code 3 or Code 4 rating do not serve a basis to support Plaintiff's servicing claim. Four of the five total Code 4 "errors" involve the nature or position of the loans themselves and have nothing to do with Flagstar's servicing. Shin Decl., Ex. B, at 4-7. The remaining ten Code 3 or Code 4 designations out of the 800 loan sample involved judgment calls, such as hiring a third party to assist in the collection of loans or foreclosure. Shin Decl., Ex. C, at 179:3-186:22, 202:4-203:22. At worst, these could be no more than "errors in judgment" that the SSA specifically excludes as a basis for liability. Shin Decl. Ex. I, at § 5.03. Ms. Walzak's findings, therefore, provide no support for her conclusion that Flagstar fell short of its servicing obligations, let alone in a manner that was grossly negligent, reckless or in bad faith. Her opinion is therefore irrelevant to whether Flagstar may be held liable under the SSA.

**B.     Walzak Ignores the Economic Collapse That Greatly Affected Servicing of Second-Lien Loans**

Not once in her report does Ms. Walzak mention the decline in housing values or the increase in unemployment that plagued the country beginning in 2007. Nor does she consider the dramatic effects that this economic downturn had on mortgage loan servicing. For instance, one of Ms. Walzak's primary complaints with Flagstar's servicing appears to be Flagstar's alleged failure to maintain contact with the first-lien holders. *See* Shin Decl. Ex. B, at 19 ("▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

▪▪▪"); *see also* Shin Decl. Ex. C, at 131:23-132:5 ("▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

11

██████████████████████████████████████████████████████████"). She does not recognize, however, that maintaining aggressive contact with a first-lien holder makes sense only when there is sufficient equity in the underlying property to allow for any recovery on the second lien. *See* Shin Decl. Ex. G, at 8. Once house prices fell and there was no longer sufficient equity to cover even the first lien, Flagstar was forced to accept whatever payment it could from a short sale or foreclosure, and aggressively attempting contact with the first-lien holder is a futile exercise that could potentially divert resources from the rest of the servicing department. *Id.* at 8-9. Ms. Walzak's blatant disregard of these pivotal facts renders her opinion irrelevant to the question of whether Flagstar's alleged breaches caused Plaintiff any harm.

### C.    Walzak Disregards Restrictions on Flagstar's Loss Mitigation Options

Flagstar was severely restricted in its ability to conduct loss mitigation on loans that were or had the potential to become delinquent. Shin Decl. Ex. J, at 165:7-168:19.[4] *See also* Shin Decl. Ex. I, at § 3.02(a) (permitting Flagstar as servicer to do only three things without the consent of the trustee or Assured: (1) waive late payment charges; (2) permit short-term repayment plans; and (3) foreclose). Ms. Anderson testified that "standard practice, standard mandates by everyone is having an active loss mitigation program. These specific loans [in the two Transactions] were not eligible for any type of program, except a repayment, which is not a loss mitigation effort. That is not helping somebody save their home." Shin Decl. Ex. J., at 114:17-23. Ms. Anderson further testified that Assured prevented any meaningful loan modifications to take place by failing to respond to Flagstar's requests in a timely manner.

While Ms. Walzak recognized that Flagstar could not engage in meaningful loss mitigation efforts, Shin Decl. Ex. C, at 69:22-70:8, she inexplicably states in her report that

---

[4] Ms. Walzak relied on Ms. Anderson's deposition in writing her expert report. *See* Shin Decl. Ex. B, at 7.

12

Flagstar failed to "███████████████████████████████████████
█████████████" Shin Decl. Ex. B, at 17. Ms. Walzk's opinions are divorced from the facts and irrelevant.

### D. Ms. Walzak Fails to Consider the Pre-Transaction Servicing Review

While Ms. Walzak was aware that Flagstar underwent a servicing operations review prior to the 2005-1 transaction, she "████████████████████████████" nor did she analyze the findings. Shin Decl. Ex. C, at 159:15-23. In fact, Assured reviewed Flagstar's servicing practices and procedures, and described them in its Executive Summary which was used to evaluate and eventually accept the terms of the two Transactions. *See* Shin Decl. Ex. K, at AGM06132244 (describing Flagstar's servicing platform, practices, procedures and size of the servicing department). Additionally, prior to closing the 2005-1 Transaction, Flagstar was required by plaintiff's underwriting guidelines to undergo a comprehensive servicing review by S&P, which rated Flagstar's servicing in the relevant fields "Average." "The rankings reflect the company's solid management depth, prudent internal controls and risk management, acceptable training programs, thorough policies and procedures, default management expertise, and suitable level of automation and use of technology." Shin Decl. Ex. L, at FLAGSTAR000185979.

These reviews demonstrate not only that Flagstar maintained a solid servicing department, but that Assured understood and accepted Flagstar's servicing practices and procedures before entering into the Transactions — practices and procedures which Ms. Walzak now faults. As discussed above, "Customary Servicing Practices" under the SSA includes "procedures that the Servicer customarily employs and exercises in servicing, administrating and collecting Mortgage Loans for its own account." Shin Decl. Ex. F, at 4. Having accepted Flagstar's practices prior to entering into the Transactions, Assured cannot now claim that Flagstar is liable for any so-called "████████████" in servicing, as alleged by Ms. Walzak.

13

Shin Decl. Ex. B, at 17-21. Ms. Walzak's blatant disregard of this component of "Customary Servicing Practices," and of Assured's acceptance thereof, render her opinion irrelevant to the question of Flagstar's purported breach.

## V.     WALZAK FAILS TO DEMONSTRATE CAUSATION

Neither Ms. Walzak nor any other of Plaintiff's proffered experts have attempted to quantify how the securitizations were injured by Flagstar's alleged improper servicing. *See* Shin Decl. Ex. C, at 174:7-22. Plaintiff's damages expert, Joseph Mason, simply accepted Ms. Walzak's allegation that Flagstar failed to properly service 32% of the 2005-1 loans and 50.2% of the 2006-2 loans, and applied these percentages to Flagstar's servicing fees, demanding reimbursement of over $6 million in fees. As previously discussed, these percentages include Ms. Walzak's "Code 2" breaches, which account for 304 of the 331 loans allegedly containing servicing breaches under Ms. Walazk's Customary Servicing Practices, and which even she concedes were "█████████████████████████████████████████████████████████████" or that in her judgment, something else in the file "██████████████████████████████" Shin Decl. Ex. C, at 167:10-15. Thus, none of Plaintiff's experts has shown damages due to Flagstar's alleged servicing breaches, and Ms. Walzak's opinions are therefore irrelevant.

## CONCLUSION

For all the foregoing reasons, Ms. Walzak's Expert Report and testimony should be excluded.

Dated: May 25, 2012
      New York, New York

                      ARNOLD & PORTER LLP

                      By:   <u>/s/ Veronica E. Rendón</u>
                             Veronica E. Rendón
                             Stewart D. Aaron
                             Susan L. Shin
                             Arnold & Porter LLP
                             399 Park Avenue
                             New York, New York  10022
                             (212) 715-1000
                             *Veronica.Rendon@aporter.com*
                             *Stewart.Aaron@aporter.com*
                             *Susan.Shin@aporter.comm*

                             *Attorneys for Defendants Flagstar Bank, FSB,*
                             *Flagstar Capital Markets Corporation and Flagstar*
                             *ABS, LLC*