UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CONFIDENTIAL
INFORMATION
REDACTED**

---

ASSURED GUARANTY MUNICIPAL CORP.,
f/k/a FINANCIAL SECURITY ASSURANCE
INC.,

                    Plaintiff,

        vs.

FLAGSTAR BANK, FSB; FLAGSTAR
CAPITAL MARKETS CORPORATION; and
FLAGSTAR ABS, LLC,

                  Defendants.

11-CIV-2375 (JSR)

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF REBECCA WALZAK CONCERNING ALLEGED BREACHES OF REPRESENTATIONS AND WARRANTIES

Veronica E. Rendón
Stewart D. Aaron
Susan L. Shin
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000
*Veronica.Rendon@aporter.com*
*Stewart.Aaron@aporter.com*
*Susan.Shin@aporter.com*

*Attorneys for Defendants Flagstar Bank,
FSB, Flagstar Capital Markets Corporation
and Flagstar ABS, LLC*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY ...................................................................................................... 1

I.     DAUBERT REQUIRES A RIGOROUS INQUIRY INTO THE RELIABILITY
OF EXPERT TESTIMONY ............................................................................ 2

II.    WALZAK FAILS TO CONSIDER LOAN PERFORMANCE AND
CAUSATION AND MAKES ASSUMPTIONS CONTRARY TO THE
FACTUAL RECORD ....................................................................................... 3

     A.    Walzak Ignores Available Performance Data And Other Causation
Factors ..................................................................................................... 5

     B.    Walzak Makes Assumptions That Are Contrary to the Record ............. 9

III.   WALZAK'S OPINIONS LACK FOUNDATION, ARE BASED ON
UNRELIABLE DATA AND CONSTITUTE IMPERMISSIBLE HEARSAY .............. 11

     A.    No Reliable Basis That the Alleged Breaches Were "Material and
Adverse" ................................................................................................ 11

     B.    Walzak Relied on Insufficient and Unreliable Data ............................ 14

          1.    Walzak's "Underwriting Survey" Is Unreliable ....................... 14

          2.    Walzak's Salary Surveys Are Unscientific And Unreliable ..... 16

     C.    Walzak's Processes and Methods Are Unreliable ................................ 18

     D.    Walzak Impermissibly "Adopted" Hearsay Opinions ........................... 20

IV.   WALZAK IMPERMISSIBLY OPINES ON THE ULTIMATE LEGAL ISSUE ........... 23

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amorgianos v. Amtrak,*
   303 F.3d 256 (2d Cir. 2002)...................................................................................3

*Astra Aktiebolag v. Andrx Pharms., Inc.,*
   222 F. Supp. 2d 423 (S.D.N.Y. 2002).....................................................................3

*Boucher v. U.S. Suzuki Motor Corp.,*
   73 F.3d 18 (2d Cir. 1996).......................................................................................10

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,*
   650 F. Supp. 2d 314 (S.D.N.Y. 2009)................................................................2, 3

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993).......................................................................................2, 3, 24

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*
   631 F.3d 42 (2d Cir. 2011)......................................................................................8

*DiRose v. PK Mgmt. Corp.,*
   691 F.2d 628 (2d Cir. 1982)..................................................................................13

*Dura Automotive Systems of Indiana, Inc. v. CTS Corp.,*
   285 F. 3d 609 (7th Cir. 2002) ...............................................................................21

*Gen. Elect. Co. v. Joiner,*
   522 U.S. 136 (1997)..............................................................................................13

*In re Agent Orange Prod. Liab. Litig.,*
   611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 187 (2d Cir. 1987).........13, 16

*In re Paoli R.R. Yard PCB Litigation,*
   35 F.3d 717 (3d Cir. 1994)......................................................................................3

*In re Rezulin Prod. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004).....................................................................9

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)................................................................................................3

*LaSalle Bank Nat'l Ass'n v. CIBC, Inc.,*
   2012 WL 466785 (S.D.N.Y. Feb. 14 2012)...................................9, 13, 14, 23, 24

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................................................20, 21, 23

*Palazzetti Import/Export, Inc. v. Morson*,
  2001 WL 793322 (S.D.N.Y. July 13, 2001) ..........................................................................14

*Primavera Familienstifung v. Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2001).....................................................................................24

*Quiles v. Bradford-White Corp.*,
  2012 WL 1355262 (N.D.N.Y. Apr. 18, 2012) ........................................................................20

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004).......................................................................................3

*U.S. v. Mejia*,
  545 F. 3d 179 (2d Cir. 2008).................................................................................................21

*United States Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988).................................................................................................8

*United States v. Rushing*,
  388 F.3d 1153 (8th Cir. 2004) .............................................................................................10

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  69 F. Supp. 2d 571 (S.D.N.Y. 1999), *aff'd*, 257 F.3d 256 (2d Cir. 2001) ..............................10

*Zaccaro v. Shah*,
  746 F. Supp. 2d 508 (S.D.N.Y. 2010)....................................................................................10

**OTHER AUTHORITIES**

Fed. R. Evid. 401 ........................................................................................................................3

Fed. R. Evid. 702 ..........................................................................................................1, 2, 3, 10

Fed. R. Evid. 703 .....................................................................................................16, 20, 21

## PRELIMINARY STATEMENT

Flagstar Bank, FSB, Flagstar Capital Markets Corporation and Flagstar ABS, LLC (collectively, "Flagstar") submit this memorandum of law in support of their motion to exclude the testimony and report of Rebecca Walzak, the liability expert of plaintiff Assured Guaranty Municipal Corp. ("AGM" or "Assured," formerly known as FSA). Ms. Walzak's opinions fail to satisfy Fed. R. Evid. 702's requirements for admissibility.

Most obviously, Ms. Walzak failed to consider loan performance and what caused the loans in her litigation samples to default. This is remarkable as Ms. Walzak herself — in a recently published article, written *after* her expert report and deposition in this matter — stated:

> For repurchases to be fair, *there should be a cause and effect relationship*. So rather than looking for possible issues to throw back to the lender after the loan defaults, *the [guaranty insurance] agencies should be able to prove that the issue or issues cited caused the default*.

Declaration of Susan Shin, dated May 25, 2011 ("Shin Decl."), Ex. A. This statement is in stark contrast to the approach Ms. Walzak adopted here. In her expert report, Ms. Walzak asserted that the mere increase in "███████████████" is sufficient to prompt a repurchase because it "███████████████████████████████████████" Shin Decl., Ex. B at 14. Despite her publicly held belief that there should be a "cause and effect relationship" between the issue cited for repurchase and the issue that caused a loan to default, here Ms. Walzak never considered when or if a loan even defaulted. This is significant as the overwhelming majority of the purportedly breaching loans identified by Ms. Walzak *either paid in full or are current in their payments*. Moreover, for the minority of loans that did default, Ms. Walzak made no effort to consider whether there was "a cause and effect relationship" between the "issues cited" for repurchase and the default. By her own admission, Ms. Walzak's

methodology is unreliable.  If Ms. Walzak does not believe her own approach, why should the Court?

Second, Ms. Walzak's opinion that the breaches in her two litigation samples were "material and adverse to the interests of the insurer" lacks foundation, is based on unreliable and incomplete data, and impermissibly speaks to the ultimate legal issue in the case.

Finally, Ms. Walzak merely regurgitates the opinions of eight underwriters and the employees of two third-party firms without meaningful personal supervision or analysis.  Such wholesale adoption of someone else's analysis is unreliable hearsay, another, independent reason to exclude Ms. Walzak's opinions and expert report.[1]

## I.   *DAUBERT* REQUIRES A RIGOROUS INQUIRY INTO THE RELIABILITY OF EXPERT TESTIMONY

Expert testimony is admissible only if it comports with Rule 702.  *See* Fed. R. Evid. 702. Rule 702 prohibits the admission of expert testimony unless it "will help the trier of fact to understand the evidence or to determine a fact in issue," "is the product of reliable principles and methods," "based upon sufficient facts or data," and "the expert has reliably applied the principles and methods to the facts of the case."  *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (Rakoff, J.) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.") (quotations omitted).  *Daubert's* "overarching subject" is the "evidentiary relevance and reliability [ ] of the principles that underlie a proposed submission."  *Daubert,* 509 U.S. at 594-95.  Among other

---

[1] Flagstar will also file a Motion to Exclude the Testimony of Joseph Mason, AGM's damages expert, whose opinions are predicated on Ms. Walzak's identification of purported breaches, and should also be excluded.  *See* Shin Decl. Ex. C, at 22:14-23:13 & 215:15-22.

things, *Daubert* requires that "[p]roposed testimony ... be supported by appropriate validation — *i.e.*, 'good grounds,' based on what is known." *Id.* at 590 (citation omitted). Crucially, it also requires the expert to employ the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert bears the "burden to demonstrate the reliability of [the expert's] data." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004). The court must evaluate each step and must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). If any step renders the expert's analysis unreliable, the testimony should be deemed inadmissible. *Id.*, citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994); *see also Compania Embotelladora*, 650 F. Supp. 2d at 319.

Additionally, as with all evidence, expert testimony is inadmissible unless it is relevant. *See Amorgianos*, 303 F.3d at 259; Fed. R. Evid. 401. "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002). AGM has not met its burden under Rule 702 and Ms. Walzak's opinions and report should be excluded in their entirety.

## II. WALZAK FAILS TO CONSIDER LOAN PERFORMANCE AND CAUSATION AND MAKES ASSUMPTIONS CONTRARY TO THE FACTUAL RECORD

On December 2, 2011, Ms. Walzak submitted the Corrected Expert Report of Rebecca B. Walzak ("Report"), and on December 19, 2011, she was deposed in this matter. In her Report, Ms. Walzak claims that counsel for AGM asked her to review two samples of 400 loans drawn respectively from the two pools of HELOCs supporting the insured notes at issue. Shin Decl.,

Ex. B, at 5.  She further claims that she and a "███████████████" reviewed each

of the loans in the samples to determine "███████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████" as well as "████████

████████████" *Id.* at 8.  Ms. Walzak further states that she utilized the services of Digital

Risk, a third-party firm, which opined as to the existence of fraud and misrepresentation in the

loan files comprising her samples.  Digital Risk, in turn, hired another firm, Clear Capital, to

analyze appraisal issues.  *Id.*

　　　Using this approach which, as discussed below, was unscientific, haphazard and based

solely on the hearsay opinions of unknown and unqualified individuals, Ms. Walzak claims that

she identified "████████████████████████████████████████████████████

██████████████████████████████" which she refers to as so-called

"██████████████" *Id.* at 14.  Specifically, Ms. Walzak claims:



*Id.* (emphasis added).

　　　In coming to this opinion, however, Ms. Walzak did not take loan performance into

account, nor did she consider whether any of the loans that defaulted did so as a result of the

purported breach of the R&Ws.  Her purported breach rates of 85% in the 2005-1 securitization

and 67.5% in the 2006-2 transaction are thus entirely unreliable.  This is most obviously shown

by the fact that *over 80% of the loans in her two litigation samples paid in full or are current in their payments, and thus have not even defaulted.*

On February 15, 2012, *after* the submission of her Report and testimony in this matter, Ms. Walzak published an article in the Mortgage Servicing News entitled, "A Fair Fight for Repurchases." *See* Shin Decl. Ex. A. In that article, Ms. Walzak discusses the "boxing matches" that develop between a guaranty insurance agency (such as AGM) looking to force repurchases of loans onto originating lenders (such as Flagstar). *Id.* She explains "the [insurance] agencies seem to forget that we are in the business of risk. Trying to find just any problem to justify forcing a repurchase for a defaulted loan is counter to the purpose of a guaranty fee." *Id.* She goes on to say, "*They should also be able to justify that the issue they are citing as the reason for repurchase is actually the driver of the default.*" *Id.* Indeed, Ms. Walzak goes on to make the following admission:

> For repurchases to be fair, there should be a cause and effect relationship. So rather than looking for possible issues to throw back to the lender after the loan defaults, *the agencies should be able to prove that the issue or issues cited caused the default.* In too many cases, this cause and effect relationship is missing, and random and unforeseen risk is what triggered a default. *Random risk is what the guarantee fee is supposed to cover, after all.* Yet every day lenders continue to face a battle in fighting repurchase requests.

*Id.* Because Ms. Walzak chose to disregard available data concerning loan performance and causation issues, her testimony — even by her own account — is unreliable and should be excluded.

## A.   Walzak Ignores Available Performance Data And Other Causation Factors

While Ms. Walzak bases her opinions about materiality and adversity of interest on vague assertions of increased risk of default, she ignores the actual performance of the loans which bespeak such assertions. Shin Decl., Ex. D, at 108:18-20, 184:20-185:2 ("███████████████")

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ ").  Having said that, Ms. Walzak

readily concedes that a loan which has performed does not result in a loss to AGM: " ████

█████████████████████████████████████████████████

██████████████████ " *Id.* at 199:13-17.

Ms. Walzak further testified that she has developed for use in her consulting business a

proprietary "WRAPS" model, which " ████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████ " *Id.* at 105:4-13.  For instance, Ms. Walzak explained that " ████████

█████████████████████████████████████████████████

██████████████ " *Id.* at  107:2-5.  Ms. Walzak stated that she used the historical

performance of the loans to develop the correlations and the model.  *Id.* at 106:6-12.  Based on

her WRAPS analysis, Ms. Walzak opined that " ██████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████ " *Id.* at 108:5-12

(emphasis added).  Notably, Ms. Walzak did not employ her WRAPS model here.

The undisputed factual record shows that of the 610 loans that Ms. Walzak alleges

contain material and adverse breaches, 484, *or almost 80%*, were paid in full or current as of

October 31, 2011.  Pl.'s Statement of Material Facts in Supp. of its Opp'n to Def.'s Mot. for

Summ. J. at 28, 29 (Pl.'s SOF); Shin Decl., Ex. E, at ¶ 36. Of the remaining 126 loans that were charged-off or delinquent, *94% had performed for at least one year prior to becoming 90+ days delinquen*t. *Id.* at ¶¶ 36, 40; *see also* Pl.'s SOF at 28, 29.

Similarly, of the twelve "exemplar" loans that Ms. Walzak discusses in detail in her Report, *eight* of them paid in full or were current at the time she issued her Report and, as shown on the chart below, each of the remaining loans performed *over* twelve months from origination before going into default. Thus, by her own account, *none* of the so-called exemplar loans contain material issues adverse to AGM's interests.

### Walzak Report: Exemplar Loans

|      | Trust  | Loan Number | Account Num | Status as of 10/31/2011 | Months to Default | Final Diligence Rating |
|------|--------|-------------|-------------|-------------------------|-------------------|------------------------|
| (1)  | 2005-1 | XXXX69995   | XXXX89758   | PAID OFF                | n/a               | n/a                    |
| (2)  | 2005-1 | XXXX85979   | XXXX97769   | CURRENT                 | n/a               | n/a                    |
| (3)  | 2005-1 | XXXX29094   | XXXX41228   | PAID OFF                | n/a               | n/a                    |
| (4)  | 2005-1 | XXXX04528   | XXXX26914   | Charge-off              | 25+               | n/a                    |
| (5)  | 2005-1 | XXXX71063   | XXXX52464   | PAID OFF                | n/a               | EV1                    |
| (6)  | 2006-2 | XXXX86077   | XXXX86077   | Charge-off              | 13 to 18          | n/a                    |
| (7)  | 2006-2 | XXXX12335   | XXXX12335   | Charge-off              | 25+               | EV1                    |
| (8)  | 2006-2 | XXXX41507   | XXXX41507   | CURRENT                 | n/a               | n/a                    |
| (9)  | 2006-2 | XXXX52799   | XXXX52799   | PAID OFF                | n/a               | n/a                    |
| (10) | 2006-2 | XXXX86162   | XXXX86162   | PAID OFF                | n/a               | n/a                    |
| (11) | 2006-2 | XXXX00641   | XXXX00641   | Charge-off              | 13 to 18          | n/a                    |
| (12) | 2006-2 | XXXX07283   | XXXX07283   | CURRENT                 | n/a               | n/a                    |

Moreover, Ms. Walzak's review provides no consideration of events that occurred in the lives of debtors subsequent to the closing of the loans, nor did she consider the historic recession and massive downturn in the U.S. economy and the housing market that occurred shortly after both Transactions closed. Shin Decl., Ex. F, at ¶¶ 22, 23, 39-41.

Doing so would greatly affect her analysis. The servicing notes Ms. Walzak had been provided revealed many instances where the borrowers made payments on time for several years before defaulting due to job loss or reduced income. *Id.* at ¶ 39. The servicing notes also revealed other instances where debtors had made timely payments for several years, only to default due to divorce or unexpected illness and the resulting medical expenses. *Id.* There were even instances where a debtor defaulted due to her death. *Id.* Ms. Walzak ignores these issues notwithstanding acknowledging that the "████" death, divorce, disease and disability, can affect loan performance, as can "████████████" when a borrower who otherwise has the ability to pay decides, given the drop in his property value, to default on his HELOC. Shin Decl. Ex. D at 118:7-120:7.

"[C]ausation is an essential element of damages in a breach of contract action, and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) (quotation omitted) (emphasis in original). The Second Circuit has held that the party bearing the burden of proof of damages *must* prove a causal link between the alleged damage and the alleged wrongful act and furnish evidence that the harm was not attributable to other causes. *See United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1379 (2d Cir. 1988) ("When a plaintiff improperly attributes all losses to a defendant's [wrongful] acts, despite the presence of significant other factors, the evidence does not permit" the fact finder to determine damages properly). Under this standard, Ms. Walzak's opinions are unreliable and should be excluded.

**B.      Walzak Makes Assumptions That Are Contrary to the Record**

Ms. Walzak further opined that "███████████████████████████
████████████████████████████████████████████████████████
███████" Shin Decl., Ex. B, at 15.  In support, she claims that because Assured:



*Id.* at 14.  To the extent, however, that Ms. Walzak attempts to testify to Assured's intent or state

of mind, such testimony must be excluded as outside her capacity as an expert.  *See In re Rezulin*

*Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or

motive of parties or others lie outside the bounds of expert testimony."); *see also LaSalle Bank*

*Nat'l Ass'n v. CIBC, Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14 2012).  But, even if

permitted to do so, Ms. Walzak has no basis to make any of these statements.  *See* Shin Decl.,

Ex. D, at 202:10-24 ("████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████").

It is undisputed that prior to entering into the Transactions, Assured used two firms to

perform thorough due diligence on a random, representative sample of the loan pool.  Assured

instructed the firms to review the samples for compliance with Flagstar's underwriting guidelines

and internally discussed and utilized the results in deciding whether to insure the

Transactions. *See* Shin Decl., Ex. G, at 181:16-22, 184:7-25, 241:6-19, 237:24-238:14;

239:17-241:19; Exs. H, I, J; Ex. K, at 281:4-15. Notably, the pre-transaction review resulted in

*no findings of "Event Level 3,"* which were deemed material underwriting exceptions. *See*

Shin Decl., Ex. L, at 3 and Ex. M, at 3. Given Ms. Walzak's focus on the "risk profile" of the

loans at closing, AGM's real-time due diligence is critical. It is the best evidence of the

quality of the loans and AGM's risk tolerance at the time of the closing of the Transactions.

Yet, Ms. Walzak simply ignores AGM's pre-transaction due diligence, and does not even

attempt to explain the wide disparity between her claim of wide-spread breaches and Assured's

contemporaneous finding of a 0% material breach rate.[2]

     Ms. Walzak's failure to consider AGM's pre-transaction due diligence makes her

analysis unreasonable. Under Rule 702, proffered expert testimony must be "applied reliably to

the facts of the case." Thus, "[e]xpert testimony should not be admitted when it is speculative, it

is not supported by sufficient facts, *or the facts of the case contradict or otherwise render the*

*opinion unreasonable." United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004) (per

curiam) (emphasis added); *see Zaccaro v. Shah*, 746 F. Supp. 2d 508, 517 (S.D.N.Y. 2010) ("A

district court should determine 'whether the expert acted reasonably in making assumptions of

fact upon which he would base his testimony,' but '[a]dmission of expert testimony based on

speculative assumptions is an abuse of discretion.'") (alteration in original) (quoting *Boucher v.*

*U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996) (per curiam)); *Virgin Atl. Airways*

---

[2] Indeed, Ms. Walzak identifies purportedly "material and adverse" breaches on 17 loans that were reviewed in AGM's pre-transaction due diligence and found to have no material issues. *See* Shin Decl., Ex. E, at pp. 30-36. In one such case, Ms. Walzak alleges eight "material and adverse" breaches stemming from a purportedly missing appraisal. During Assured's real-time due diligence, however, this loan was cleared prior to closing *and was current in payments as of October 2011. Id.*, at pp. 30-31.

*Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999) ("[A]n expert's opinion is

not a substitute for a plaintiff's obligation to provide evidence of facts that support the

applicability of the expert's opinion to the case."), *aff'd*, 257 F.3d 256 (2d Cir. 2001).

## III.   WALZAK'S OPINIONS LACK FOUNDATION, ARE BASED ON UNRELIABLE DATA AND CONSTITUTE IMPERMISSIBLE HEARSAY

### A.   No Reliable Basis That the Alleged Breaches Were "Material and Adverse"

Ms. Walzak purports to have identified thousands of breaches that she claims "materially

and adversely" affected AGM's interests. *See, infra,* at 4; *see also* Shin Decl., Ex. B, at 14.[3] Her

Report and testimony, however, are devoid of any basis for her opinion, which is predicated on

the equally unsupported opinion that the breaches "███████████████████████████████

███████████" Shin Decl., Ex. B, at 14. Ms. Walzak was unable to articulate any standard

by which a level of risk was deemed unacceptably high. Rather, she conceded that certain

variations from the underwriting guidelines would not increase risk to an unacceptable level,[4]

and further admitted that risk determinations were left to the discretion of her "team" of

reviewers, to whom she provided no meaningful instruction or guidance:

████████████████████████████████████████████

████████████████

---

[3] Many of Ms. Walzak's allegations are duplicative or derivative of one another. For example, if an allegation is that income verification is missing, the derivative allegation is that the debtor's debt-to-income ("DTI") was calculated incorrectly, and any "no" response would trigger "no" responses to other questions. This causes a significant overstatement of the actual number of alleged breaches, grossly inflating the purported breach findings.

[4]   For instance, Ms. Walzak testified that a DTI ratio of 1% above the guidelines may not result in an unacceptable increase in the risk profile, assuming the loan file contains "████████████████████" Shin Decl., Ex. D, at 59:25-60:13. She also stated that "████████████████████████████████████████████████ ████████" *Id.* at 60:14-18.

11



Shin Decl., Ex. D, at 125:8-126:4.[5]  Ms. Walzak also conceded two underwriters might come to

different determinations of reasonableness:



---

[5]   *See also* Shin Decl., Ex. D, at 188:7-189:4. (



)

████████████████████████████████████████

*Id.* at 192:7-193:5.

████████████████████████████████████████

████████████

*Id*. at 190:9-15.

The Southern District has recently held that such an ill-defined standard cannot form the basis of an expert's opinion concerning an alleged material and adverse breach. In *LaSalle Bank National Association v. CIBC, Inc.*, 2012 WL 466785 (S.D.N.Y. Feb. 14 2012), the plaintiff trustee brought claims similar to those alleged here, for breaches of representations and warranties contained in a mortgage loan purchase agreement. The defendant retained an expert in commercial real estate financing, who was "asked to review and analyze whether [the defendant] breached specific Representations and Warranties … in selling a certain mortgage loan to" the plaintiff. *Id.* at *2. The court excluded the expert's opinion regarding "material and adverse" breaches when the expert was unable to sufficiently define the meaning of these terms, and testified only that "[w]hat I mean by materially is based on my experience and my background is I have an opinion of what something is material. I can't define material… Adversely, again, it's based on my experience and background is — again, I know, based on my experience, what something adversely affects something. I can't define what adversely would be." *Id.* at *10. The court held that any testimony "opining on whether an event was material or adverse would be a mere *ipse dixit*, unsupported by an articulable analysis." *LaSalle*, 2012 WL 466785, at * 10, citing *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1249 (E.D.N.Y. 1985) ("Experts must ground

their opinions on *verifiable propositions of fact*" and "conclusions that 'rest upon conclusory and subjective opinions will not suffice.'") (emphasis added), *aff'd*, 818 F.2d 187 (2d Cir. 1987) (quoting *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628 (2d Cir. 1982)).  Here, Ms. Walzak did not employ any verifiable method or standard for assessing purported increase of risk, but relied upon her reviewers' subjective judgment which she admits may not be consistent or systematic.

**B.    Walzak Relied on Insufficient and Unreliable Data**

**1.    Walzak's "Underwriting Survey" Is Unreliable**

Ms. Walzak states that she based her determinations of underwriting "████████" on a self-administered survey on "█████████" Specifically:



Shin Decl., Ex. B, at 13.

Industry standards, however, are irrelevant.  As noted by the the *LaSalle* court, "To the extent [Ms. Walzak] seeks to offer an opinion on industry standards, [her] testimony is irrelevant because the issue here is [Flagstar's] compliance with its own standards, not industry standards." *LaSalle*, 2012 WL 466785, at *17; *see also Palazzetti Import/Export, Inc. v. Morson*, 2001 WL 793322, at *3 (S.D.N.Y. July 13, 2001) (excluding expert testimony regarding custom within the franchise industry when custom was irrelevant to whether the contract was a franchise agreement under the applicable statute).

Even if industry standards were considered, Ms. Walzak did not consistently or reliably define them.  Ms. Walzak testified that she employed an "████████████" she had

developed in 2007, which included a series of questions concerning the reasonableness of certain

loan-file documents and underwriting processes.  Shin Decl., Ex. D, at 76:11-77:14.  In 2007,

Ms. Walzak had contacted 20 "█████████████████" the names of whom she could not

recall and asked them to complete the survey.  *Id.* at 80:7-81:18; Shin Decl., Ex. N.[6]

 When asked why she conducted the survey, Ms. Walzak stated that "█████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████" Shin Decl. Ex. D, at 76:18- 77:10.  Ms. Walzak

had hoped to determine whether there was a "█████████████████████████████

█████████████████" *Id.*  With respect to why the survey was used in the

review of the loan files in this litigation, Ms. Walzak stated:





Shin Decl., Ex. D, at 83:6-21.  Yet the results of Ms. Walzak's survey demonstrate that *no such*

*consensus exists.  See* Shin Decl., Ex. N; Shin Decl., Ex. D, at 84:22-85:16 (disparate results

among surveyed underwriters concerning reasonable compensating factors for exceeding DTI

ratio guidelines); 85:25-86:12 (discrepancies on reasonable percentage allowed above the stated

DTI); 86:19-87:2 (no consensus on whether it is reasonable to confirm stated income with a

---

[6] While a request was made for the production of the names of the 20 underwriters who
participated in this survey in 2007, AGM has not produced it.

4506-T verification for questionable income); 87:2-6 (no consensus on whether it is reasonable to accept bank statement deposits for validating income); 87:19-24 (wide discrepancies regarding the reasonable amount to gross a bank statement deposit income).  When questioned about these discrepancies and how she reconciled them, Ms. Walzak stated: "████████████████████ ████████████████████████████████████████████" Shin Decl., Ex. D at 86:13-18.

Ms. Walzak's survey is inherently flawed and can hardly constitute an "industry standard" on which any reliable findings can be based.  Not only is the survey composed entirely of hearsay statements, it demonstrates that no reasonable industry consensus exists, including on what constitutes material underwriting exceptions for stated income and stated asset loans, of which there are many in the Transactions.

Ms. Walzak's reliance on this survey renders her methodology and findings unreliable. Federal Rule of Evidence 703 states that an "expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  F.R.E. 703.  The trial court, however, must examine the data relied on, and require "at least that the expert base his or her opinion on sufficient factual data [and] not rely on hearsay deemed unreliable by other experts in the field…." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. at 1244.

### 2.    Walzak's Salary Surveys Are Unscientific And Unreliable

Ms. Walzak and her reviewers relied heavily on data provided by salary.com and similar online salary surveys in determining whether a stated income in a loan file was "reasonable." Shin Decl., Exs. Q & R, at question E108 ("████████████████████ ████████████████████████████████████").  Indeed, Ms. Walzak's reviewers used salary.com as the "████████" in determining the veracity of stated income. Shin Decl., Ex. D, at 258:8-20 ("████████████████████████



Ms. Walzak testified that salary.com "

" Shin Decl., Ex. D, at 23:17-21. This tool reflects the median

salary for a given position, as well as the "          " of wages for that position. *Id.* at

147:20-148:9. According to Ms. Walzak, if a stated income loan indicated an income in excess

of the 90th percentile of the salary ranges reported by salary.com, the reviewer would conclude

that the loan "                           " or a misrepresentation. *Id.* at

142:8-11 ("

"), 164:1-18.

Reliance on such online salary surveys is problematic for at least two reasons.  First,

online salary surveys are only as reliable as the survey participants who choose to report salary

information and the integrity of the specific methodologies by which such data are gathered and

analyzed.  Because of this fundamental limitation, the data cannot be relied upon to definitively

conclude, as Ms. Walzak does, that anyone reporting a salary on their loan application that

exceeds the 90th percentile range must be misrepresenting his or her income.[7]  For instance, as of

December, 2011, salary.com showed that the 90th percentile salary of a "senior" attorney in New

---

[7] While Flagstar's guidelines permitted underwriters to consult salary.com in evaluating a loan as
a whole, Ms. Walzak relied upon this survey to establish definitive thresholds as to whether a
borrower had affirmatively misrepresented her income.  *See* Shin Decl. Ex. D at 259:24-260:4.
Given the obvious infirmities of salary.com, such reliance is overblown and misplaced.

York City—the highest-ranking attorneys according to the website's categorization—was less than $247,000 per year.  Shin Decl., Ex. D, at 166:22-167:6; Shin Decl., Ex. O.  According to Ms. Walzak's flawed methodology, the majority of the thousands of mid-level to senior attorneys employed by New York City law firms would have been determined to have misrepresented their income.

Second, salary.com and payscale.com reflect only *current* salary data and do not account for historical salary information.  Shin Decl., Ex.D, at 23:10-23.   Ms. Walzak and her team thus assumed borrower misrepresentation based on data reported five to seven years *after* the loans in question closed, and *after* a massive downturn in the economy and recession of historic proportions dramatically changed the national economy and employment environment.  While Ms. Walzak testified that her reviewers at times also considered the Bureau of Labor Statistics ("BLS") to address the time discrepancy in the data, she could not articulate a method or process as to when and under what circumstances BLS was used:



Shin Decl., Ex. D, at 143:17-25.  This selective and random methodology is not sound, and the data relied upon is insufficient and unreliable.

### C.    Walzak's Processes and Methods Are Unreliable

The process by which Ms. Walzak ran her loan file review lacked sufficient control and oversight, rendering the findings unreliable.  Ms. Walzak herself reviewed very few completed loan files and left the bulk of the review of the 800 loans to her "team" of underwriters.  Shin

Decl., Ex. D, at 35:15-36:16.  Ms. Walzak provided the reviewers with a two-page protocol and Flagstar's underwriting guidelines.  *Id.* at 12:16-14:11; Shin Decl., Ex. P.  Per the protocol's instructions, the underwriters were to consult a spreadsheet created by Ms. Walzak containing 106 separate "yes/no" questions.  Shin Decl., Exs. P, Q, R.  After answering each question, the underwriters were asked to "█████████████████████████████████████████████████ █████████████████████████████████████████" Shin Decl., Ex. P.  Ms. Walzak did not meet with the underwriters, who were geographically dispersed, in person, nor did she ever email them directly, preferring instead to conduct her communications through another contact.  Shin Decl., Ex. D, at 21:17-22:5, 72:14-24.  Her instructions amounted to the two-page protocol, and a one-hour conference call at the inception of the review.  *Id.* at 22:8-16.

 The third-party firms that were hired to analyze potential borrower fraud and appraisal issues were even further removed from Ms. Walzak's control and oversight.  Ms. Walzak testified that AGM's counsel contracted with a company called Digital Risk, a "████████████ ████████████████████████" to review the loans for potential borrower fraud, and that she herself provided no written instructions to the company.  Shin Decl., Ex. B, at 8; Shin Decl., Ex. D at 132:5-17, 133:13-134:2.  While Ms. Walzak testified that she "██████████████████████████████████ ███████████████████████████████████████" undisclosed debts and collateral value on all 800 loans in the sample, Shin Decl., Ex. D, at 139:20-23, she did not know what level of loan file review Digital Risk performed in connection with its fraud determinations.  *Id.* at 267:9-20.  In fact, she was not even aware that Digital Risk had possession of the complete loan files until counsel for AGM informed her at her deposition.  *Id.* at 266:22-267:8.

 Digital Risk, in turn, contracted with a company called Clear Capital to develop opinions of value with respect to the properties underlying the loans in Ms. Walzak's samples.  *Id.* at

134:15-22.  Ms. Walzak testified that Clear Capital generally used a proprietary AVM or automatic valuation model for such reviews.  Ms. Walzak admitted, however, that she did not speak with any representatives from Clear Capital, *Id.* at 159:17-19, and did not know if Digital Risk provided Clear Capital with any instructions.  *Id.* at 138:25-139:4.  She further testified:  "███

████████████████████████████████████████████████████

████████████████████████████████████████████" *Id.* at 138:9-12, which were sent directly to Digital Risk.  *Id.* at 174:4-11.

Ms. Walzak defended her lack of oversight and control by stating that, "████████

████████████████████████████████████████████████████

████" Shin Decl., Ex. D, at 137:8-13.  Ms. Walzak's system of contracting with outside parties, who in turn contracted with even further removed parties, produced unverifiable results that Ms. Walzak often could not explain.  This haphazard and uncontrolled process not only renders her breach findings unreliable, but also has deprived Flagstar of a genuine opportunity to challenge the processes employed by these third parties.  The findings of purported breach should be excluded.

### D.    Walzak Impermissibly "Adopted" Hearsay Opinions

Finally, Ms. Walzak impermissibly adopted the hearsay opinions of her eight underwriters as well as those of employees of Clear Capital and Digital Risk, forming an independent reason to exclude her testimony.  While FRE 703 "allows an expert to opine based on hearsay or conclusions gathered through the assistance of other experts, the proffered expert must give *his own opinion* based upon *his own expert analysis*....  An expert cannot simply parrot the findings of another arrived at in another context."  *Quiles v. Bradford-White Corp.*, 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012) (emphasis added) (proffered expert in engineering and fire inspection could not testify to feasible alternative design for water heater

when he simply adopted opinions of the Consumer Safety and Protection Commission and experts at defendant's competitors), citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664-66 (S.D.N.Y. 2007) (expert opinion held inadmissible where expert acted as a "mouthpiece" for another, unproduced individual: "[t]he expert witness must in the end be giving his *own* opinion. He cannot simply be a conduit for the opinion of an unproduced expert."). The *Malletier* court further observed that testimony would be inadmissible hearsay — the expert would be relating the statistician's out-of-court statements, offered for the truth of the statistician's opinion. "It is true that under Rule 703, experts can rely on hearsay in reaching their own opinions. But a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Id.* at 666. *See also Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F. 3d 609 (7th Cir. 2002) (excluding testimony of expert hydrogeologist who admitted that he had relied on models created by two employees of his consulting firm: "Without their testimony explaining and justifying the discretionary choices that they made, [the expert's] testimony would have rested on air."). Likewise, in *U.S. v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008), the Second Circuit held that while an expert may rely on hearsay evidence in forming his conclusion, he may not "simply transmit the hearsay to the jury" but "must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials… Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [party offering the expert testimony] to circumvent the rules prohibiting hearsay." *Id.* at 197 (internal quotations omitted).

      As discussed above, Ms. Walzak outsourced the review of 800 loan files in AGM's sample to eight underwriters. Shin Decl. Ex. D, Walzak Dep. at 14:17-19; 18:3-6; 35:15- 36:16.

Each of these underwriters made subjective determinations concerning the existence of purported breaches and whether such alleged breaches " ███████████████████████ ███████ " and thus, purportedly "materially and adversely" affected AGM's interest.  Yet Ms. Walzak did not provide any meaningful guidance on the manner in which they were to determine whether an identified defect was "material and adverse," and Ms. Walzak testified that she checked only certain limited findings that her underwriters made, but otherwise adopted their findings and incorporated them into her report and opinion.[8]

Further, Ms. Walzak did not have an understanding of the fraud review process employed by Digital Risk, nor did she even bother to speak to Clear Capital, review their reports or understand their automated valuation model.  Shin Decl. Ex. D, at 132:8-10, 136:24-137:7; 138:9-12.  Although Ms. Walzak claims that 14% of the 2005-1 loan sample and 19.75% of the 2006-2 loans sample allegedly contain borrower fraud or misrepresentation, unsurprisingly, she was unable to explain how this number was derived.  *Id.* at 126:2-129:18.  The work product of Digital Risk and Clear Capital appears to have been simply "cut and pasted" into Exhibit B of the Report, without any analysis or insight by Ms. Walzak.  *Id.* at at 150:22-151:6 ("████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

███████████████ ").

---

[8] Ms. Walzak testified that she checked the findings made by her reviewers only if they concerned compliance with Flagstar's specific guidelines, which only accounted for 26 of the 106 questions listed in her Exhibit B of her report.  Shin Decl. Ex. D at 45:11- 46:16; 49:16-22; Shin Decl. Exs. Q, R.

Ms. Walzak served merely as a "mouthpiece" for determinations made by others.  These individuals were not produced as experts, did not submit their own reports and Flagstar has not deposed them.  *See Malletier*, 525 F. Supp. 2d at 664.  The opinions of these individuals are inadmissible hearsay which pervade Ms. Walzak's testimony and should be excluded.

## IV.   WALZAK IMPERMISSIBLY OPINES ON THE ULTIMATE LEGAL ISSUE

Ms. Walzak's opinion that the identified breaches "materially and adversely" affected AGM's interest should be excluded on the additional ground that it states a legal conclusion and will not assist the trier of fact.  According to Ms. Walzak's Report, the assignment she received from Assured's counsel directed her to "███████████████████████████████████████ ████████████████████████████████████████████████████" — the ultimate legal issue in the case.  Shin Decl., Ex. B, at p. 5; *see also id.* at p. 14 ("████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████").  Ms. Walzak then repeatedly characterized her methodology and approach as considering these legal issues,[9] and her conclusions impermissibly speak in terms of coming to ultimate legal conclusions.  *See id.* at p. 14 ("███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ ███████████").

---

[9] *See, e.g.,* Shin Decl., Ex. B, at p. 8 ("██████████████████████████████████ ██████████████████"); *see also id.* at p.12 ("██████ ██████████████████████"); *see also id.* at p.13 ("█████ ████████████████████████████████████████████ ████████████████████████████████████")

In *LaSalle*, the court excluded a similar expert opinion. The *LaSalle* court held that the testimony "does not merely embrace an ultimate issue…, it unabashedly repeatedly opines on whether [the defendant] breached its warranties in a manner that materially and adversely effects the relevant interests." *LaSalle*, 2012 WL 466785 at *2 (internal quotations omitted). Ms. Walzak's opinions that Flagstar breached specific provisions of the Transaction Documents, and that the purported breaches "materially and adversely affected Assured's interests" are similarly inappropriate and should be excluded. *See also Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 528-29 (S.D.N.Y. 2001) (holding inadmissible the testimony of finance expert who "was asked to reach legal conclusions regarding [ ] ultimate issues: whether [defendants] complied with the [contractual] Agreements, whether they adhered to the covenant of good faith and fair dealing, and whether they conducted the liquidations in a commercially reasonable manner…. [H]e does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury interpreting the evidence."). Ms. Walzak's testimony similarly usurps the Court's role and exceeds the scope of admissibility under *Daubert*. For this and the many reasons discussed above, Ms. Walzak's Report and testimony is riddled with insurmountable issues that preclude their consideration at trial.

## CONCLUSION

For the foregoing reasons, Ms. Walzak's Report and testimony should be excluded.

Dated: May 25, 2012
New York, New York

ARNOLD & PORTER LLP


By: /s/ Veronica E. Rendón
Veronica E. Rendón
Stewart D. Aaron
Susan L. Shin
399 Park Avenue
New York, New York  10022
Tel:  (212) 715-1000
Fax:  (212) 715-1399
*Veronica.Rendon@aporter.com*
*Stewart.Aaron@aporter.com*
*Susan.Shin@aporter.com*

*Attorneys for Defendants Flagstar Bank, FSB,
Flagstar Capital Markets Corporation and Flagstar
ABS, LLC*