CONFIDENTIAL
INFORMATION
REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ASSURED GUARANTY MUNICIPAL CORP.,
f/k/a FINANCIAL SECURITY ASSURANCE,
INC.

                          Plaintiff,

        vs.                                             Case No.: 11-CIV-2375 (JSR)

FLAGSTAR BANK, FSB; FLAGSTAR
CAPITAL MARKETS CORPORATION; and
FLAGSTAR ABS, LLC

                          Defendants.

### DECLARATION OF SUSAN SHIN IN SUPPORT OF FLAGSTAR BANK, FSB, FLAGSTAR CAPITAL MARKETS CORPORATION, AND FLAGSTAR ABS, LLC's MOTION TO EXCLUDE THE TESTIMONY OF REBECCA WALZAK CONCERNING ALLEGED BREACHES OF REPRESENTATIONS AND WARRANTIES

SUSAN SHIN declares:

1.      I am an attorney admitted to the Bar of the State of New York and the Bar of this

Court, and I am a member of the law firm of Arnold & Porter LLP, attorneys for defendants

Flagstar Bank, FSB, Flagstar Capital Markets Corporation, and Flagstar ABS (collectively,

"Flagstar").  I submit this declaration in support of defendants' motion to exclude the testimony

of Rebecca Walzak concerning alleged breaches of representations and warranties.

2.      Attached hereto as Exhibit A is a true and correct copy of Rebecca Walzak, "A

Fair Fight for Repurchases," MORTGAGE SERVICING NEWS, Feb. 15, 2012, *available at*

http://www.nationalmortgagenews.com/blogs/risky/fair-fight-repurchases-1028904-1.html (last

visited May 22, 2012).

3.      Attached hereto as Exhibit B is a true and correct copy of the Corrected Expert
Report of Rebecca Walzak, dated December 2, 2011.  This exhibit is filed under seal pursuant to
Protective Order.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the
deposition of Joseph Mason, taken  January 4, 2012 and February 13, 2012.

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the
deposition of Rebecca Walzak, taken December 19, 2011.  This exhibit is filed under seal
pursuant to Protective Order.

6.      Attached hereto as Exhibit E is a true and correct copy of the Expert Report of
Jeffrey Nielsen, dated December 22, 2011.  This exhibit is filed under seal pursuant to Protective
Order.

7.      Attached hereto as Exhibit F is a true and correct copy of the Expert Report of
John Griggs, dated January 1, 2012.  This exhibit is filed under seal pursuant to Protective Order.

8.      Attached hereto as Exhibit G is a true and correct copy of excerpts from the
deposition of George Stiehl, taken November 17, 2011.

9.      Attached hereto as Exhibit H is a true and correct copy of Exhibit 25 to the
deposition of George Stiehl.  This exhibit is filed under seal pursuant to Protective Order.

10.      Attached hereto as Exhibit I is a true and correct copy of Exhibit 26 to the
deposition of George Stiehl.  This exhibit is filed under seal pursuant to Protective Order.

11.      Attached hereto as Exhibit J is a true and correct copy of Exhibit 27 to the
deposition of George Stiehl.  This exhibit is filed under seal pursuant to Protective Order.

12.      Attached hereto as Exhibit K is a true and correct copy of excerpts from the
deposition of David Beard, taken November 1 and November 10, 2011.

13.     Attached hereto as Exhibit L is a true and correct copy  FSA's Executive Summary Flagstar Home Equity Loan Trust 2005-1.  This exhibit is filed under seal pursuant to Protective Order.

14.     Attached hereto as Exhibit M is a true and correct copy of FSA's Executive Summary Flagstar Home Equity Loan Trust 2006-2.  This exhibit is filed under seal pursuant to Protective Order.

15.     Attached hereto as Exhibit N is a true and correct copy of Exhibit 6 to the deposition of Rebecca Walzak taken December 19, 2011.   This exhibit is filed under seal pursuant to Protective Order.

16.     Attached hereto as Exhibit O is a true and correct copy of Exhibit 10 to the deposition of Rebecca Walzak taken December 19, 2011.

17.     Attached hereto as Exhibit P is a true and correct copy of Exhibit 3 to the deposition of Rebecca Walzak taken December 19, 2011.  This exhibit is filed under seal pursuant to Protective Order.

18.     Attached hereto as Exhibit Q  is a true and correct copy of Exhibit B (2005-1) to the Corrected Expert Report of Rebecca Walzak dated December 2, 2011.  This exhibit is filed under seal pursuant to Protective Order.  For the Court's convenience, this exhibit is also being provided in its original Excel format via disk.

19.     Attached hereto as Exhibit R is a true and correct copy of Exhibit B (2006-2) to the Corrected Expert Report of Rebecca Walzak dated December 2, 2011.  This exhibit is filed under seal pursuant to Protective Order.  For the Court's convenience, this exhibit is also being provided in its original Excel format via disk.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 25, 2012
      New York, New York

/s/      Susan Shin
Susan L. Shin
399 Park Avenue
New York, New York 10022
Tel: (212) 715-1000
Fax: (212) 715-1399
*Susan.shin@aporter.com*

*Attorney for Defendants Flagstar Bank, FSB,
Flagstar Capital Markets Corporation and Flagstar
ABS, LLC*

# Exhibit A

Case 1:11-cv-02375-JSR   Document 94   Filed 05/25/12   Page 6 of 41

# National Mortgage News

(http://www.nationalmortgagenews.com)



**By** Rebecca Walzak
FEB 15, 2012

RISKY BUSINESS

# A Fair Fight for Repurchases

Rebecca Walzak
FEB 15, 2012 10:46am ET

Is there any enjoyment derived from two people punching each other until one drops to the ground? To me, there isn't, but I'm sure plenty of boxing fans would beg to differ.

**4TH ANNUAL**
**Best Practices in**
**LO$$ MITIGATION**

*Register Now*
*Call (212) 803-8456*
July 19-20, 2012
Dallas/Addison Marriott Quorum  I  Dallas, TX

Boxing reminds me a lot of today's lenders. Most lenders get into the ring every day, fighting until someone drops. The reason however is not to win a match, but to prevent a repurchase.

Just ask the staff of any lender. They will tell you that the biggest risk they face is the risk of repurchase. In fact, many will say that quality loans are those that don't have to be repurchased. Is that how the industry should be defining quality loans? How did we get to the point that we are more worried about what will happen after we produce a loan, rather than making sure we produce it correctly in the first place?

There are two reasons for these boxing matches. The first is that the agencies seem to forget that we are in the business of risk. Trying to find just any problem to justify forcing a repurchase for a defaulted loan is counter to the purpose of a guaranty fee.

Secondly, we refuse to accept the fact that there is a clear relationship between processes and performance. Failing to manage process risk creates a high probability that many of the files will have errors that can lead to default. In my opinion, worrying about individual mistakes is like trying to prevent accidents. Preventing process risk is stopping a war.

In other words, I believe the agencies need to look at loans holistically, rather than focusing on individual issues or errors. They should also be able to justify that the issue they are citing as the reason for repurchase is actually a driver of the default.

For repurchases to be fair, there should be a cause and effect relationship. So rather than

Case 1:11-cv-02375-JSR   Document 94   Filed 05/25/12   Page 7 of 41

looking for possible issues to throw back to the lender after a loan defaults, the agencies should be able to prove that the issue or issues cited caused the default. In too many cases, this cause and effect relationship is missing, and random and unforeseen risk is what triggered a default. Random risk is what the guarantee fee is supposed to cover, after all. Yet every day lenders continue to face a battle in fighting repurchase requests.

Which brings me back to boxing. As lenders go toe to toe with the agencies, let's make sure it's at least a fair fight. It's time for the industry to independently establish these relationships so that they can be addressed at the time the loans are purchased and not have to do battle years later.



© 2012 National Mortgage News and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT B

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

# Exhibit C

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 11-CV-2375 (JSR)
------------------------------------x

ASSURED GUARANTY MUNICIPAL CORP.,
f/k/a FINANCIAL SECURITY
ASSURANCE INC.,

                     Plaintiff,

      -against-

FLAGSTAR BANK, FSB; FLAGSTAR
CAPITAL MARKETS CORPORATION;
and FLAGSTAR ABS, LLC,

                  Defendants.

------------------------------------x

                560 Lexington Avenue
                New York, New York

                January 4, 2012
                9:30 a.m.

        VIDEOTAPED DEPOSITION of JOSEPH R.

MASON, taken by the Defendants, pursuant to

Notice, held at the aforementioned time and

place, before Sherri Flagg, a Registered

Professional Reporter, Certified LiveNote

Reporter, and Notary Public.

```
 1                    - J. MASON, Ph.D -
 2    allegations were true.
 3                    MR. SWANSON:  Would you mark,
 4         please, as Exhibit 5 the Corrected
 5         Expert Report of Rebecca Walzak.
 6              (Exhibit 5: Corrected Expert
 7         Report of Rebecca Walzak 12/2/11, was
 8         marked for identification.)
 9    BY MR. SWANSON (continuing):
10         Q.   Dr. Mason, did you ever review
11    Ms. Walzak's report that we've marked as
12    Exhibit 5?
13         A.   No, I did not.
14         Q.   Did anyone ever tell you about
15    Ms. Walzak's work?
16         A.   I have some familiarity with
17    Ms. Walzak's work and I used her results in
18    my work.
19         Q.   How did you gain that familiarity?
20         A.   Just a general familiarity.
21         Q.   Well, how did you gain that
22    familiarity?  By talking to counsel?  By
23    talking to Ms. Walzak?  By osmosis?  Tell me
24    how.
25         A.   I'm familiar with re-underwriting
```

```
 1                - J. MASON, Ph.D -
 2     exercises, I saw some of the background
 3     spreadsheets that were used and, of course,
 4     I implemented the results of this analysis
 5     in my own analysis.
 6          Q.   Well, you say -- when you say you
 7     "implemented the results of this analysis,"
 8     tell me what you mean by that.
 9          A.   I relied upon Ms. Walzak's
10     assessment of underwriting breaches --
11          Q.   You assumed --
12          A.   -- in my own estimation of
13     damages.
14          Q.   In other words, you assumed her
15     conclusions?
16               MR. PORTERA:   Object to form.
17          A.   I was asked to implement her
18     conclusions in my analysis.
19          Q.   Well, what does it mean to
20     implement a conclusion?  That's not a phrase
21     that I would usually use in normal
22     conversation.
23          A.   I was asked to utilize the
24     findings that she produced of defects on a
25     loan-by-loan basis --
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 11-CV-2375 (JSR)

--------------------------------x
ASSURED GUARANTY MUNICIPAL CORP.,
f/k/a FINANCIAL SECURITY
ASSURANCE INC.,

                Plaintiff,

vs.

FLAGSTAR BANK, FSB; FLAGSTAR
CAPITAL MARKETS CORPORATION;
and FLAGSTAR ABS, LLC,

                Defendants.
--------------------------------x



              February 13, 2012

              10:16 a.m.


      Continued Videotaped Deposition of

JOSEPH R. MASON, Ph.D., held at the offices

of Arnold & Porter LLP, 399 Park Avenue,

New York, New York, pursuant to adjournment,

before Cary N. Bigelow, Court Reporter, a

Notary Public of the State of New York.

1                          J. Mason

2    documents that are listed on appendix B did you

3    rely upon, if any, in preparing your second

4    supplemental report.

5        A.    The reason I offered the answer is

6    because I had assumed that we had cited the

7    prospectuses and supplements here in appendix B,

8    but I may have assumed incorrectly.  If I did so,

9    I'm sorry.

10       Q.    Did you rely upon the academic

11   literature listed at the top of the page on

12   appendix B in preparing your second supplemental

13   expert report?

14       A.    No, I did not.

15       Q.    Did you rely upon the expert report of

16   Rebecca Walzak in preparing your second

17   supplemental expert report?

18       A.    I suppose so.  I relied upon the

19   determinations of defective underwriting that she

20   made that I indicated in the first report and

21   followed up to utilize those in the same way in

22   the second report.

23       Q.    Are there any other documents listed on

24   page 22 that you relied upon in preparing your

25   second supplemental expert report?

# EXHIBIT D

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

# EXHIBIT E

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

# EXHIBIT F

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

# Exhibit G

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


ASSURED GUARANTY MUNICIPAL      )
CORP., f/k/a FINANCIAL          )
SECURITY ASSURANCE INC.,        )
            Plaintiff,          )
                                )   Case No.
            vs.                 )   11-CV-2375 (JSR)
                                )
                                )
FLAGSTAR BANK, FSB;             )
FLAGSTAR CAPITAL MARKETS        )
CORPORATION; and FLAGSTAR       )
ABS, LLC,                       )
            Defendants.         )
_____  )



November 17, 2011

9:50 a.m.


        Videopated deposition of GEORGE STIEHL,

held at the offices of Arnold & Porter, 399 Park

Avenue, New York, New York, pursuant to notice,

before Barbara Driscoll, a Notary Public of the

State of New York.

1                          STIEHL

2    access to all the underwriting guidelines.

3         Q.    Your original e-mail says, I am

4    reviewing your HELOC guidelines.  So it appears

5    from your original e-mail that you had access to

6    Flagstar's HELOC underwriting guidelines?

7         A.    Yeah.  You asked me if I was getting

8    access to all their second liens and first liens.

9    In the e-mail Brian provided to me, I don't know

10   if I am getting all access to the first and second

11   liens.

12              At a prior period of time, I might have

13   been handed the second lien underwriting

14   guidelines, but I am not sure if he was giving me

15   access in the directions of his e-mail.

16        Q.    So just to simplify even the question I

17   asked of you, your original e-mail indicates that

18   you have access to the Flagstar's HELOC

19   underwriting guidelines, correct?

20        A.    It appears that is the case, although I

21   don't remember doing -- performing such a task,

22   but yes, it looks like I had them.

23        Q.    Then in the e-mail that Mr. Boike sent

24   you on October 6 at 2005 at 5:50, he refers to

25   there being a product description for the agency

Page 184

```
 1                        STIEHL
 2   attachment.  I can't pick out the 125 loans.  I
 3   don't know what their loan ID's -- I didn't
 4   memorize them because you're saying they are
 5   attachment to this, I would assume they are the
 6   125 loans.
 7        Q.    Look at Stiehl 9.  The top e-mail
 8   appears to be an e-mail from yourself to Paul H.
 9   White at JP Morgan sending him the Flagstar 125
10   random selection from the 10/05 tape with
11   attachment to it.  It says, here is our diligence
12   sample.
13             What do you understand you're doing in
14   that e-mail?
15        A.    Providing JP Morgan our 125 randomly
16   selected loans.
17        Q.    What was the expectation that you had
18   in providing that to JP Morgan?
19        A.    My expectation that was JP Morgan was
20   going to forward this sample to a diligence firm.
21   I guess Clayton was the diligence firm that worked
22   on the first diligence.  I can't say that we were
23   assuming that Clayton would do the second
24   diligence, but -- that is what I would assume was
25   the point of this.
```

1                         STIEHL

2        A.    Yes.

3        Q.    Would it be your expectation that this

4   would reflect what FSA's FICO loss model was

5   reflecting for the 2005-1 securitization as of

6   December 5, 2005?

7        A.    It appears to be the same analysis that

8   we discussed earlier, just on the 2005 tape -- I

9   mean, the December 5 tape.

10             THE VIDEOGRAPHER:  This is the end of

11        tape number 5 in the videotape deposition of

12        George Stiehl.  We are going off the record at

13        5:25.

14             (Recess taken.)

15             MS. RENDON:  We are marking Exhibit 25

16        which is Bates AGM 04329220 through 9272.

17             (Stiehl Exhibit 25, Bates AGM 04329220

18        through 9272, marked for identification, as of

19        this date.)

20             THE VIDEOGRAPHER:  This marks the

21        beginning of tape number 6 in the videotape

22        deposition of George Stiehl.  We are going on

23        the record.  Time is it 5:42.

24        Q.    While we were off the record, we marked

25   Exhibit 25.  This is from Mr. Hachikian to a

Page 238

1                              STIEHL

2    number of people, including yourself, related to

3    Flagstar 2006-2.  On 8720 it says, 250 dil sample.

4            What do you understand Mr. Hachikian is

5    sending to you and others on December 15, 2006?

6        A.    It appears to be a diligence sample for

7    the Flagstar 2006-2 transaction.

8        Q.    This appears to be the attachments to

9    this or at least the attachment beginning at AGM

10   4329248 to 22972.  Does this appear to be a

11   listing of randomly selected loans for the file

12   diligence on the 2006-2 transaction?

13       A.    I am guessing that is what this appears

14   to be.

15            MR. BUCHDAHL:  You said 249 --

16            THE WITNESS:  9248 --

17       Q.    I said 9248 through the end of the

18   document.  Does that appear to be a listing of the

19   250 randomly selected loans?

20       A.    It looks to be more than 250 loans

21   starting on 9428.

22       Q.    The list of loans that appears starting

23   on 9249 to the end of the document, does that

24   appear to be --

25       A.    I have no idea if these are the loans.

1                         STIEHL

2          Q.    I will ask you to look at AGM 43229267.

3          A.    Sorry.

4          Q.    I know you're getting tired.  I need to

5    authenticate this stuff so we can understand what

6    these are.

7                On the pages appearing on AGM 4329249

8    to the end of the document, does this appear to be

9    a list of the 250 randomly selected loans?

10         A.    I don't know if -- you asked me -- your

11   first question is the information on 248 was the

12   250 loans and it is showing 3,675 loans --

13         Q.    Which I understand to be the amount of

14   loans proposed for the transaction.

15         A.    So I don't know if the next pages

16   represent the loans that are the 3,000 or the 250.

17         Q.    Understanding that this starting at AGM

18   4329249 to the end of the document is, in its

19   native form, an Excel spreadsheet, do you see on

20   the first page beginning at 249, it says match and

21   there is a number 1 through 69 on the first page?

22         A.    Yes.

23         Q.    Then if I ask you to turn to Bates

24   stamp 267, that match column goes down to 250?

25         A.    Okay.

```
 1                       STIEHL

 2        Q.    Does that cause you to believe that

 3   this is a list -- if we had printed it in Excel,

 4   that would show a list of 250 randomly selected

 5   loans?

 6        A.    It is a reason to believe that, yeah,

 7   sure.

 8        Q.    I will ask you to turn to Stiehl

 9   Exhibit 26, please.

10             (Stiehl Exhibit 26, AGM 04140675

11             through 676, marked for identification, as of

12             this date.)

13             MS. RENDON:   Exhibit 26 is an e-mail

14             stream bearing AGM 04140675 through 676.

15        Q.    The bottom is from Ryan Ashley to Brian

16   Boike at Flagstar copying yourself and Mr. Beard

17   on September 15, 2006 and says, please find

18   attached FSA's 250 loan random due diligence pool

19   list for the Flagstar 2006-2 transaction.  Then at

20   the top it says, sorry this was returned the first

21   time.

22             Is it your belief that by this e-mail

23   Mr. Ashley was transmitting to Mr. Boike at

24   Flagstar the list of the 250 randomly selected

25   loans for the 06-2 transaction.
```

```
1                        STIEHL

2        A.      Appears to be the case.

3               (Stiehl Exhibit 27, Bates number

4        04140402 through 0405, marked for

5        identification, as of this date.)

6        Q.     I will ask you to turn to Stiehl

7   Exhibit 27, Bates number 04140402 through 0405.

8   It contains an e-mail string on -- all of which

9   occur on September 21, 2006.  The original e-mail

10  is from Joel C. Readance at JPM to folks at the

11  Bohan group, Mr. Boike at Flagstar and Paul White

12  at JP Morgan Chase.

13              Does it appear to be that Mr. Readance

14  in his e-mail is explaining to folks at the Bohan

15  group what the expectation is for their diligence

16  of the 250 loan files?

17              MR. BUCHDAHL:  Objection to the form.

18       A.     It appears it is directions to Bohan

19  from Mr. Readance.

20       Q.     I will ask you to look at what is being

21  marked as Stiehl Exhibit 28.

22              (Stiehl Exhibit 28, Bates AGM 04621901

23       through 910, marked for identification, as of

24       this date.)

25       Q.     Look at Exhibit Stiehl 28.  I will read
```

# EXHIBIT H

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT I

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

# EXHIBIT J

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# Exhibit K

Page 202

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


ASSURED GUARANTY MUNICIPAL    )
CORP., f/k/a FINANCIAL        )
SECURITY ASSURANCE INC.,      )
        Plaintiff,    )
                      )   Case No.
        vs.            )   11-CV-2375 (JSR)
                      )
                      )
FLAGSTAR BANK, FSB;           )
FLAGSTAR CAPITAL MARKETS      )
CORPORATION; and FLAGSTAR     )
ABS, LLC,                     )
        Defendants.    )
_____)


CONTINUED DEPOSITION OF DAVID BEARD

New York, New York

November 10, 2011


Reported By:

CATHI IRISH, RPR, CLVS, CCR

1                          BEARD

2       A.      This is -- I believe this is the

3   results of a file review that Bohan did.

4       Q.      And Bohan would have been retained by

5   FSA for that purpose?

6       A.      Could have been.  I don't recall

7   specifically.  Would have been retained by

8   either -- I would expect Bohan was retained by us

9   but I don't recall specifically.

10      Q.      Either way, it would appear from this

11  memo that FSA got the benefit of the loan file

12  diligence that Bohan did; is that correct?

13              MR. BUCHDAHL:  Objection to form.

14              THE WITNESS:  Yes, we had the results

15      of Bohan's analysis.

16  BY MS. RENDON:

17      Q.      And, in fact, that's what the first

18  line under section 3 would indicate, right, RMG,

19  and that's the risk management group within FSA;

20  is that correct?

21      A.      Uh-huh.

22      Q.      Has received the results from Bohan's

23  due diligence on the 250 loans reviewed in

24  October.  It says there a hundred percent of the

25  sample was randomly selected and the grades of the

# EXHIBIT L

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT M

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

# <u>EXHIBIT N</u>

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

Ex. N Filed Under Seal docx

# Exhibit O

Salary.com Salary Wizard - Do you know what you're worth?          http://swz.salary.com/SalaryWizard/Attorney-V-Salary-Details-New-...







EXHIBIT

Walzak 10

12/19/11      CL

PENGAD 800-631-6989

salary.com®

Advertisement

**Ask Labor Lawyers Online** A Lawyer Will Answer You Now! A Question is Answered Every 9 Sec. Labor-Law.JustAnswer

**Diagnostic Med Sonography** Train In Diagnostic Med. Ultrasound Financial Aid Available - Apply Now Garden-City-Sm

**List Of Paralegal Schools** Search A Complete List Of Colleges That Offer Paralegal Legal Programs www.CampusExplorer.c

AdChoices ▷

| Salary | Job Search | Education | Resume Tips | Career Advice | Salary.com for Business |
|--------|-----------|-----------|-------------|---------------|------------------------|

Welcome to Salary.com | Sign In | Create a Free Profile                    Like us? Spread the word    Share    0

# __EXHIBIT P__

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

Ex. P Filed Under Seal docx

# EXHIBIT Q

## FILED UNDER SEAL
## PURSUANT TO PROTECTIVE ORDER

Ex Q Filed Under Seal.docx

# EXHIBIT R

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

Ex R Filed Under Seal.docx