UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., | |
| Plaintiff, | 11-CIV-2375 (JSR) |
| vs. | |
| FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTIONS IN LIMINE AND TO EXCLUDE PLAINTIFF'S EXPERTS' TESTIMONY**

Veronica E. Rendón
Stewart D. Aaron
Susan L. Shin
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000
Veronica.Rendon@aporter.com
Stewart.Aaron@aporter.com
Susan.Shin@aporter.com

*Attorneys for Defendants Flagstar Bank,
FSB, Flagstar Capital Markets Corporation
and Flagstar ABS, LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT .............................................................................................................2

I.    AGM SHOULD BE PRECLUDED FROM USING SAMPLING TO
EXTRAPOLATE POOL-WIDE LIABILITY AND DAMAGES ...............................2

    A.    The Transaction Documents Limit Assured To The Exclusive Cure Or
Repurchase Remedy Which Requires Flagstar's Actual Awareness And
Dictates Ensuing Procedural Protections ...............................................2

    B.    Sampling And Extrapolation Across The Loan Pool Is Inconsistent
With The Transaction Documents ...........................................................4

    C.    Even If Flagstar's "Awareness" Of Any And All Breaches Could
Be Proved By Demonstrating Pervasiveness, Plaintiff Has Not
Made Such A Showing ............................................................................8

II.    THE TESTIMONY AND REPORTS OF AGM'S EXPERTS SHOULD BE
EXCLUDED ............................................................................................................10

    A.    Lipshutz's Testimony And Report Regarding The Construction Of The
Purportedly Random Samples Should Be Excluded ..............................11

    B.    Walzak's Testimony And Report Concerning Alleged Breaches Of
Representations And Warranties Should Be Excluded ...........................13

        1.    *Walzak Ignores Available Performance Data And Other Causation
Factors* ...........................................................................................15

        2.    *Walzak's Assumptions Are Contrary To The Record* ................17

        3.    *There Is No Reliable Basis For Walzak's Opinion That Alleged
Breaches Were Material And Adverse* .........................................18

        4.    *Walzak's "Underwriting Survey" Is Unreliable* .........................20

        5.    *Walzak's Salary Surveys Are Unscientific And Unreliable* .......22

        6.    *Walzak's Processes And Methods Are Unreliable* ......................23

        7.    *Walzak Impermissibly Adopted "Hearsay" Opinions* ...............24

i

**<u>TABLE OF CONTENTS</u>**

**(cont'd)**

<u>Page</u>

C.    **Mason's Testimony And Report Concerning Damages For Alleged Breaches Of Representations And Warranties Should Be Excluded** ......................................................26

    1.    *AGM Failed To Establish That The Samples Were Representative Of Defaulted Loans In The Transactions* ......................................................27

    2.    *AGM Failed To Establish That The Samples Were Representative Of Original Principal Balance of Loans In The Transactions* .................28

    3.    *Dr. Mason Improperly Calculates Higher Damages The Later In Time AGM Alleges Flagstar Purportedly Knew Of Alleged Breaches* ......................................................29

    4.    *Dr. Mason's Origination Damages Analysis Is Not Relevant* .................31

D.    **Walzak's And Mason's Testimony And Reports Concerning Alleged Servicing Breaches And Damages Should Be Excluded** ......................................................34

    1.    *Ms. Walzak's Opinion Regarding Flagstar's Alleged Servicing Breaches Lacks Any Reliable Foundation Or Support* ..........................35

    2.    *Ms. Walzak's Processes And Methods Are Unreliable* ..........................36

    3.    *Ms. Walzak's Opinion Fails To Account For Numerous Determinative Facts And Is Therefore Irrelevant* ......................................37

    4.    *Dr. Mason's Servicing Damages Calculations Should Be Excluded* ......................................................39

**CONCLUSION** ......................................................40

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Amorgianos v. Amtrak,*
    303 F.3d 256 (2d Cir. 2002)................................................................................11, 15

*Astra Aktiebolag v. Andrx Pharms., Inc.,*
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)....................................................................11

*Boucher v. US Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) .......................................................................................33

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,*
    650 F. Supp. 2d 314 (S.D.N.Y. 2009) (Rakoff, J.) .........................................11, 28

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993)...........................................................................................10, 28

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*
    631 F.3d 42 (2d Cir. 2011)......................................................................................16

*DiRose v. PK Mgmt. Corp.,*
    691 F.2d 628 (2d Cir. 1982)....................................................................................20

*Gen. Elect. Co. v. Joiner,*
    522 U.S. 136 (1997)................................................................................................20

*In re Agent Orange Prod. Liab. Litig.,*
    611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987).........20, 21

*In re Best Payphones, Inc.,*
    No. 01-15472 (SMB), 2003 WL 1089525 (Bankr. S.D.N.Y. Mar. 10, 2003) ........33

*In re Lipper Holdings LLC,*
    1 A.D.3d 170 (1st Dep't 2003) ...............................................................................5

*Klos v. Polskie Linie Lotnicze,*
    133 F.3d 164 (2d Cir. 1997)....................................................................................5

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)................................................................................................11

*LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.,*
    No. 02-cv-7868 (HB), 2003 WL 21671812 (S.D.N.Y. July 16, 2003).....................5

*LaSalle Bank Nat'l Assoc.v. CIBC, Inc.,*
    2012 WL 466785 (S.D.N.Y. Feb. 14 2012).....................................................19, 20

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)................................................................25, 26

*MASTR Asset Backed Secs. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC
  Mortg. Corp.*,
  No. 11-cv-2542, 2012 WL 539374 (D. Minn. Feb. 16, 2012) ("*MASTR*") ..........................6, 7

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  30 Misc. 3d 1201(A) (N.Y. Sup. Ct. Dec. 22, 2010) .................................................7

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  936 N.Y.S.2d 513 (N.Y. Sup. Ct. Jan. 3, 2012)......................................................7

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
  564 F. Supp. 2d 298 (S.D.N.Y. 2008) (Rakoff, J.) ...................................................4

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
  392 F. 3d 520 (2d Cir. 2004)........................................................................26

*Postlewite v. McGraw-Hill, Inc.*,
  411F.3d 63 (2d Cir. 2005)...........................................................................4

*Quiles v. Bradford-White Corp.*,
  2012 WL 1355262 (N.D.N.Y. Apr. 18, 2012) ........................................................25

*Shatkin v. McDonnell Douglas Corp.*,
  727 F.2d 202 (2d Cir. 1984).........................................................................33

*Syncora Guar. Inc. v. EMC Mortg. Corp.*,
  No. 09-cv-3106 (PAC), 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011) ...................................7

*Trust for Cert. Holders of Merrill Lynch Mortg. Passthrough Cert. Series 1999-C1 v.
  Love Funding Corp.*,
  No. 04-cv-9890 (SAS), 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005)....................................4

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004)...............................................................11

*United States v. Mejia*,
  545 F. 3d 179 (2d Cir. 2008).......................................................................25

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988)...............................................................17, 26, 27

*United States v. Rushing*,
  388 F.3d 1153 (8th Cir. 2004) (per curiam).........................................................18

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
     69 F. Supp. 2d 571 (S.D.N.Y. 1999), *aff'd*, 257 F.3d 256 (2d Cir. 2001) ..............................18

## STATUTES, RULES AND REGULATIONS

Fed. R. Evid. 401 .................................................................................................................1, 15

Fed. R. Evid. 702 ................................................................................................................ passim

Fed. R. Evid. 703 ...............................................................................................................21, 25

Flagstar Bank, FSB, Flagstar Capital Markets Corporation and Flagstar ABS, LLC (collectively, "Flagstar") submit this memorandum of law in support of their motions in limine to preclude the use of sampling as a method of proof by plaintiff Assured Guaranty Municipal Corp.'s ("AGM" or "Assured," formerly known as FSA), and to exclude the testimony and report of plaintiff's experts Nelson Lipshutz, Rebecca Walzak and Joseph Mason for failure to satisfy F.R.E. 702 and 401's requirements for admissibility.

## PRELIMINARY STATEMENT

AGM's entire case teeters atop a shaky foundation constructed of faulty statistical hypotheses and disconnected expert opinions.

First, AGM has committed to prove its case of Flagstar's alleged breaches of loan-level representations and warranties in two residential mortgage-backed securitizations insured by AGM through the use of statistical sampling. Notwithstanding that AGM is contractually bound to a loan-by-loan identification and repurchase of allegedly breaching mortgages, AGM purported to compile two statistically representative samples of loans within each of the two securitizations, from which it asserts it can validly "extrapolate" the frequency and dollar value of breaches onto the entire populations of underlying loans. Not only is this method of proof at odds with the plain language of the contracts that AGM seeks to enforce (the "Transaction Documents"), as well as the Court's prior rulings, but there is no proof in the record that the samples are in fact statistically representative with respect to key variables used by AGM's liability and damages experts. AGM's use of sampling and extrapolation as a method of proof is improper and should be precluded.

Second, the testimony and opinion of Rebecca Walzak, the expert retained by AGM to identify breaches of loan-level representations and warranties in the sample loans cannot pass

muster under F.R.E. 702.  Most notably, in forming her opinion Ms. Walzak failed to consider

two factors she finds important in determining liability:  (1) whether any loan performed

notwithstanding the alleged existence of breaches; and (2) whether alleged breaches caused a

loan to default.  Although Ms. Walzak's failure to consider criteria she would normally consider

as an expert alone renders her opinion inadmissible, her reports and testimony are rife with

numerous other flaws rendering it insufficiently reliable and relevant under F.R.E. 702.

Third, the remainder of AGM's experts' testimony is no more reliable and no better

connected to facts of the case than is Ms. Walzak's.  For example, the damages calculations of

Joseph R. Mason are illogical and do not comport with either the relevant facts or applicable law.

For the reasons set forth below, this court should preclude AGM's use of sampling as a

method of proof in this matter, and exclude the testimony of each of AGM's expert's under

F.R.E. 702.

## ARGUMENT

## I.  AGM SHOULD BE PRECLUDED FROM USING SAMPLING TO EXTRAPOLATE POOL-WIDE LIABILITY AND DAMAGES

### A.  The Transaction Documents Limit Assured To The Exclusive Cure Or Repurchase Remedy Which Requires Flagstar's Actual Awareness And Dictates Ensuing Procedural Protections

The Court explicitly limited AGM's remedies "to those related to enforcing Flagstar's

'cure or repurchase' obligations" set forth in the parties' contracts.  Am. Mem. dtd. Sept. 8,

2011, Doc. No. 43 at 2.  The relevant contract language is clear:  Flagstar is only required to cure

or repurchase an allegedly defective loan after it becomes aware of a material and adverse breach

of a representation or warranty in that loan.  Section 2.04(c) of the Sale and Servicing Agreement

for the 2006-2 securitization ("2006-2 SSA") creates an obligation to provide notice of any

breach discovered:

> If the Seller, the Sponsor, the Depositor, the Servicer, the Note Insurer, or a Responsible Officer of the Indenture Trustee *discovers* a breach of any of the foregoing representations and warranties, without regard to any limitation concerning the knowledge of the Seller and the Sponsor, that materially and adversely affects the interests of the Issuer, the Indenture Trustee under the Indenture, the Noteholders, or the Note Insurer in the Mortgage Loan, *the party discovering the breach shall give prompt notice* to the other parties and the Note Insurer.

Decl. of Stewart D. Aaron ("Aaron Decl."), Ex. A 2006-2 SSA § 2.04(c) (emphasis added).[1]

Flagstar's cure or repurchase obligation is keyed to the date upon which Flagstar "becomes aware" of a breach:

> The Seller *shall use all reasonable efforts to cure in all material respects any breach of any of the foregoing representations and warranties* (other than a breach of the representation and warranty in Section 2.04 by virtue of the repetition of the representation in Section 3.02(a)(6) of the Purchase Agreement) within 90 days *of becoming aware of it* or, not later than the Business Day before the Payment Date in the month following the Collection Period in which the cure period expired (or any later date that the Indenture Trustee and the Note Insurer consent to) ....

*Id.* § 2.04(d) (emphasis added).  Based on the above, the "notice" and "awareness" provisions are central, complementary components to Flagstar's cure or repurchase obligation.

If Flagstar fails in its obligations to cure a breach within the applicable 90-day notice period, "all interest … in the Defective Mortgage shall … automatically be retransferred … to [Flagstar]."  *Id.*  As previously noted by the Court,

> [t]he SSAs also set forth the process by which AGM's damages, if any, are to be calculated in the event of a repurchase.  The "Indenture Trustee," which the SSAs identify as the Bank of New York … "shall determine" if the repurchase "would cause a Transfer Deficiency" in the loan pools.  [SSA] § 2.07(a).  "If so, the Indenture Trustee shall notify [Flagstar] of the deficiency, [Flagstar] shall transfer to the [Trust] … Eligible Substitute

---

[1]   The relevant provisions of the 2006-2 and 2005-1 documents are substantively identical.

3

> Mortgage Loans or deposit … an amount in immediately available
> funds equal to the amount of the Transfer Deficiency."

Am. Mem. at 4.

Thus, AGM must make the threshold showing that Flagstar was aware of facts about a loan that constituted a material and adverse breach and yet failed to cure or repurchase the loan. Flagstar is also entitled to the contractual procedural mechanisms dictated by the Transaction Documents, none of which can occur by extrapolation.

### B. Sampling And Extrapolation Across The Loan Pool Is Inconsistent With The Transaction Documents

"In New York ... if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 305 n.10 (S.D.N.Y. 2008) (Rakoff, J.) (citing *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (citation and internal quotation marks omitted)).  The plain language of the contracts require that Flagstar be aware of alleged breaches before it is obliged to cure or repurchase, and further dictate that a repurchase is required only upon Flagstar's failure to cure breaches in a particular loan.  Following repurchase, Flagstar is to receive retransfer of the Defective Mortgage and must pay a Transfer Deficiency as calculated by the Indenture Trustee — there is no room for any other interpretation.

Here, the two complementary provisions of the Transaction Documents quoted above show that actual awareness of a breach as to a specific loan is required to trigger Flagstar's cure or repurchase obligation as to that loan.  Flagstar is obliged to cure or repurchase upon receipt of "prompt notice" from one of the parties upon the "discovery" of such a breach, and its ensuing awareness of the purported material and adverse breach.  *See* Aaron Decl. Ex. A 2006-2 SSA § 2.04(c), (d).  This structure is common in RMBS securitization agreements.  *See, e.g.*, *Trust for Cert. Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding*

*Corp.*, No. 04-cv-9890 (SAS), 2005 WL 2582177, at *7 (S.D.N.Y. Oct. 11, 2005); *LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02-cv-7868 (HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) ("[Defendant]'s obligation to cure or repurchase is triggered in either of two situations—when it receives notice of or when it discovers on its own a material defect in a mortgage loan or a breach of its representations and warranties in the PSA.").  Importantly, the Transaction Documents frequently refer to a single breach, eschewing the plural "breaches," which would have been used had the parties intended that Flagstar could become generally aware of pool-wide breaches.  *See* Aaron Decl. Ex. A 2006-2 SSA § 2.04(c) ("discovers a breach"); § 2.04(d) ("The Seller shall use all reasonable efforts to cure … any breach … within 90 days of becoming aware of it…."); § 2.04(e) (under the repurchase obligation, the seller must accept a transfer of a "Mortgage Loan as to which a breach has occurred and is continuing").  The Transaction Documents therefore do not reflect that the parties intended that Flagstar's knowledge as to some subset of breaches would create constructive awareness as to any and all breaches.  Neither would it be sensible to begin the running of the 90-day cure period from the date of inquiry notice, which could only be finally determined in the litigation context.  *See Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (noting the goal in interpreting a contract is to give effect to the intention of the parties); *In re Lipper Holdings LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.").  Reading such concepts into the contracts here is inconsistent with their plain language and the parties' intent.  Indeed, AGM's 2009 Demands show that it understood the Transaction Documents required identification of specific breaches associated with specific loans, asserting in a letter to Flagstar that purported breaches "are *described with specificity* in <u>Appendix A</u> with

respect to *each mortgage Loan identified therein*."  Aaron Decl. Ex. B FLAGSTAR 000020130-FLAGSTAR 000020156 (emphasis added).[2]

Moreover, the weight of authority does not support the use of sampling to show awareness.  A recent decision from the District of Minnesota (applying New York law) dismissed a plaintiff's breach of contract claim as to any loan not previously identified in its sample, and in doing so, rejected the use of sampling to prove awareness.  In *MASTR Asset Backed Securities Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, No. 11-cv-2542, 2012 WL 539374, at *1 (D. Minn. Feb. 16, 2012) ("*MASTR*"), the Trustee of a mortgage-backed securitization sued the two bank originators of the underlying loans.  The suit began after a review of a sample of 200 loan files purportedly identified "material breaches of the Originators' representations and/or warranties in 150 out of 200 Mortgage Loan files."  *Id.* at *1.  The Trustee then demanded that the banks repurchase certain of those loans and the banks refused.  *Id.*  The Trustee then sued the banks to force the repurchase of "all mortgages the Defendants sold the Trust, or otherwise reimburse the Trust for the bad mortgages."  *Id.*  The Court observed that the relevant contracts, especially the purchase agreements, "limit[ed] the remedy for breach to 'cure, substitute, or repurchase' of an allegedly defective mortgage."  *Id.* at *3.  The purchase agreement required that "*upon discovery* by the Company or Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans…, the party discovering such breach shall give prompt … written notice to the other."  *Id.* (emphasis added).

The Equifirst Defendant moved to dismiss any claims plaintiff alleged for loans not included in the original 200-loan sample, arguing:  "there can be no claim unless and until U.S.

---

[2]   Significantly, Flagstar cured or rebutted these Demands in their entirety and AGM never responded to those rebuttals.

Bank identifies the loans, provides EquiFirst timely notice, and EquiFirst wrongly fails to cure, repurchase or substitute," and to "'conclude otherwise would impermissibly read the notice and cure provisions out of' the contracts." Aaron Decl. Ex. C Mem. of Law in Supp. of EquiFirst's Mot. to Dismiss, filed Dec. 29, 2011, at 13-15 (citation omitted). As here, the plaintiffs in *MASTR* argued that the pervasiveness of the alleged breaches ("a 'stunning 75 percent [R&W] failure rate'") as evidenced by the reviewed sample was "more than sufficient to put Defendants on notice of breaches in all of the Loans in the Trust." Aaron Decl. Ex. D Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss the Compl., filed Jan. 19, 2012, at 10-14 (citations omitted).

The Court dismissed any claims as to loans outside the 200 loan sample:

> There is no dispute that U.S. Bank has never demanded that WMC or EquiFirst cure any defective loans other than the loans in the first sample. Thus, U.S. Bank's claims arising out of other loans, for which it has yet to give WMC and EquiFirst notice and an opportunity to cure, are not yet ripe.

*MASTR*, 2012 WL 539374, at *4. The result should be no different here.[3]

---

[3]     AGM has argued that sampling has been permitted in other RMBS cases, most notably by Justice Bransten in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 30 Misc. 3d 1201(A) (N.Y. Sup. Ct. Dec. 22, 2010). There, Justice Bransten provisionally allowed the use of sampling, but made "no finding that Plaintiff's proposed method is the only method by which Plaintiff (or Defendant) may present evidence or that Plaintiff's method is without flaw or unsusceptible to challenge." *Id.* at *5. Further, the *MBIA* case is distinguishable from the instant case and the *MASTR* case in two important respects. First, MBIA has alleged fraud and seeks recissionary damages for fraud and breach of contract, essentially arguing that the entire loan pool is subject to repurchase. Second, MBIA is not limited to the cure and repurchase remedy. *See MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 936 N.Y.S.2d 513, 527 (N.Y. Sup. Ct. Jan. 3, 2012). Similarly, in *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09-cv-3106 (PAC), 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011), Judge Crotty permitted the use of sampling, but also did not limit plaintiff to the exclusive "cure and repurchase" remedy based on the language of the transaction documents at issue there. *Id.* at *6-7. Neither case is persuasive here.

**C.     Even If Flagstar's "Awareness" Of Any And All Breaches Could Be Proved By Demonstrating Pervasiveness, Plaintiff Has Not Made Such A Showing**

At the outset of this litigation, AGM argued it could prove awareness by demonstrating that the Demands showed such pervasive material and adverse breaches that Flagstar was constructively aware of any and all breaches in both loan portfolios.  AGM's theory was accepted by the Court for purposes of ruling on Flagstar's motion to dismiss.[4]  *See* Am. Mem. at 17-18 (citing SSA §2.04(d)).

AGM has since expressly abandoned any attempt to prove awareness based on its Demands.  Instead, AGM has explained it intends to demonstrate awareness through its litigation sample.  In its June 2011 motion to permit the use of sampling, AGM acknowledged that it planned to use sampling to show awareness:

> [AGM] will also use sampling to demonstrate the pervasiveness of Flagstar's breaches, and will show that Flagstar — who was involved in the origination, underwriting, selection, packaging, and servicing of *all* the loans in the portfolio — became aware of these pervasive breaches long before this action was filed or AGM made a single specific repurchase request.

Aaron Decl., Ex. E Mem. of Law in Supp. of Pl.'s Motion *In Limine* Regarding the Use of Sampling ("Pl.'s Mem. in Supp. of Sampling"), at 10.[5]

Even if AGM could show Flagstar's "awareness" through sampling, which Flagstar contends is impermissible under the Transaction Documents, the Court and the parties must

---

[4]     As the Court itself recognized, its decision was limited to the motion to dismiss, and goes no further than concluding that AGM's allegations regarding awareness met the pleading standards. Although minimal allegations of awareness may be sufficient to survive the pleading stage, at trial, AGM must prove such allegations.  However, other than the suspect Walzak opinions (discussed below), such proof is lacking here.

[5]     AGM's counsel also reaffirmed AGM's intent to rely on the litigation samples to prove awareness during a hearing on AGM's assertion of privilege over documents and testimony concerning its investigative process leading up to its 2009 and 2010 Demands.  *See* Aaron Decl. Ex. F Tr. of Proceedings held Nov. 4, 2011, at 9-10, 19-20.

address the related issues of how to define and assess pervasiveness of material and adverse breaches. AGM will need to establish if and when Flagstar's "constructive awareness" was triggered, something it has not yet addressed.

AGM will undoubtedly argue that the breach rates alleged by its expert, Rebecca B. Walzak, of 85% in the 2005-1 sample and 67.5% in the 2006-2, demonstrate such pervasiveness as to constitute constructive awareness. As argued below, Ms. Walzak's breach rates are artificially inflated. In addition, Ms. Walzak's methodology and assumptions are fatally flawed. More fundamentally, it is undisputed that 79.3% of the loans in AGM's litigation samples as to which Plaintiff claims breaches exist have either paid in full or are current, something that Ms. Walzak simply ignores in claiming the existence of pervasive "material and adverse" breaches. *See generally infra*, Section II.B. Thus, even if Ms. Walzak's assumptions, methodology, and breach rates are accepted, the actual performance of the loans undermines AGM's argument that Flagstar should have been constructively aware of the pervasive material and adverse breaches: of the 800 loan sample, 610 loans are allegedly in breach. Of those 610, however, *484 were either paid in full or are current* as of October 2011 — no less than 5 years after origination and notwithstanding a deep recession and the most significant housing market decline in decades.

Beyond awareness, the exclusive cure or repurchase remedy to which AGM is bound does not permit trial by extrapolation. Extrapolation writes out of the Transaction Documents Flagstar's right to cure any purportedly material breach, receive a retransfer of the purportedly breaching loan and have the Indenture Trustee calculate any Transfer Deficiency, if any, on a purportedly breaching loan. The ability to cure is a meaningful right as shown by the pre-transaction due diligence process, in which large numbers of findings of alleged underwriting errors were successfully remediated and cured in an ongoing iterative process occurring between

the third party due diligence firms and Flagstar (which, notably, did *not* occur with Ms. Walzak, who made her findings entirely in a vacuum, without *any* dialogue or interaction with Flagstar).

Moreover, the fact that the Indenture Trustee recently calculated a zero Transfer Deficiency on three loans that Flagstar attempted to repurchase further demonstrates why Plaintiff cannot prove its case through extrapolation.[6]  To do so would likely result in Flagstar overpaying significant sums to the Trusts without any proper evidentiary showing and, more importantly, and would be in contravention of the Transaction Documents.

## II. THE TESTIMONY AND REPORTS OF AGM'S EXPERTS SHOULD BE EXCLUDED

Expert testimony is admissible only if it comports with Rule 702.  Rule 702 prohibits the admission of expert testimony unless it "will help the trier of fact to understand the evidence or to determine a fact in issue," "is the product of reliable principles and methods," "based upon sufficient facts or data," and "the expert has reliably applied the principles and methods to the facts of the case."  *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993).  Rule 702's "overarching subject" is the "evidentiary relevance and reliability … of the principles that underlie a proposed submission."  *Daubert*, 509 U.S. at 594-95.  Among other things, Rule 702 requires that "[p]roposed testimony ... be supported by appropriate validation — *i.e.*, 'good grounds,' based on what is known."  *Id.* at 590.  Crucially, it also requires experts to

---

[6]  Earlier this year, Flagstar became aware that certain loans apparently contained breaches of representations and warranties.  Consistent with the terms of the Transaction Documents, Flagstar advised the trustee that it discovered three loans appeared to contain breaches of R&Ws, and that Flagstar had not been able to cure such breaches within the 90-day period set forth in the Transaction Documents.  *See* Aaron Decl. Ex. G, March 21, 2012 letters from Matthew Roslin to Bank of New York Mellon Trust Co., FLAGSTAR 000394497-500.  Flagstar requested that the trustee immediately effect the retransfer to Flagstar of the subject loans, calculate the amount of any Transfer Deficiency and notify Flagstar of these amounts.  *Id.*  The trustee advised Flagstar that the Transfer Deficiencies were zero.  *See* Aaron Decl. Ex. H, Emails between Matthew Roslin and Bank of New York regarding Transfer Deficiency, FLAGSTAR 000394504-08.

employ the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The expert's proponent bears the "burden to demonstrate the reliability of [her] data." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004).  A court must evaluate each step and "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).  If any step renders an expert's analysis unreliable, the testimony should be deemed inadmissible.  *Id.*; *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (Rakoff, J.).

As with all evidence, expert testimony is inadmissible unless it is relevant.  *See Amorgianos*, 303 F.3d at 259; F.R.E. 401.  "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value."  *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002).  AGM has not met its burden under Rule 702 for any of its expert witnesses, and their opinions and reports should be excluded in their entirety.

### A.   Lipshutz's Testimony And Report Regarding The Construction Of The Purportedly Random Samples Should Be Excluded

Dr. Lipshutz created the loan samples on which the work of AGM's other two experts is based.  Dr. Lipshutz admitted that he sought to have his samples reflect the overall population distribution of the variables of particular relevance.  *See* Aaron Decl. Ex. I, Expert Report of Nelson R. Lipshutz, Ph.D.("Lipshutz Rep.") at ¶ 7.  Dr. Lipshutz notes that "any random sample runs the risk of not reflecting the overall population distribution of variables of particular

relevance." *Id.* However, he failed to use certain key variables that are of particular relevance to AGM's claims when testing the representativeness of the samples he constructed.

AGM's liability expert, Rebecca Walzak, identified the "certain key variables" that Dr. Lipshutz used in his analysis. *Id.* These are Geographic Distribution, Combined-Loan-to-Value ratio, Debt-to-Income ratio, Current Note Rate, Unpaid Loan Balance and Appraisal Type. *Id.* He "compared the sample distributions of these variables with the total population distributions," and found them to be the same at the 95% confidence level. *Id.* ¶¶ 7 & 11. He then concluded that "[t]he random samples which I constructed provide a sound basis for assessing the degree to which Flagstar failed to meet its contractual obligations." *Id.* ¶ 20.

With respect AGM's claims regarding breaches of the representations and warranties, Dr. Lipshutz fails to take into account payment status, i.e., the variables of whether loans were current, paid in full or defaulted. Ms. Walzak testified that a performing loan did not result in any loss to AGM. Aaron Decl. Ex. J, Dep. Tr. R. Walzak dtd. Dec. 19, 2011 ("Dec. 19. Walzak Tr.") at 199. Also, the damages calculated by AGM's expert, Dr. Mason, are based upon defaulted loans. *See* Aaron Decl. Ex. K, Second Supplemental Expert Rep. of Joseph R. Mason ("Mason Rep. II"). Yet, Dr. Lipshutz made no effort to determine if his loan samples are representative of the overall population with respect to current, paid-in-full or defaulted loans. Dr. Lipshutz also failed to consider whether the sample loans are representative of the overall population with respect to their original principal balances. As discussed more fully below, original principal balance is a key component of AGM's damages calculations.

With respect to AGM's servicing claims, Dr. Lipshutz fails to take into account the variable of loan delinquency. None of the variables considered by Dr. Lipshutz in constructing his samples are discussed in Ms. Walzak's Corrected Supplemental Rep., dated December 2,

2011, in which she opined on Flagstar's servicing of the loans in the securitizations.  Rather, Ms. Walzak focuses on the delinquency status of the loans.  Yet, Dr. Lipshutz made no effort to determine if his samples reflect the overall population distribution of delinquent loans.

Because Dr. Lipshutz has not shown that the samples are representative of the overall populations for variables particularly relevant to AGM's claims, AGM has not met its burden to show the reliability of those samples,  Dr. Lipshutz's report and testimony should be excluded.

### B.   Walzak's Testimony And Report Concerning Alleged Breaches Of Representations And Warranties Should Be Excluded

AGM retained Ms. Walzak to review two samples of 400 loans drawn respectively from the two pools of HELOCs supporting the insured notes at issue.  Aaron Decl. Ex. L, Corrected Expert Report of Rebecca B. Walzak dtd. Dec. 2, 2011 ("Walzak Origination Rep.") at 5.  She and a team of allegedly experienced underwriters reviewed each of the loans in the samples to determine whether the loans were underwritten in compliance with the representations and warranties in the Transaction Documents, the relevant underwriting guidelines and industry" practice.  *Id.* at 8.  Ms. Walzak also used a third-party firm, Digital Risk, which opined as to the existence of fraud and misrepresentation in the sample loan files.  Digital Risk, in turn, hired another firm, Clear Capital, to analyze appraisal issues.  *Id.*

Ms. Walzak purports to have identified loans containing breaches of representations and warranties which she refers to as so-called "Defective Loans."  *Id.* at 14.  Ms. Walzak claims that the breaches she alleges made the relevant loans riskier by making them less likely to perform. *See id.*  Ms. Walzak opines that the mere existence of such breaches materially and adversely affected AGM's interests in the loans because they increased the potential that AGM *might* pay claims.  *See id.*

In coming to this opinion, however, Ms. Walzak did not take loan performance into account, nor did she consider whether any of the loans that defaulted did so as a result of the purported breach of the representations and warranties.  Her purported breach rates of 85% in the 2005-1 securitization and 67.5% in the 2006-2 transaction are thus entirely unreliable.  This is most obviously shown by the fact that *over 80% of the loans in her two litigation samples paid in full or are current in their payments, and thus have not even defaulted*.

On February 15, 2012, *after* the submission of her report and testimony in this matter, Ms. Walzak published an article in the Mortgage Servicing News entitled, "A Fair Fight for Repurchases."  *See* Aaron Decl. Ex. M.  In that article, Ms. Walzak discusses the "boxing matches" that develop between a guaranty insurance agency (such as AGM) looking to force repurchases of loans onto originating lenders (such as Flagstar).  *Id.*  She explains "the [insurance] agencies seem to forget that we are in the business of risk.  Trying to find just any problem to justify forcing a repurchase for a defaulted loan is counter to the purpose of a guaranty fee."  *Id.*  She goes on to say, "*They should also be able to justify that the issue they are citing as the reason for repurchase is actually the driver of the default.*"  *Id.* (emphasis added).  Ms. Walzak goes on to make the following admission:

> *For repurchases to be fair, there should be a cause and effect relationship*.  So rather than looking for possible issues to throw back to the lender after the loan defaults, *the agencies should be able to prove that the issue or issues cited caused the default*.  In too many cases, this cause and effect relationship is missing, and random and unforeseen risk is what triggered a default.  *Random risk is what the guarantee fee is supposed to cover, after all*.  Yet every day lenders continue to face a battle in fighting repurchase requests.

14

*Id.* (emphasis added).  Because Ms. Walzak chose to disregard available data concerning loan performance and causation issues, her testimony — even by her own account — is unreliable and should be excluded.

1.  *Walzak Ignores Available Performance Data And Other Causation Factors*

While Ms. Walzak bases her opinions about materiality and adversity of interest on vague assertions of increased risk of default, she deliberately ignores the actual performance of the loans which bespeak such assertions.  Aaron Decl. Ex. J, Dec. 19. Walzak Tr. at 108:18-20 & 184:20-185:2.  Yet, Ms. Walzak admitted under oath that a loan which has performed does not result in a loss to AGM.  *Id.* at 199:13-17.

Ms. Walzak further testified that she has developed for use in her consulting business a proprietary "WRAPS" model, which correlates underwriting error to the loan's performance probability.  *Id.* at 105:4-13.  For instance, this model assigns a probability percentage to the likelihood of a given loan's performance based on certain underwriting mistakes.  *Id.* at 107:2-5. Ms. Walzak testified that she used the historical performance of the loans to develop the correlations and the model.  *Id.* at 106:6-12.  Based on her WRAPS model, Ms. Walzak opined that, to the extent underwriting errors, including fraud, affect loan performance, they will do so within the loan's first year of performance.  *Id.* at 108:5-12.  Notably, Ms. Walzak did not employ her WRAPS model here.  That is, she failed to utilize the methodology that she employs as an "expert" outside of court to the work that she performed in the context of the pending action, which is improper.  *See, e.g.*, *Amorgianos*, 303 F.3d at 268-69 (excluding as unreliable testimony of expert who failed to consider variables normally considered by experts in the field).

The factual record shows that of the 610 loans that Ms. Walzak alleges contain material and adverse breaches, 484, *or almost 80%*, were paid in full or current as of October 31, 2011.

*See* Aaron Decl. Ex. N, Expert Report of Jeffrey S. Nielsen ("Nielsen Report") at ¶ 36.  Of the remaining 126 loans that were charged-off or delinquent, *94% had performed for at least one year prior to becoming 90+ days delinquen*t.  *Id.* at ¶¶ 36, 40.[7]

Moreover, Ms. Walzak's review provides no consideration of events that occurred in the lives of debtors subsequent to the closing of the loans, neither did she consider the historic recession and massive downturn in the U.S. economy and the housing market that occurred shortly after both Transactions closed.  *See* Aaron Decl. Ex. O, Expert Report of Solutions Assocs. LLC Prepared by John R. Griggs, dated Dec. 22, 2011, Revised Jan. 1, 2012 ("Griggs Report") at ¶¶ 22, 23, 39-41.  Doing so would greatly affect her analysis.  The servicing notes Ms. Walzak had been provided revealed many instances where the borrowers made payments on time for several years before defaulting due to job loss or reduced income, divorce, unexpected illness, or even death of the borrower.  *Id.* at ¶ 39.  Ms. Walzak ignores these issues, yet acknowledges that the "4 D's," death, divorce, disease and disability, can affect loan performance, as can "strategic defaults," when a borrower who otherwise has the ability to pay decides, given the drop in his property value, to default on his HELOC.  Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 118:7-120:7.

"[C]ausation is an essential element of damages in a breach of contract action, and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) (quotation omitted) (emphasis in original).  The Second Circuit has held that the party bearing the burden of proof of damages *must* prove a causal link between the alleged damage and

---

[7]     Similarly, of the twelve "exemplar" loans that Ms. Walzak discusses in detail in her Report, *eight* of them paid in full or were current at the time she issued her Report and each of the remaining loans performed *over* twelve months from origination before going into default.

the alleged wrongful act and furnish evidence that the harm was not attributable to other causes.
*See United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1379 (2d Cir.
1988).  Under this standard, Ms. Walzak's opinions are unreliable and should be excluded.

> 2. *Walzak's Assumptions Are Contrary To The Record*

Ms. Walzak opined that the presence of allegedly breaching loans in the securitizations
invalidated the basis upon which AGM guaranteed the transactions.  Aaron Decl. Ex. L, Walzak
Origination Report at 15.  However, Ms. Walzak has no basis for her opinion since she was not
made aware of, and did not consider, the extensive pre-transaction due diligence under taken by
AGM.  *See* Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 202:10-24 (Redacted

).

Prior to entering into the Transactions, Assured used two firms to perform thorough due
diligence on a random, representative sample of the loan pool.  Notably, the pre-transaction
review resulted in *no findings of material underwriting exceptions*, deemed "Event Level 3."
*See* Aaron Decl. Ex. P, 2005 Executive Summary at 3; Ex. Q 2006 Executive Summary at 3.
Given Ms. Walzak's focus on the risk profile of the loans at closing, AGM's real-time due
diligence is critical, and is the best evidence of the quality of the loans, as well as AGM's risk
tolerance at the time of the closing of the Transactions.  Yet, Ms. Walzak simply ignores
AGM's pre-transaction due diligence, and does not even attempt to explain the wide disparity

between her claims of wide-spread breaches and AGM's contemporaneous finding of a 0% material breach rate.[8]

Ms. Walzak's failure to consider AGM's pre-transaction due diligence makes her analysis unreliable.  Under Rule 702, proffered expert testimony must be "applied reliably to the facts of the case."  Thus, "[e]xpert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, *or the facts of the case contradict or otherwise render the opinion unreasonable.*"  *United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004) (per curiam) (emphasis added); *see also Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999) ("[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case."), *aff'd*, 257 F.3d 256 (2d Cir. 2001).

> 3.    *There Is No Reliable Basis For Walzak's Opinion That Alleged Breaches Were Material And Adverse*

Ms. Walzak purports to have identified thousands of breaches that she claims "materially and adversely" affected AGM's interests.  *See* Aaron Decl. Ex. L, Walzak Origination Report at 14.[9]  Her eport and testimony, however, are devoid of any basis for her opinion, which is predicated on the equally unsupported opinion that the breaches "Redacted

" *Id*.  Ms. Walzak was unable to articulate any standard by which a level of risk was deemed unacceptably high.  Rather, she admitted that risk determinations

---

[8]    Indeed, Ms. Walzak identifies purportedly "material and adverse" breaches on 17 loans that were reviewed in AGM's pre-transaction due diligence and found to have no material issues. *See* Aaron Decl. Ex. N, Nielsen Report at 30-36.

[9]    Many of Ms. Walzak's allegations are duplicative or derivative of one another.  For example, Ms. Walzak will pile onto an allegation of missing income verification a derivative allegation that the debtor's debt-to-income ratio ("DTI") was calculated incorrectly, grossly inflating the actual number of alleged breach findings.

were left to the discretion of her "team" of reviewers, to whom she provided no meaningful

instruction or guidance:



Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 125:8-126:4.[10]  Ms. Walzak also conceded that two

different underwriters might come to different determinations of reasonableness.  *Id*. at 190:9-15.

The Southern District has recently held that such an ill-defined standard cannot form the

basis of an expert's opinion concerning an alleged material and adverse breach.  In *LaSalle Bank*

*National Association v. CIBC, Inc.*, 2012 WL 466785 (S.D.N.Y. Feb. 14 2012), the defendant's

expert was "asked to review and analyze whether [the defendant] breached specific

---

[10]    Ms. Walzak further testified that she did not feel she was required to give her team direction in part because each borrower and each loan's individual circumstances differed.  *See* Aaron Decl., Ex. J, Dec. 19 Walzak Tr. at 188:7-189:4. ("Redacted

").  This admission contradicts AGM's assertion that the loans underlying the securitizations are sufficiently similar such that sampling and extrapolation of liability and damages is fair and appropriate.

Representations and Warranties … in selling a certain mortgage loan to" the plaintiff.  *Id.* at *2.
The court excluded the expert's opinion regarding "material and adverse" breaches when the
expert was unable to sufficiently define the meaning of these terms, and held that any testimony
"opining on whether an event was material or adverse would be a mere *ipse dixit*, unsupported
by an articulable analysis."  *LaSalle*, 2012 WL 466785, at * 10, citing *Gen. Elect. Co. v. Joiner*,
522 U.S. 136, 146 (1997).  *See also In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223,
1249 (E.D.N.Y. 1985) ("Experts must ground their opinions on *verifiable propositions of fact*"
and "conclusions that 'rest upon conclusory and subjective opinions will not suffice.'")
(emphasis added), *aff'd*, 818 F.2d 187 (2d Cir. 1987) (quoting *DiRose v. PK Mgmt. Corp.*, 691
F.2d 628 (2d Cir. 1982)).  Here, Ms. Walzak did not employ any verifiable method or standard
for assessing purported increase of risk, but relied only upon her reviewers' subjective judgments
which she admits may not be consistent or systematic.

    4.    *Walzak's "Underwriting Survey" Is Unreliable*

    Ms. Walzak states that she based her determinations of underwriting reasonableness on a
self-administered survey of standards in the industry.  In 2007, Ms. Walzak contacted 20
allegedly experienced underwriters, the names of whom she could not recall, and asked them to
complete the survey which included a series of questions concerning the reasonableness of
certain loan-file documents and underwriting processes.  Aaron Decl. Ex. J, Walzak Dec. 19 Tr.
at 76:11-77:14; Ex. R, Underwriting Survey.

    When asked why she conducted the survey, Ms. Walzak stated that " Redacted

"  Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at

76:18-77:10.  Ms. Walzak had hoped to determine whether there was a "Redacted

_____"  *Id.*  With respect to why the

survey was used in the review of the loan files in this litigation, Ms. Walzak stated:



>       A.    Redacted
>
>       Q.    Redacted
>
>       A.    Redacted

*Id.* at 83:6-21.  Yet the results of Ms. Walzak's survey demonstrate that *no such consensus exists*.

*See* Aaron Decl. Ex. R, Underwriting Survey; Ex. J, Walzak Dec. 19 Tr. at 84:22-87:24 (showing

disparate results among surveyed underwriters on issues including compensating factors, stated

DTI ratios, and acceptable documents for validating income).  When questioned about these

discrepancies and how she reconciled them, Ms. Walzak stated: "Redacted

_____"  *Id.* at 86:13-18.

Ms. Walzak's survey is inherently flawed and can hardly constitute an "industry

standard" on which any reliable findings can be based.  Not only is the survey composed entirely

of unreliable hearsay statements, it demonstrates that oftentimes, no reasonable industry

consensus exists.  Federal Rule of Evidence 703 states that an "expert may base an opinion on

facts or data in the case that the expert has been made aware of or personally observed."  F.R.E.

703.  The trial court, however, must examine the data relied on, and require "at least that the

expert base his or her opinion on sufficient factual data [and] not rely on hearsay deemed

unreliable by other experts in the field."  *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. at

1244.  Ms. Walzak has not met that requirement here.

5.      *Walzak's Salary Surveys Are Unscientific And Unreliable*

Ms. Walzak and her reviewers relied heavily on data provided by salary.com and similar online salary surveys in determining whether a stated income in a loan file was "reasonable." Aaron Decl. Exs. S, Exhibit B to Walzak Origination Report for 2005-1 & Ex. T, Exhibit B to Walzak Origination Report for 2005-1, at question Redacted

Redacted

data on "Redacted

" and reflects the "Redacted

" of wages for that position.  *Id.* at 23:17-21, 147:20-148:9.  According to Ms. Walzak, if a stated income loan indicated an income in excess of the 90th percentile of the reported salary ranges, her reviewer would conclude that the loan *per se* "Redacted

" or a misrepresentation.  *Id.* at 142:8-1, 164:1-18.

Reliance on such online salary surveys is problematic for several reasons.  First, online salary surveys are only as reliable as the survey participants who choose to report salary information and the integrity of the specific methodologies by which such data are gathered and analyzed.  Because of this fundamental limitation, the data cannot be relied upon to definitively conclude, as Ms. Walzak does, that anyone reporting a salary on their loan application that exceeds the 90th percentile range must be misrepresenting his or her income.[11]  Second, salary.com reflects only *current* salary data and does not account for historical salary

---

[11]     While Flagstar's guidelines permitted underwriters to consult salary.com in evaluating a loan as a whole, Ms. Walzak relied upon this survey to establish definitive thresholds as to whether a borrower had affirmatively misrepresented her income.  *See* Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 259:24-260:4.  Given the obvious infirmities of salary.com, such reliance is overblown and misplaced.

information.  *See id.* at 23:10-23.  Ms. Walzak and her team thus assumed borrower

misrepresentation based on data reported five to seven years *after* the loans in question closed,

and *after* a massive downturn in the economy and recession of historic proportions dramatically

changed the national economy and employment environment.[12]  This methodology is not sound,

and the data relied upon is insufficient and unreliable.

> 6. *Walzak's Processes And Methods Are Unreliable*

The process by which Ms. Walzak ran her loan file review lacked sufficient control and

oversight, rendering its findings unreliable.  Ms. Walzak herself reviewed very few completed

loan files and left the bulk of the review of the 800 loans to her "team" of underwriters.  *See id.*

at 35:15-36:16.  Ms. Walzak provided the reviewers with a two-page protocol and Flagstar's

underwriting guidelines.  *Id.* at 12:16-14:11; Aaron Decl. Ex. U, Underwriter Protocol.  Per the

protocol's instructions, the underwriters were to consult a spreadsheet created by Ms. Walzak

containing 106 separate "yes/no" questions.  *See id.* & Aaron Decl. Exs. S, Exhibit B to Walzak

Rep for 2005-1 & T, Exhibit B to Walzak Rep for 2006-2.  After answering each question, the

underwriters were asked to " Redacted

"  Aaron Decl. Ex. U, Underwriter

Protocol.  Ms. Walzak did not meet with the underwriters, who were geographically dispersed, in

person, nor did she ever email them directly, preferring instead to conduct her communications

through another contact.  Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 21:17-22:5, 72:14-24.

Ms. Walzak testified that AGM's counsel separately contracted with a company called

Digital Risk, a " Redacted " to review the loans for potential borrower

---

[12]   While Ms. Walzak testified that her reviewers at times also considered the Bureau of Labor
Statistics ("BLS") to address the time discrepancy in the data, she could not articulate a method
or process as to when and under what circumstances BLS was used.  Aaron Decl. Ex. J, Walzak
Dec. 19 Tr. at 143:17-25.

fraud, and that she herself provided no written instructions to the company.  Aaron Decl., Ex. L,

Walzak Origination Report at 8; Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 132:5-17, 133:13-

134:2.  Ms. Walzak further testified that did not know what level of loan file review Digital Risk

performed in connection with its fraud determinations.  *See id.* at 267:9-20.  In fact, she was not

even aware that Digital Risk had possession of the complete loan files until counsel for AGM

informed her at deposition.  *See id.* at 266:22-267:8.  Digital Risk, in turn, contracted with a

company called Clear Capital to develop opinions of value with respect to the properties

underlying the loans in Ms. Walzak's samples. *See id.* at 134:15-22.  Ms. Walzak admitted that

she did not speak with any representatives from Clear Capital, *see id.* at 159:17-19, and did not

know if Digital Risk provided Clear Capital with any instructions, *see id.* at 138:25-139:4.  She

further testified: "Redacted

                                                                                                              ,"

which were sent directly to Digital Risk.  *Id.* at 138:9-12, 174:4-11.

     Ms. Walzak defended her lack of oversight and control by stating that she had "Redacted

                        ,"  *Id.* at 137:8-13.  Ms. Walzak's system of contracting with outside parties, who in turn

contracted with even further removed parties, produced unverifiable results that Ms. Walzak

herself often could not explain.  This haphazard and uncontrolled process not only renders her

breach findings unreliable, but also has deprived Flagstar of a genuine opportunity to challenge

the processes employed by these third parties.  The findings of purported breach should be

excluded.

     7.     *Walzak Impermissibly Adopted "Hearsay" Opinions*

     Finally, Ms. Walzak impermissibly adopted the hearsay opinions of her eight

underwriters as well as those of employees of Clear Capital and Digital Risk, forming an independent reason to exclude her testimony.  While F.R.E. 703 "allows an expert to opine based on hearsay or conclusions gathered through the assistance of other experts, the proffered expert must give *his own opinion* based upon *his own expert analysis*….  An expert cannot simply parrot the findings of another arrived at in another context."  *Quiles v. Bradford-White Corp.*, 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012) (emphasis added), citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664-66 (S.D.N.Y. 2007); *see also U.S. v. Mejia*, 545 F. 3d 179, 197 (2d Cir. 2008) (an expert "must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials… Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [party offering the expert testimony] to circumvent the rules prohibiting hearsay.") (internal quotations omitted).

As discussed above, Ms. Walzak outsourced the review of 800 loan files in AGM's sample to eight underwriters.  Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 14:17-19, 18:3-6, 35:15-36:16.  Each of these underwriters made subjective determinations concerning the existence of purported breaches and whether such alleged breaches "fundamentally changed the risk profile in the loans in question," determinations which Ms. Walzak adopted without any reflection or inquiry.[13]

Further, Ms. Walzak did not have an understanding of the fraud review process employed by Digital Risk, nor did she even bother to speak to Clear Capital, review their reports or understand their methods.  *See id.* at 132:8-10, 136:24-137:7; 138:9-12.  Although Ms. Walzak

---

[13]    Ms. Walzak testified that she checked the findings made by her reviewers only if they concerned compliance with Flagstar's specific guidelines, which only accounted for approximately 26 of the 106 questions listed in her Exhibit B of her report.  Aaron Decl. Ex. J, Walzak Dec. 19 Tr. at 45:11- 46:16; 49:16-22; Aaron Decl. Exs. S & T.

claims that 14% of the 2005-1 loan sample and 19.75% of the 2006-2 loans sample allegedly contain borrower fraud or misrepresentation, unsurprisingly, she was unable to explain how this number was derived.  *See id.* at 126:2-129:18.  The work product of Digital Risk and Clear Capital appears to have been simply "cut and pasted" into Ms. Walzak's findings, without any analysis or insight by Ms. Walzak.  *See id.* at 150:22-151:6.

Ms. Walzak served merely as a "mouthpiece" for determinations made by others.  These individuals were not produced as experts, did not submit their own reports and Flagstar has not deposed them.  *See Malletier*, 525 F. Supp. 2d at 664.  The opinions of these individuals are inadmissible hearsay which pervade Ms. Walzak's testimony and should be excluded.  For this and the many reasons discussed above, Ms. Walzak's Report and testimony is riddled with insurmountable issues that preclude their consideration at trial.

### C.   Mason's Testimony And Report Concerning Damages For Alleged Breaches Of Representations And Warranties Should Be Excluded

To start, the entirety of Dr. Mason's origination damages analysis is predicated on the work of both Dr. Lipshutz and Ms. Walzak.  *See* Aaron Decl. Ex. V, Dep. Tr. J. Mason dtd. Jan. 4 & Feb. 13, 2012 ("Mason Tr.") at 22:14-23:13, 215:15-22 & 318:12-19.  Should the Court preclude either of these analyses, Dr. Mason's analysis must also fall.  Dr. Mason's analysis also fails to support an essential element of AGM's breach of contract claim, that the alleged breaches caused AGM's alleged damages.  *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F. 3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." (emphasis in original)).  Dr. Mason does not identify a single alleged breach as the cause of a single penny of alleged damages, or even attempt to control for other causes.  *See U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1378-79 (2d

Cir. 1988) (a "plaintiff's proof of amount of damages … must provide … a reasonable basis upon which to estimate the amount of its losses caused by other factors, such as … a general recession").  Dr. Mason's analysis suffers from other numerous flaws rendering it so unreliable that it should be excluded.

>    1.    *AGM Failed To Establish That The Samples Were Representative Of Defaulted Loans In The Transactions*

Dr. Mason inappropriately uses AGM's statistical sample in his damages calculations, which are based on defaulted loans.  Dr. Mason calculates an "Adverse Defect Rate" and an "Underwriting Defect Rate," which he then uses to determine what percentage of losses experienced by the transactions he attributes to the alleged breaches identified by Ms. Walzak. *See* Aaron Decl. Ex. K, Mason Rep. II at 5.  Dr. Mason defines his Underwriting Defect Rate as the original principal balance of allegedly breaching loans divided by the original principal balance of all loans in the transaction.  *See id.* at 4-5.  He defines his Adverse Defect Rate as the original principal balance of allegedly breaching loans that have defaulted as of a given "frustration date" divided by the cumulative gross liquidation losses for all loans that have defaulted as of the frustration date.  *See id.*  Dr. Mason then applies these Defect Rates to the entire losses experienced by the transactions in whole, on the apparent basis that he can validly extrapolate the characteristics of the defaulted loans in AGM's samples to the defaulted loans in the pools' entire populations.  *See id.* & Ex. I, Lipshutz Rep. ¶ 20.

However, even though Dr. Mason analyzed defaulted loans (*i.e.*, loans which are no longer paying), neither he nor Dr. Lipshutz tested whether the frequency of defaulted loans in the samples were sufficiently similar to that frequency in the transactions as a whole.  Thus, there is no evidence in the record that the samples used by AGM are representative of the entire populations with respect to defaulted loans.

Dr. Mason's Adverse Defect Rate damages calculations therefore rest on a completely untested hypothesis, *i.e.*, that the breach rate observed in defaulted loans in each of AGM's samples is representative of the breach rate for all the defaulted loans in each pool.  Because AGM has not even attempted to offer any evidence that this hypothesis is correct, Dr. Mason's opinions in these scenarios are insufficiently reliable to pass muster under F.R.E. 702 and *Daubert*.  *See Compania Embotelladora Del Pacifico,* 650 F. Supp 2d at 320 (precluding expert testimony in part because it was based on "unsupported assumptions").

> ### 2.    *AGM Failed To Establish That The Samples Were Representative Of Original Principal Balance of Loans In The Transactions*

Another fatal flaw is Dr. Mason's use of the original principal balance of loans to calculate damages.  Dr. Lipshutz did not examine whether the original principal balances of the loans in his samples were representative of the original principal balances of the loans in the transactions.  *See* Aaron Decl. Ex. I, Lipshutz Rep. ¶ 19.  Instead, Dr. Lipshutz subjected the unpaid principal balances of the sample loans at the time they were included in the transactions to the chi-squared test.[14]  *See id.* ¶ 16.  Because there is no evidence in the record that the original principal balances of the loans in the samples are representative of the original principal balances of the loans in the transactions, any calculation using the sample loans' original balances rests on an untested assumption, and is unreliable.

Dr. Mason's Underwriting and Adverse Defect Rate calculations use the sample loans' original principal balances to move from the number of allegedly breaching loan units to the dollar amount of damages Flagstar purportedly owes AGM.  *See* Aaron Decl. Ex. K, Mason Rep. II at 5.  To the extent that the original principal balances of the loans in the samples are larger

---

[14]    Unpaid principal balance is the amount of the original line of credit a borrower used, not the entire amount of the line of credit.  *See, e.g.*, Aaron Decl. Ex. FF, LIPSHUTZ_00101.

than the average principal balances of the loans in the transactions, Dr. Mason's damages

numbers are inflated, prejudicing Flagstar.  Because AGM has failed to carry its burden to

demonstrate that Dr. Mason's analysis is reliable in this regard, it should be excluded.

>   3.   *Dr. Mason Improperly Calculates Higher Damages The Later In Time*
>        *AGM Alleges Flagstar Purportedly Knew Of Alleged Breaches*

Dr. Mason's analysis is also unreliable because it inexplicably requires Flagstar to pay

more damages the later in time that AGM alleges Flagstar purportedly knew of alleged breaches,

even though the total defaulted principal balance of the loans for which AGM alleges it is owed

damages does not change over time.  Dr. Mason calculates Defect Rates that purport to account

for various "frustration dates" by which AGM alleges Flagstar should have been aware of the

alleged breaches.  *See* Aaron Decl. Ex. K, Mason Rep. II ¶ 7.  The four "frustration dates"

represent the transactions' closing dates, the date of AGM's first repurchase demands, the date

AGM commenced this action, and the date of Ms. Walzak's origination report.  *See id.* ¶ 7.  Dr.

Mason then applies these rates both retrospectively to allegedly breaching loans that defaulted

before the "frustration date," and prospectively to allegedly breaching loans that defaulted after

the "frustration date"; thus, Dr. Mason applies any given frustration date's defect rate to all loans

AGM alleges contain breaches that defaulted both before and after that date.

These frustration dates are irrelevant for any purpose.  As discussed in Section I *supra*,

the contracts AGM seeks to enforce mandate that Flagstar have actual knowledge of material and

adverse breaches in specifically identified loans—rather than constructive knowledge of the

possibility that unknown breaches may exist in unidentified loans—in order to trigger its cure or

repurchase obligations.  That said, the total number of loans containing alleged breaches that

defaulted, and the total defaulted principal balance, does not change, in fact or in Dr. Mason's

analysis, based on when AGM alleges Flagstar knew about the alleged breaches.  Therefore,

logically, neither should the amount of any damages AGM alleges against Flagstar depend on

Dr. Mason's "frustration dates."

Yet, for the 2006-2 transaction, the later in time that AGM charges Flagstar with

constructive knowledge of the alleged breaches, the higher the defect rate Dr. Mason applies to

determine the amount Flagstar should repurchase.  For the 2005-1 transaction, the Adverse

Defect rate fluctuates, but is at all times higher than the Underwriting Defect Rate.

| Trust | Origination Underwriting Defect Rate | January 26, 2009 Adverse Defect Rate | April 25, 2011 Adverse Defect Rate | November 28, 2011 Adverse Defect Rate |
|-------|-----------|-----------|-----------|-----------|
| 2005-1[15] | 84.50% | 87.59% | 86.05% | 86.05% |
| 2006-2[16] | 75.56% | 75.73% | 84.56% | 84.56% |

As shown above, the Adverse Defect Rate assuming that Flagstar first had actual

knowledge of the alleged breaches in loans in the 2006-2 transaction in April of 2011 is almost

nine percentage points higher than the applicable rate had Flagstar learned of the breaches in

January 2009, even though the total number of loans and principal balance to which these two

rates apply are the same.  The Adverse Defect Rate for January 2009 is 17 basis points higher

than the Underwriting Defect Rate applicable for  the 2006-2 Transaction's offering date.  Thus,

Dr. Mason incredibly would require Flagstar to cover more of the transactions' actual losses

depending on when Flagstar learned of the alleged breaches, even though neither the total losses

nor the total number of loans with breaches depend on when Flagstar acquired such knowledge.[17]

Dr. Mason offers no explanation or basis this effect, and, indeed, there can be none.  Dr. Mason's

---

[15]   *See* Aaron Decl. Ex. W, Mason Dep. Ex. 15.

[16]   *See* Aaron Decl. Ex. X, Sample Defaults Workbook 2005-1.

[17]   Dr. Mason's methodology was not an attempt to deal with the time value of money, since he separately applies interest to Flagstar's repurchases.  *See, e.g.*, Aaron Decl. Ex. V, Mason Tr. at 303:23-304:9.

methodology is simply flawed, and his analysis should be excluded.

          *4.     Dr. Mason's Origination Damages Analysis Is Not Relevant*

      In addition to being unreliable, Dr. Mason's damages analysis is inconsistent with the cure and repurchase remedy to which the Court held AGM is bound.  Even were the Court to find that Dr. Mason's analysis is sufficiently reliable, it should be precluded because of its disconnect from the facts of this case.  Dr. Mason insists that the damages he calculates should be paid to AGM rather than to the securitization trusts themselves as required by the provisions of the sole remedy.  *See, e.g*, Aaron Decl. Ex. A, 2006-2 SSA §§ 2.04(c, d) & 2.07(a) (requiring Flagstar to "deposit into the Custodial Account an amount in immediately available funds equal to the amount of [any] Transfer Deficiency").  This Court has already ruled that AGM "is limited to remedies that are commensurate" with the sole remedy.  Am. Mem. at 14.  Dr. Mason nonetheless repeatedly opines that Flagstar must pay damages directly to AGM.  *See* Aaron Decl. Ex. K, Mason Rep. II ¶ 5.[18]

      Further, as discussed in Section I *supra*, sampling as used by Dr. Mason is inconsistent with the sole remedy.  The cure and repurchase remedy for which Flagstar and AGM bargained specifically provides that Flagstar be given 90 days to cure any breach after becoming aware of it.  *See* Aaron Decl. Ex. A, 2006-2 SSA § 2.04(c, d).  Extrapolations of sample breach rates to the broader pool population do nothing to identify any specific breaches in any specific loans such that Flagstar may be given its contractual right to cure them.  Neither do such extrapolations identify specific loans for which Flagstar must accept retransfer in the event breaches cannot be cured.

---

[18]   As noted earlier, requiring Flagstar to pay AGM damages, rather than the securitization trusts pursuant to the mechanism of the sole remedy, exposes Flagstar to duplicative damages claims as there would be nothing to prevent the trustee from invoking the sole remedy to force Flagstar to repurchase the same loans for which AGM was paid.

As shown by Flagstar's rebuttal to Ms. Walzak's origination report, there are numerous disagreements over what constitutes a breach. *Compare* Aaron Decl. Ex. O, Griggs Report *with* Aaron Decl. Ex. L, Walzak Origination Repor.  Many purported breaches, such as missing paperwork, can be cured retrospectively, even after a loan has been charged-off.  *See* Aaron Decl. Ex. Y, Dep. Tr. M. Scott Tr. dtd. Oct. 27, 2011 at 215:24-216:19 (testifying that "missing docs [such as] employment verifications, for instance, can be completed today on someone's employment five years ago and you've cured the item").  The correction of other alleged errors, such as incorrect debt or income amounts, may result in a loan still being underwritten in accordance with applicable guidelines.  *See* Aaron Decl. Ex. Z, Dep. Tr. L. Terrasi dtd. Dec. 19, 2011 at 39:10-20 (testifying that even were an underwriter to initially incorrectly calculate a ratio, it does not mean that the correctly calculated ratio "does not qualify for a particular product").  Extrapolations to derive repurchase amounts that are not tethered to specific breaches in specific loans deprive Flagstar of its bargained-for right to cure and is completely incongruent with the sole remedy to which the Court held AGM is bound.

Dr. Mason's analysis specifically rests on the assumptions that all the breaches identified by Ms. Walzak are in fact breaches, that Flagstar did not cure any of these breaches, and that Flagstar would not be able to cure any of the breaches identified by extrapolation onto the entire Transactions upon becoming aware of them.  *See* Aaron Decl. Ex. V, Mason Tr. 22:14-23:13, 215:15-22 & 259:23-262:23.  Given both the rebuttal that Flagstar made to Ms. Walzak's allegations of breaches for charged off loans, and Flagstar's success at clearing exceptions during AGM's due diligence, these assumptions are clearly incorrect.  *See generally* Aaron Decl. Ex. O, Griggs Report & Ex. N, Nielsen Report ¶¶ 20-32.  Resting on unrealistic assumptions, Dr. Mason's analysis has no relevance to this case.

Dr. Mason also ignores the fact that the sole remedy gives Flagstar 90 days after becoming aware of a breach before its repurchase obligation is triggered.  *See* Aaron Decl. Ex. A, 2006-2 SSA § 2.04(c, d) & Ex. V, Mason Tr. 262:24-264:23.  His analysis assumes that Flagstar's repurchase payments were due at the same time that Assured made a demand.  This starts the clock ticking on any interest due on Dr. Mason's monthly repurchase payments 90 days earlier than the sole remedy provides.  Dr. Mason's erroneous assumption fails to comport with the sole remedy's provisions, overcharges Flagstar interest, and inflates AGM's damages; as such, his testimony should be precluded.  *See Boucher v. US Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (noting that "expert testimony should be excluded … if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith'" (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)).

Dr. Mason used an incorrect interest rate for certain of his calculations, knowing that the parties' contract provided for a different rate.  The I&I specifically states that payments made to AGM pursuant to the I&I "shall bear interest at the Late Payment Rate from the date when due to the date paid."  Aaron Decl. Ex. AA, 2006-2 I&I § 6.03; *see also id.*, Appendix I (defining "Late Payment Rate").  Dr. Mason applied New York's statutory prejudgment interest rate to payments after a frustration date, even as he used the contract interest rate for payments up to that frustration date.  *See* Aaron Decl. Ex. V, Mason Tr. at 303:23-304:9.  It is black letter law that contract rates supersede statutory rates.  *See, e.g.*, *In re Best Payphones, Inc.*, No. 01-15472 (SMB), 2003 WL 1089525, at *5 (Bankr. S.D.N.Y. Mar. 10, 2003) (contract rather than statutory rate applied where contract stated interest accrued on unpaid invoices beginning on the date payment was due).  Dr. Mason also did not account for recoveries Flagstar collected on defaulted loans, and applied his Defect Rates to gross liquidation losses instead of liquidation losses net of

recoveries.  *See* Aaron Decl. Ex. K, Mason Rep. II at ¶ 7 & Ex. V, Mason Tr. 280:5-20 & 285:9-14.  This failure improperly inflates AGM's damages.

Dr. Mason also purports to calculate as damages the servicing fees paid in respect of allegedly breaching loans on the basis that had the loans been repurchased, no servicing would have been necessary.  *See* Aaron Decl. Ex. BB, Suppl. Expert Rep. of Joseph R. Mason Damages, dtd. Nov. 29, 2011 ("Mason Rep. III") ¶¶ 2-5.  Dr. Mason's damages calculations in this respect include loans that have paid in full and are currently not in default.  *Id.* ¶ 2 (referring to Ms. Walzak's total breach rates for the transactions).  AGM derived, and continues to enjoy, the full benefit these loans' servicing as payments were, and for current loans are still, being collected on behalf of the securitizations.  Dr. Mason's analysis also does not consider whether and to what extent servicing defaulted loans resulted in any borrower payments, given that a loan may have paid for months before it defaulted.  Dr. Mason's analysis requires Flagstar to reimburse the entirety of the servicing fees in these instances, even though some payments may have been collected for the benefit of the securitizations.

Dr. Mason's analysis is neither reliable nor relevant.  Having failed to meet the standards of F.R.E. 401 and 702, Dr. Mason's testimony is inadmissible and should be excluded.

### D.  Walzak's And Mason's Testimony And Reports Concerning Alleged Servicing Breaches And Damages Should Be Excluded

Ms. Walzak's opinions on Flagstar's servicing obligations are unreliable, based on incomplete and insufficient information, and fail to satisfy the requirements of Rule 702.  Ms. Walzak is unable to articulate the basis for her opinions, and the processes and methods she used are haphazard and inconsistent.  Furthermore, Ms. Walzak fails to account for a number of highly relevant facts and issues, including the standard by which Flagstar may be held liable under the contracts.  Finally, even if one were to assume that, through her faulty analysis, she

correctly identified a servicing error, she has failed to consider causation or to meaningfully

demonstrate that her purported servicing "errors" had any effect on the securitizations or AGM.

Indeed, under the inappropriately lax standard applied by Ms. Walzak, 98% of the loans in her

samples were either (i) paid in full or current; (ii) found to be "compliant"; or (iii) found to

contain purported errors that, in Ms. Walzak's own words, were "Redacted" to lead

to any "Redacted."  Ms. Walzak's opinions are therefore also irrelevant and

should be struck.

            1.     *Ms. Walzak's Opinion Regarding Flagstar's Alleged Servicing Breaches*
                 *Lacks Any Reliable Foundation Or Support*

Ms. Walzak's opinions are based primarily on her understanding of "Customary

Servicing Practices."  Although "Customary Servicing Practices" is defined by the parties'

contracts, Ms. Walzak's understanding of this term is not connected to this definition.  *See* Aaron

Decl. Ex. CC, 2006-2 Glossary of Defined Terms at 4 ("[P]rocedures that the Servicer

customarily employs … in accordance with accepted mortgage servicing practices of prudent

lending institutions servicing Mortgage Loans of the same type as the Mortgage Loans in the

jurisdictions in which the related Mortgage Properties are located.").  She purportedly derived

her standard in part from a vague compilation of FNMA and FHLMC servicing guidelines.  *See*

Aaron Decl. Ex. DD, Dep. Tr. R. Walzak dtd. Dec. 20, 2011 ("Walzak Dec. 20 Tr.") at

93:4-94:3.  The loans at issue here are not FNMA or FHLMC loans, but HELOCs.  Further, Ms.

Walzak's understanding is without any reliable basis.  She admits that her subjective definition is

not published or documented anywhere, and is in part based on what she deemed to be the "Redacted

"  *See id.* at 79:24-80:06 &

93:4-94:3.

Ms. Walzak lacks the expertise necessary for this Court to admit her "belief" as to what constitutes servicing "best practices."  Ms. Walzak has not been employed as a servicer since the mid-1980s, when she managed a small bank's origination and servicing operations for only one year.  *See id.* at 8:16-9:25.  Ms. Walzak has not had a single servicing-related consulting engagement since March 2007, including during the recent economic collapse which caused unprecedented changes in the field of mortgage servicing.  *See id.* at 21:25-24:13.  Neither is Ms. Walzak's "belief" based on any operational reviews of servicers during the 2007-2010 time period.  *See id.* at 104:19-105:17.  Instead, Ms. Walzak based her opinion of what constituted a "Customary Servicing Practice" in 2007-2010 on informal conversations with specialty servicers; when asked how she confirmed whether these specialty servicers abided by their published procedures, Ms. Walzak stated: "Redacted

"  *See id.* at 105:14-17.

Ms. Walzak's understanding of a "Customary Servicing Practice" lacks any reliable or verifiable basis.  She is unable to detail the standards by which she gained this understanding, neither did she confirm the veracity and reliability of her alleged sources.  Under *Daubert*, Rule 702 requires more.

       2.    *Ms. Walzak's Processes And Methods Are Unreliable*

Ms. Walzak testified that employees of the Weston Portfolio Group were asked to review the servicing files of the sampled loans and "Redacted

"  *See id.* at 231:5-10.  She did not examine any of her reviewers' résumés, and left the decision of whom to employ up to Weston.  *Id.* at 231:25-232:16.

Not surprisingly, Ms. Walzak did not provide these reviewers with any standards regarding "Customary Servicing Practices," and indeed, did not provide any instructions or guidance at all.  *See id.* at 233:16-234:4.  Ms. Walzak testified that the reviewers "Redacted

" *Id.* at 233:18-22.  Ms. Walzak left it up to each individual reviewer to distill each of these varied sources and to subjectively determine what comprised a "Customary Industry Practice" and whether Flagstar complied.  This haphazard and unreliable process resulted in findings that cannot be verified or replicated in any meaningful way.  Ms. Walzak's lack of standardization or oversight of the reviewers—whose qualifications even she has not evaluated—resulted in an unreliable process, the results of which must be excluded.

3.　　*Ms. Walzak's Opinion Fails To Account For Numerous Determinative Facts And Is Therefore Irrelevant*

Ms. Walzak fails to account for a number of critical facts, rendering her opinion irrelevant.  Ms. Walzak patently ignores the standard under the SSA, which clearly premises Flagstar's liability for servicing on "misfeasance, bad faith or gross negligence," and absolves Flagstar for acting in "good faith" and "for errors in judgment."  Aaron Decl. Ex. A, 2006-2 SSA § 5.03.  Yet, Ms. Walzak applied a "Customary Servicing Practices" standard purportedly based on best practices, a standard far more exacting than that required by the parties' contracts.

Ms. Walzak's findings do not approach the level of "misfeasance, bad faith, gross negligence" or "recklessness."  Under her best practices standard, Ms. Walzak purports to have uncovered servicing breaches on 32% of the 2005-1 sample and 50.2% of the 2006-2 sample.  These figures, however, include findings:  a) of alleged breaches that "Redacted

"; b) of alleged breaches "Redacted

Redacted; and c) that "Redacted" If

Ms. Walzak cannot commit to a liability determination after her review, clearly no actionable

misfeasance, bad faith, gross negligence or recklessness has occurred.[19]

Moreover, virtually all of the defects Ms. Walzak identified in her report were placed in a

category for loans where "Redacted

Redacted" or where something else in

the file "Redacted"  Aaron Decl. Ex. DD, Walzak Dec. 20 Tr. at

167:10-15.  The few remaining purportedly more serious designations out of the 800 loan sample

involved judgment calls, such as hiring a third party to assist in the collection of loans or

foreclosure.  *See id.* at 179:3-186:22 & 202:4-203:22.  At worst, these are no more than mere

"errors in judgment" that the SSA specifically excludes as a basis for liability.  Aaron Decl. Ex.

A, 2006-2 SSA § 5.03.

Ms. Walzak's opinion also ignores the fact that Flagstar was severely restricted by the

parties' contracts in its ability to engage in meaningful loss mitigation on delinquent loans or

those that were at risk of becoming delinquent.  *See* Aaron Decl. Ex. DD, Walzak Dec. 20 Tr. at

165:7-168:19; Ex. A, 2006-2 SSA § 3.02(a) (without the consent of the trustee or AGM, Flagstar

was limited as a servicer to waiving late payment charges, short-term repayment plans or

foreclosure).  Further, Assured prevented any meaningful loan modifications to take place by

failing to respond to Flagstar's requests in a timely manner.  *See* Aaron Decl. Ex. DD, Walzak

Dec. 20 Tr. at 166:12-168:5.  Although Ms. Walzak testified that Flagstar could not engage in

meaningful loss mitigation efforts, *id.* at 69:22-70:8, she inexplicably states in her report that

Flagstar failed to "Redacted

---

[19]   These findings also make clear that nothing in Ms. Walzak's servicing analysis supports a conclusion that these alleged breaches caused any losses, let alone damages, to AGM.

Redacted ” Aaron Decl. Ex. EE, Corrected Supplemental Expert Report of

Rebecca B. Walzak dtd. Dec. 2, 2011 ("Walzak Servicing Report") at 17.  Ms. Walzak's

opinions are divorced from the facts and should therefore be excluded as irrelevant.

### 4.  *Dr. Mason's Servicing Damages Calculations Should Be Excluded*

Dr. Mason purported to calculate damages arising from AGM's allegations of Flagstar's

breach of its servicing obligations.  *See* Aaron Decl. Ex. BB, Mason Rep. III ¶¶ 6-7.  Since this

analysis rests on Ms. Walzak's flawed testimony identifying purported servicing breaches, it is

unreliable and should be precluded.  *See id.*  This aspect of Dr. Mason's testimony is defective in

that Dr. Mason does not account for loans that have paid in full or are current, or for the

servicing work done in collecting and administering payments on those delinquent loans that

performed for some period of time before default.

Dr. Mason's servicing damages calculation is also flawed in that it is based on samples

that AGM has failed to demonstrate are indeed random with respect to key servicing variables.

Ms. Walzak testified that the payment status of a loan was an important factor in determining

whether a loan is serviced appropriately.  *See* Aaron Decl. Ex. EE, Walzak Servicing Report at

11-13.  As noted above, Dr. Lipshutz did not consider whether the distribution of the payment

statuses of loans in the sample was sufficiently similar to the distribution of payment statuses of

the loans in the transactions, and there is no evidence in the record that the sample is

representative of the entire population with respect to payment status.  *See* Aaron Decl. Ex. I,

Lipshutz Rep. ¶ 19.

As such, Dr. Mason's servicing damages analysis is no more reliable or relevant than his

origination damages analysis and should likewise be excluded.

## CONCLUSION

For the foregoing reasons, AGM should be precluded from using sampling and extrapolation as a method of proof, and the reports and testimony of Dr. Lipshutz, Ms. Walzak and Dr. Mason should be excluded.

Dated: May 31, 2012
      New York, New York

                    ARNOLD & PORTER LLP

                    By:   /s/ Stewart D. Aaron
                        Veronica E. Rendón
                        Stewart D. Aaron
                        Susan L. Shin
                        399 Park Avenue
                        New York, New York  10022
                        Tel:  (212) 715-1000
                        Fax:  (212) 715-1399
                        *Veronica.Rendon@aporter.com*
                        *Stewart.Aaron@aporter.com*
                        *Susan.Shin@aporter.com*

                        *Attorneys for Defendants Flagstar Bank, FSB, Flagstar Capital Markets Corporation and Flagstar ABS, LLC*