**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., <br><br> Plaintiff, <br><br> vs. <br><br> FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, <br><br> Defendants. | Civil Action No. 11–CIV–2375 (JSR) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS *IN LIMINE* AND TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY**

Jacob W. Buchdahl
Arun Subramanian
Warren Burns
Joseph Portera
SUSMAN GODFREY LLP
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 336-8330

*Attorneys for Plaintiff Assured*
*Guaranty Municipal Corp.*

## Table of Contents

Page No(s).

INTRODUCTION ....................................................................................................1

ARGUMENTS & AUTHORITIES ..........................................................................3

I.    LEGAL STANDARDS .................................................................................3

      A.    Rule 702's Admissibility Standard is "Flexible" ............................3

      B.    Expert Testimony is Presumptively Admissible in a Bench
            Trial .................................................................................................4

II.   FLAGSTAR'S SAMPLING ARGUMENT IS UNTIMELY AND
      MERITLESS .................................................................................................6

      A.    Flagstar Waived its Categorical Objection to Sampling .................6

      B.    Flagstar's Categorical Objection to Sampling is Meritless ...........7

      C.    The Caselaw Supports the Use of Sampling .................................10

      D.    Flagstar's Post-Litigation "Self-Help" Is Irrelevant To This
            Case ...............................................................................................12

III.  THE TESTIMONY OF ASSURED'S SAMPLING EXPERT IS
      RELIABLE .................................................................................................13

      A.    Dr. Lipshutz's Approach ...............................................................14

      B.    Flagstar Misunderstands Dr. Lipshutz's Approach ......................15

IV.   FLAGSTAR'S CRITICISMS OF ASSURED'S UNDERWRITING
      EXPERT ARE MISPLACED ......................................................................16

      A.    Ms. Walzak's Opinions .................................................................16

      B.    Flagstar's Arguments for Exclusion of Ms. Walzak's
            Testimony Are Baseless .................................................................18

            1.    Flagstar's Reprised "Causation" Argument Has Been
                  Rejected ...............................................................................18

            2.    Assured's "Due Diligence" is Irrelevant to
                  Ms. Walzak's Testimony ......................................................19

2429415v1/011967

3.      Ms. Walzak's Opinions on the Significance of
        Flagstar's Breaches are Reliable ........................................................20

4.      Ms. Walzak's Use of an Underwriting Survey and
        Salary.com Results Was Proper ...........................................................23

5.      Ms. Walzak's Reliance on Her Team, Digital Risk, and
        Clear Capital, Was Proper .................................................................26

V.      THE TESTIMONY OF ASSURED'S DAMAGES EXPERT IS
        RELIABLE ..................................................................................................28

        A.      Dr. Mason's Opinions .........................................................................28

        B.      Flagstar's Challenges to Dr. Mason's Methodology are
                Meritless ..............................................................................................30

                1.      Dr. Mason's Analysis Does Not Overlook Causation ..................30

                2.      Dr. Mason's Analysis Properly Relies on Statistically
                        Valid Random Samples.................................................................31

                3.      Dr. Mason's Use of Original Principal Balances Was
                        Appropriate ...................................................................................31

                4.      The Percentage of Defective Defaulted Loans Does
                        Change Over Time .........................................................................32

                5.      Even if Certain Breaches Could be "Cured," It Makes
                        No Difference to Dr. Mason's Damages Analysis.........................33

                6.      Dr. Mason Does Not Overstate the Amount of
                        Recoverable Interest......................................................................34

                7.      Dr. Mason Did Not Give Assured Double Credit for
                        Putative "Recoveries" ...................................................................35

VI.     ASSURED IS WITHDRAWING ITS CLAIMS FOR SERVICING
        BREACHES AND DAMAGES ..................................................................35

CONCLUSION..................................................................................................................36

2429415v1/011967

## Table of Authorities

**Page No(s).**

**Cases**

*A.H.A. Gen. Constr. v New York City Hous. Auth.*,
  92 N.Y.2d 20, 31 (N.Y. 1998) ................................................................ 9

*American Home Assur. Co. v. Masters' Ships Management S.A.*,
  2005 WL 159592, at *1 (S.D.N.Y. Jan. 25, 2005)................................... 5

*Amorgianos v. National R.R. Passenger Corp.*,
  303 F.3d 256, 265 (2d Cir. 2002) .......................................................... 3

*BIC Corp. v. Far Eastern Source Corp.*,
  23 F. App'x 36, 39 (2d Cir. 2001) (unpublished) ................................... 4

*CDR-Wantagh, Inc. v. Shell Oil Co.*,
  2011 WL 795865, at *9 (E.D.N.Y. Feb. 28, 2011)................................. 4

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 597 (1993) ............................................................. 3, 4, 5

*Goldberg v. 401 North Wabash Venture LLC*,|
  2012 WL 3686644, at *5 (N.D. Ill. Aug. 24, 2012)............................. 21

*In re Agent Orange Prod. Liab. Litig.*,
  611 F. Supp. at 1244. .......................................................................... 24

*In re Fosamax Prods. Liability Litig.*,
  645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)...................................... 1, 4

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*,
  643 F. Supp. 2d 482, 494 (S.D.N.Y. 2009)........................................ 24

*Ixe Banco, S.A. v. MBNA America Bank, N.A.*,
  2009 WL 3124219, at *5 (S.D.N.Y. Sept. 29, 2009)........................... 9

*Joseph S. v. Hogan*,
  2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011) ............................. 5

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 141 (1999)............................................................. 3, 4, 5

*LaSalle Bank Nat'l Ass'n v. CIBC, Inc.*,
  2012 WL 466785 (S.D.N.Y. Feb. 14, 2012)................................. 21, 22

*Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*,
No. 04-Civ.-1432, 2007 WL 2904591, at *13 (S.D. Ind. Sept. 28, 2007) ....................... 8

*Lester v. Percudani*,
2008 WL 4722749, at *9 n.23 (M.D. Pa. Oct. 24, 2008) ................................................ 27

*Lippe v. Bairnco Corp.*,
2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002) ............................................................. 21

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558, 565 (S.D.N.Y. 2007) .................................................................. 27

*MASTR Asset Backed Securities Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg.
Corp.*,
No. 11-Civ.-2542, 2012 WL 539374, at *1 (D. Minn. Feb. 16, 2012) ..................... 11, 12

*MBIA v. Countrywide Home Loans, Inc.*,
30 Misc. 3d 1201(A) (N.Y. Sup. Ct. Dec. 22, 2010) ..................................................... 11

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038, 1044 (2d Cir. 1995) .............................................................................. 3, 4

*New York v. Solvent Chemical Co., Inc.*,
2006 WL 2640647, at *1-2 (W.D.N.Y. Sept. 14, 2006); .................................................. 5

*Nimely v. City of New York*,
414 F.3d 381, 395 (2d Cir. 2005) .................................................................................... 3

*Orix Real Estate Capital Mkts. v. Superior Bank*,
127 F. Supp. 2d 981, 983 (N.D. Ill. 2000) ................................................................... 10

*Resolution Trust Corp. v. Key Financial Services, Inc.*,
280 F.3d 12, 18-19 & n.15 (1st Cir. 2002) ................................................................... 10

*Schultz v. Butcher*,
24 F.3d 626, 631-32 (4th Cir. 1994) ............................................................................... 4

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 2011 WL 1135007, at *4 (S.D.N.Y. March 25,
2011) .......................................................................................................................... 11

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09 Civ. 3106 (PAC),
Dkt. No. 73, at 18, 32 (S.D.N.Y. Mar. 15, 2011) ......................................................... 11

*United States ex. rel Jones v. Brigham and Women's Hosp.*,
678 F.3d 72, 94 (1st Cir. 2012) .................................................................................... 21

*United States v. Alcan Aluminum Corp.*,
2006 WL 5278224, at *1 (N.D.N.Y. June 9, 2006) .......................................................... 5

*United States v. Bedford*,
    548 F. Supp. 732, 736 (S.D.N.Y. 1982)................................................................ 10

*United States v. Dukagjini*,
    326 F.3d 45, 58 (2d Cir. 2003)........................................................................... 24

*United States v. Meija*
    545 F.3d 179, 197 (2d Cir. 2008)....................................................................... 24

*United States v. Williams*,
    506 F.3d 151, 160 (2d Cir. 2007)......................................................................... 3

*Universe Antiques, Inc. v. Vareika*,
    2011 WL 5117057, at *6 (S.D.N.Y. Oct. 21, 2011) ............................................. 5

*Van Alen v. Dominick & Dominick, Inc.*,
    560 F.2d 547, 552 (2d Cir. 1977)......................................................................... 5

*Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC,*
    2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009).................................... 1, 4

*Zaremba v. General Motors Corp.*,
    360 F.3d 355, 358 (2d Cir. 2004)......................................................................... 3

**Other Authorities**

11 C. Wright & A. Miller & M. Kane, Federal Practice and Procedure
    §2885, at 454-55 (2d ed. 1995)........................................................................... 5

Michael Cavendish, <u>New Analysis of the Repurchase Obligation in Participation Agreements</u>,
    127 Banking L.J. 417, 419 (2010) ..................................................................... 10

**Rules**

Fed. R. Evid. 401 ...................................................................................................... 3

Fed. R. Evid. 702 ...................................................................................................... 3

Fed. R. Evid. 703 .......................................................................................... 24, 27, 28

**INTRODUCTION**

Flagstar moves to exclude <u>all</u> of Assured's expert witnesses and to preclude Assured from trying its case based on 400-loan samples of the nearly ten thousand loans at issue in this lawsuit.  Most of Flagstar's arguments are now moot, having been rejected by this Court in its September 25, 2012 decision (the "Order") denying Flagstar's motion for summary judgment. The rest of Flagstar's arguments are without merit.

Flagstar faces a heavy burden in seeking to bar Assured's use of sampling, and to exclude the testimony of all of Assured's experts.   "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion" of expert evidence.  *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).  There is even greater flexibility in the context of a bench trial, where "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC,* 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009).  Flagstar does not come close to showing that Assured's evidence should be excluded in advance of trial, before even a single piece of evidence has been aired or a single witness has testified.

<u>First</u>, Flagstar raises a categorical objection to sampling, a method of proof that has been accepted by courts for over a century, and which has been accepted by a court handling a similar mortgage-backed securities case.   Not only is Flagstar's objection to this method of proof meritless, but Flagstar waived this contention over a year ago.  During a hearing last September, Flagstar argued that Assured's motion *in limine* seeking approval of the sampling approach was "premature." Assured withdrew that motion based on the understanding that Flagstar would not further pursue the categorical objection leveled at that time.   Now, at the eleventh hour, and with

1

Assured having spent millions of dollars and over a year litigating this case using sampling, Flagstar resurrects that objection and seeks the dismissal of Assured's case.  Flagstar's sampling argument is both untimely and meritless.

Second, Flagstar challenges the methodology of Assured's sampling expert, Dr. Nelson Lipshutz.  Flagstar does not challenge Dr. Lipshutz's academic or professional credentials or his general approach to sampling, and indeed Flagstar retained no statistical expert of its own. Flagstar solely argues that Dr. Lipshutz allegedly "failed to use certain key variables" in creating his sample.  However, as explained further below, Dr. Lipshutz employed standard random samples that were representative for all variables at a 95% confidence level.

Third, Flagstar contends that the testimony of Rebecca Walzak, a thirty-year mortgage industry veteran with substantial re-underwriting experience, should be excluded before trial. Flagstar's primary argument is that Ms. Walzak failed to consider whether the breaches she identified "caused" the loans to default.  The argument that Assured must prove that an individual breach of a representation or warranty "caused" a default has now been squarely rejected by this Court.  (Order, Slip Op. at 12.)  Flagstar also offers a number of "cross-examination" contentions challenging bits and pieces of Ms. Walzak's opinions.  Many of these meritless contentions are now also moot based on the Court's summary judgment decision; none of them warrants the exclusion of Ms. Walzak's testimony.

Fourth, Flagstar contends that the opinions and methodology of Assured's damages expert, Dr. Joseph R. Mason, should be excluded.  Much like its criticisms of Assured's other experts, Flagstar rehashes its faulty argument concerning causation, relies on a fundamental misunderstanding of Dr. Lipshutz's sampling methodology and Dr. Mason's damages opinions, and improperly raises cross-examination points as reasons to exclude Dr. Mason's entire

testimony.  Flagstar has <u>no</u> damages expert of its own to rebut Dr. Mason's conclusions, and its last-ditch attempt to derail Assured's case by excluding its damages expert should be rejected.

<u>ARGUMENTS & AUTHORITIES</u>

## I.      LEGAL STANDARDS

### A.      Rule 702's Admissibility Standard is "Flexible"

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Rule 702 "embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

The District Court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), <u>quoting</u> *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see also Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

Rule 702 identifies three indicia of reliability: "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702).  The test for reliability is "flexible," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)*; see also Zaremba v. General Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004), and the court has broad discretion regarding the admissibility of expert evidence. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).  "[I]n accordance with the liberal admissibility standards of the Federal Rules of

3

Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). As the Supreme Court has explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). Therefore, if an expert's reasoning and methodology satisfy the low thresholds for reliability and relevance, remaining controversies as to the expert's testimony generally bear on the weight and credibility of the testimony, not its admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d at 1043. "If an expert's testimony lies within 'the range where experts might reasonably differ,'" the factfinder "should 'decide among the conflicting views of different experts.'" *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at 173, quoting *Kumho Tire Co.*, 526 U.S. at 153.

### B.    Expert Testimony is Presumptively Admissible in a Bench Trial

Where, as here, issues of fact are to be determined by the Court, there is greater flexibility. This Court need not serve as a "gatekeeper" because the Court is "presumed to be able to exclude improper inferences from its own decisional analysis." *BIC Corp. v. Far Eastern Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001) (unpublished); *Schultz v. Butcher*, 24 F.3d 626, 631-32 (4th Cir. 1994) ("For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value and reject any improper inferences."). There is also no need in a bench trial to protect the jury from dubious expert testimony. *See, e.g., CDR-Wantagh, Inc. v. Shell Oil Co.*, 2011 WL 795865, at *9 (E.D.N.Y. Feb. 28, 2011) ("A court has greater flexibility in satisfying its gatekeeping function *vis a vis* expert testimony where it is the trier of fact given the absence of the need to protect juries from dubious expert evidence."); *Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC,* 2009 WL 959775,

4

at *8 n.4 (S.D.N.Y. Apr. 8, 2009) ("In the context of a bench trial, however, there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis."); *American Home Assur. Co. v. Masters' Ships Management S.A.*, 2005 WL 159592, at *1 (S.D.N.Y. Jan. 25, 2005) ("As this will be a bench trial, there is no concern with protecting a jury from being bamboozled by technical evidence of dubious merit.").

In conducting the bench trial, the Court may assess and weigh the expert testimony itself, in light of the *Daubert* and *Kumho Tire* standards, and will "have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions." *Id.* at *2-3.[1]  "It follows then that in a bench trial, the risk is with <u>exclusion</u> of expert testimony rather than with its admission—it is <u>exclusion</u> that has the potential for an indelible impact on the record; if the appellate court disagrees that the expert's testimony was unreliable, a review for harmless error will be thwarted."  *Joseph S. v. Hogan*, 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011) (emphasis added); *see also Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 552 (2d Cir. 1977) ("[I]t may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records, and testimony based on them."); 11 C. Wright & A. Miller & M. Kane, Federal Practice and Procedure §2885, at 454-55 (2d ed. 1995) ("In nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence. The appellate court will disregard the inadmissible evidence and hold that its admission was harmless if there was competent evidence to sustain the findings of the court.").

---

[1] *See also Universe Antiques, Inc. v. Vareika*, 2011 WL 5117057, at *6 (S.D.N.Y. Oct. 21, 2011); *New York v. Solvent Chemical Co., Inc.*, 2006 WL 2640647, at *1-2 (W.D.N.Y. Sept. 14, 2006); *United States v. Alcan Aluminum Corp.*, 2006 WL 5278224, at *1 (N.D.N.Y. June 9, 2006) ("At trial in the case at bar, the Court will be the trier of fact, and consequently will not have to function as a gate-keeper for a jury. Using the discretion given to it, the Court will parse and evaluate the evidence as it comes in.").

5

## II.     FLAGSTAR'S SAMPLING ARGUMENT IS UNTIMELY AND MERITLESS

### A.     Flagstar Waived its Categorical Objection to Sampling

Flagstar first contends that Assured cannot use sampling in this case because the Transaction Documents are categorically inconsistent with extrapolation from a sample.  Mot. In Limine, at 2-7.  This is the same argument that Flagstar raised over a year ago in its opposition to Assured's motion *in limine* seeking approval of the use of sampling.  *See* Dkt. No. 31, at 14-20. At the hearing on that motion, the Court stated that while it was not prepared to render a ruling as to the validity of any particular sampling methodology, "I do think this is an appropriate case for the use of statistical sampling," and that "I don't see anything in the nature of this case that would inherently make it inappropriate for a statistical sampling, given the allegations in the complaint."  Decl. of Jacob W. Buchdahl, Ex. A, Sept. 8, 2011 Hearing Tr., at 2:17-24, 3:22-25.

At that time, Flagstar did not press its categorical objection, or insist on a ruling that the Transaction Documents were inconsistent with sampling, but rather argued that the issue was "premature and impossible to properly consider as a result of the failure for there to be a methodology that has been proposed at this point."  *Id*. at 3:5-7.  Assured's counsel raised the fact that an advance resolution of the issue was necessary because Flagstar had taken the position that "there is something incompatible between the use of sampling and the repurchase remedy," but voiced his understanding that based on the Court's ruling on Flagstar's motion to dismiss the complaint, "that is not the case."  *Id*. at 4:21-25.  The Court agreed with Assured, and while the Court made clear that Flagstar could raise arguments later based on "discovery" or "a different factual record," it did not suggest that Flagstar could raise the very same categorical objections to sampling (based solely on the Transaction Documents) that the Court rejected.  *Id*. at 5:1-3, 5:14-6:1.  Flagstar, for its part, did not disagree with this understanding.  Indeed, Flagstar concluded

6

the hearing by preserving solely an objection to sampling "based upon what's developed during factual discovery."  *Id*. at 6:5-10 (emphasis added).

Flagstar's current argument in its motion *in limine* is not based on "what's developed during factual discovery."  Rather, Flagstar tactically raises the same objection it had forgone over a year earlier, two weeks before this case was set for trial in June, and after millions of dollars have been spent by Assured developing its case.  Flagstar's argument respectfully should be rejected.

**B.     Flagstar's Categorical Objection to Sampling is Meritless**

Even if Flagstar's categorical objection to sampling was not waived, it is meritless.  As Assured argued in its motion on sampling over a year ago, sampling has been an accepted method of proof in contract cases for over a century.  Dkt.  Nos. 26, at 6-13; 39, at 1.  Flagstar argues that sampling is inconsistent with the terms of the Transaction Documents in this case. That is incorrect.

First, Flagstar once again suggests that there is a "notice" or "demand" condition to its repurchase obligation, and that this condition could only be satisfied on a loan-by-loan basis. For this reason, Flagstar argues that its "awareness" of a breach also can be judged solely on a loan-by-loan basis.   Mot. In Limine at 4.  The Court has already rejected these arguments.  In denying in part Flagstar's motion to dismiss the complaint, the Court rejected the argument that there is a "notice" precondition, stating that "notably absent in SSA §2.04 is any indication that the parties intended this 'notice and opportunity to cure' process to be the exclusive means by which [Assured] may enforce its rights under the Transaction Documents," and emphasizing that the parties' contracts stated that Assured may "take whatever action at law or in equity that may appear necessary to enforce any obligation of [Flagstar's] . . . ."  Dkt. No. 56, at 17.  *See also Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*, No. 04-Civ.-1432, 2007 WL

7

2904591, at *13 (S.D. Ind. Sept. 28, 2007) (notice "is not a condition precedent to Laureate's duty to cure or repurchase. Laureate's obligation to cure or repurchase . . . is triggered in either of two situations—upon notice of or when it discovers on its own a material defect in a mortgage loan or a breach of its representations or warranties").

The Court also rejected Flagstar's loan-by-loan view of when a party can be "aware" of a breach:

> [G]iven the material uniformity of the underlying loan population, AGM contends that its 'notification [to Flagstar] of pervasive breaches' affecting the charged off loans that were the subject of AGM's internal review . . . rendered Flagstar constructively 'aware' – or, at minimum, put Flagstar on inquiry notice – of the substantial likelihood that these breaches extended beyond the charged off loan population and into the broader loan portfolio. For purposes of the instant motion, <u>the Court agrees</u>.

Dkt. No. 56, at 18 (emphasis added).  The Court recognized that Flagstar could be "aware" of a breach on an aggregate basis given its actual or constructive knowledge of pervasive breaches in a pool of similar mortgage loans bearing similar characteristics.  This is consistent with the express recognition in the Transaction Documents that there can be "breach[es] of a representation and warranty relating to the characteristics of the Mortgage Loans in the aggregate."  Decl. of Stuart D. Aaron, Ex. A, SSA §2.04(d).  For this reason, the Court's observation that there is nothing in "the nature of this case that would inherently make it inappropriate for a statistical sampling, given the allegations in the complaint," was sound.  Buchdahl Decl., Ex. A, at 3:22-25.

Flagstar also suggests that extrapolation "writes out of the Transaction Documents Flagstar's right to cure any purportedly material breach, receive a retransfer of the purportedly breaching loan and have the Indenture Trustee calculate any Transfer Deficiency."  Mot. In Limine at 9.  The Court has now rejected this argument: "[T]he cure or repurchase period ends

8

90 days after defendants learned of the loan breaches . . . and that time period has long since expired."   (Order, Slip Op. at 20.)   Moreover, Assured's damages model is based only on defective, defaulted loans.   The notion of "curing" a breach with respect to a loan that has already resulted in losses to Assured is fiction: the only available "cure" at this point is the payment of damages.

Third, while Flagstar contends that Assured is strictly limited to the procedures set forth in the Transaction Documents regarding the repurchase remedy, including having "the Indenture Trustee calculate any Transfer Deficiency," nothing in the Transaction Documents provides that these procedures apply in the context of litigation after Flagstar has breached its contractual repurchase obligations.   Mot. In Limine at 9.   The Court has noted that "notably absent in SSA §2.04 is any indication that the parties intended this 'notice and opportunity to cure' process to be the exclusive means by which [Assured] may enforce its rights under the Transaction Documents.   Instead, the I&Is state that [Assured] may 'take whatever action at law or in equity that may appear necessary to enforce any obligation of [Flagstar's] . . . .'" Dkt. No. 56, at 17.

Further, it would be unreasonable and unsupported by law to permit Flagstar to evade its obligations under the repurchase remedy, force Assured to file a lawsuit, and then make that lawsuit unworkable by requiring Assured to follow the contractual procedures that Flagstar frustrated in the first place.   *See, e.g., Ixe Banco, S.A. v. MBNA America Bank, N.A.*, 2009 WL 3124219, at *5 (S.D.N.Y. Sept. 29, 2009) (condition need not be satisfied where defendant's behavior "substantially hindered performance"); *A.H.A. Gen. Constr. v New York City Hous. Auth.*, 92 N.Y.2d 20, 31 (N.Y. 1998)  ("[I]t is a 'well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself.'"), quoting *Young v. Hunter*, 6 N.Y. 203, 207 (N.Y. 1852); *accord United States v. Bedford*, 548 F.

Supp. 732, 736 (S.D.N.Y. 1982) ("[It is a] well-settled principle that where one of the parties to a contract makes performance by the other <u>materially more difficult or expensive</u>, the latter will be discharged." (emphasis added)).

Finally, the "Transfer Deficiency" that Flagstar refers to is simply an amount of damages that is readily amenable to expert extrapolation.  Dkt. No. 56, at 11 (holding Assured may seek "damages in an amount equivalent to the "Transfer Deficiency"); *id.* at 20 (based on complaint's allegations, "the proper measure of damages for a charged off loan is the amount of the outstanding principal balance on that loan at the time it was 'charged off' by Flagstar"); *see also, e.g., Resolution Trust Corp. v. Key Financial Services, Inc.*, 280 F.3d 12, 18-19 & n.15 (1st Cir. 2002) (affirming district court's calculation of damages for breach of repurchase remedy, which "merely represents what Key would <u>have paid to Home Owners had it repurchased the loans when it was supposed to have done so</u>" (emphasis added)); *Orix Real Estate Capital Mkts. v. Superior Bank*, 127 F. Supp. 2d 981, 983 (N.D. Ill. 2000) (under New York law, awarding damages under repurchase provision as "[t]here is no practical difference between this repurchase remedy and compensatory damages").[2]

For each of these reasons, Flagstar's categorical objection to sampling must be rejected.

### C.   The Caselaw Supports the Use of Sampling

Sampling has been accepted by courts applying New York law for over a century, and this method of proof has even been adopted by New York's own Commercial Division in a mortgage-backed securities case involving a repurchase claim.  Dkt. No. 39, at 1,3,5.  *See*

---

[2] Michael Cavendish, <u>New Analysis of the Repurchase Obligation in Participation Agreements</u>, 127 Banking L.J. 417, 419 (2010) (noting that courts treat repurchase clauses "as mere liquidated obligations to pay money, without practical distinction against any other manner of contract clause providing for compensatory or liquidated damages," but that litigants (like Flagstar) attempt to "characterize the remedy as a specific performance in order to create a heightened burden for the plaintiff or a general aura of exoticism").

*MBIA v. Countrywide Home Loans, Inc.*, 30 Misc. 3d 1201(A), at *4 (N.Y. Sup. Ct. Dec. 22, 2010) ("The court finds that Plaintiff's proposed methodology of statistical sampling may be used at trial."); *see also Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 2011 WL 1135007, at *4 (S.D.N.Y. March 25, 2011) (granting Syncora's motion for partial summary judgment, where Syncora contended that "it was not limited to the contractual loan-by-loan remedy, but rather could seek a pool-wide remedy based on sampling and extrapolation"); Buchdahl Decl., Ex. E, *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09 Civ. 3106 (PAC), Dkt. No. 73, at 18, 32 (S.D.N.Y. Mar. 15, 2011) ("You've been practicing a long time. Do you agree with me, no judge in his right mind would sit there and referee on 9,800 or 1,800 or 1,300 separate mortgage loans?" and "Can you think of a single judge . . . who would sit here and go through 9800 separate transactions to find out whether there was or was not a material breach of the representations and warranties?").

In an attempt to challenge these New York decisions, Flagstar's brief cites a single Minnesota district court case allegedly in its favor, *MASTR Asset Backed Securities Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, No. 11-Civ.-2542, 2012 WL 539374, at *1 (D. Minn. Feb. 16, 2012), but Flagstar's comparison of that case to this one is improper.[3]  As an initial matter, that case did not address the issue of sampling at all, but rather dealt with the threshold issue of whether the lawsuit was ripe for adjudication if a pre-suit demand for repurchase had only been made on a subset of loans.  As noted above, this Court has already answered that question in the affirmative.  Dkt. No. 56, at 17-18.

In *MASTR Asset*, seemingly contrary to this Court's prior ruling, the court assumed that a formal repurchase demand on a loan originator <u>was</u> a prerequisite for the repurchase of a loan

---

[3] Flagstar claims in its brief that the "weight of authority" does not support the use of sampling, Mot. In Limine, at 6, but *MASTR Asset* is the only case to which Flagstar cites.

and for a lawsuit relating to that loan.  *MASTR Asset*, 2012 WL 539374, at *4 (stating that
"there is no dispute that U.S. Bank has never demanded that WMC or Equifirst cure any
defective loans other than the loans in the first sample," and that claims arising out of any other
loans "are not yet ripe").  That determination was made under a different set of contracts, and
right or wrong as to the facts of that case, it certainly has no bearing here, especially given this
Court's ruling on Flagstar's motion to dismiss.

### D.      Flagstar's Post-Litigation "Self-Help" Is Irrelevant To This Case

Flagstar states that "the Indenture Trustee recently calculated a zero Transfer
Deficiency on three loans that Flagstar attempted to repurchase," and that this "further
demonstrates why Plaintiff cannot prove its case through extrapolation."  Mot. In Limine at 10.
These calculations should have no bearing on this case.

In its motion to dismiss the complaint, Flagstar raised the argument that under the
Transaction Documents, the "Transfer Deficiency" on any loan that Flagstar had previously
charged off was necessarily "zero."  This was based on the fact that an annex to the Sale and
Servicing Agreement for one of the transactions defined the Asset Balance for a Liquidated
Mortgage Loan using the words "means zero."  Flagstar contended that this meant that the
damages available to Assured with respect to a charged-off loan in either transaction must also
be "zero."

There was no rational business justification for such a construction, which would allow
Flagstar to avoid liability for its breaches on the worst performing loans, simply because it
elected to "charge off" the balances on the loans—with the losses being absorbed by
Assured—before they were repurchased.  In its order denying in part Flagstar's motion to
dismiss, this Court properly and unequivocally rejected Flagstar's "zero" damages argument.
Dkt. No. 56, at 18-20 ("The Court finds this argument unconvincing.").  The Court noted that

Flagstar's construction would render broad swaths of the Transaction Documents "wholly superfluous," and that under Flagstar's logic, "it would have the unilateral ability to insulate itself from damages with respect to any breach of its contractual obligations by simply charging off the offending loan.  That cannot be what the parties intended when they entered into their agreements."  The Court concluded that "the proper measure of damages for a charged off loan is the amount of the outstanding principal balance on that loan at the time it was 'charged off' by Flagstar."  *Id*. at 20.

Months after the Court's decision, Flagstar elected to voluntarily repurchase three of the charged-off loans identified by Assured as containing material breaches.  Flagstar then requested that the Trustee for the transactions calculate the "Transfer Deficiency" for each of the loans.  The extent of the communications that Flagstar had with the Trustee in connection with this request is unclear, but there is no indication that Flagstar advised the Trustee about this Court's decision on Flagstar's motion to dismiss.  Rather, in a crude attempt to circumvent this Court's ruling, Flagstar enlisted the Trustee to rely on the same "means zero" argument that the Court had already rejected.  *See* Aaron Decl., Ex. H, at 1 (April 4, 2012 Email from Flagstar's Matthew Roslin to the Bank of New York Mellon, the Trustee).  Flagstar's clumsy gamesmanship is improper, and the "calculations" referred to in Assured's motion are no reason to reject the use of sampling in this case.

### III.    THE TESTIMONY OF ASSURED'S SAMPLING EXPERT IS RELIABLE

Flagstar next argues that the opinions of Assured's sampling expert, Dr. Nelson Lipshutz, should be excluded because they are "unreliable."  Flagstar does not challenge Dr. Lipshutz's academic or professional credentials, his general approach to sampling, or the sample sizes he utilized.  Instead, Flagstar solely argues that Dr. Lipshutz allegedly "failed to use certain key variables" that Flagstar insists he should have used.  Flagstar did not retain its

13

own sampling expert, nor did Flagstar elect to depose Dr. Lipshutz during the discovery period. Flagstar's arguments are based not on any expert principles of statistics, but rather on counsel's misapprehension of statistical theory. For the reasons below, Flagstar has failed to demonstrate that Dr. Lipshutz's methodology should be excluded from this case.

### A.   Dr. Lipshutz's Approach

Dr. Lipshutz specializes in the application of economics, statistics, and financial theory to legal and regulatory issues, Aaron Decl., Ex. I, ¶2, and has 39 years of experience in carrying out economic, financial, and statistical studies. These studies involved the collection and analysis of data of various types, and Dr. Lipshutz's work has frequently required the design of statistical samples. *Id*. at ¶4. He holds a Ph.D. in theoretical physics from the University of Chicago and an MBA in finance from the Wharton School of Business. *Id*. at ¶2. He currently is the president of Regulatory Research Corporation. *Id*.

Dr. Lipshutz constructed two random samples of 400 loans each, separately for the 2005-1 and 2006-2 loan pools. *Id*. at ¶6. Dr. Lipshutz double-checked his samples using a number of variables including geographic distribution, combined loan-to-value ("CLTV") ratio, debt-to-income ("DTI") ratio, current note rate, unpaid loan balance, and appraisal type. *Id*. at ¶7. He compared the sample distributions of these variables with the total population distributions using a "chi-squared" methodology. Dr. Lipshutz verified that, at a 95% confidence level, the distribution of the variables in the samples were the same as the distributions of the variables in the loan populations as a whole. *Id*. ¶¶11-19. Dr. Lipshutz concluded that the random samples he constructed provide a sound basis for assessing the degree to which Flagstar failed to meet its contractual obligations. *Id*. at ¶20.

### B.     Flagstar Misunderstands Dr. Lipshutz's Approach

Flagstar does not attack Dr. Lipshutz's general methodology, but instead argues that he did not consider two variables: payment status and original principal balance.[4]  Flagstar does not cite to any expert evidence demonstrating why these variables <u>must</u> be considered to confirm that a sample is representative, nor does Flagstar indicate how the samples would be different if these variables were factored in.

Flagstar's argument also reflects a basic misunderstanding of Dr. Lipshutz's approach. Dr. Lipshutz's 400-loan samples are <u>random</u>.  Dr. Lipshutz cross-checked the samples against several variables simply to confirm the quality of the samples he had constructed.  As set forth in Dr. Lipshutz's declaration in opposition to Flagstar's motion, a random sample is "unbiased because it selects members with equal probability irrespective of their specific characteristics," and thus, a sample constructed in this manner "avoids over-representing or under-representing <u>any</u> characteristic of the population being sampled."  Decl. of Nelson Lipshutz, ¶4 (emphasis added).  The variables that Dr. Lipshutz identified in his report had nothing to do with the way in which the samples were constructed, but simply confirmed that the samples were in fact representative.   As Dr. Lipshutz explains in his declaration, to achieve a 95% confidence interval as to any variable, a random sample would simply need to be a large enough size, which he calculated as 371 loans for the 2005-1 pool, and 357.37 loans for the 2006-2 pool. Dr. Lipshutz rounded up the figures to 400 to ensure that both his samples were larger than required to accurately estimate the presence of any particular variable.  *Id*. at ¶7.

---

[4] Flagstar also contends that Dr. Lipshutz did not consider "loan delinquency," which it claims is relevant to Assured's servicing claims.  As stated below in Part VI, Assured will not proceed on any claims relating to servicing, and therefore, Flagstar's argument on this point need not be considered.

For these reasons, it is unsurprising that Flagstar makes no suggestion that either sample misstates to a statistically significant degree the incidence of default or the average original principal balance of either loan population.  Moreover, the Court has now made clear that whether a loan has defaulted is not relevant to the question of what loans should be repurchased (Order, Slip Op. at 12), and therefore there is no reason that Dr. Lipshutz should have considered this variable.  Flagstar's arguments do not begin to approach the high standard for excluding his testimony.

### IV.   FLAGSTAR'S CRITICISMS OF ASSURED'S UNDERWRITING EXPERT ARE MISPLACED

Flagstar next offers a host of reasons to exclude the testimony of Rebecca Walzak, a seasoned loan re-underwriter who has decades of industry experience.  Ms. Walzak—whose credentials and expertise are not challenged by Flagstar—reviewed Assured's samples and found that a staggering percentage of loans breached Flagstar's contractual representations and warranties.  Flagstar's contentions about the nature of Ms. Walzak's analysis, and the legal standards applicable in this context, are incorrect.

Flagstar's primary argument is that Ms. Walzak failed to consider whether the breaches she identified "caused" the loans to default.  However, as the Court has now ruled, Assured need not prove that a breach "caused" a loan to default, but rather need only demonstrate that a breach caused Assured "to incur an increased risk of loss."  (Order, Slip op. at 12.)  For this reason, and those discussed further below, Flagstar's bid to exclude the opinions of Ms. Walzak should be rejected.

### A.   Ms. Walzak's Opinions

Ms. Walzak has thirty years of experience in the consumer mortgage industry and has been directly responsible for underwriting and originating mortgages, as well as the development

and implementation of quality control, anti-fraud, and operational risk management programs. She is the former Chairwoman of the Quality Assurance Committee of the Mortgage Bankers Association of America ("MBAA"), and has served on a number of committees, including the MBAA's Quality Assurance Leadership Committee, Fannie Mae's Quality Control Liaison Group, and the Federal Housing Administration's Business Practices Working Group. *See* Aaron Decl., Ex. L, Corrected Expert Report of Rebecca Walzak, Part II.

Ms. Walzak and her team of underwriters reviewed each of the loans in the random samples generated by Dr. Lipshutz to determine whether Flagstar complied with its representations and warranties in the Transaction Documents. Ms. Walzak and her team also reviewed the loans to determine whether the loan underwriting complied with any relevant industry practices. *Id.*, Part III. Where Digital Risk, a third-party vendor, uncovered materials from bankruptcy filings, online salary databases, or other sources that contradicted information in the loan files, Ms. Walzak reviewed the source materials that revealed the discrepancies.

Applying the standard provided to her by counsel to determine materiality (and now approved by this Court), namely that the breaches in question "changed the risk profile of the loans in question, reducing the likelihood that the loans would ultimately perform," *id.*, Part V, at 14, Ms. Walzak found that a large percentage of the loans in the samples contained material breaches of Flagstar's representations and warranties. Specifically, Ms. Walzak found that 85% of the loans in the 2005-1 random sample contained material breaches, over 65% of the loans on the 2006-2 sample contained material breaches, and that nearly one of seven (2005-1) and nearly one out of five (2006-2) loans in the samples contained material instances of fraud or misrepresentation on the part of the borrower or other person, which Flagstar had warranted against. *Id.*, Part I, at 2.

17

Case 1:11-cv-02375-JSR   Document 101   Filed 10/02/12   Page 24 of 42

**B.** **Flagstar's Arguments for Exclusion of Ms. Walzak's Testimony Are Baseless**

**1.** **Flagstar's Reprised "Causation" Argument Has Been Rejected**

Flagstar first argues that "Ms. Walzak did not take loan performance into account, nor did she consider whether any of the loans that defaulted did so as a result of the purported breach of the representations and warranties." Mot. In Limine at 14. The Court has rejected this argument, and need not revisit it. Similarly, Flagstar chides Ms. Walzak for not considering the actual performance data of the loans she reviewed, including whether the loans were current or fully paid off, or whether there were unexpected "life events" such as divorce that may have ultimately contributed to the borrower's decision to default on her loan. Mot. In. Limine 15-17. Once again, Ms. Walzak did not take these factors into account because they are irrelevant to whether the breaches increased the risk of loss at the time of the transactions. Further, the payment status of any of the loans in this case is irrelevant because (a) nothing in the Transaction Documents restricts the repurchase remedy to defaulted loans, and in any event, (b) it is undisputed that Assured's highly conservative damages analysis takes into account only those loans that defaulted.

Flagstar cites to a February 15, 2012 Internet article written by Ms. Walzak, which addresses the "boxing match" for repurchases between "agencies" such as Fannie Mae and Freddie Mac (not, as Flagstar improperly contends, private insurers such as Assured) and mortgage originators. Ms. Walzak's article states that for repurchases to be "fair," there should be a "cause and effect relationship." Mot. In. Limine 14. This article is entirely irrelevant, as the Court has already held that the proper causation standard in this case is whether Flagstar's

2429415v1/011967

breaches of representations and warranties increased Assured's risk of loss.  (Order, Slip Op. at 12.)[5]

### 2.    Assured's "Due Diligence" is Irrelevant to Ms. Walzak's Testimony

Flagstar next argues that Ms. Walzak's statement that the presence of the defective loans in the pools "undermined the assumptions upon which Assured issued its policies," Aaron Decl., Ex. L, Part IV, at 15, is unreliable because Ms. Walzak did not consider Assured's pre-transaction due diligence on samples of the loan pools.  Mot. In Limine 17-18.  The Court has already indicated that it is "skeptical" that Assured's due diligence could have defined what breaches by Flagstar are material, and that it "cannot endorse" a theory that this due diligence would have rendered the representations and warranties "superfluous."  (Order, Slip Op. at 14-15.)  And indeed, Assured's due diligence is irrelevant to this lawsuit.  Among other things, the due diligence referred to by Flagstar was conducted by third parties who made no attempt to determine whether the loans complied with the representations and warranties in the Transaction Documents.  Rather, the diligence teams (a) relied on information provided by Flagstar; (b) focused primarily on cross-checking the information on Flagstar's loan tape against the information in Flagstar's loan files; (c) reviewed the underwriting based on generic guidelines and the information in the loan files; and (d) made no attempt to verify any of the information in Flagstar's loan files.  The third-party file reviews therefore did not involve any substantive investigation or search for fraud, concealment or misrepresentations related to the borrowers'

---

[5] This article is irrelevant for another reason.  The article is not about this case or these contracts, and does not address the proper legal standards for a breach pursuant to the Transaction Documents.  At most, the article discusses Ms. Walzak's aspirations for how the federal agencies and mortgage originators should conduct themselves in the "ring" of back and forth negotiations about loan repurchases, which has no bearing on this case, and certainly not on the views expressed in Ms. Walzak's expert report.

income, employment, assets, appraisal, other debts, or occupancy.  Dkt. No. 69, at 19-20.  Thus, the argument that these limited pre-closing reviews nullified the express representations and warranties that Assured had bargained for is meritless.  Those representations and warranties, and not the diligence referred to by Flagstar, properly informed Ms. Walzak's opinions concerning Assured's contractual assumptions.

### 3.      Ms. Walzak's Opinions on the Significance of Flagstar's Breaches are Reliable

Flagstar next contends that Ms. Walzak lacked any standard for determining whether a breach "materially and adversely" affected Assured's interests.  Mot. In Limine 18-20.  That is untrue.  As an initial matter, Ms. Walzak did not subjectively determine whether a breach "materially and adversely" affected Assured's interests without an underlying standard to support that finding.  Rather, Ms. Walzak made this determination based on her conclusion that the breaches on a loan would have increased the risk of loss.  Aaron Decl., Ex. L, at 14 (noting that breaches that were material "fundamentally changed the risk profile" of the loan, "reducing the likelihood that the loans would ultimately perform." "[A]s to each Defective Loan that I identified, the presence of one or more breaches of representations and warranties materially and adversely affected Assured's interests by increasing the possibility of claims and payments." (emphasis added)).

Ms. Walzak also provided a number of specific examples of loans containing "material" breaches to describe by example what types of breaches would "fundamentally change the risk profile" of a loan.  As to these loans, Ms. Walzak observed that each of the exemplars contained multiple breaches, and that the "layering of additional risk and multiplicity of R&W violations exacerbates the probability of default among the loans identified and the probability of losses to

2429415v1/011967

Assured." *Id*. at 18-30.  This is not a subjective inquiry, but rather a detailed and fact-sensitive review by a seasoned expert.

Finally, Ms. Walzak supplied with her reports voluminous spreadsheets describing the breaches she identified, with comments on the severity of the violations, and at trial Ms. Walzak will be ready and able to discuss the significance of the breaches she identified to Assured's risk profile.  There is no basis for Flagstar's false allegation that Ms. Walzak's report is "devoid of any basis for her opinion."  Mot. In Limine at 18.

Ms. Walzak, a thirty-year industry veteran, is certainly qualified to opine on the significance of the breaches she identified and whether they would increase the possibility of claims and payments on the securities.  Indeed, this is classic expert testimony concerning "the customs and standards of an industry," and "how a party's conduct measured up against such standards."  *Lippe v. Bairnco Corp.*, 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002).  Further, courts have approved of the use of expert testimony on the materiality of breaches or other wrongs committed by the defendant in a case.  *See, e.g., United States ex. rel Jones v. Brigham and Women's Hosp.*, 678 F.3d 72, 94 (1st Cir. 2012) (permitting expert to testify as to materiality in an action alleging fraud in a grant application); *Goldberg v. 401 North Wabash Venture LLC*, 2012 WL 3686644, at *5 (N.D. Ill. Aug. 24, 2012) (expert with "extensive and relevant experience in commercial real estate" permitted to testify on materiality of ownership interests and breach in commercial real estate case).

Flagstar cites to *LaSalle Bank Nat'l Ass'n v. CIBC, Inc.*, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) (Pitman, M.J.), but it misinterprets the holding of that case.  In *LaSalle*, while the expert was permitted to testify as to a number of different issues, the court did not permit the expert to provide an opinion "characterizing" the putative breaches "as being not material or not

21

adverse," based on its review of the facts of that case.  The court concluded that the terms "material" and "adverse" were "straightforward and well known," and "no evidence has been offered that these are terms of art in the financial services industry or that they have meanings in that industry that are different from their ordinary meanings." *Id.* at *10.  Further, the expert at deposition was unable to supply any definition for these terms.  It is for these reasons that the court concluded that "any testimony from [the expert] opining on whether an event was material or adverse would be a mere *ipse dixit*, unsupported by an articulable analysis." *Id.* at *11.  In this case, counsel supplied Ms. Walzak with a clear standard for judging a "material and adverse effect," and as reflected in Ms. Walzak's report, she is prepared to provide substantial analysis underlying her determinations that the breaches meet that standard.  For all these reasons, Flagstar's comparison of this case to *LaSalle* is inappropriate.

Flagstar also states, citing to an isolated snippet from Ms. Walzak's deposition, that she left risk determinations "to the discretion" of her team of reviewers, "to whom she provided no meaningful instruction or guidance."  Mot. In Limine at 19.  That is untrue.  As set forth in Ms. Walzak's declaration, she conveyed written and verbal instructions to the team members and provided copies of Flagstar's underwriting guidelines.  She also provided the underwriters with a spreadsheet containing over 100 questions designed to ensure the proper performance of the underwriting review and to answer questions concerning underwriting compliance.  Decl. of Rebecca Walzak, ¶6.  The breaches in this case are similar and pervasive; nevertheless, each loan on some level presents different facts, and thus the initial evaluations concerning the breaches identified were in the discretion of Ms. Walzak's underwriters.  Buchdahl Decl., Ex. C, Dep. Tr. at 193:3-5 ("Each loan is individual and that's why you use experienced underwriters to do the

evaluation.").  However, the underwriters collectively had decades of experience in underwriting loans to ensure compliance with originator underwriting guidelines.  Walzak Decl., ¶5.

Further, Flagstar's motion omits the fact that <u>after</u> her underwriters completed their evaluations, Ms. Walzak personally reviewed their findings to ensure that they were consistent and met the relevant standard.  Walzak Decl., ¶¶7-10; Buchdahl Decl., Ex. C, Dep. Tr. 223:8-15 (noting that Ms. Walzak, not her reviewers, answered the critical question of whether a breach was "material"; Ms. Walzak made this finding by "reviewing all of the other questions that [the underwriters] had answered and reviewing their comments, reviewing what Digital Risk had given me, and then where I was unclear, I would go back and find the particular documents or document and use that to make the determination.").

### 4.    Ms. Walzak's Use of an Underwriting Survey and Salary.com Results Was Proper

Ms. Walzak utilized a survey that was developed by the Mortgage Bankers Association quality assurance subcommittee in 2007 to provide direction to underwriters and quality control personnel in the industry.   Aaron Decl., Ex. R; Buchdahl Decl., Ex. C, Dep. Tr. at 79:3-7 (describing questionnaire).  Ms. Walzak developed the questions and a recommended list of underwriters in the industry answered the questions, which focused on the reasonableness of various underwriting practices.  Ms. Walzak did not develop the survey for this case, but rather uses the results of the survey in many different engagements and other areas of her practice.  *Id*. at 77:20-22.  She utilized the results of the survey in discussions with her underwriting team to make sure that their approaches to various underwriting issues that did not have a fixed standard were consistent.  *Id*. at 83:17-21 ("Q: And you used this survey and described this survey to these reviewers to help come up with what would be deemed a consistent approach to reasonableness; is that correct? A. That is correct.").

Flagstar argues that Ms. Walzak's reliance on the survey was improper, Mot. In Limine at 20-21, but the use of a detailed survey produced by an industry group, and which Ms. Walzak uses in her practice, bolsters rather than diminishes the credibility of her conclusions.  Flagstar's assertions about the questionnaire are also wrong.  For instance, Flagstar asserts that the "survey" demonstrates that "no" industry consensus exists on any issue, Mot. In Limine at 21, but even a cursory review of the survey demonstrates that there was consensus on a great deal of the questions posed by Ms. Walzak.  Aaron Decl., Ex. R.  And even where there are variations, Ms. Walzak certainly could discern what the majority practices were and choose an approach and make conclusions based on her own industry expertise.

Flagstar's assertion that Ms. Walzak's reliance on the survey violates Fed. R. Evid. 703, which permits experts to rely on otherwise inadmissible hearsay, is improper for two reasons.  First, there is no showing that the survey results are "deemed unreliable by other experts in the field," Mot. In Limine at 21, quoting *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1244 (E.D.N.Y. 1985).  For one thing, Flagstar has failed to address the substance of the survey in any detail.   And on the contrary, Ms. Walzak uses the survey in her own practice and developed the survey while serving on an industry quality control committee.  *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 643 F. Supp. 2d 482, 494 (S.D.N.Y. 2009) (noting that Rule 703 is designed to "bring the judicial practice into line with the practice of the experts themselves when not in court").  Second, an expert violates Rule 703 where he "simply transmit[s] that hearsay to the jury," thus circumventing the rules prohibiting hearsay, instead of "form[ing] his own opinions by applying his extensive experience and reliable methodology' to the inadmissible materials."   *United States v. Meija*, 545 F.3d 179, 197 (2d Cir. 2008), quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003).  In this case,

Ms. Walzak is not testifying about the results of the survey at all, but rather, consistent with *Meija*'s instruction, used the survey to inform her independent analysis of the particular loans at issue in this case.

Flagstar also criticizes Ms. Walzak's use of data provided by Salary.com and similar online salary surveys to evaluate the "reasonableness" of the income stated by borrowers, but Flagstar recognizes that its own guidelines permitted underwriters to consult Salary.com in evaluating loans.  Mot. In. Limine, at 22 & n.11.  Indeed, Ms. Walzak testified that "every" lender she consulted used an online salary tool such as Salary.com and that they are "widely used," that Flagstar's guidelines expressly stated that the reviewers should use Salary.com, and that they specifically "used Salary.com to test the reasonableness of a stated income."  Buchdahl Decl., Ex. C, Dep. Tr. at 226:10-227:3.

Flagstar also overlooks the fact that Ms. Walzak, her underwriters, and Digital Risk tried a number of different avenues to determine the reasonableness of the income stated by Flagstar's borrowers, including Salary.com, information from the United States Bureau of Labor Statistics (BLS), calls to the borrowers' employers, and requests for verifications of employment.  *See, e.g., id*. at 143:2-16, 232:7-17.   Flagstar contends that the use of Salary.com is inappropriate because it reports current data, as opposed to data that existed in the 2005-06 timeframe.  However, this improperly assumes without any basis that income moved so radically during the intervening period as to foreclose the use of these online tools.  Further, as previously stated, other methods were employed to gain a historical reference on salary amounts, for instance information from the BLS.  *Id*. at 232:7-11 ("If they went to salary.com it showed there was a significant variance from the 90th percentile, they may go to BLS and look back at the . . . salary and the time frame in which the loan was underwritten").  Notably, Flagstar's motion points to

no instance in which Ms. Walzak's use of a current salary figure as opposed to a historical one yielded an error.

### 5.    Ms. Walzak's Reliance on Her Team, Digital Risk, and Clear Capital, Was Proper

Flagstar makes the blunderbuss contention that Ms. Walzak's "processes and methods are unreliable," and that she "impermissibly adopted 'hearsay' opinions," largely because she utilized the services of an underwriting team, and vendors such as Digital Risk and Clear Capital, in arriving at her findings.  Mot. In Limine 23-26.  However, as explained above, Ms. Walzak provided her underwriting team with written and verbal instructions on how they should conduct their analysis, Walzak Decl., ¶6, and she personally reviewed their findings to ensure that they were consistent and met the relevant standard.  *Id*. at ¶7; Buchdahl Decl., Ex. C, Dep. Tr. 223:8-15 (noting that Ms. Walzak, not her reviewers, answered the critical question of whether a breach was "material"; Ms. Walzak made this finding by "reviewing all of the other questions that [the underwriters] had answered and reviewing their comments, reviewing what Digital Risk had given me, and then where I was unclear, I would go back and find the particular documents or document and use that to make the determination.").

As for Digital Risk and Clear Capital, they did not provide any expert opinions outside Ms. Walzak's ken, but rather simply collected factual information concerning the loans in the pool on Ms. Walzak's instructions so that Ms. Walzak could determine whether, when compared to the information provided in the borrowers' application, there was fraud or misrepresentation. This ultimate determination was not left up to these vendors, but rather was made by Ms. Walzak.  As she testified at her deposition, Ms. Walzak received "all of the results that they [Digital Risk] looked at or all the information that they got," Buchdahl Decl., Ex. C, Dep. Tr. 128:25-129:10.  *Id*. at 244:22-24 ("Q: Did you look at all [of] Digital Risk's findings.  A: Yes I

did.").   This included automatic valuation model ("AVM") information—a largely standard

valuation based on public information on properties in the same geographic area as the property

at issue—that was received from Clear Capital.[6]   *Cf. Lester v. Percudani*, 2008 WL 4722749, at

*9 n.23 (M.D. Pa. Oct. 24, 2008) (noting that "the underlying appraisal need not be introduced

because an expert witness may testify regarding sources outside the record upon which he relied

provided that they are 'of a type reasonably relied upon by experts in the particular field in

forming opinions.'   Fed. R. Evid. 703. Underwriters and mortgage bankers such as plaintiff's

expert undoubtedly review and rely upon the results of appraisals in assessing the qualifications

of prospective borrowers").

In determining whether fraud was evident in the file, Ms. Walzak examined the file and

only if Digital Risk's findings were consistent with her own team's findings, would the loan be

indicated as containing fraud; otherwise Ms. Walzak would herself "go back and pull some of

the documentation or the appropriate documents and make a decision."   *Id*. at 175:3-12; Walzak

Decl. ¶9 ("I carefully considered each of their findings utilizing my extensive expertise in the

industry.   Based on my personal review, I incorporated Digital Risk's findings in the expert

opinions reflected in my report.").   In each case where Ms. Walzak found fraud based on the

work of Digital Risk, she herself had reviewed the underlying source materials relied on by the

Digital Risk personnel.

Far from acting as a "mouthpiece of a scientist in a different specialty," *Malletier v.*

*Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 565 (S.D.N.Y. 2007), Ms. Walzak applied her

---

[6] AVMs are commonly relied on by experts in underwriting loans, and indeed by Flagstar itself. Buchdahl Decl., Ex. C, at 235:6-24 (noting that "everyone" uses AVMs, and that AVMS are generally relied on by experts in the field); *id*. at 268-69 (noting that while models may have different features, the AVM methodology is accepted in the industry, and that the outputs of different models will not "vary wildly" as "[t]hey are all getting their information from public records").

underwriting expertise to the data she received to make the ultimate determination of whether there was a breach of Flagstar's representations and warranties, and to evaluate the severity of that breach, precisely what the cases envision an expert will do under Fed. R. Evid. 703. *See, e.g., Meija*, 545 F.3d at 196-97 (an expert must form his own opinions by applying his expertise to the inadmissible materials). Indeed, Ms. Walzak's approach was largely identical to the approach taken by an underwriter in the industry evaluating a loan in the first instance.

In sum, Ms. Walzak's testimony is solidly grounded in the facts of this case, using proven methods and procedures for re-underwriting loans. Flagstar's arguments (to the extent not mooted by this Court's Order), while perhaps appropriate to raise on cross-examination, provide no basis for excluding Ms. Walzak as an expert.

## V.     THE TESTIMONY OF ASSURED'S DAMAGES EXPERT IS RELIABLE

Flagstar contends that the opinions and methodology of Assured's damages expert, Dr. Joseph P. Mason, should be excluded from trial. Much like its criticisms of Assured's other experts, Flagstar rehashes its faulty argument concerning causation, relies on a fundamental misunderstanding of Dr. Lipshutz's sampling methodology and Dr. Mason's damages opinions, and improperly raises points for cross-examination as reasons to exclude Dr. Mason's opinions. Flagstar itself has <u>no</u> damages expert to rebut Dr. Mason's opinions, and its last-ditch attempt to derail Assured's case by excluding its expert should be rejected.

### A.     Dr. Mason's Opinions

Dr. Mason is the Professor of Finance and Hermann Moyse, Jr. / Louisiana Bankers Association Endowed Chair of Banking at the Ourso School of Business, Louisiana State University, and a Senior Fellow at the Wharton School at the University of Pennsylvania. Buchdahl Decl., Ex. B, Mason Rep., ¶1. He holds a Ph.D. and a M.S. from the University of Illinois at Urbana Champaign in Monetary Economics and Financial Institutions. *Id.* at ¶8.

28

Dr. Mason has held visiting appointments at the Federal Reserve Bank of Atlanta, the Federal Deposit Insurance Corporation, and the Federal Reserve Bank of Philadelphia, and he has testified before numerous Congressional Committees, the European Parliament, and the Federal Reserve Board.  Dr. Mason's consulting practice specializes in applying financial, economic, valuation, and statistical analyses to complex commercial litigation and corporate strategic decision-making.  *Id.* at ¶¶9-11.

Focusing solely on the defaulted loans in the sample populations, Dr. Mason calculated the repurchase sums that would be owed to the 2005-1 and 2006-2 securitization trusts, and concluded that those payments would result in the reimbursement of substantially all of the policy claims paid, and expected to be paid, by Assured.  *Id.*  ¶36.  Dr. Mason calculated the amount of damages owed to Assured by Flagstar using this data.

In a supplemental report, Dr. Mason used monthly data he received to cross-check and verify the figures he had initially calculated, this time using a simulation of the actual cash flows that would have flowed through the securitization waterfalls month to month, assuming Flagstar had complied with its contractual repurchase remedy.  Aaron Decl., Ex. K, Mason Second Supp. Rep. ¶¶1-2.  As he had done in his original report, Dr. Mason calculated the repurchase payments owed to the trusts.  For purposes of trial, Assured has instructed Dr. Mason to assume that Flagstar was obligated to repurchase the loans no later than January 26, 2009, shortly after Assured served its first repurchase demands on Flagstar.[7]  Dr. Mason

---

[7] Flagstar contends that Assured has "abandoned any attempt to prove awareness based on its Demands."  Mot. In Limine at 8.  This is not true.  Assured will demonstrate through its samples the pervasiveness of the breaches at issue.  And as Flagstar originated and serviced the loans, it plainly should have been aware, of those pervasive breaches from <u>day one</u>.  But Flagstar certainly can be charged with awareness when Assured demanded that large numbers of loans be repurchased three years later.  Assured did not "abandon" that argument.  Flagstar cites to snippets from Assured's motion *in limine* on sampling and from a discovery hearing last year,

calculated the damages owed to Assured on the basis of this January 2009 "frustration" date, inclusive of contractual and statutory interest.  In his Second Supplemental Report, Dr. Mason calculated those damages to be approximately $103.2 million.  Since that time, Assured's damages have continued to increase, largely due to the continued accrual of interest.  As a result, Dr. Mason's current calculation of the amount of total damages owed to Assured is $108,443,503.[8]

**B.      Flagstar's Challenges to Dr. Mason's Methodology are Meritless**

As an initial matter, Flagstar asks the Court to exclude Dr. Mason's testimony because it is based in part on the opinions of Assured's statistical and underwriting experts, whose opinions Flagstar also asks the Court to exclude.  Flagstar's Br. at 26.  For the reasons explained in Parts III and IV of this brief, there is no legitimate basis for the Court to exclude the testimony of Assured's statistical and underwriting experts.  Thus, there is no basis to exclude Dr. Mason's testimony on those grounds.

**1.      Dr. Mason's Analysis Does Not Overlook Causation**

Flagstar next seeks to exclude Dr. Mason's testimony because he does not address whether the alleged breaches "caused" the loans to default, and thus on Flagstar's flawed logic, "caused" Assured's claimed damages.  Mot. In Limine at 26.  This argument has now been rejected by this Court.  (Order, Slip Op. at 12.)  Dr. Mason's analysis does, however,

but neither addressed the issue of awareness.  Moreover, the date when Assured made its first demand—January 2009—has always been one of the key dates in Dr. Mason's expert reports for establishing when Flagstar's repurchase obligation was triggered.  Flagstar knows this, as its counsel discussed the issue with Dr. Mason at length during his deposition in January.  Buchdahl Decl., Ex. D, Mason Dep. Tr., 126:8-20; 130:20-24; 134:22-25; 135:4-7; 136:22; 137:9; 141:14-21; 142:10-18; 143:23-25.

[8] This updated damages figure reflects additional contractual and statutory interest through June 25, 2012 and additional net claims paid by Assured from December 2011 through April 2012. Additionally, in response to defendants' expert submissions, the number of loans used to compute the Adverse Defect Rate was reduced slightly.

demonstrate the economic harm caused to Assured by Flagstar's refusal to comply with its repurchase obligations.  It is undisputed that Flagstar has, to date, refused to repurchase nearly all of the defective loans that are the subject of Assured's repurchase claims.  Dr. Mason's analysis calculates the direct economic impact of that refusal on Assured.

Flagstar also contends that Dr. Mason's damages analysis is inconsistent with the Transaction Documents because he opines that Flagstar should pay direct damages to Assured. However, as Dr. Mason makes clear in his reports, these direct damages are simply a reflection of the losses Assured would have avoided had the proper repurchase amounts been paid by Flagstar to the securitization trusts at the appropriate times.

### 2.   Dr. Mason's Analysis Properly Relies on Statistically Valid Random Samples

Flagstar contends that Dr. Mason's opinions should be excluded because the random samples upon which Dr. Mason relies are supposedly not representative of the entire population when viewed from the isolated standpoint of defaulted loans, or the original principal balances of the loans.  Mot. In Limine at 27-28.  However, as discussed above, *see supra* Part III, Assured's samples are representative as to both of these variables.  Notably, Flagstar has retained neither a statistical nor a damages expert, and offers no evidence that the samples do not reliably represent the distribution of these variables.

### 3.   Dr. Mason's Use of Original Principal Balances Was Appropriate

Flagstar also appears to ask the Court to exclude Dr. Mason's analysis because he utilized the original principal balance of the loans, rather than the unpaid or average principal balance of the loans, in order to calculate damages.  Mot. In Limine at 28-29.  Flagstar speculates—again, without any evidence or analysis, expert or otherwise—that this <u>could</u> result in "inflation" of Assured's damages.  *Id.*  This assumption is incorrect.

31

As Dr. Mason explains in the attached declaration, recalculating Assured's damages using the unpaid loan balances at the time of charge-off, instead of the original balances, makes no material difference to Dr. Mason's ultimate conclusions concerning Assured's damages. Mason Decl. at ¶¶2-5.  Instead, the recalculation exercise simply confirms that Dr. Mason's original figures constitute a highly reasonable and accurate estimate of Assured's damages.  As Dr. Mason explains in his declaration, using either method, enforcement of the repurchase obligation with regard to the defective loans exceeds the threshold amount above which Assured would have avoided, or been reimbursed for, all of the claims it has paid.  *Id*. at ¶5.

### 4.   The Percentage of Defective Defaulted Loans Does Change Over Time

Flagstar asks the Court to exclude Dr. Mason's testimony entirely because Dr. Mason's "Adverse Defect Rate" changes over time in the various frustration-date scenarios that he examined. Mot. In Limine at 29-30.  But the reason for this change is unsurprising: Dr. Mason has conservatively limited his damages analysis to defective <u>defaulted</u> loans—not <u>all</u> defective loans regardless of performance.  As a result, the Adverse Defect Rate is necessarily different depending on the point in time at which it is measured.  This does not render Dr. Mason's analysis unreliable; on the contrary, it renders Dr. Mason's analysis a reliable representation of the actual facts as of the given frustration date scenario that he examined.

As explained in Dr. Mason's expert report and attached declaration, Dr. Mason's damages analysis relies upon his computation of an "Adverse Defect Rate" that is then applied to the loans in the two securitizations.  Mason Decl. at ¶2.  The Adverse Defect Rate represents the dollar amount of defective (in breach) defaulted loans divided by the dollar amount of total defaulted loans in the two transactions as of the date in question.  Unsurprisingly, the Adverse Defect Rate changes because—as a factual matter—the ratio of defective defaulted loans to

defaulted loans changes over time.  *Id.* at ¶13.  Flagstar also claims that Dr. Mason calculates "higher" damages the later in time that Flagstar was aware of breaches.  Mot. In Limine, at 29. But that is simply untrue, as reflected in Dr. Mason's damages reports.  Aaron Decl., Ex. K, at 4 (Mason Second Supp. Rep.).[9]

### 5.     Even if Certain Breaches Could be "Cured," It Makes No Difference to Dr. Mason's Damages Analysis

Flagstar speculates that Dr. Mason's damages calculations <u>might</u> be flawed to the extent they are based on allegedly "curable" breach findings premised on missing loan documentation, and asks the Court to strike his testimony on that basis.  Flagstar's Br. at 32.  However, Dr. Mason only considered defective loans that have defaulted and been charged off by Flagstar; it is impossible to cure a breach "in all material respects" where the loan at issue has already resulted in a loss to Assured.

Moreover, as Dr. Mason explains in his declaration, even assuming that some breaches based on missing loan documentation or other underwriting defects <u>were</u> potentially curable (which Assured disputes), it does not make a material difference to Assured's damages analysis. Mason Decl., at ¶6.  Based on the January 2009 frustration date and calculated through June 25, 2012, Assured's damages attributable <u>solely</u> to fraudulently-originated loans (which cannot be "cured" under any circumstance) are approximately $108,361,440.  *Id.* at ¶8.[10]  The reason for

---

[9] Flagstar also contends that Flagstar must have "actual" knowledge of breaches in "specifically identified" loans in order for its repurchase obligation to be triggered.  Mot. In Limine at 29. Again, the limitations that Flagstar wants to import into the Transaction Documents are not supported by the text of the agreements or any rational business justification.  Indeed, the Transaction Documents do not use the "actual" or "specifically identified" qualifiers that Flagstar slips into its brief.  Moreover, the Court's ruling on summary judgment already has rejected the logic of this argument.  (Order, Slip Op. at 12.)

[10] The slight difference in amount is due to a difference in the amount of statutory interest that would have accrued if a fraud-only defect rate is used.  Mason Decl. ¶8.

this is simple: the Adverse Defect Rate for breaches of the no-fraud representation <u>alone</u> exceeds

the threshold above which Assured would have avoided, or been reimbursed for, all of the claims

it has paid if Flagstar had timely complied with its repurchase obligations.  Mason Decl. at ¶¶6-9

(summarizing defect rates and related damages by defect subcategory).

### 6.     Dr. Mason Does Not Overstate the Amount of Recoverable Interest

Flagstar suggests Dr. Mason's testimony should be excluded because he allegedly

overstates—by some unspecified amount—Assured's recoverable interest by "ignoring that the

transaction documents afford Flagstar a 90-day cure period before its repurchase obligations are

triggered."  Flagstar's Br. at 33.  Flagstar, however, did not attempt to cure the breaches at issue.

Rather, Flagstar ignored the breaches for years, to this day denies that there are breaches, and has

thumbed its nose at the entire repurchase process.  As this Court has pointed out in its summary

judgment order, "that time period [for cure] has long since expired."  (Order, Slip Op. at 20.)[11]

In any event, the amount of interest implicated by Flagstar's "90-day" argument is a trivial sum

in comparison to the over $100 million that Flagstar owes Assured for including an enormous

percentage of defective loans in the two pools at issue.

Flagstar also asks the Court to exclude Dr. Mason's testimony on the grounds that he

supposedly employs an "incorrect interest rate."  Flagstar apparently contends that Dr. Mason

improperly applied the statutory prejudgment interest rate to certain claim amounts to which only

contractual interest should have been applied.  Flagstar's Br. at 33.  But in fact, Dr. Mason

properly applied statutory prejudgment interest <u>only</u> to those claim amounts that Assured <u>would

never have paid</u> (or for which it should have been reimbursed sooner) had Flagstar complied

---

[11] Given Flagstar's total breach of the parties' contracts, Flagstar cannot take advantage of a 90-day period designed for a seller operating in good faith to "use all reasonable efforts to cure in all material respects any breach."  Aaron Decl., Ex. A, §2.04(d).

with its contractual obligations.  *See* Mason Decl. at ¶¶10-11.  The contractual interest rate from

the parties' Insurance & Indemnity Agreement applies to claims and payments made in the

normal course.  Dkt. No. 14-6, §6.03, at 33-34 (referring to payments for which Assured is

entitled to be reimbursed for "as provided above").  This provision does not apply to claims that

were paid—or that were reimbursed later in time—because Flagstar breached its obligation to

repurchase a loan earlier.  And, in any case, even if <u>contractual</u> interest were applied to claim

amounts (as Flagstar appears to suggest), Assured's damages would still total approximately

$102 million.  *Id.*  Flagstar, with no damages expert, provides no evidence to the contrary.

### 7.    Dr. Mason Did Not Give Assured Double Credit for Putative "Recoveries"

Flagstar argues for exclusion of Dr. Mason's entire testimony on the grounds that his

damages calculations are "inflated" because they do not "account for putative recoveries Flagstar

collected on defaulted loans" and because Dr. Mason allegedly improperly applied "Defect Rates

to gross liquidation losses instead of liquidation losses net of recoveries."  Flagstar's Br. at 33-

34.  The premise of Flagstar's argument, however, is fundamentally flawed.  The putative

recoveries to which Flagstar refers provide additional cash flows that offset claims paid under

Dr. Mason's model.  Mason Decl. at ¶12.  Accordingly, subtracting those amounts <u>again</u> from

that month's claims paid by Assured, as Flagstar argues, would be improper double-counting in

Flagstar's favor, and therefore would <u>understate</u> Assured's damages.  *Id.*

### VI.    ASSURED IS WITHDRAWING ITS CLAIMS FOR SERVICING BREACHES AND DAMAGES

Flagstar contends in its brief that the testimony of Ms. Walzak and Dr. Mason

concerning Flagstar's servicing breaches and damages should also be excluded from the case.

Mot. In Limine at 34-39.  In light of the Court's comments in the Order regarding Assured's

servicing claims, and to streamline its case by narrowing the issues, Assured will withdraw its

35

claims regarding servicing, and will not present these claims during trial.  For this reason, this branch of Flagstar's motion is moot and need not be adjudicated by the Court.

## CONCLUSION

For the foregoing reasons, Assured respectfully submits that the motions *in limine* and to exclude expert testimony filed by defendants should be denied in their entirety.

Dated:  October 2, 2012
         New York, NY                              Respectfully Submitted,

                                                   **SUSMAN GODFREY LLP**


                                                   By:   */s/ Jacob W. Buchdahl*
                                                        Jacob W. Buchdahl
                                                        Arun Subramanian
                                                        Warren Burns
                                                        Joseph Portera
                                                        SUSMAN GODFREY L.L.P.
                                                        560 Lexington Ave., 15th Floor
                                                        New York, NY 10022
                                                        (212) 336-8330

36