Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., f/k/a FINANCIAL SECURITY ASSURANCE INC., <br><br> Plaintiff, <br><br> vs. <br><br> FLAGSTAR BANK, FSB; FLAGSTAR CAPITAL MARKETS CORPORATION; and FLAGSTAR ABS, LLC, <br><br> Defendants. | 11-CIV-2375 (JSR) |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Veronica E. Rendón
Stewart D. Aaron
Susan L. Shin
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000
Veronica.Rendon@aporter.com
Stewart.Aaron@aporter.com
Susan.Shin@aporter.com

*Attorneys for Defendants Flagstar Bank, FSB, Flagstar Capital Markets Corporation and Flagstar ABS, LLC*

Based on the testimonial and documentary evidence to be submitted at trial in this action, Defendants Flagstar Bank, FSB, Flagstar Capital Markets Corporation, and Flagstar ABS, LLC ("Defendants" or "Flagstar") respectfully urge that this Court make the following findings of fact and conclusions of law:

## PROPOSED FINDINGS OF FACT

## I.      PRE-LITIGATION FACTS

### A.      Background

1.      Flagstar Bank is a federally chartered stock savings bank with banking centers located in Michigan, Indiana and Georgia.  Flagstar ABS, LLC and Flagstar Capital Markets Corporation are subsidiaries of Flagstar Bank's parent company, Flagstar Bancorp.

2.      Flagstar Bank also has residential mortgage loan origination operations.  The residential mortgage products offered by Flagstar Bank include, among other things, home equity lines of credit ("HELOCs") and second-lien mortgages, both of which carry a subordinated priority to first-lien mortgages.

3.      Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc. ("AGM" or "Plaintiff"), provided bond insurance for or "wrapped" Residential Mortgage Backed Securitizations, or "RMBS."

4.      In 2005, Flagstar completed the first of its four non-agency mortgage loan securitizations,[1] Flagstar Home Equity Loan Trust 2005-1 ("2005-1 Trust").  Flagstar had never issued a non-agency mortgage loan securitization prior to this time and was inexperienced in this regard.

---

[1]      The loans collateralizing a non-agency security are not insured by a federal agency, such as FNMA or FHLMC.

5.      In 2006, Flagstar completed a second non-agency securitization, Flagstar 2006-2 Home Equity Loan Trust 2006-2 ("2006-2 Trust").   The loans underlying the notes issued by the 2005-1 and 2006-2 Trusts were HELOCs.

6.      HELOCs are second lien loans in which the collateral is the equity in the borrower's home.  Because HELOCs are subordinate to first lien mortgages, they are especially susceptible to higher default rates and loss severities.  HELOCs have a thinner relative equity "cushion" in the property, meaning that there is a greater risk that HELOCs will become unsecured if borrowers find themselves "upside down" or in a "negative equity" position when the value of their home falls below the amount they owe on their mortgages.

7.      When issued, the 2005-1 Trust was collateralized by 8,155 individual HELOCS.  Approximately 1,875 more HELOCs were subsequently added to the 2005-1 trust for a total of 10,030 loans.   When issued, the 2006-2 Trust was backed by 4,186 HELOCs.   Another approximately 1,400 HELOCs were subsequently added to the 2006-2 Trust for a total of 5,586 loans.

8.      Flagstar had considerable "skin in the game" with respect to the performance of the two securitizations.  The underlying loans were sold by Flagstar to the trust vehicles.  In lieu of an upfront cash payment or gain on sale, Flagstar maintained a residual ownership or equity interest in the securitizations.  Flagstar's residual equity interest was the most subordinate interest in the Transactions' "waterfall."[2]  Therefore, if any part of the securitizations performed below expectations, Flagstar's residual equity interest absorbed the shortfall.

---

[2]    The waterfall structure determines how payments are made and losses absorbed within a securitization.

9.     Another component of Flagstar's ownership interest in and additional credit support to the 2005-1 Trust and the 2006-2 Trust (collectively, the "Trusts") is the Transferor's Interest. Because the Transferor's Interest is subordinated to reimbursement of the Plaintiff's claims on the two Transactions' cash flows, it will only have a positive value after AGM is fully reimbursed at the end of the Transaction for all claims it has paid into the Trusts.

10.     AGM has been a leading provider of financial guaranty insurance for over twenty years. Plaintiff is a sophisticated participant in the RMBS market and performed extensive analysis of the risks it assumed when insuring such transactions, including by engaging in due diligence of the lender and its lending and servicing operations, performing mortgage loan file review, performing credit analysis of the mortgage loan characteristics and reviewing and testing the credit enhancement and transaction structure.

11.     AGM issued policies guaranteeing certain payments of principal and interest to the holders of the notes issued by the Trusts. In return, AGM was paid a premium out of the cash flows generated by the underlying mortgages in the Trusts.

12.     As a bond insurer, AGM guaranteed the timely payment of interest and principal to bondholders in the RMBS on each payment date. AGM, like any guaranty insurer of RMBS transactions, had an unconditional obligation to pay the bondholders.

13.     AGM's goal in structuring transactions was to never pay a claim. Accordingly, AGM underwrote all transactions to include sufficient credit enhancement in the structures such that AGM would never have to pay claims that, in the aggregate, exceeded the revenues flowing into the Trusts by the HELOCs and the additional credit enhancements embedded in the structure of the Transactions. This model, which was common in the financial guaranty insurance industry, is referred to by AGM and other insurers as a "zero-loss" insurance model.

3

14.     The "zero-loss" model required that AGM accurately project expected losses in order to structure a deal that included sufficient credit enhancement or cushion against having to pay claims.  Such claims would occur if the cash flows generated by the HELOCS were insufficient and the structural reserves and overcollateralization included in the structure of the Transactions failed to make up for any deficiencies. AGM's cushion or credit enhancement was derived by mechanisms such as excess spread accounts, overcollateralization and structural subordination. Thus, Plaintiff only paid claims when it was forced to pay claims due to the inadequacy of revenue streams and the failure to have properly structured the Transactions and associated credit enhancements.

**B.     AGM's Pre-Transaction Due Diligence Was Extensive and Thorough**

15.     In order to project expected losses and ensure that the HELOCs were of proper credit quality to meet AGM's risk profile, AGM performed extensive due diligence on the HELOCs included in the Transactions.

16.     Completion of due diligence with results that were satisfactory to AGM, in its sole discretion, was a condition precedent to AGM's agreement to provide bond insurance for the Trusts.

17.     Such due diligence included verifying the integrity of the loan data tape, which contained detailed information (for example, loan to value ratio ("LTV"), combined loan to value ratio ("CLTV"), income, geography) about each loan to be included in the Transactions, and then performing extensive analysis on that data through various data stratifications and computations.

18.     As part of its due diligence, AGM also performed an operational review of Flagstar, which included, among other things, going on site and meeting with executive management, Flagstar's underwriters and Flagstar's loan servicing professionals.  This was to ensure that Flagstar's

approach to originating, underwriting and servicing loans was sufficient in AGM's estimation, and that AGM was comfortable with Flagstar's philosophy and approach to originating and servicing loans.  AGM ultimately determined that it was so comfortable.

19.     AGM's due diligence also included selecting adverse and random, representative samples of the HELOCs to be included in the Transactions, which were then reunderwritten by experienced third-party vendors to Flagstar's underwriting guidelines, and graded to AGM's internal guidelines.  This was to determine whether any material issues existed in the HELOCs, including material departures from Flagstar's underwriting guidelines and obvious fraud issues.

20.     Based on this detailed testing, AGM ultimately determined that the credit quality of the HELOCs for inclusion in both Trusts was "A+."

21.     AGM utilized the Clayton Group ("Clayton") on the 2005-1 Transaction, and the Bohan Group ("Bohan") on the 2006-2 Transaction to conduct a reunderwriting of random, representative samples of the loans that were to be included in each Trust, as well as adverse samples of the loans.  According to Rebecca Walzak, AGM's liability expert, these firms had strong reputations for file review.

22.     AGM's Residential Mortgage Group ("RMG"), which was the business group within AGM that was responsible for residential-mortgage-backed securitizations, prepared Executive Summaries for each of the Transactions.  ¶

23.     AGM's Management Review Committee ("MRC") was required to approve the 2005-1 and 2006-2 Transactions prior to AGM's agreeing to provide note insurance with respect to those transactions.

24.     The Executive Summaries were submitted to the MRC for their consideration in deciding whether to provide note insurance with regard to the two Transactions.

25.     In connection with each Transaction, AGM prepared a credit memo which included, among other things, an Executive Summary that was submitted to AGM's executive Credit Committee for consideration in deciding whether to insure or "wrap" the two Transactions.  The Executive Summaries provided a detailed and contemporaneous account of AGM's understanding of the Transactions, its identification and evaluation of major risk issues — none of which included the credit quality of the HELOCs — and the due diligence it performed in evaluating the credit quality of the loans

26.     The Executive Summaries also described the structure of the Transactions as well as the loss models that AGM utilized to anticipate expected losses within the Transactions, which formed the basis for how the Transactions would be evaluated relative to AGM's goal of 100% loss coverage under its "zero loss" model.

27.     For both Transactions, AGM designed random, representative samples of loans for the purpose of having them reunderwritten.  The purpose of reviewing random, representative samples was so that AGM could be confident that the loans included in the Transactions were of strong credit quality, contained virtually no material issues, and were consistent with AGM's risk appetite at the time of the closing of the Transactions.

28.     Additionally, AGM decided to wrap the Transactions based on the reunderwriting of a sufficient number of loans to create a 95% confidence level in the sample. It therefore ensured that no more than 5% of the HELOCs would be found unacceptable if the entire portfolio had been reviewed in detail.  Even if one assumed material adversity, fraud or human error existed in that 5% population, the structuring of the Transactions and associated credit enhancement were designed to cover any potential material issues in that small segment of

the portfolio.  AGM thereby recognized, and in fact modeled for, some deviation from the Underwriting Guidelines.

29.     AGM directed Clayton and Bohan to review the random, representative samples for compliance with both Flagstar's underwriting guidelines and AGM's underwriting guidelines. Additionally, Clayton and Bohan also looked for instances of observable fraud which, if detected, would be communicated to AGM.

30.     Based on their review, Clayton and Bohan were to rate each loan Event Level 1 (EV-1), Event Level 2 (EV-2), or Event Level 3 (EV-3), as defined in AGM's internal grading system.

31.     Event Level 1s were deemed to have no exceptions to Flagstar's underwriting guidelines or any other issues.  Event Level 2s were deemed to have exceptions to Flagstar's underwriting guidelines; however, compensating factors were determined to exist such that the exception or any other associated issue was not deemed "material."

32.     Event Level 3s would be scrutinized closely by AGM because they could involve material departures from Flagstar's underwriting guidelines or have some other type of material issue that could be adverse to AGM's interests.  The existence of Event Level 3s might cause AGM to decide not to "wrap" the deal.

33.     When Clayton and Bohan reviewed the loans, they engaged in an iterative process that involved a great deal of communication with Flagstar and AGM.  This led to the additional transmission of loan documentation and permitted questions to be asked and answered throughout the process.  This is part of the typical "clearing" process that occurs in connection with any securitization due diligence.

34.     During the process, the particular exceptions to the underwriting guidelines that constituted an Event Level 2 or 3 would be discussed, frequently cured (*i.e.*, a required part of the loan file that had not been located at first would be provided by Flagstar), or expressly excepted by AGM (*i.e.*, a loan characteristic such as a borrower's net assets might be lower than required by the guidelines, but the borrower's high credit rating could compensate).

35.     AGM was deeply involved in the loan file review process, including decisions about the rating of the loans.  AGM received regular updates from Clayton and Bohan, including receiving extensive Excel spreadsheets which set forth, on a loan-by-loan basis, the results of Clayton's and Bohan's findings and the rationale behind each reunderwriting decision and associated grade.  Throughout the process, AGM was able to and did comment on those decisions, including the acceptability of the underlying rationale.

36.     Over the course of the due diligence, the cure rate for Event Level 3s increased.  An AGM employee testified that this was not unusual and is a result of the iterative nature of the file review process.  During the course of Clayton and Bohan's loan file review for the 2005-1 and 2006-2 Transactions, a number of Event Level 3s were found initially and, through the clearing process, were cleared.  AGM did not find this worrisome as it was part of a typical due diligence process.

37.     According to the 2005-1 Executive Summary, there were zero Event Level 3s in the random, representative sample by the time the Transaction closed.[3]   For the 2006-2 Transaction, Bohan reviewed a 250-loan random, representative sample and found six Event

---

[3]    The Executive Summary explains that there were Event Level 3s that were the result of a potential infraction of the regulatory Truth In Lending Act. This issue, however, was identified early during the course of due diligence and remediated to the satisfaction of AGM, as were all other major risk issues identified in the Executive Summaries.

Level 3s at the time of AGM's Credit Committee consideration, although AGM indicated that,they would be cleared by the time of closing.  By the time of closing, all "material" Event Level 3s were in fact cleared.

38.    As set forth in the Executive Summaries, AGM's due diligence resulted in the credit quality of the HELOCs being rated "A+" for both Transactions.  These grades demonstrate that, after extensive due diligence on adverse and random, representative samples of loans, AGM found that the risk profile of the HELOCs was acceptable and that no material credit issues were associated with the loans.

39.    As set forth in the Executive Summary, unlike the credit rating of the loans, the collateral underlying the loans (*i.e.*, the property which secured the loans) was rated a "C." According to AGM, this was not unique to Flagstar.  Rather, it reflected that HELOCs were second lien products, and thus had higher CLTV ratios than first lien products.  As such, they were, by their nature, more risky loan products.

### C.    Plaintiff's Loss Modeling Was Materially Flawed and Underweighted the Primary Risk Associated with HELOCs, Which Was Known by AGM at the Time of Closing

40.    In order for AGM to satisfy its "zero loss" model, it had to accurately forecast expected loss from the Transactions and design a securitization structure that created sufficient "cushion" above and beyond the expected loss such that AGM would never have to pay a claim. It failed to do so.

41.    As known by AGM at the time it closed the Transactions, the primary risk associated with HELOCs is that they are second liens and have higher CLTVs than first lien products.  It is for this reason that the collateral underlying the HELOCs in the Transactions received a C.

9

42.     At the time of the closing of the Transactions, AGM also understood that there was a "housing bubble" or, stated another way, a housing market that could not sustain itself.

43.     Nonetheless, when AGM calculated the expected loss figure, upon which the Transactions were structured, it did so by averaging of three separate loss models: the "RMG Model," the "FICO Model," and the "Historic Model."

44.     The RMG Loss Model was the only one of the three Models that considered loan product, CLTV and geographic location of the property, loan documentation, and property type in predicting expected loss.  It also was the only model that was based on the inputs from AGM's due diligence and loan file review for the two Transactions.

45.     The FICO Model relied on borrowers' historic credit performance, which contained historic data drawn from periods in which there was a strong economic environment and a more robust housing market.  Similarly, the Historical Model assessed the performance of HELOC transactions in the prior 13 years when, again, there was primarily a strong economic environment and a more robust housing market.  Unlike either the FICO or Historic Models, the RMG Loss Model had very little historic bias.

46.     For the 2005-1 Transaction, the FICO Model produced an expected loss of 1.28%, as a percent of the aggregate mortgage loan pool. The Historical Model produced an expected loss of 1.74%.  Yet the RMG model produced an expected loss of 9.94%. When averaged, the total expected loss figure was 4.32%.  By taking the average of the three Models, it diluted the predicted expected loss of the RMG Loss Model by over half.

47.     For the 2006-2 Transaction, AGM's FICO Model produced an expected loss of 1.10%, the Historical Model produced an expected loss of 1.74%, and the RMG Model produced an expected loss of 8.05%.  By taking the average of the three Models, AGM

10

calculated an expected loss for the 2006-2 Transaction of 3.63%—again, less than half of the predicted expected loss generated by the RMG Loss Model.

48.     AGM's "averaging" approach was not common in the bond insurer industry.  In fact, senior executives at AGM, in connection with the closing of the 2005-1 Transaction and in general conversations about credit and underwriting approach, questioned the appropriateness of utilizing the averaging approach and articulated discomfort with it.  Yet, AGM continued to use averaging in structuring these Transactions.

49.     Shortly after the closing of the 2006-2 Transaction, the real estate bubble burst. Unprecedented and widespread economic fallout resulted.  Unemployment spiked to double-digit levels and has remained stubbornly high.   Home prices experienced steep and precipitous declines across the country, and the entire housing market has dropped to unprecedented levels.

50.     As the economy continued to deteriorate, the level of default volume began to increase across the industry for all mortgage products, but particularly for HELOCs, which have a heightened sensitivity to a falling housing market.  It became very clear that the HELOC portfolios were becoming rapidly more unsecured as property values fell across the nation and borrowers became less willing to pay second lien debts.  As AGM's liability expert testified, this phenomenon led to an increase in so-called "strategic defaults," meaning that certain borrowers opt to default on their second lien mortgage rather than continue to make payments on an "underwater" property, in particular when they know the second lien creditor is unlikely to foreclose on the property since foreclosing does no economic good.

51.     As AGM's liability expert further testified, these effects from the economic downturn and housing crisis were particularly felt in the states in which the properties associated with the 2005-1 and 2006-2 Transactions are concentrated.

52.     The charge-off of loans in the 2005-1 Transaction and the 2006-2 Transaction show a strong correlation with the increase in national unemployment and the decrease in the national housing market beginning in 2008 and later years.

53.     Had AGM attempted to structure the Transactions in a manner consistent with the expected loss figures generated by the RMG Loss Model, it would not have insured the Transactions or it would have structured the Transactions to have a much higher level of non-insurance credit enhancement.   In either event, it would not have sustained the losses of which it now complains, and which it now tries to mask behind allegations of poor credit quality —claims belied by its own pre-closing due diligence and file review.

**D.     Cure and Repurchase Remedy for Representation & Warranty Breaches**

54.     Each of the Transactions included a Mortgage Loan Purchase Agreement ("MLPA")[4] that contained approximately 75 loan-level representations and warranties ("R&Ws"), covering numerous aspects of the underlying loans.

55.     Based on the due diligence and file review that AGM performed in connection with its insurance decision-making process — which created a 95% confidence level regarding the credit quality of the underlying loans — AGM considered the risk of material loss arising from loans being of a lower credit quality than originally represented by management to be remote.   Rather, AGM relied upon the existence of the R&Ws for circumstances where it became apparent that portfolio-wide fraud may have occurred, such as borrowers that did not actually

---

[4]     Flagstar ABS, LLC purchased these loans from Flagstar Capital Markets Corp. pursuant to an MLPA, to which Flagstar Bank, FSB was also a party.   See Flagstar Home Equity Loan Trust 2006-2 Purchase Agreement, p. 3.   Plaintiff is a third party beneficiary of the MLPA.   See id. at § 7.08.

exist, or loans that had been double-pledged to securitizations.   In such circumstances, the severity of loss is likely to be much higher than anticipated originally.

56.   The Sale and Servicing Agreement ("SSA")[5] details the repurchase process associated with purported breaches of loan-level R&Ws.

57.   The SSA provides that upon discovery of any breach of an R&W as to the mortgage loans that is both material and adverse to AGM's interest, the discovering party must provide prompt notice to the other parties.

> If the Seller, the Sponsor, the Depositor, the Servicer, the Note Insurer, or a Responsible Officer of the Indenture Trustee discovers a breach of any of the foregoing representations and warranties . . . that materially and adversely affects the interests of the Issuer, the Indenture Trustee under the Indenture, the Noteholders, or the Note Insurer in the Mortgage Loan, the party discovering the breach shall give prompt notice to the other parties and the Note Insurer.[6]

58.   The SSA further provides that, "within 90 days of becoming aware" of a breach of a loan-level R&W, Flagstar "shall use all reasonable efforts to cure [such breach] in all material respects."  *Id.* at § 2.04(d).

59.   The SSA also identifies the sole remedy that can be sought from Flagstar for a breach of a loan-level R&W—retransfer of the defective mortgage back to Flagstar, and a payment by Flagstar into the Trust in the amount of the Transfer Deficiency for the loan, as calculated by the Indenture Trustee for the Transactions.  *Id.*

60.   Thus, Flagstar's obligation to pay money into the Trusts in respect of a Defective Mortgage Loan only arises after Flagstar has actual notice of a material and ongoing breach that

---

[5]   The Sale and Servicing Agreement ("SSA") was executed in conjunction with and by the same parties to the MLPA, and covers the sale of the underlying loans to the Trust as well as the servicing of those loans.  As with the MLPA, Insurer is a third-party beneficiary of the SSA.
[6]   2005-1 and 2006-2 SSA, § 2.04(c).

materially and adversely affects the interests of AGM in such loan, Flagstar is unable to cure the breach, and the Indenture Trustee for the Trusts calculates a Transfer Deficiency for the associated loan.

61.     AGM has only issued repurchase demands for charged-off loans contained in its 2009 and 2010 demands.  At the time it made the demands, AGM did not request that the Indenture Trustee calculate the associated Transfer Deficiency for the loans.  AGM, to this date, has failed to do so.

62.     Under the Transaction Documents, AGM is not entitled to direct payment of any Transfer Deficiency or amounts associated with a repurchase.  2006-2 SSA §§ 2.04(e), 2.07(a), 3.02(b).  Pursuant to the Transaction Documents, to the extent a Transfer Deficiency is calculated for any given loan, the loan must be retransferred to Flagstar and Flagstar must pay the associated Transfer Deficiency into the Custodial Account for the associated Trust.

63.     Requiring Flagstar to pay AGM damages directly, rather than the Trusts, creates a windfall for AGM, and exposes Flagstar to duplicative damage claims brought by the Indenture Trustee on behalf of the Trust and/or Noteholders to the Trust.

64.     Flagstar did not, until recently, have actual awareness that any loans required repurchase.

65.     AGM's 2009 and 2010 repurchase demands did not trigger the repurchase remedy because Flagstar cured or rebutted those demands back in time and AGM never responded to those rebuttals.

66.     The filing of the instant lawsuit did not trigger the repurchase remedy because Plaintiff did not identify any loans allegedly containing breaches with sufficient specificity such that Flagstar could identify the loan, let alone investigate the alleged breach.

67.     When Flagstar discovered the existence of three loans which its own liability expert, John Griggs, determined contained potential material and adverse breaches, within 90 days, Flagstar notified the Indenture Trustee, pursuant to the Transaction Documents, that it wished to repurchase the loans and requested that the Trustee calculate the associated Transfer Deficiency.   This approach is consistent with the protocol set forth in the Transaction Documents.

68.     To this day, AGM has not issued any demand on non-charged off loans, nor has it sought damages for any loans other than non-charged off loans.

## II.    PLAINTIFF'S LITIGATION LOAN SAMPLE AND CLAIMS

69.     In this lawsuit, AGM relies on a sample of loans to allege breaches throughout the loan pools ("Litigation Sample").   To that end, Dr. Nelson Lipshutz created what purport to be two random, representative samples of 400 loans, drawn from the 2005-1 and 2006-2 Transactions.

70.     Dr. Lipshutz failed to use certain key variables that are of particular relevance to AGM's claims when testing the representativeness of the samples he constructed.

71.     Dr. Lipshutz also failed to consider whether the sample loans are representative of the overall population with respect to their original principal balances.

72.     With respect to AGM's servicing claims, Dr. Lipshutz fails to take into account the variable of loan delinquency.

73.     Dr. Lipshutz has not shown that the samples are representative of the overall populations for variables relevant to AGM's claims.

74.     The work of Plaintiff's liability expert, Rebecca Walzak, and damages expert, Dr. Joseph Mason, is based on the flawed sample.

75.     Ms. Walzak claims that she and a team of underwriters, as well as certain third party vendors, reviewed each of the loans in the samples to determine whether the loan complied with the R&Ws in the Transaction Documents.

76.     Ms. Walzak claims material and adverse breaches based on three separate R&Ws: (1) the loan originated in good faith and in accordance with Flagstar's underwriting guidelines; (2) loans acquired through brokers or correspondents were originated per Flagstar's underwriting guidelines; and (3) that "[n]o error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person . . . ."

77.     Ms. Walzak asserts that "340 loans or 85 percent of the loans in the 2005-1 random sample contain one or more breaches of contractual representations and warranties which individually and/or collectively materially and adversely affect the interests of Assured in such loans."  Ms. Walzak further asserts that "270 loans or 67.5 percent of the loans in the 2006-2 random sample contain one or more breaches of contractual representations and warranties which individually and/or collectively materially and adversely affect the interests of Assured in such loans."

78.     The vast majority of alleged breaches relate to compliance with underwriting guidelines.  Ms. Walzak concludes that 608 of the 610 loans she claims included material and adverse breaches failed to comply with the appropriate underwriting guidelines.  This is contrary to the work performed by Clayton and Bohan when they reunderwrote random, representative samples of loans for each Transaction.

79.     The structural similarities between Ms. Walzak's review and the contemporaneous diligence performed by Clayton and Bohan at the time of the closing of the respective Transactions cast Ms. Walzak's findings into significant doubt.  Ms. Walzak states in

her report that she "reviewed nine core categories of loan file information regarding each loan in the random sample," comprised of the following: "(1) assets; (2) borrower eligibility; (3) borrower credit characteristics; (4) borrower employment and income; (5) indications of fraud (red flags) in the loan file; (6) title and closing information; (7) property characteristics; (8) regulatory compliance; and (9) performance of underwriting."[7]  These same categories were likewise encompassed in the testing conducted as part of the contemporaneous file-level diligence performed by Clayton and Bohan.

80.     AGM's contemporaneous due diligence at the time of the closing of the Transactions is the best evidence of what AGM considered material in relation to a loan's risk profile.

81.     Through AGM's extensive pre-transactional due diligence and detailed loan file review, AGM scrutinized the credit-quality of the HELOCs to be included in the Transactions, analyzed portfolio-wide data regarding the Transactions, and watched the iterative process unfold.  It had ample opportunity to properly identify any material or adverse risks prior to the time of the closing, and determined to a 95% confidence level that no such material risks existed with regard to the credit quality of the loans.

82.     Ms. Walzak's claims of pervasive material and adverse breaches are belied by the contemporaneous pre-transactional due diligence, which was performed by two independent loan file due diligence firms that each concluded that Flagstar's originations and loan underwriting were of a high quality.

83.     The iterative process that occurred between the third party due diligence firms did not occur with plaintiff's expert, Ms. Walzak, or her file reviewers.  Rather, they made findings

---

[7]     Walzak Report, p. 13.

17

in a vacuum, without any dialogue or interaction with Flagstar, several years after the Transactions closed and in a litigation context.  This is the equivalent of accepting the initial EV3 findings of Clayton and Bohan, without engaging in the ensuing "clearing" process. Among other things, the failure of Ms. Walzak to engage in a more iterative process has led to an inflated breach rate.

84.    Ms. Walzak's opinion that the alleged breaches in the loans "fundamentally changed the risk profile" is unsupported.

85.    Among other things, Ms. Walzak failed to utilize her WRAPs proprietary risk model, which is specifically designed to correlate underwriting mistakes to the probability or risk of default.  As testified to by Ms. Walzak, one factor that is probative of such correlation is historic performance of the loans at issue.  Yet, in this matter, Ms. Walzak did not consider ensuing loan performance.

86.    Out of the 800 loans reviewed by Ms. Walzak's team of reviewers, Ms. Walzak claims 610 contain material and adverse breaches.   Of those 610, however, 316 have been paid in full and 168 loans had a payment status of current as of October 31, 2011.  Therefore, 484 of the 610 allegedly breaching loans (approximately 80%) have either paid in full or had a current payment status as of October 31, 2011.

87.    Flagstar conducted a review of each breach allegation contained in all 126 individual loan files that were either charged off or were classified with an adverse payment status as of October 31, 2011.  Of the 126 loans reviewed, Ms. Walzak has failed to establish the existence of a material breach in all but three instances. The vast majority of her findings are entirely without basis or contained only non-material errors.

88.     Additionally, Ms. Walzak's "fraud" review is spurious and unreliable.  Among other things, Ms. Walzak had little to no control over the work performed by the third-party vendors that performed this analysis, and much of the analysis was dependent upon resources that are not reliable, including, for instance, salary.com to identify purported material income deviations from what was contained in the loan files.[8]

## III.    PLAINTIFF'S CLAIM FOR DAMAGES

### A.    Plaintiff's Breach of R&Ws Damages Claim

89.     Dr. Mason did not even attempt to quantify the extent to which Plaintiff claims that the alleged breaches fundamentally changed the risk profile of the loans in question.

90.     The entirety of Dr. Mason's origination damages analysis is predicated on the flawed work of both Dr. Lipshutz and Ms. Walzak.

91.     In calculating damages, Dr. Mason relied exclusively on Ms. Walzak's inflated breach rate, on the unsupported assumption that but for awareness of the alleged breaches, AGM would not have accepted the allegedly defective loans into the Loan Pools.

92.     Dr. Mason applied Ms. Walzak's breach rate only to defaulted (charged-off) loans.

93.     Dr. Mason's damages calculations are flawed for other reasons, which results in grossly overstated damages.

94.     Dr. Mason's damages analysis is inconsistent with the cure and repurchase remedy to which AGM is bound.

---

[8]     Based upon Assured's representation that it is withdrawing its servicing claims, this document does not address such claims.

95.     Dr. Mason used an incorrect interest rate for certain of his calculations.   The Insurance and Indemnity Agreement ("I&I") specifically states that payments made to AGM pursuant to the I&I "shall bear interest at the Late Payment Rate from the date when due to the date paid."[9]

**B.      There Are No Damages for 2005-1—Transferor's Interest**

96.     There are no damages for the 2005-1 Trust because of AGM will be fully reimbursed at the end of that Transaction for all claims it has paid.

97.     The transferors' interest is the vehicle by which ownership is transferred from Trusts to Flagstar, once a rapid amortization period ("RAP") is declared in each of the transactions.

98.     Once RAP was declared by Plaintiff for the 2005-1 Trust in April 2008, and for the 2006-2 Trust in December 2007, all new draws were no longer funded by the Trusts; instead, Flagstar became obligated to fund those draws in exchange for a beneficial interest in the Trusts ("Transferor's Interest").   All principal payments were then directed to the extinguishment of the outstanding notes.   With each new draw funding, Flagstar gradually retained a pro rata portion of the deal, which represents the Transferor's Interest, and which grew over time.

99.     The Transferor's Interest is subordinated to reimbursement of the Plaintiff's claims on the Transaction's cash flows; therefore, it can only have a positive value if Plaintiff is fully reimbursed at the end of the Transaction for all claims it has paid.   Accordingly, at the end of the 2005-1 transaction, all the monies due to the Plaintiff will be reimbursed, and there will be asset values remaining for Flagstar.

---

[9]     2006-2 I&I § 6.03; *see also id.*, Appendix I (defining "Late Payment Rate").

100.    As of June 30, 2012, Flagstar's total draw contribution for the 2005-1 Trust was $35.59 million.  As of that date, there existed $25.95 million in credit support in the 2005-1 Trust, which represented Flagstar's $35.59 million draw contribution to date, less $9 million in losses.[10]

101.    As of June 30, 2012, Flagstar booked a Transferor's Interest valuation for the 2005-1 transaction of $7.66 million.[11]

102.    As of June 30, 2012, Flagstar's total draw contribution for the 2006-2 Trust was $51.3 million.  As of that date, there existed $28.9 million in credit support in the 2006-2 Trust, which represented Flagstar's $51.3 million draw contribution to date, less $22.4 million in losses.[12]

103.    The available $28.9 million in credit support for the 2006-2 Trust will reimburse Plaintiff insurer, but such reimbursement will be partial.  Accordingly, Flagstar has not booked a positive Transferor's Interest valuation for the 2006-2 transaction.[13]

## IV.    PROCEDURAL HISTORY

104.    On April 7, 2011, AGM filed a Complaint against Flagstar for breach of contract, reimbursement and indemnification under New York law.  Specifically, AGM made two breach of contract claims alleging breaches of the representations and warranties Flagstar made in the Transaction Documents relating to both the 2005-1 and 2006-2 Transactions.  In its third and fourth claim AGM sought reimbursement and indemnification relating to the 2005-1 and 2006-2 Transactions.

---

[10]    2012Q2 10 10Q, Note 9.

[11]    *Id.*

[12]    *Id.*

[13]    *Id.*

105.    On July 7, 2011 the Court granted Flagstar's May 23, 2011 Motion to Dismiss in part, dismissing AGM's reimbursement and indemnification claims, and limiting AGM's remedies on its remaining breach of contract claims to "those related to enforcing Flagstar's 'cure or repurchase' obligation set forth in the Transaction Documents."  July 7, 2011 Order. On September 8, 20011, the Court issued a reasoned opinion reconfirming its July 7, 2011 Order.

106.    On August 18, 2011, AGM filed an Amended Complaint, which added its fifth and sixth claims alleging breaches of the 2005-1 and 2006-2 SSAs for Flagstar's alleged failure to properly service the mortgage loans in the Pools.

107.    On February 29, 2012, the Court denied Flagstar's Motion for Summary Judgment on all remaining claims.  On September 25, 2012, the Court issued a reasoned opinion setting forth the basis for its ruling and confirmed that trial would be held in October 2012.

## PROPOSED CONCLUSIONS OF LAW

**I.      FIRST AND SECOND CLAIMS:  BREACH OF 2005-1 AND 2006-2 I&Is**

### A.      Elements of Breach of Contract Claim

1.      In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011).

2.      When a party fails to satisfy the obligations set forth in a contract as prerequisites to the other party's duty to act, or such duty is otherwise not triggered by the occurrence of a contingent event, such a claim is not ripe.  *Advanced Global Tech., LLC v. XM Satellite Radio, Inc.*, No. 07 Civ. 3654 (JSR), 2007 WL 3196208, at *3 (S.D.N.Y. Oct. 29, 2007); *Oldcastle*

*Precast, Inc. v. U.S. Fidelity & Guar. Co.*, 458 F. Supp. 2d 131, 145 (S.D.N.Y. 2003); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003).

### B.   Formation of Contract and Performance by Plaintiff

3.   There is no dispute that a contract was formed between the parties with respect to the obligations in the I&Is, or that Plaintiff performed under the I&I by issuing the financial guaranty insurance policy.

### C.   Defendants Did Not Fail to Perform

4.   In order to state a claim for breach of contract, the Defendants must have failed to perform. *Diesel Props*, 631 F.3d at 52-53.

5.   Plaintiff has not met its burden of proving that Defendants breached their contractual obligations.

6.   Plaintiff alleges that the Defendants breached certain representations and warranties.  As set forth in the findings of fact above, there is no proof that such breaches occurred.

7.   The sampling methodology used by Plaintiff is flawed and unreliable.[14]

8.   In order to establish Defendants' liability in this action, Plaintiff is solely relying on the expert opinion of its liability expert, Ms. Walzak.  However, Mr. Walzak's opinions are unreliable.[15]

---

[14]   Flagstar's Memorandum of Law in Support of Their Motions In Limine and to Exclude Plaintiff's Expert Testimony, filed on May 31, 2012 ("Flagstar's MIL"), at 11-13.

[15]   Flagstar's MIL at 13-26.

### D.   Plaintiff Has Not Shown the Requisite Causation

9.   "[C]ausation is an essential element of damages in a breach of contract action, and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Diesel Props*, 631 F.3d at 52-53 (internal quotations omitted).

10.   "[T]he causation that must here be shown is that the alleged breaches caused plaintiff to incur an increased risk of loss." *Assured v. Flagstar*, 11 Civ. 2375 (JSR) (N.Y. Sept. 25, 2012) at *12.

11.   The sole proof of causation offered by Plaintiff is the expert opinion of Ms. Walzak who states, without basis, that the breaches she identified "fundamentally changed the risk profile of the loans in question." Ms. Walzak's opinions are not reliable.[16]

### E.   Plaintiff Has Not Proven Its Damages.

12.   In order to recover damages for breach of contract under New York law, a plaintiff must prove it was damaged by the contract's breach. *See LNC Inv., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465 (2d Cir. 1999) ("Under New York law, in fact the failure to prove damages is fatal to a plaintiff's breach of contract cause of action.") (internal quotations omitted); *Bernard Nat'l Loan Inv. v. Traditions Mgmt., LLC*, 688 F. Supp. 2d 347, 364 (S.D.N.Y. 2010) (finding that plaintiff failed to prove any damages as a result of the claimed breach).

13.   The sole proof of damages offered by Plaintiff is the expert opinion of Dr. Joseph Mason. Dr. Mason's opinions are not reliable and are excluded.[17]

---

[16]   *Id.*

[17]   Flagstar's MIL at 26-34.

14.     The expert testimony of Ann Rutledge is reliable and persuasive.    Because Plaintiff will be made whole as to its losses with respect to the 2005-1 Transaction, Plaintiff cannot recover any damages with respect to that transaction.

**F.      There Are Contractual Limitations on Plaintiff's Damages Remedy**

**1.      Plaintiff's Remedy is Limited to Cure or Repurchase**

15.     Plaintiff is contractually restricted to the sole remedy of retransfer and reimbursement to the securitization trusts for loans that contain a material and ongoing breach. SSA § 2.04(d).  The repurchase provision provides, it

> is the Seller's obligation, subject to certain cure periods specified herein, to accept a transfer of a Mortgage Loan as to which a breach has occurred and is continuing and to make any required deposit in the Custodial Account or to substitute an Eligible Substitute Mortgage Loan.

*Id.* § 2.04(e).

16.     It is the law of the case that Plaintiff's recovery in damages is limited to the repurchase remedy.  *Assured v. Flagstar*, 11 Civ. 2375 (JSR) (July 8, 2011) (order partially granting Flagstar's motion to dismiss) ("AGM's remedies with respect to its remaining claims are limited to those related to enforcing Flagstar's 'cure or repurchase' obligations set forth in the Transaction Documents."); *Assured v. Flagstar*, 11 Civ. 2375 (JSR) (Sept. 8, 2011) (Opinion on motion to dismiss) ("[T]he combined effect of these provisions is to restrict AGM's remedies to (a) enforcing Flagstar's obligation to either cure its breaches or repurchase the defective loans, and (b) damages in an amount equivalent to the 'Transfer Deficiency,' as calculated in the SSAs . . . ").

## 2. Awareness Has Not Been Proven

17.     Plaintiff has not complied with the notice and cure periods required under the contracts for those loans.  *See* 2006-2 I&I § 5.02.

18.     Upon discovery of any breach of representation and warranty as to the mortgage loans that was both material and adverse, the discovering party was required to give notice to the other parties to the Transactions.

> If the Seller, the Sponsor, the Depositor, the Servicer, the Note Insurer, or a Responsible Officer of the Indenture Trustee discovers a breach of any of the foregoing representations and warranties . . . that materially and adversely affects the interests of the Issuer, the Indenture Trustee under the Indenture, the Noteholders, or the Note Insurer in the Mortgage Loan, the party discovering the breach shall give prompt notice to the other parties and the Note Insurer.

2005-1 and 2006-2 SSA, § 2.04(c).

19.     Under the Transaction Documents, Flagstar was obligated to cure material and adverse breaches, or, failing that, to accept a retransfer of the loan, upon becoming aware of such breach:

> The Seller shall use all reasonable efforts to cure in all material respects any breach of any of the foregoing representations and warranties . . . within 90 days of becoming aware of it or . . . all interest of the Trust in the Defective Mortgage Loan shall, subject to the requirements of Section 2.07, automatically be retransferred without recourse, representation, or warranty to the Seller and the Asset Balance of such retransferred Mortgage Loan shall be deducted from the Loan Pool Balance.

2005-1 and 2006-2 SSA, § 2.04(d).

20.     To satisfy the "becomes aware" requirement under the transaction documents, AGM must show that Flagstar was actually aware of breaches that were material and adverse. The Transaction Documents do not contemplate constructive notice.  *See* 2006-2 SSA § 2.04(c);

2006-2 SSA § 2.04(d); 2006-2 SSA § 2.04(e) (under the repurchase obligation, the seller must accept a transfer of a "Mortgage Loan as to which a breach has occurred and is continuing . . ."). *See also MASTR Asset Backed Securities Trust 2006-HE3 ex rel. U.S. Bank Nat. Ass'n v. WMC Mortg. Corp.*, 843 F. Supp. 2d 996 (D. Minn. 2012) (dismissing claims under New York law relating to mortgage loans outside a 200 loan sample because notice and an opportunity to cure had not been provided).

21.     Courts' interpretation of similar contractual provisions illustrates that the parties here contemplated actual awareness of a material defect in a mortgage loan. *LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) ("[Defendant]'s obligation to cure or repurchase is triggered in either of two situations—when it receives notice of or when it discovers on its own a material defect in a mortgage loan or a breach of its representations and warranties in the PSA.").

22.     The transaction documents do not impose a general duty upon Flagstar to inquire into or to investigate the potential existence of breaches in loans other than those specifically identified individual loans brought to Flagstar's attention by any of the Seller, Depositor, Sponsor, Servicer, Note Insurer, or a Responsible Officer of the Indenture Trustee as allegedly containing breaches. *See* 2005-1 and 2006-2 SSA §§ 2.04(c), 2.07.

23.     The 90-day period by which Flagstar must cure a breach of a loan-level representation or warranty does not begin to run until Flagstar becomes actually aware of a material and adverse breach.

24.     AGM has only issued repurchase demands for loans contained in its 2009 and 2010 demands.

25.     Those repurchase demands did not begin the 90-day period for cure with respect to the purportedly breaching loans included in the repurchase demands, because Flagstar responded to the demands and refuted the alleged breaches.

26.     The repurchase demands also did not begin the 90-day period for cure with respect to loans not included in the repurchase demands, because the contracts do not contemplate constructive notice/awareness.

27.     This lawsuit did not begin the 90-day period for cure with respect to any loans because Plaintiff did not identify any loans allegedly containing breaches with sufficient specificity such that Flagstar could identify the loan, let alone investigate the alleged breach.

28.     AGM has not issued any notice or repurchase demands on non-charged off loans.

**3.      Any Damages Must Be Paid to the Trustee, and Not the Plaintiff**

29.     For any loan determined by this Court to contain a breach of a loan-level representation or warranty that is material and adverse to the interests of AGM, Flagstar must comply with the cure or repurchase provisions.  To do so, Flagstar must notify the Trustee of the breach, request that the Trustee retransfer the loan to Flagstar and the trustee must calculate any resulting Transfer Deficiency, which Flagstar is then obligated to pay into the appropriate transaction's Custodial Account.  *See* 2005-1 SSA § 2.07(a); 2006-2 SSA § 2.07(a).

30.     AGM is not entitled to direct payment of any Transfer Deficiency.  2006-2 SSA §§ 2.04(e), 2.07(a), 3.02(b).[18]  Therefore, pursuant to the Transaction Documents, to the extent

---

[18]    To the extent the Court does not adopt this conclusion of law and instead requires Flagstar to pay Plaintiff in respect of such breaches, Flagstar moves to join the Trustee as a necessary party on the grounds that Flagstar will be exposed to double obligations in the Trustee's absence, and for the Court to order that the Trustee is prohibited from retransferring those loans for which Flagstar has already paid Plaintiff.  In the alternative, Flagstar requests that the Court order Plaintiff to indemnify and reimburse Flagstar for any Transfer Deficiency amounts Flagstar is required to pay with respect to those loans for which Flagstar is required to pay Plaintiff.

damages are awarded for any given loan, the loan must be retransferred to Flagstar and Flagstar must pay the appropriate damages into the Custodial Account.  Requiring Flagstar to pay AGM damages, rather than the securitization trusts pursuant to the mechanism of the sole remedy, exposes Flagstar to duplicative damages claims as there would be nothing to prevent the trustee from invoking the sole remedy to force Flagstar to repurchase the same loans for which AGM was paid.

**4.     Only Material and Adverse Breaches of Representations and Warranties Trigger Repurchase Remedy**

31.     Not every breach of a representation and warranty gives rise to Flagstar's cure or repurchase obligation.  Rather, Flagstar's obligation to comply with the cure or repurchase provision is triggered only where the breach of representation or warranty "materially and adversely affects the interest of the Issuer, the Noteholders or the Note Insurer in the related Mortgage Loan." 2006-2 SSA § 2.04(d).

32.     "Material" and "adverse" have distinct meanings.  *Assured v. Flagstar*, 11 Civ. 2375 (JSR) at 13 (N.Y. Sept. 8, 2011) (Opinion on motion to dismiss) ("an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)).

33.     "Material" means "of a nature that knowledge of the item would affect a person's decision-making; significant; essential."  *Assured v. Flagstar*, 11 Civ. 2375 (JSR) (N.Y. Sept. 25, 2012) at *9.  S*ee also Bernard Nat'l Loan Invs.,* 688 F. Supp. 2d at 360-61, quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers,* 442 F.3d 101, 117 (2d Cir. 2006) ("For a breach of contract to be material, it must go to the root or essence of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats the object

of the parties in entering into the contract.").  Thus, here, "material" means that that the truth of

the warranty was important to AGM's decision to insure the transaction.

34.     As set forth in the findings of fact above, Plaintiff's pre-transaction due diligence

findings are the best and only evidence that reflects a contemporaneous evaluation of the risk

profile, and frequency of material breaches, as understood at the time. [19]

Dated: October 3, 2012
     New York, New York

ARNOLD & PORTER LLP

By:     /s/ Veronica E. Rendón  
     Veronica E. Rendón
     Stewart D. Aaron
     Susan L. Shin
     399 Park Avenue
     New York, New York  10022
     Tel:  (212) 715-1000
     Fax:  (212) 715-1399
     *Veronica.Rendon@aporter.com*
     *Susan.Shin@aporter.com*
     *Daniel.Kuhn@aporter.com*
     *Mary.Sylvester@aporter.com*

     *Attorneys for Defendants Flagstar Bank, FSB, Flagstar Capital Markets Corporation and Flagstar ABS, LLC*

---

[19]     Plaintiff's Third and Fourth Claims were previously dismissed by the Court, and Plaintiff has withdrawn its Fifth and Sixth Claims.